FILED
14-0265
2/4/2015 11:52:10 PM
tex-4028401
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

No. 14-0265

# In the

# Supreme Court of Texas

---

BRANDON DARBY,

*Petitioner*,

v.

THE NEW YORK TIMES COMPANY
AND JAMES C. MCKINLEY, JR.,

*Respondents*.

---

On Petition for Review to the Seventh Court of Appeals,
arising from the 274th District Court of Hays County

---

## PETITIONER'S BRIEF ON THE MERITS

---

Robert B. Kleinman
State Bar No. 24055786
KLEINMAN LAW FIRM, PLLC
404 West 7th Street
Austin, Texas 78701
(512) 299-5329
(512) 628-3390 *fax*
robert@kleinmanlawfirm.com

Don Cruse
State Bar No. 24040744
LAW OFFICE OF DON CRUSE
1108 Lavaca Street,
  Suite 110-436
Austin, Texas 78701
(512) 853-9100
(512) 870-9002 *fax*
don.cruse@texasappellate.com

COUNSEL FOR PETITIONER

## Identity of Parties and Counsel

<u>Please note</u>: This section is unchanged from the petition for review.

**Plaintiff/Appellant/Petitioner**

Brandon Darby

*Counsel in this Court
and the court of appeals:*

Don Cruse
 SBN 24040744
LAW OFFICE OF DON CRUSE
1108 Lavaca St. #110-436
Austin, Texas 78701
(512) 853-9100
(512) 870-9002 *fax*
don.cruse@texasappellate.com

Robert B. Kleinman
  SBN 24055786
KLEINMAN LAW FIRM, PLLC
404 West 7th Street
Austin, Texas 78701
(512) 299-5329
(512) 628-3390
robert@kleinmanlawfirm.com

*Counsel at trial and
in the court of appeals:*

Rain Levy Minns
 SBN 24034581
MINNS LAW FIRM, P.C.
4412 Spicewood Springs, Suite 500
Austin, Texas 78759
(512) 520-4034
(512) 861-2403 *fax*

**Defendants/Appellees/Respondents**

James C. McKinley, Jr.
The New York Times Company

*Counsel:*       Laura Lee Prather
            SBN 16234200
           Catherine Lewis Robb
            SBN 24007924
           HAYNES & BOONE, LLP
           600 Congress Ave., Suite 1300
           Austin, Texas 78701
           (512) 867-8400
           (512) 867-8470 *fax*

           Jonathan H. Hull
            SBN 10253350
           401 Main Plaza, Suite 200
           New Braunfels, Texas 78130
           (512) 625-8026
           (512) 625-4433 *fax*

# TABLE OF CONTENTS

**FRONT MATTER**

Identity of Parties and Counsel ....................................................i

Table of Contents ........................................................................iii

Index of Authorities....................................................................vi

Statement of the Case..................................................................ix

Statement of Jurisdiction............................................................x

Issue Presented............................................................................xii


**BRIEF ON THE MERITS**

Introduction..................................................................................1

Statement of Facts........................................................................4

   I. Facts Related to the Events in Minnesota..............................4

      A. Events leading up to the 2008 GOP Convention............4

      B. A Molotov cocktail plot is thwarted...............................5

      C. McKay first blames Darby, but is forced to recant .........6

   II. The Facts of the Reporting Process.....................................7

      A. The February 22, 2011 article .......................................7

      B. After a second editorial process, the paper publishes
         a modified article on March 16, 2011 .............................9

   III. Procedural History .........................................................11

Summary of the Argument ..........................................................13

Argument...................................................................................16

   I.  A Court Evaluating 'Reckless Disregard' Must Examine
      How Conflicting Information Was Reconciled..................................16

     A.  The court of appeals refused to examine the reporting process....17

     B.  The record includes contrary facts that have gone unexplained ...18

        1.  Statesman article of February 18, 2011......................................19

        2.  Materials from the *Times* research department .........................19

        3.  Coverage in the Times Past archive ...........................................22

     C.  Purposeful avoidance raises a fact question.................................23

     D.  The selective omission of facts also raises a fact question............25

  II.  The Court of Appeals's Approach to 'Reckless Disregard'
       Effectively Immunizes Reporters in Public-Figure Cases. .................27

  III. Reckless Disregard of the Truth Should Start With the
       Same Concept of 'Truth' as Other Defamation Elements.................29

     A. Actual malice should be tested against the 'gist'
        of the article................................................................................29

     B. When evaluating malice, the court of appeals used
        dictionary definitions rather than evaluating
        knowledge about the story's 'gist' .................................................32

     C. The movants did not try to establish that they actually
        held some idiosyncratic view of the meaning of these words........36

IV. The Affidavits Also Failed To Meet Rule 166a ...................................37

    A. Defendants' burden on summary judgment ..................................38

    B. Conclusory affidavits do not meet Defendants' initial
       summary-judgment burden ..........................................................38

    C. Neither defendant met this initial burden ..................................40

       1. The New York Times Company ..............................................40

       2. McKinley ...............................................................................42

V. The Court of Appeals Ignores the Substantial Evidence of
    Actual Malice in the Second Editorial Process ..................................44

Prayer ...................................................................................................49

Certificate of Service ..............................................................................50

Certificate of Compliance .......................................................................50

# Index of Authorities

## Cases

*Bentley v. Bunton,*
    94 S.W.3d 561 (Tex. 2002) ................................................................18, 29

*Carr v. Brasher,*
    776 S.W.2d 567 (Tex. 1989) ...................................................................38

*Casso v. Brand,*
    776 S.W.2d 551 (Tex. 1989) ..............................................................38-39

*Churchill v. State,*
    876 A.2d 311 (N.J. App. 2005) ............................................................46n.

*Doubleday & Co. v. Rogers,*
    674 S.W.2d 751 (Tex. 1984) ...................................................................17

*Firth v. State,*
    775 N.E.2d 463(N.Y. 2002).................................................................46n.

*Forbes, Inc. v. Granada Biosciences, Inc.,*
    124 S.W.3d 167 (Tex. 2003) ...................................................................36

*Franco v. Cronfel,*
    311 S.W.3d 600 (Tex. App.—Austin 2010, no pet.) ..................................x

*Harte-Hanks Comm'ns v. Connaughton,*
    491 U.S. 657 (1989)..............................................................18, 23, 24

*Huckabee v. Time Warner Ent'mt Co.,*
    19 S.W.3d 413 (Tex. 2000)..........................x, 23, 24-25, 28, 38, 39-40, 43

*In re Davis,*
    334 B.R. 874 (Bankr. W.D. Ky. 2005) ...................................................46n.

*Lehman v. Har-Con Corp.,*
    39 S.W.3d 191 (Tex. 2001) .....................................................................45

*Masson v. New Yorker Magazine,*
    501 U.S. 496 (1991) ...................................................................16, 30-32

*Neely v. Wilson*,
418 S.W.3d 52 (Tex. 2013) ...........................................x, 23n., 27-28, 29-30

*New Times, Inc. v. Isaacks*,
146 S.W.3d 144 (Tex. 2004) ...................................................................29

*New Times, Inc. v. Wamstad*,
106 S.W.3d 916 (Tex. App.—Dallas 2003, pet. denied) .........................27

*New York Times v. Sullivan*,
376 U.S. 254 (1964) ...............................................................................16

*Olson v. Westergren*, No. 13-10-00054-CV
(Tex. App.—Corpus Christi Aug. 18, 2011, pet. denied) .....................x, 18

*St. Amant v. Thompson*,
390 U.S. 727 (1968) ...............................................................................15

*Turner v. KTRK TV, Inc.*,
38 S.W.3d 103 (Tex. 2000) .....................................................................29

*WFAA-TV, Inc. v. McLemore*,
978 S.W.2d 568 (Tex. 1998) .........................................................36-37, 39

*Woodhull v. Meinel*,
202 P.3d 126 (N.M. App. 2008) ...........................................................46n.

## Constitutions, Statutes, and Rules

Tex. Gov't Code §22.001(a) ..........................................................................ix

Tex. Penal Code §7.02(a)(2) .........................................................................32

Tex. R. App. P. 47.1 .................................................................................45n.

Tex. R. Civ. P. 166a .....................................................................................39

## Other Authorities

Mirriam-Webster's Collegiate Dictionary (11th ed. 2003) ....................34

Prosser and Keeton on Law of Torts (5th ed. 1984) .............................31

Restatement (Second) of Torts §563......................................................31

## STATEMENT OF THE CASE

Nature of the Case:      Defamation

Trial Court:      274th District Court, Hays County
Hon. Gary Steel

Course of Proceedings:      Traditional summary judgment

Trial Court Disposition:      Granted summary judgment for defendants without specifying grounds. Tab A.

Parties on Appeal:      *Appellant*:    Brandon Darby
*Appellees*:    James C. McKinley, Jr.
           The New York Times Company

Court of Appeals:      Transferred to the Seventh Court of Appeals, where the panel was Chief Justice Quinn, Justice Pirtle, and Justice Campbell.

Disposition:      On February 26, 2014, the court of appeals divided 2-1 to affirm:

• Chief Justice Quinn concluded that the ground of actual malice supported summary judgment. Tab B.

• Justice Pirtle concurred and dissented, concluding that the defendants had failed to meet their summary judgment burden on actual malice. Tab C.

• Justice Campbell also concurred and dissented. He would have found a second ground supported summary judgment. Tab D.

## STATEMENT OF JURISDICTION

This case implicates Government Code §22.001(a)(1), (2), and (6).

**Dissent jurisdiction:** The panel had two dissents. One Justice dissented on "actual malice" and the judgment. *See* Tab C. A second dissented on what legal standard governs defamation per se. *See* Tab D.

**Importance jurisdiction:** Beyond the importance of coherent First Amendment principles, the court of appeals's approach to "actual malice" poses risks for future media defendants. First, by refusing to require initial summary-judgment affidavits to detail how conflicting evidence was rejected, or even what source materials actually were consulted, the court of appeals's approach will necessitate more frequent and more intrusive early depositions, both of the press and its sources. Indeed, depositions are precisely what the court of appeals recommends to address vague and detail-lacking affidavits. Op. 18. That approach is inferior to simple adherence to Rule 166a.

Second, to fill those gaps in the affidavits, the court of appeals violates the core idea that actual malice is subjective. It parses out-of-context phrases from deep within a document that there is no evidence that McKinley ever read, or even saw. Op. 16. And it credits McKinley with his sources' own subjective knowledge, rather than what they actually told him to influence his. Op. 15-16.

ix

This loose approach to actual malice, which rescued the media defendants here, presents a double-edged sword for those sued in future cases.

**Conflicts jurisdiction:** The opinion below presents serious problems for how actual malice should be analyzed, some of which present direct conflicts with previous decisions of sister courts and this Court, including:

- whether reckless disregard should be measured against the gist of the article or against some idiosyncratic meaning derived from dictionary definitions, *see* pp. 29-37; *cf. Neely v. Wilson*, 418 S.W.3d 52, 69 (Tex. 2013) (examining whether a defendant "acted with actual malice as to the gist of the broadcast").

- when it is proper to examine a reporter's internal research process when evaluating reckless disregard, *see* pp. 16-18, such as by evidence of purposeful avoidance or that facts needed for context were selectively omitted to give a different impression, *see* pp. 23-26; *cf. Olson v. Westergren*, No. 13-10-00054-CV, 2011 Tex. App. LEXIS 6611, at *8-10 (Tex. App.—Corpus Christi Aug. 18, 2011, pet. denied); *Franco v. Cronfel*, 311 S.W.3d 600, 607 (Tex. App.—Austin 2010, no pet.); *Huckabee v. Time Warner Ent'mt Co.*, 19 S.W.3d 413, 425-26 (Tex. 2000).

## Issue Presented

The court of appeals's handling of actual malice presents five different sub-issues:

1. **Purposeful avoidance and selective omission.** The court of appeals sided with an anachronistic view of Texas law in holding that it was barred from considering irregularities in the reporting process when evaluating "reckless disregard." It therefore refused to consider evidence of both purposeful avoidance and selective omission of facts needed for context.

2. **One source does not conclusively disprove reckless disregard.** In tension with the recent *Neely* decision rejecting the third-party allegation rule, the court of appeals has effectively immunized a reporter with at least one <u>un</u>attributed source.

3. **Whether the reporter held a different, idiosyncratic understanding of his own article is another fact question.** The court of appeals evaluated malice using a different meaning for "encourage" than it had used to test defamation per se, substantial truth, or protected opinion, thereby failing to test whether the reporter had serious doubts about the truth of what an ordinary reader would glean from the story.

4. **Initial burdens on summary judgment.** The affidavits here are conclusory and failed to conclusively negate actual malice by detailing the reporting and editorial processes that led to this accusation.

5. **Second publication.** There is no evidence negating actual malice as to the March 16, 2011 version of the article—which came after two knowledgeable reporters had written McKinley highly critical of his specific charge against Darby.

# Introduction

Actual malice defines the outer boundary of the First Amendment's protection of truthful reporting. It protects certain <u>un</u>truthful reports, so long as the defendants have shown the right attitude toward truth. When a defendant exhibits appropriate care for the truth of what they are reporting, this doctrine creates a zone of First Amendment protection shielding them even if it later turns out they were mistaken. But when a defendant exhibits reckless disregard for the truth or falsity of what is published, there is no First Amendment interest in protecting them from the consequences of having published falsehoods that damage another's reputation.

The courts have recognized that reckless disregard for the truth or falsity of a report constitutes actual malice. That can include a reporter who disregards contrary information without explanation, a reporter who purposefully avoids learning information that could blow up their working thesis, or a reporter who selectively omits exculpatory facts and thus conveys a false impression.

Those hallmarks of reckless disregard are present here. This reporter, James McKinley, has offered no information about how he chose to disregard a research bundle he was sent by *Times* researchers that cast doubt on the accusation he made against Darby. His email acknowledging receipt says he

1

thought it was "Great. This is great." But his affidavit does not explain what he did with that material. Nor does it explain his choice to avoid what key documents from the Minnesota trial said—even <u>after</u> he assured another *Times* editorial staffer that he would "check on the legal question." And neither McKinley nor his editors has explained their selective omission of exculpatory facts, such as that a federal judge already rejected the gist of their theory.

On February 22, 2011, McKinley and the *Times* published an accusation that the plot to use Molotov cocktails against police cars at the 2008 GOP Convention, one that Darby reported to the FBI and with their help stopped, was actually one that "he had encouraged." The difference is one of cause or cure. After that 2008 incident, one of the Minnesota plotters made a similar charge against Darby and obtained an initial mistrial. But he later recanted, under oath, at his federal sentencing—and a judge concluded that this attempt to blame Darby was obstruction of justice warranting a sentencing enhancement. The FBI issued a press release with the details, and the finding was reported by the local press—and by *The New York Times*. The FBI press release and local press accounts were within the focused research bundle that McKinley received. The *Times* archive was brought to his attention by a copy-editor who flagged

another way his account diverged from the *Times*'s prior coverage. Yet he pressed forward in making this accusation.

After the print publication of his article, two outside reporters contacted McKinley to relay their concerns about what he had written. Both noted the discrepancy between his unqualified accusation and the state of the facts as they knew them. Both had far greater knowledge of the underlying facts; both told McKinley as much. He thanked one of them for "straightening us out." But, when it came time for the paper to make some corrections to the piece, McKinley and his editors repeated without qualification their accusation.

A divided court of appeals held that the reporter and newspaper had conclusively, beyond any fact question, established a lack of reckless disregard and thus were entitled to summary judgment. But if this record does not at least show a fact question for summary judgment, with all reasonable inferences to be drawn against summary judgment, it is difficult to see what short of an outright confession might meet that test. The court of appeals was fundamentally wrong about its role in a defamation case. When evaluating actual malice, courts can inquire into the reporting process and, thereby, protect the balance stuck by the First Amendment's actual-malice doctrine.

## I.    FACTS RELATED TO THE EVENTS IN MINNESOTA

The colorful backstory involves Austin-based anarchist groups, a thwarted plot to use Molotov cocktails at the 2008 Republican Convention in Minnesota, and an FBI informant traveling with them who told authorities about the plot.

### A.    Events leading up to the 2008 GOP Convention

Brandon Darby built a reputation among activists through his unconventional work in New Orleans after Hurricane Katrina.  2CR487.[1]  His group, Common Ground, eventually earned the begrudging respect of local law enforcement.  2CR488.

In 2007, Darby moved to Austin.  He explored the idea of an organization to provide aid overseas, but while discussing that idea, he was propositioned to help fund terrorism in Israel.  2CR492-93 ("And I was, like, 'No, I'm not… I'm not doing this, man.'").  Darby called a police officer he trusted in New Orleans, who in turn told Darby to call the FBI.  2CR492-93.  Darby did.  2CR493.

The next year, the FBI asked Darby to check out a local Austin activist group that was planning to protest the 2008 Republican National Convention.

---

[1] This citation, along with some others here, is to a *This American Life* episode about Darby and the events in Minnesota, which is part of the summary-judgment record.

"Brandon thought [this] was a waste of time, but he says when he got there, the group used a phrase that alarmed him. They talked about protests involving a diversity of tactics." 2CR494. The FBI asked Darby to travel to the Republican Convention with the group, which included McKay and Crowder. 3RR1220, ¶4.

## B. A Molotov cocktail plot is thwarted

On August 31, 2008, two members of the group (McKay and Crowder) bought components for Molotov cocktails, including a gas can, tampons, motor oil, and rubber bands at a Walmart in St. Paul, Minnesota. 3CR1213. Darby was not aware of this bomb plot until it was underway. 3CR1223, ¶¶45-47. Another person traveling with the group told Darby about these materials. 3CR1220-21, ¶¶7-8; 3CR1222, ¶24. Darby then told the FBI about the plot. 3CR1214.

In the timeline of this defamation case, this is the precise point—when Darby "told authorities of the plot"—described in the article:

> An F.B.I. informant from Austin, Brandon Darby, was traveling with the group <u>and told authorities of the plot, which he had encouraged</u>.

2CR425 (emphasis added). Darby alleges that the statement that "he had encouraged" this plot is defamatory, portraying him as someone who took part in a serious crime rather than as the one who stopped it.

5

After Darby told the FBI, he was asked to gather more information. To that end, the FBI arranged to record discussions between Darby and McKay. 3CR1215. In one recorded conversation, according to the affidavit of an FBI agent, McKay said "that he [McKay] and Crowder manufactured several Molotov cocktails together." 3CR1215. McKay then described how these bombs had been assembled and how and where he intended to use them. 3CR1215. Soon after, the bomb materials were seized. The FBI agent in charge later thanked Darby for his role in stopping this plot. 3CR1221, ¶13 ("[He] later wrote to me … 'Brandon: we would not have stopped this … without you.'"); 3CR1309 (note).

## C. McKay first blames Darby, but is forced to recant

In the criminal prosecutions that followed, McKay's first defense strategy was claiming that Darby urged him to make the Molotov cocktails. 3CR1093. That approach secured an initial mistrial, but when McKay learned that his friend Crowder would to testify against him in a second trial, McKay recanted. 3CR1093-95. After a plea, at his sentencing hearing, McKay testified, "I embellished and, I guess, factually lied that Brandon Darby came up with the idea about the Molotov cocktails." 3CR1121. The federal judge enhanced his sentence, finding that he had obstructed justice in his first trial by trying to

6

blame Darby. 3CR1127; 3CR1289. The coverage of this sentencing in *The New York Times* noted that, although McKay had first blamed Darby, his story changed under oath: "McKay told a federal district judge that he would have made the bombs without knowing [] Darby." 3CR1133 (Mar. 18, 2009 piece).

## II. THE FACTS OF THE REPORTING PROCESS

### A. The February 22, 2011 article

On Friday, February 18, 2011, the *Austin American-Statesman* ran an update on the investigation of the Texas Governor's Mansion arson. 3CR1131-32. That piece was straightforward and mentioned Darby's role in stopping the Minnesota plot in 2008:

> "Authorities said the men intended to use the Molotov cocktails on police vehicles and perhaps even police officers, but their plot was stopped with the help of Austin-area activist turned government informant Brandon Darby." (3CR1131).

Later that day, James McKinley wrote an email to that *Statesman* reporter asking how to contact "any of these anarchist types you quoted today," explaining, "I need to match your story." 3CR1229. He eventually spoke to Scott Crow, a member of the local anarchist community who did not travel to Minnesota, and to McKay's criminal-defense attorney. 2CR767-68.

A research staffer at *The Times* emailed McKinley the text of three articles related to the Minnesota incident, including:

- The Department of Justice press release about McKay's sentencing hearing, which included that "[t]oday's sentence [of McKay] included a finding by Judge Davis that McKay obstructed justice at his January trial by falsely accusing a government informant, Brandon Darby, of inducing him to manufacture the Molotov Cocktails," 3CR1241; and

- A contemporaneous article from the *Pioneer Press* of St. Paul, Minnesota in which "Crowder said he and McKay, alone, built the devices and nobody influenced their decision to do so," 2CR1232.

McKinley acknowledged receipt of that packet of information, 2CR1231 ("Great. This is great."). His affidavit does not say, however, if he read these articles or how he squared this information with his contrary thesis. 2CR768.

McKinley also heard from another *Times* staffer, who told him that "two previous Times Past [archive] references to the St. Paul convention case say the two men pleaded guilty…" 3CR1149-50. McKinley acknowledged that email and said that he would look into it. 3CR1149 ("I'll check on the legal question.") His affidavit does not mention this, or explain whether he did "check on" those questions or how he reconciled what he found with his thesis. 2CR768.

On February 22, 2011, *The New York Times* published McKinley's accusation stating flatly, and without qualification, that the plot Brandon Darby reported to the FBI was one "he had encouraged":

> Yet federal agents accused two men from these circles of plotting to make firebombs and hurl them at police cars during the convention. An F.B.I. informant from Austin, Brandon Darby, was traveling with the group and told the authorities of the plot, which he had encouraged.

2CR425.  The article does not mention McKay's retraction or a federal judge's conclusion that his allegation against Darby had obstructed justice.  2CR424-26.

### B.   After a second editorial process, the paper publishes a modified article on March 16, 2011

Shortly after, other journalists shared what they knew about these facts. On February 24, 2011, Michael May, who spent months researching the episode of *This American Life* about Darby and Minnesota, emailed McKinley:

> I read your article on the mansion fire with interest.  But I was very surprised by this sentence:
>
> > An F.B.I. informant from Austin, Brandon Darby, was traveling with the group and told the authorities of the plot, which he had encouraged.
>
> I spoke to Brad Crowder yesterday and he told me that Brandon only learned they'd made the Molotov cocktails after the fact.  My investigation uncovered that Darby may have encouraged the group to

9

prepare for a violent confrontation with a [sic] police, … [b]ut <u>this is quite different from saying he encouraged "the plot" to build Molotov cocktails.</u>

3CR1253-54 (emphasis added).

Jim Walsh, a journalist at the *Minneapolis Star Tribune*, also wrote, noting the lack of essential context:

I covered this case from beginning to end, including the trial. Darby repeatedly testified that he NEVER encouraged violence or the making of Molotov cocktails. That was a defense of [McKay]'s, that Darby talked him into it. [McKay] won a hung jury with his entrapment defense, but later admitted he lied when Crowder was going to testify against him.

3CR1256.

McKinley did not budge, and there is no evidence whether or when he shared these criticisms with his superiors. It was after being sued that "we immediately investigated whether a clarification or correction was in order, and, if so, what it should state." 2CR903-04, ¶8 (Strum); *see also* 2CR769, ¶16 (McKinley). The affidavits provide no details about the second editorial process, how it took into account the specific criticisms brought to its attention by journalists Walsh and May, what other sources and research materials the newspaper considered to support its contrary view, or how it led to a revised article that — while changing the context of the accusation against Darby by

including some details from the later criminal trials — still maintains that Darby "had encouraged" "the plot" that he reported to the FBI.

On March 16, 2011, the newspaper published a correction notice with some details about McKay and Crowder's criminal proceedings. 2CR577. It also replaced the original article in online archive with this new version. 2CR581-83. The new version still contained an unqualified accusation against Darby, now set against a new context describing more of McKay and Crowder's trial proceedings. 2CR581-83.

## III.   PROCEDURAL HISTORY

On March 10, 2011, Darby filed suit. 1CR1-17. On September 7, 2011, Darby filed a second amended petition that took into account the new version published beginning March 16, 2011. 1CR160-61, ¶¶49-51, ¶¶53-54; *see also* 1CR161, ¶54 (providing the URL for that new version).

Defendants filed a new answer, along with a new set of special exceptions, 1CR209-223, which included an assertion that the petition "fails to mention that *The New York Times* printed a clarification that has been permanently appended to the online version of the article." 1CR209-210 (Exception B). A third amended petition was filed on January 11, 2012 to remove any doubt that the March 16, 2011 version is a distinct basis for defamation liability. 3CR1044-45.

In the meantime, Defendants had filed this motion for summary judgment. 2CR366-1024. Darby filed his response to the summary-judgment motion on January 12, 2012. 3CR1170-1411. The trial court held a hearing on January 19, 2012. Defendants brought a reply brief and a set of motions to strike with them to the hearing, having filed them that morning. 3CR1824-52 (reply); 3CR1853-72 (motion to strike).

On March 28, 2011, the trial court granted the motion for summary judgment. 3CR1887. The court also denied Defendants' pending request to strike the third amended petition. 3CR1886; 3CR1894. An appeal was taken to the Third Court, 3CR1895, and the case was transferred by docket-equalization order to the Seventh Court.

On February 26, 2014, the three-judge appellate panel issued three separate opinions. The majority held, by a 2-1 vote, to affirm the summary judgment on the sole ground of actual malice. Op. 22. Justice Pirtle in dissent would have reversed on all grounds, concluding that fact questions remained on actual malice. Dissent Op. 6-7. Justice Campbell concurred. He would have found that a second ground supported summary judgment. Concurring Op. 4.

This petition followed and, on November 21, 2014, the Court requested briefing on the merits.

## Summary of the Argument

The indications of reckless disregard here should have easily defeated a traditional motion for summary judgment.  The reporter was sent at least two emails by other staffers at his newspaper, pointing him to information contradicting his thesis (including that one of the parties he painted as a victim had recanted his allegations under oath, in front of a judge).  Yet McKinley's article made an unqualified, unattributed accusation that Darby "had encouraged" "the plot" he reported to the FBI.  That stark allegation led, in turn, to even more remarkable evidence:  critical emails sent to McKinley from two outside journalists, each of whom were far more knowledgable about the underlying facts, who told him that his accusation departed from the facts.  Those emails arrived before the paper's second editorial process, and yet were ignored as the newspaper again accused Darby, in the unqualified voice of the newspaper itself.  Whether reckless disregard is analyzed as selective omission of exculpatory facts, purposeful avoidance of those facts, or outright refusal by defendants to detail in affidavits how they came to reject the contrary information known to them, this record should defeat summary judgment.

13

Instead of crediting the summary-judgment evidence, the court of appeals made a series of untenable legal holdings:

- It declined to examine details of the reporting process. Op. 19-20. Nowhere in the opinion does it discuss, for example, the contents of the research bundle sent to McKinley, nor does it discuss the back-and-forth that McKinley had with an editor in which he promised to look into issues related to the Minnesota sentencing.

- Looking to support for the idea that the reporter was not reckless, the court of appeals looked to documents there is no basis to think the reporter ever saw—and then drew improper inferences from that evidence against the non-movant. *E.g.,* Op. 15-19; *see also* Dissent Op. 5-6 (criticizing that aspect of the majority).

- It described having a source as essentially outcome-determinative: "[r]elying on a single source of information which source reflects only one side of the story is not actual malice." Op. 16-17.

- Ignoring what it had already held was the article's 'gist' as would be understood by an ordinary reader, it used dictionary definitions of "entrap" and "encourage" to develop a "distinction" under which knowledge "about McKay recanting or being found to have obstructed justice by lying" would be "irrelevant." Op. 21-23.

- The court also held that the boilerplate affidavits, which merely stated that they had no reason to doubt the article, were "of a type that could be readily controverted [because] Darby could have deposed McKinley and Strum to test their representations." Op. 18.

Those legal errors infect every part of the judgment below.

And there is a second major reason to reverse:  the second version of the article was published <u>after</u> the defendants had even more information in their possession, including two remarkable emails from other journalists critical of precisely the accusation made against Darby here.  3CR1253-54; 3CR1256.  Yet the defendants have offered no summary-judgment evidence to explain how they chose, in the face of those emails, to again make an unqualified accusation of wrongdoing against Darby.  Far more than boilerplate affidavits would be required, if indeed conclusive <u>dis</u>proof of reckless disregard were possible given these unusual circumstances. *Cf. St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("The defendant in a defamation action … cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith.").  Although the Court should reverse the judgment in its entirety, if it does not, it should at a minimum reverse on this second publication.

## I. A COURT EVALUATING 'RECKLESS DISREGARD' MUST EXAMINE HOW CONFLICTING INFORMATION WAS RECONCILED.

Actual malice is an attitude toward truth, not toward the plaintiff. *Masson v. New Yorker Magazine*, 501 U.S. 496, 511 (1991). It does not require actual awareness that an accusation is false, although that is sufficient. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964). A person can also exhibit actual malice through a "reckless disregard of whether it was false or not." *Id.* (quoted in *Masson*, 501 U.S. at 510).

McKinley might have set out to "match" the *Statesman*'s straightforward account of an update about an ongoing criminal investigation, 3CR1229, but he took a very different path. He painted the local Austin anarchist community as peaceful and engaged in good works, an inexplicable target for the authorities investigating the 2008 arson at the Governor's Mansion. 2CR424-26. The piece suggests the image of anarchists as violent is "dated," contrasting that with their "run[ning] a recycling center, a food-distribution program, a bookstore, a cafe, and even a thrift shop." 2CR425. It also portrays the investigators as out-of-place ("rangers in their trademark cowboys hats … [in] the city's countercultural hangouts") and ultimately out-of-touch with this new strain of anarchism.

McKinley's thesis confronted inconvenient facts: two members of this same anarchist community were convicted of federal crimes related to a plot to firebomb a political convention, at about the same time as the 2008 Governor's Mansion arson. McKinley's solution was to explain away "the plot" as something the federal informer Darby "had encouraged," and thus no basis for suspecting Austin's community of utopian anarchists. 2CR425.

## A. The court of appeals refused to examine the reporting process

In evaluating reckless disregard, the court of appeals refused to examine the reporting process itself. It brushed aside Darby's evidence related to the newspaper's internal research process, reasoning that it was prohibited from what it called "guess[ing] about that" by the general rule that a mere failure to investigate did not show actual malice. Op. 19-20. And it wrongly held that even the bundle of research materials that the record shows was gathered by internal staffers and acknowledged by McKinley prior to publication "misses the mark" of relevance. Op. 19.

The court of appeals relied on broad statements in, among other authorities, *Doubleday & Co. v. Rogers*, 674 S.W.2d 751 (Tex. 1984). Op. 19-20. But as other courts of appeals and this Court have recognized, evidence about deliberate failures to investigate or other irregularities in the research process

17

can be combined with other evidence suggesting subjective intent—such as a defendant's desire to avoid the truth, or the deliberate omission of facts needed for proper context—to be at least some evidence of actual malice.  *E.g.*, *Olson v. Westergren*, No. 13-10-00054-CV (Tex. App.—Corpus Christi Aug. 18, 2011, pet. denied) ("Olson's failure to investigate does not stand alone in this case"); *see also Bentley v. Bunton*, 94 S.W.3d 561, 591 (Tex. 2002) (citing *Harte-Hanks Comm'ns v. Connaughton*, 491 U.S. 657, 667-68 (1989)).

Standing on the wrong side of that division in the law, the court of appeals did not credit—and because of its erroneous view of Texas law, did not even discuss—the red-flag evidence that Lyles and Bagley put in McKinley's email box during the editing process.  As explained more below, McKinley's unexplained avoidance of this information, and omission of that necessary context from his article,  should have defeated summary judgment.

B.    The record includes contrary facts that have gone unexplained

This record contains documents from McKinley's email box, including emails from other *Times* staffers directing him to materials raising doubts about the truth or falsity of his story about Darby.  The affidavits do not explain how these materials were used.

18

### 1. Statesman article of February 18, 2011

McKinley's reporting began with another paper's conclusion.  He was assigned to (in his words) "match" some original reporting by the *Austin American-Statesman*.  3CR1229 ("Hate to do this, but I'm [McKinley] up a creek… I need to match your [Three Tied to Arson Inquiry] story.").  The article that McKinley set out to "match" described Darby as the person who "stopped" the plot—not who started it:

> Authorities said the men intended to use the Molotov cocktails on police vehicles and perhaps even police officers, but their plot was stopped with the help of Austin-area activist turned government informant, Brandon Darby.

3CR1311.  Yet McKinley, who had not previously researched the events in Minnesota, 2CR767, ¶5, published the opposite accusation in his own piece.  McKinley does not explain what (if any) process he followed to reconcile his own conclusion with that of the *Statesman* piece that he had set out to match.

### 2. Materials from *The New York Times* research department

Before publication, McKinley asked Toby Lyles, a researcher at *The New York Times*, to provide him with more information about the Texas Two case.  We know that he was sent the text of at least three articles.  3CR1231-44.  McKinley replied to this email, "Great.  This is great."  3CR1231.

The three items in that bundle were: (1) the Department of Justice press release from May 21, 2009 about McKay's sentencing hearing; (2) an article about McKay's trial and Darby's role from the *Pioneer Press* of St. Paul, Minnesota dated January 25, 2009; and (3) an *Austin American-Statesman* article about the case.

The Department of Justice press release included the following:

Today's sentence [of McKay] included a finding by Judge Davis that McKay obstructed justice at his January trial by falsely accusing a government informant, Brandon Darby, of inducing him to manufacture the Molotov Cocktails.

…

During a conversation overheard by law enforcement through electronic surveillance on Sept. 2, McKay told an informant that he intended to throw Molotov cocktails at police vehicles parked in a lot [that was]… visibly patrolled by U.S. Secret Service, various police agencies and the military.

3CR1241 & 3CR1243. McKinley thus had before him a statement—from the Department of Justice—that a federal judge found that McKay obstructed justice by falsely accusing Darby of inducing him to make the firebombs. Yet McKinley published a contrary statement, with reckless disregard for its falsity. McKinley says that he relied on his recollection of a discussion with McKay's attorney, 2CR768, ¶9, the person whose litigation strategy in McKay's first trial

20

was arguing that Darby had entrapped him.  Given that context, McKinley offers no explanation why he treated DeGree's account as sufficiently authoritative to support an unqualified accusation.  *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports").

The St. Paul *Pioneer-Press* story described a trial proceeding in which Crowder gave testimony casting serious doubt on whether Darby "had encouraged" this plot:

> Under questioning by a prosecutor, his lawyer and Davis, Crowder said he and McKay, alone, built the devices and nobody influenced their decision to do so.

2CR1232.[2]  This article should have cast doubt both on the statement and on using DeGree as the source for a contrary accusation here.

---

[2] If McKinley saw those transcripts—his affidavit does not specify what research materials he was provided—he would have seen that McKay's sentencing contains the following admission:  "I embellished and, I guess, factually lied that Brandon Darby came up with the idea about the Molotov cocktails."  3CR1296.  That led to a finding by the judge that McKay's earlier testimony had been an obstruction of justice and thus warranted a sentencing enhancement.  3CR1289.

The *Statesman* article references (and quotes) an affidavit by the FBI highlighting McKay's role as the one advocating the use of Molotov cocktails against police cars.  That article says:

> In a conversation recorded by the FBI, McKay told the FBI informant later identified as Darby that he planned to throw the explosives at a parking lot used as a staging area for police and federal agents, an FBI affidavit said.
>
> "What if there's a cop sleeping in the car?" Darby asked McKay, according to the affidavit.
>
> "He'll wake up," McKay replied, according to the affidavit.
>
> McKay also said, "It's worth it if an officer gets burned or maimed," the affidavit said.

2CR1241.[3]

### 3.  Coverage in the Times Past archive

In 2009, *The New York Times* published an article about McKay's sentencing.  The newspaper reported:  "Mr. McKay told a federal district judge that he would have made bombs without knowing Mr. Darby."  3CR1133.  While there is no general rule that a publication is always charged with knowledge of its

---

[3] The "FBI affidavit" it mentions explains: (1) that McKay and Crowder made the Molotov cocktails without the knowledge of Brandon Darby; (2) that it was ultimately through the actions of Darby that the FBI was able to prevent the bombing.  2CR1211-18 (Langert affidavit).  No evidence says whether this affidavit was considered in either editorial process.

own archives, this record contains evidence that the editorial staff and reporter were made aware of these reports about the events in Minnesota.[4] The email from Marlene Bagley to McKinley points out that "two previous Times Past [archive] references to the St. Paul convention case say the two men pleaded guilty…" 3CR1149-50. McKinley acknowledged that email and said that he would look into it. 3CR1149 ("I'll check on the legal question."). His affidavit, however, leaves us guessing whether McKinley did follow through—and if not, why not. The Times Past story about the sentencing included McKay's retraction of his earlier accusation. 3CR1133. Without some explanatory details, the affidavits do not conclusively disprove reckless disregard.

## C.  Purposeful avoidance raises a fact question

McKinley avoided the evidence that "would have confirmed or denied many of [the] claims" he sought to level at Darby to bolster his story about the peaceful local anarchist community. *Huckabee v. Time Warner Ent'mt Co.*, 19 S.W.3d 413, 427-28 (Tex. 2000) (citing *Harte-Hanks*, 491 U.S. at 692). That a reporter "purposefully avoided learning facts" can suggest actual malice. That

---

[4] In its reply brief below, Defendants assert "McKinley did not know of the [2009] article … prior to writing his article." 3CR1831 n.22. His affidavit does not say, and the Bagley email suggests he was pointed in the direction of two Times Past articles about that event. The reasonable inference from the evidence in the record is that he did. *See Neely*, 418 S.W.3d at 59-60 (must indulge every reasonable inference and resolve any doubts against the motion).

same principle should have at least defeated summary judgment here.  Yet the court of appeals, with its overly rigid view of "reckless disregard," did not even entertain this argument.

In *Harte-Hanks*, the newspaper published an allegation of corruption, without actually listening to a recording it had been provided that "would have confirmed or denied many of Thompson's claims."  *Huckabee*, 19 S.W.3d at 427-28 (citing *Harte-Hanks Comm'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989)).  That paper "failed to interview Stephens, the one person not associated with Connaughton who could have confirmed or denied Thompson's allegations."  *Huckabee*, 19 S.W.3d at 427 (citing *Harte-Hanks*, 491 U.S. at 691-92).  "[T]he newspaper's failure to consult the two sources that could have objectively verified the story was evidence that the newspaper purposefully avoided learning facts that would have shown the story to be false."  *Id.*  That a newspaper "purposefully avoided learning facts" was enough to establish actual malice in *Harte-Hanks* and support a defamation claim.

*Huckabee* stands as a useful contrast.  There, the Court found that filmmakers had not purposefully avoided the truth where they "interviewed several people <u>on both sides of the story</u>, including [the accused]" and they read "among other documents, the transcript of the [court] hearing."  *Huckabee*,

24

19 S.W.3d at 428 (emphasis added).  Our case is different on both counts.

McKinley only spoke to DeGree (who was McKay's lawyer in the first trial, the one in which the federal judge later concluded McKay had obstructed justice by blaming Darby) and to Scott Crow.  This is barely one "side" of the story, certainly not both sides, and Defendants' refusal to seriously consider the other resources brought to its attention was purposeful avoidance.  At the least, given the inferences to be drawn in favor of the non-movant, a fact question remains.

D.    The selective omission of facts also raises a fact question

Certain facts omitted from a story can also support an inference of actual malice sufficient to defeat summary judgment.  *Huckabee*, 19 S.W.3d at 426.  The example the Court gave is instructive:

> For example, when an article reported that an FBI memorandum mentioned plaintiff several times in connection with Jimmy Hoffa's disappearance, the newspaper's <u>decision not to report that the memorandum also cleared plaintiff of wrongdoing was held to be evidence of actual malice.</u>  In such a case, the omission so changes the character of the story that one could infer that the defendant knew, or at least suspected, that the omission would convey a false impression.

*Id*. (emphasis added; citations omitted).  That fits our case. Defendants reported an allegation made against Darby without reporting that the prosecutors and a federal judge formally rejected it.  Nor did the article report

25

that McKay had recanted this allegation at his sentencing, as had Crowder at his. 2CR1232.

By contrast, when the *New York Times* covered this case in 2009, the article included the statement "Mr. McKay told a federal district judge that he would have made the bombs without knowing Mr. Darby, said David Anderson, a spokesman for the United States Attorney's Office." 3CR1133. That reporter wrote an email to Darby explaining:

> I thought it was important to include something in the *Times* making the point that McKay told the judge that he would've made explosives whether or not he knew you. In particular I think that was necessary on many levels after all the attention the original stories stirred up about the "Austin Affinity Group."

3CR1135. McKinley and Strum chose to omit those same facts. That decision, unexplained in their affidavits, is at least some evidence toward actual malice. Yet the court of appeals, with its overly rigid view of reckless disregard, did not even entertain this argument.

## II. THE COURT OF APPEALS'S APPROACH TO 'RECKLESS DISREGARD' EFFECTIVELY IMMUNIZES REPORTERS IN PUBLIC-FIGURE CASES.

*Neely* rejected the suggestion by various media groups that the press is effectively immune, so long as they attribute defamatory statements to a third party. *Neely v. Wilson*, 418 S.W.3d 52, 64-65 (Tex. 2013) ("we cannot locate such a rule in any other jurisdiction [and] did not establish a third-party allegation rule in *McIlvain* [*v. Jacobs*, 794 S.W.2d 14 (Tex. 1990) (per curiam)]").

The court of appeals may have created a loophole for public-figure cases. It held that having one source for a defamatory statement—even an <u>un</u>attributed source—was not merely some evidence relating to "reckless disregard" but was actually conclusive evidence, obviating any need for the court to evaluate competing evidence about the reporting process. Op. 16-17 ("As stated, a reporter may rely on statements by a single source.") (citing *New Times, Inc. v. Wamstad*, 106 S.W.3d 916, 928 (Tex. App.—Dallas 2003, pet. denied)). But what the Dallas Court did not hold in *Wamstad*, and this Court has never held, is that a reporter can rely on a single source despite indications calling into doubt the truth of the statement being made.

Much as the inquiry into substantial truth does not end as soon as a third party is willing to be credited with a defamatory statement, *see Neely*, 418 S.W.3d

at 64-65, the inquiry into reckless disregard does not stop if a source is willing to whisper some self-serving falsehood into the reporter's ear.

The inquiry for 'reckless disregard' is not whether there is at least one supportive source, but rather what process was followed in disregarding the information that cast doubt on the accusation. Especially on summary judgment, the existence of other reasons to doubt the truth of the story should create a fact question. Here, that included the emails sent to McKinley by the *Times* staffers, as well as the materials they brought before him. 3CR1231-43 (the research bundle); 3CR1149-50 (referencing specific previous coverage in the *Times* archive); 3CR1233 (that previous coverage). There is no explanation of why McKinley disregarded this information and chose, instead, to make an unqualified accusation against Darby. Without that, the reporter has not conclusively disproven reckless disregard. *Cf. Huckabee v. Time Warner Ent'mt Co.*, 19 S.W.3d 413, 428 (Tex. 2000) (no reckless disregard where interviewed people "on both sides of the story" and read "among other documents, the transcript of the [court] hearing").

## III. RECKLESS DISREGARD OF THE TRUTH SHOULD START FROM THE SAME CONCEPT OF 'TRUTH' AS OTHER DEFAMATION ELEMENTS.

### A. Actual malice should be tested against the gist of the article

*Neely* held that the 'gist' of an article was the proper measure of its truth or falsity. *Neely v. Wilson*, 418 S.W.3d 52, 63 (Tex. 2013). It explained, "[w]e determine a broadcast's gist or meaning by examining how a person of ordinary intelligence would view it. 'If the evidence is disputed, falsity must be determined by the finder of fact.'" *Id.* at 64 (citing *Turner v. KTRK TV, Inc.*, 38 S.W.3d 103, 114-15 (Tex. 2000) and quoting *Bentley v. Bunton*, 94 S.W.3d 561, 587 (Tex. 2002)). The inquiry goes beyond parsing text to understanding the context. A story that "err[s] in the details but that correctly convey[s] the gist" is substantially true. *Id.* at 63-64. "On the other hand, a broadcast 'can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory.'" *Id.* at 64 (quoting *Turner*, 38 S.W.3d at 114).

Does that same concept of truth apply to actual malice? In *Neely*, the Court assumed that it did. Although Neely was not a public figure, the question of actual malice nonetheless came up in the context of a statutory privilege. *Neely*, 418 S.W.3d at 69 (looking to the common-law standard for "reckless disregard" in *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 162 (Tex. 2004)). In

that discussion, the Court used the 'gist' of substantial truth when assessing actual malice: "…acted with actual malice <u>as to the gist of the broadcast</u> that Neely was performing unnecessary surgery." *Id.* (emphasis added).[5]

The link between substantial truth and actual malice has been noted by the U.S. Supreme Court. In *Masson v. New Yorker Magazine*, 501 U.S. 496 (1993), the Court examined a summary judgment that had been granted on the basis of actual malice. There, the defamation involved some "allegedly fabricated quotations," which the district court held "were either substantially true, or were 'one of a number of possible rational interpretations of ambiguous conversations.'" *Masson*, 501 U.S. at 508-09. A divided court of appeals affirmed, echoing those reasons. *Id.* at 509. The Supreme Court reversed—and in so doing, described how actual malice intersects with state-law concepts of substantial truth.

---

[5] The Response not only rejects *Neely*'s approach, but is highly critical of the court of appeals dissent for adopting it. Resp. to Pet. viii (saying the dissent below should be ignored because it "conflates two separate elements—'substantial truth' and 'actual malice'"); *see also* Dissent Op. at 6 (echoing *Neely*'s reasoning, and citing *Neely* for the proposition that "in determining the 'truth' of a statement, the assessment of a broadcast's 'gist' must be the critical focus."). The majority opinion below is, respectfully, the one that departs from *Neely*.

The Supreme Court discussed how actual malice builds on "the concept of falsity" borrowed from other elements of defamation:

> The constitutional question we must consider here is whether, in the framework of a summary judgment motion, the evidence suffices to show that respondents acted with the requisite knowledge of falsity or reckless disregard as to truth or falsity.  <u>This inquiry in turn requires us to consider the concept of falsity; for we cannot discuss the standards for knowledge or reckless disregard without some understanding of the acts required for liability.</u>

*Masson*, 501 U.S. at 513 (emphasis added).

Actual malice should start from the same view of truth and falsity as the tort of defamation itself.  "The common law of libel takes but one approach to the question of falsity, regardless of the form of the communication." 501 U.S. at 516 (citing RESTATEMENT (SECOND) OF TORTS § 563, cmt. c (1977); W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, PROSSER AND KEETON ON LAW OF TORTS 776 (5th ed. 1984)). The *Masson* Court discussed how state law had refined these concepts into a coherent doctrine of substantial truth.  *Id*. at 516-17. It then added, "Our definition of actual malice rests upon this historical understanding." *Id*. at 517.  And it then analyzed actual malice using that same, reader-focused model of truth. *Id*. at 517-19 (examining whether "the alteration

31

[of quotations] results in a material change in the meaning conveyed by the statement" and what "a reasonable reader would conclude").

### B.    When evaluating malice, the court of appeals used dictionary definitions rather than evaluating knowledge about the story's 'gist'

Before reaching actual malice, the court of appeals had already demonstrated that it grasped the 'gist' of the article. When evaluating substantial truth, it held that an ordinary reader could understand Darby to be accused of "helping Crowder and McKay further the particular bit of arson and assault they planned," Op. 10, referring to "the plot" in the article. The court noted that this was a crime. Op. 4-5 (citing TEX. PENAL CODE §7.02(a)(2)). And it also (correctly) rejected the defendants' attempt to say "encourage" was inherently too vague to be more than opinion. Op. 7-8. As it recognized when discussing that issue, the context brings clarity: "McKinley was not speaking of unverifiable fact or proffering vague rhetoric. Rather, he was speaking of particular crimes and the identity of those to whom the crimes could be attributed." Op. 9.

Yet when the court of appeals turned to actual malice, it seemed to be describing an entirely different article. Pages after recognizing that "McKinley was not … proffering vague rhetoric [but] was speaking of particular crimes,"

32

Op. 9, the Court decided that maybe he was.  Instead of looking at the article's

'gist' as the measure for truth or falsity, the Court used dictionary definitions to

explain why it would not seriously consider Darby's evidence.  Op. 20-22.

The dissent called out this doctrinal misstep, as well as the departure from

*Neely v. Wilson* it represents:

> … the majority finds McKinley's affidavits sufficiently negate actual
> malice because [the article] was published without knowledge of the
> falsity or reckless disregard of the truth.   In reaching this conclu-
> sion, the majority focuses on the question of whether Darby "en-
> couraged" the criminal conduct in question. However, in determin-
> ing the "truth" of a statement, the assessment of a broadcast's
> "gist" must be the critical focus.  *Neely* [*v. Wilson*, 418 S.W.3d 52, 63
> (Tex. 2013)].

> … the gist of the statement—i.e., that Darby participated in the
> commission of a criminal act—is equally controverted by Darby's
> summary judgment evidence. The majority as much as says so in its
> analysis of grounds two and three.[6]

Dissent Op. 6-7.

Instead of directly confronting Darby's evidence, the court dismisses it as

an "attempt [by Darby] to paint McKinley with the brush of malice by

attempting to confuse the distinction between the words 'encourage' and

---

[6] The second ground contended that the statement was mere opinion.  Op. 7-9.  The third
ground contended that the statement was substantially true.  Op. 9-12.

'entrap.'" Op. 20.  The court observed that some of the evidence related to what happened in Minnesota used the word "entrap."[7]  The substance of that evidence, however, is broader.  The member of the Texas Two who went to trial (McKay) originally accused Darby of having a greater role, leading to a mistrial.  But he later admitted he "embellished and, I guess, factually lied" about his allegations against Darby, 3CR1121—and was subjected to a sentencing enhancement for obstruction-of-justice for having made the accusation in the first place.  *E.g.*, 3CR1231-44 (research packet); 3CR1133 (Times Past article).

The court of appeals viewed this evidence as categorically irrelevant because the dictionary definitions of "encourage" and "entrap" are not perfectly coextensive.  We are told that the dictionary definition of "encourage" includes some senses broad enough to also mean "to inspire with courage, spirit, or hope," among other things, and could even be consistent with cheerleading "even after the other already committed the act."  Op. 21 (citing MIRRIAM-WEBSTER'S COLLEGIATE DICTIONARY 410 (11th ed. 2003)).  Thus, the court of appeals majority reasoned, evidence that McKay's actual accusation against

---

[7] Not all of it actually used that term.  One article in the research bundle describes "a finding by Judge Davis that McKay obstructed justice by falsely accusing a government informant, Brandon Darby, of inducing him to manufacture the Molotov Cocktails." 3CR1241.

Darby was false was "no evidence of a subjective belief about the accuracy of the statement that Darby encouraged the misconduct." Op. 20.

A reader of the article may or may not have a copy of Webster's Collegiate Dictionary handy. But the context in which that word was used—discussing a criminal prosecution, and whether a government informant (as the *Times* flatly stated) "had encouraged" a specific plot he reported to the FBI—is a powerful clue to what the article means by that word.

The word "entrap," however, is not in the original version of the article. 2CR424-26. Yet the court of appeals relies on a supposed distinction between "entrap" and "encourage" to ignore "[a]ll Darby's allusions to evidence about McKay recanting or being found to have obstructed justice by lying":

> This distinction between the two words or concepts is of import because McKinley did not say in his article that Darby "entrapped" McKay or Crowder. Rather, he said Darby "encouraged" the plot. All <u>Darby's allusions to evidence about McKay recanting or being found to have obstructed justice by lying are irrelevant, since they relate to McKay's claim of entrapment.</u> In short, potentially knowing that Darby did not entrap McKay does not mean he also had doubts about whether Darby encouraged him.[8]

---

[8] This last sentence illustrates a related problem: That the court of appeals drew inferences against the non-movant (Darby), rather than against the movants. This mode of reasoning from dictionaries meant that the court was using the most favorable possible meaning of each word, without any basis in the record to conclude it was the view subjectively held.

Op. 21-22 (emphasis added). The court's categorical rejection of this evidence based on dictionary definitions departs from *Neely* and *Masson*.

### C. The movants did not try to establish that they actually held some idiosyncratic view of the meaning of these words.

Absent real evidence that a particular defendant subjectively held an idiosyncratic understanding of what the words meant, the baseline rule should be the one mentioned in *Neely* and *Masson*, that a reporter's actual malice is tested against how an ordinary reader would understand their words.

It is possible, of course, for any writer to subjectively mean something different than a reader might perceive. Not all writing succeeds. But this is another question of fact. In a different procedural situation, the court has recognized that sorting out multiple meanings might be part of the plaintiff's trial burden: "When the defendant's words lend themselves to more than one interpretation, the plaintiff must establish either that the defendant knew the words would convey a defamatory message, or had reckless disregard for their effect." *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 172 (Tex. 2003) (citing *Bunton*, 94 S.W.3d at 603). On traditional summary judgment, what matters is that the burden of conclusive proof falls on the movants. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 574 (Tex. 1998) (burden is on the movant to

36

"negate actual malice as a matter of law," including "evidence that shows he or she did not publish the alleged defamatory statement with actual knowledge of any falsity or with reckless disregard for the truth"). They have offered none.[9]

Indeed, the newspaper disavows that there was any secret, subjectively-held meaning to this article. *See* Resp. to Pet. 16. The affidavits said nothing about there being any such meaning, held either by the reporter or the editorial staff. The court of appeals fundamentally misframed actual malice by presuming without proof that these words meant something different subjectively to the reporter than they would to an ordinary reader.

## IV. THE AFFIDAVITS ALSO FAILED TO MEET RULE 166A

The court of appeals's analysis of the summary-judgment record was distorted by the legal errors above. Had it viewed this record through the correct

---

[9] In this regard, it might be objected that McKinley is not an "ordinary reader." But the natural reading of his words is still a natural place to start. Moreover, to the extent the point might be disputed, this summary-judgment record actually does contain two data points of how a reporter familiar with these facts might read this exact statement. Michael May wrote that the accusation made in the article was too broad, distinguishing general encouragement from what it said: "this is quite different from saying he encouraged 'the plot' to build Molotov cocktails." 3CR1253-54. Jim Walsh wrote, reacting to the same thing, nothing that the idea Darby encouraged violence "was a defense of [McKay's]" and he "later admitted he lied when Crowder," the other member of the Texas Two, "was going to testify against him." 3CR1256. Both of those reporters recognized this article as making a very specific (and unsupported) accusation. At the very least, this should confirm that a fact question exists.

legal lens, it should have reversed because the defendants offered merely boilerplate affidavits that could not conclusively <u>dis</u>prove reckless disregard.

## A.    Defendants' burden on summary judgment

Actual malice does not ask whether a person's intent is malicious in the common sense.  *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989).  Reciting that a person harbors no ill will toward the plaintiff does not disprove "actual malice."

On summary judgment, "[a] libel defendant can negate actual malice as a matter of law by presenting evidence that he or she did not publish the statement with knowledge of its falsity or reckless disregard for its truth." *Huckabee v. Time Warner Entm't Co. L.P.*, 19 S.W.3d 413, 420 (Tex. 2000).  In the defamation context, "reckless disregard" means "a high degree of awareness of probable falsity." *Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex. 1989).  The evidence presented in the motion must be sufficient to "negat[e] actual malice as a matter of law." *Huckabee*, 19 S.W.3d at 420.  Only then would any burden shift to the plaintiff to offer controverting evidence. *Id.*

## B.    Conclusory affidavits do not meet Defendants' initial summary-judgment burden

The Court rejected as inadequate a defamation defendant's affidavit that said "never did I make an untrue statement knowingly" and "all I did was to

make logical and justified inferences from facts known to me personally." *Casso*, 776 S.W.2d at 559. The Court held that this was not enough: "If it attempts to negate actual malice, it provides no information as to Casso's knowledge that the statements were not false or were not made with reckless disregard to their truth or falsity. In short, this proof meets none of the tests of rule 166a." *Id.* at 559 (citing TEX. R. CIV. P. 166a).

That is because, even in a defamation case, affidavits from interested witnesses must be "clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and [contain allegations that] could have been readily controverted." *Casso*, 776 S.W.2d at 558 (citing TEX. R. CIV. P. 166a(c). Summary-judgment affidavits must address the issue completely, which for actual malice means addressing <u>both</u> whether the defendant had knowledge of falsity <u>and</u> whether the publication was made with reckless disregard for truth or falsity. *McLemore*, 978 S.W.2d at 574 (negating actual malice requires "evidence that shows he or she did not publish the alleged defamatory statement with actual knowledge of any falsity or with reckless disregard for the truth")).

*Huckabee* illustrates the type of affidavits that might satisfy the Defendants' burden. Those affidavits included significant detail about the reporting process being followed, including how conflicting information was

reconciled.  19 S.W.3d at 423-24.  That media defendant included details about why it chose to rely on the reputation of its reporter.  *Id*. at 423.  That reporter provided not only a complete list of sources consulted, but also "detailed her reasons" for choosing to disregard the view of one side in favor of the other.  *Id*. at 424.  None of those details were offered here.

## C.  Neither Defendant met this initial burden.

### 1.  The New York Times Company

The newspaper offers an affidavit from Charles Strum, who identifies himself as "the editor of the article at issue in this lawsuit."  2CR903, at ¶4.  The following paragraphs are Mr. Strum's only discussion of the reporting process, the editorial process, his own personal state of mind, and what facts were known to any other member of the paper's editorial and research staff:

> 6.  I believed the statement "which he had encouraged," in reference to Brandon Darby, to be true at the time the article was published.  I believe it to be true still.
>
> ...
>
> 8.  Once *The Times* received communication that Mr. Darby considered the article to contain a defamatory statement (through the service of the lawsuit), we immediately investigated whether a clarification or correction was in order, and, if so, what it should state.  On March 16, 2011, a clarification was issued.

> ...
>
> 10.     I did not entertain any serious doubts about the statement in question. ...

2CR903-04, at ¶6, 8, 10.  This says nothing to negate reckless disregard and falls far short of what is needed for traditional summary judgment.

Other summary-judgment evidence indicates that, at a minimum, Toby Lyles of the research department selected and sent articles to McKinley. 3CR1231-44.  Defendants offer no testimony, however, about its researcher Lyle's process, her understanding of Darby's role, what information she conveyed to other *Times* editors or to McKinley, or what articles she reviewed herself but ultimately decided not to forward to McKinley.  Nor is testimony offered explaining Marlene Bagley's work, which flagged for McKinley a concern that he was describing the proceedings in a way at odds with the newspaper's prior coverage.  When the record confirms that both of these potential red flags were known to the defendants, their summary-judgment affidavits have a high bar to conclusively <u>dis</u>prove reckless disregard.  These did not even try.

### 2. McKinley

James McKinley's affidavit, 2CR767-69, is also inadequate—either to establish his own lack of actual malice or to support the newspaper's argument that it (as a corporate defendant) lacked actual malice.

**Conclusory.** McKinley's affidavit provides so little information about his reporting, research, and fact-checking process as to be conclusory and not readily subject to being controverted under Rule 166a. In particular, as to his research, the affidavit raises questions it does not answer. It states, "Toby Lyles, at the *Times* research desk, provided me with background research for the article." 2CR768, at ¶6. But the affidavit says no more about what that research contained, what McKinley did with it, or how the contrary information was reconciled with publishing the defamatory statement here.

As to McKinley's conversations with sources, the affidavit states that he spoke to both Jeffrey DeGree and Scott Crow. McKinley says, "[m]y inclusion of the statement in the article at issue was based on my then-recent conversations with Jeffrey DeGree and Scott Crow [about Darby's overall role]." 2CR768, at ¶9. The phrase "based on" lacks crucial detail. And the affidavit is silent as to why these two sources—both of whom were aligned against Darby—

42

were given final say as to Darby's role.[10]  The affidavits in *Huckabee* could not be more different.  They "explained the steps" the reporter took, the specific transcripts reviewed, the specific evidence reviewed, totaling "over two thousand pages of documents." *Huckabee*, 19 S.W.3d at 424.  They also "detailed [the reporter's] reasons for doubting" a conflicting view, including specific corroborating facts. *Id.*  Given the circumstances here, including the contrary statements under oath by DeGree's client at the sentencing, this record does not conclusively <u>dis</u>prove reckless disregard.

---

[10] Scott Crow is another activist.  Crow's affidavit—submitted by Defendants—explains that he did not participate in activities in Minnesota and has "no direct knowledge that Darby encouraged McKay or Crowder to commit arson specifically." 2CR673-75, ¶10, 12.  That affidavit does not conclusively disprove actual malice.  If anything, it raises questions about why McKinley would rely on Crow for precisely that.  DeGree was McKay's attorney when a federal judge concluded that the trial strategy had been an obstruction of justice that warranted a sentencing enhancement.

## V.   The Court of Appeals Ignores the Substantial Evidence of Actual Malice in the Second Editorial Process

However the Court resolves the previous issues, it should reverse as to the modified version of the story published beginning on March 16, 2011 and continuing to this day.  2CR581-83 (article).  The new text added refers directly to the allegation against Darby, changing the context in which the accusation would be understood.  And the live pleading treats this article as a distinct basis for defamation liability.  3CR1044-45.  Yet the affidavits do not refute actual malice in the editorial process leading to this second version.  The reporter and the paper mention that process.  2CR903-04, ¶8 (Strum: "we immediately investigated whether a clarification or correction was in order and, if so, what it should state"); 2CR769, ¶16 (McKinley).  But they say nothing more.

The biggest difference is that this second editorial process came after two emails to McKinley from knowledgable fellow journalists, who were each critical of the accusation that Darby "had encouraged" "the plot."  3CR1253-54 (May email); 3CR1256-57 (Walsh email).  There is no evidence how this second editorial process addressed these emails, or any other new information developed as McKinley or Strum "investigated" the situation.  Their affidavits do not <u>conclusively</u> negate reckless disregard.  2CR903-04, ¶8 (Strum) (not

44

describing process); 2CR769, ¶16 (McKinley). The actual-malice holding reached by the court of appeals cannot apply to this publication.

When Darby amended his live petition to be extremely clear that this was a distinct basis for liability, an amendment later blessed by an explicit order from the trial court, 3CR1886; 3CR1894, the Defendants faced a choice: they could either adapt their motion to fully cover Darby's claims, or they could not. By choosing the latter path, they limited the proper reach of any summary judgment. "So, for example, if a defendant moves for summary judgment on only one of four claims asserted by the plaintiff, but the trial court renders judgment that the plaintiff take nothing on all claims asserted, the judgment is final—erroneous, but final." *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 200 (Tex. 2001). At a minimum, the court of appeals erred to affirm the portion of the judgment relating to this second publication.[11]

Respondents contend, as a legal matter, that defamation law cannot impose substantive liability against such a revised publication unless the correction text would, taken in isolation, itself be independently defamatory.[12]

---

[11] The court of appeals was silent about its reasons. *But see* TEX. R. APP. P. 47.1. Nonetheless, its judgment has this effect, as does the trial court's. 3CR1893.

[12] Strictly speaking, this is not a ground for summary judgment. *See* 2CR384-86 (grounds in the motion). The argument appears in the reply filed the day of the hearing. 3CR1824.

Resp. to Pet. at 17 ("Darby does not contend that the clarification contained defamatory material."). The legal principle they cite, however, is the single-publication rule, which relates to a limitations clock, not a bar to liability.[13] The clock may start when a party is put on notice that defamation has occurred, but that clock does not affect the substantive question of whether each each version is defamatory.

To be sure, a publication may hope that edits it makes after a lawsuit is filed could reduce its defamation exposure, at least for future damages. But the defamatory impact of a statement necessarily depends on context. A supposedly "clarified" story can be more, less, or just differently defamatory based on how the newly added context surrounds the statement.

The changes here were both substantive and directly referable back to Darby—they were, in short, designed to change a reader's context for the accusation that Darby "had encouraged" "the plot" that he reported to the FBI.

---

[13] And even by their own terms, that body of statute-of-limitations cases is distinguishable. When a new article is materially changed (as opposed to just rotating the ads in a sidebar or fixing typos), a new limitations period does begin. *E.g.*, *Woodhull v Meinel*, 202 P.3d 126, 131 (N.M. App. 2008) (a substantive "update" appended to an article constitutes a new publication); *In re Davis*, 334 B.R. 874, 884 (Bankr. W.D. Ky. 2005) (adding an "update" and "breaking news" section with new information related to the original material constitutes republication); *cf. Firth v. State*, 775 N.E.2d 463, 466 (N.Y. 2002) (not republication if the added material is "unrelated"); *Churchill v. State*, 876 A.2d 311, 315 (N.J. App. 2005) (minor website alterations are not republication; altering "substance or form" of the article is).

As the Response puts it, new text was permanently added to the online version of the article "so that its Internet readers would not miss it."  Resp. to Pet. 17.

Those are the stakes.  Unlike the print era, the presentation of almost any article or post online can evolve over time, with a new version displacing the old.  The choice to make a substantive change to that presentation can surely implicate defamation law.  While the Response says it would be "a significant departure from existing law," Resp. to Pet. 17n.10, the ground has already been laid by the statute-of-limitations cases, which recognize that substantive changes can mark a new publication.  *See* note 13, *supra*.

As a policy matter, the Response also protests that recognizing the possibility of a defamation claim here would "discourage publications from ever running retractions, clarifications or corrections."  Resp. to Pet. 17n.10.  To the contrary, it would ensure that the common-law incentives are aligned.  A "correction" that actually cures the 'gist' of the article would not be subject to liability.  So, too, would a "retraction" that actually retracted the original accusation.  Both of those are encouraged by the normal application of the elements of defamation.  The reason the defendants are not shielded by those normal principles is that they neither actually cured the defamatory 'gist' nor recanted the accusation, which remains unqualified and full-throated.  What has

changed is the surrounding context.  If anything, an ordinary reader would also quite naturally understand the accusation made against Darby had been further blessed by the *Times* when it survived a formal corrections process.

Readers today will encounter only this new version.  Whether a modified version of an online article is defamatory, and whether it was made with actual malice, are fact questions precluding summary judgment.  Media defendants are not, and should not be, shielded from defamation liability as a matter of law merely by virtue of having previously published a different version of the story.

## PRAYER

The petition should be granted and, ultimately, the summary judgment reversed and the cause remanded for further proceedings.

Respectfully submitted,

/s/ Don Cruse

_____

Don Cruse
State Bar No. 24040744
LAW OFFICE OF DON CRUSE
1108 Lavaca Street, Suite 110-436
Austin, Texas 78701
[Tel.] (512) 853-9100
[Fax] (512) 870-9002
*don.cruse@texasappellate.com*

Robert B. Kleinman
State Bar No. 24055786
KLEINMAN LAW FIRM, PLLC
404 West 7th Street
Austin, Texas 78701
(512) 299-5329
(512) 628-3390 *fax*
*robert@kleinmanlawfirm.com*

COUNSEL FOR PETITIONER

## CERTIFICATE OF SERVICE

I certify that on February 4, 2015, this **Petitioner's Brief on the Merits** was served on counsel of record by electronic service (or, if not possible when e-filing, by fax):

Laura Prather
HAYNES & BOONE, LLP
600 Congress Ave., Suite 1300
Austin, Texas 78701
(512) 867-8400
(512) 867-8470 *fax*
*Counsel for Respondents*

/s/ Don Cruse
Don Cruse

## CERTIFICATE OF COMPLIANCE

This brief complies with Texas Rules of Appellate Procedure 9.4 because the sections covered by the rule contain no more than 10,585 words. The font used in the body of the brief is no smaller than 14 points, and the font used in the footnotes is no smaller than 12 points.

/s/ Don Cruse
Don Cruse

# Appendix

# Tab A

**Final Judgment
(3CR1893)**

CAUSE NO. 11-0528

FILED

2012 MAR 29 AM II: 21

| | | |
|---|---|---|
| BRANDON DARBY, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | *Beverly Crawley* |
| | § | DISTRICT CLERK |
| | § | HAYS COUNTY, TEXAS |
| vs. | § | HAYS COUNTY, TEXAS |
| | § | |
| THE NEW YORK TIMES COMPANY, | § | |
| and JAMES C. McKINLEY, JR., | § | |
| | § | |
| Defendants. | § | 274TH JUDICIAL DISTRICT |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On January 19, 2012, the parties appeared before the Court to hear and consider Defendants' Motion for Summary Judgment, Plaintiff's Response to Defendants' Motion for Summary Judgment and Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment.

After considering the arguments of counsel, Plaintiff's response, Defendants' reply, any objections, and exhibits, affidavits, and pleadings on file, at the time of the hearing and, after a hearing on the motions and objections, the Court finds that Defendants' Motion for Summary Judgment should be, and hereby is, GRANTED.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the Defendants' Motion for Summary Judgment is GRANTED in its entirety, and Plaintiff's case is dismissed in its entirety with prejudice. Plaintiff shall take nothing of and from Defendants, and Defendants shall recover their costs from Plaintiff together with such other and further relief to which Defendants may be justly entitled, at law and in equity.

THIS ORDER CONSTITUTES A FULL AND FINAL DISMISSAL WITH PREJUDICE OF ALL CLAIMS IN THIS CASE.

Entered this 28th day of March, 2012.

_____
Judge Presiding

# Tab B

**Majority Opinion
(Chief Justice Quinn)**



In The

Court of Appeals

Seventh District of Texas at Amarillo

_____

No. 07-12-00193-CV
_____

BRANDON DARBY, APPELLANT

V.

THE NEW YORK TIMES COMPANY AND JAMES C. MCKINLEY, JR., APPELLEES

On Appeal from the 274th District Court
Hays County, Texas
Trial Court No. 11-0528, Honorable Gary L. Steel, Presiding

February 26, 2014

MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

This appeal involves a claim of defamation. According to Brandon Darby, the New York Times and its writer, James C. McKinley, Jr., besmirched his reputation by uttering a falsehood in an article. McKinley's article delved into the burning of the Texas Governor's mansion, the people allegedly behind that bit of arson, self-styled political activists or anarchists, and the 2008 Republican National Convention in Minnesota. Among the article's many paragraphs appeared one stating that:

. . . federal agents accused two men from these circles of plotting to make firebombs and hurl them at police cars during the convention. An F.B.I. informant from Austin, Brandon Darby, was traveling with the group and told the authorities of the plot, which he had encouraged.

Darby does not dispute his status as a purported activist-turned-paid government informant. Nor does he deny participating in the adventure to the Republican Convention with a small group from Texas, which group included the "two men" alluded to in the writing. That the group members went there to engage in protests and that Darby's purpose for joining them included the gathering of information about their activities for the FBI is similarly undisputed. What he does question, however, is the accuracy of the statement indicating that "he had encouraged" the "plot" to "make firebombs and hurl them at police cars."

The "two men" alluded to in the article, David McKay and Bradley Crowder, actually made Molotov cocktails. Darby knew that. McKay and Crowder planned to throw the incendiary devices as part of their protest. Darby knew that as well. But, the two had a change of heart. That change did not prevent McKay and Crowder from being arrested, prosecuted, convicted, and jailed.

Because he believed he was wrongfully accused of encouraging the plot, Darby sued the newspaper and McKinley for defamation.[1] The latter moved for summary judgment, which motion was granted them. We now address the propriety of that judgment and, upon doing so, affirm it.

---

[1] We refer to the New York Times and McKinley as McKinley for purposes of this opinion.

*Applicable Law*

The standard of review applicable to summary judgments is settled. Rather than reiterate its general tenets, we cite the litigants to *Neely v. Wilson*, No. 11-0228, 2013 Tex. LEXIS 1082, at *10-11 (Tex. June 28, 2013). Whether the movant seeks a traditional or no evidence summary judgment may affect the respective burdens of the parties. However, when each party presents evidence supporting their position, the issue is not so much whether a party fulfilled its burden but whether a material question of fact exists. *Id.* at *11. In deciding this, we construe the evidence in a light most favorable to the non-movant; so too are reasonable inferences from that evidence drawn in favor of the non-movant. *Id.*

Because the trial court's judgment at bar did not specify a particular ground upon which it acted, Darby has the burden to illustrate why none of those grounds support the trial court's decision. *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995). In other words, we must affirm the decree if any one of the grounds asserted is meritorious. *Western Investments, Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005).

*Application of the Standard*

McKinley proffered seven grounds purportedly warranting summary judgment in his favor. We address those necessary to the disposition of the appeal.

*Whether the Statement is Libelous Per Se*

McKinley and his employer initially contended that the statement in question was not libelous *per se* because it failed to accuse Darby of a crime or injure him in his office, profession, or occupation. We disagree.

The category of statements deemed per se defamatory include those 1) accusing one of untruthfulness, dishonesty or fraud, 2) that impute to the complainant the commission of a crime, indicate he contracted a loathsome disease, or indicate that he engaged in sexual misconduct, and 3) causing injury to a person's office, business, or profession. *Medical Gardens, LLC v. Wikle*, No. 07-12-00111-CV, 2013 Tex. App. LEXIS 6699, at *3-4 (Tex. App.—Amarillo May 29, 2013, no pet.) (mem. op.) Whether the comment at issue falls within one of these categories is a question of law. *Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013); *Medical Gardens, LLC v. Wikle,* 2013 Tex. App. LEXIS 6699, at *3-4. And, being a question of law, we consider it *de novo*. *Stockton v. Offenbach*, 336 S.W.3d 610, 615 (Tex. 2011) (stating that an appellate court reviews questions of law *de novo*).

McKinley did not suggest via his motion that manufacturing and possessing Molotov cocktails with the intent to throw them at police officers is not a crime. So, we need not consider that. *See* TEX. R. CIV. P. 166a(c) (stating that issues "not expressly presented to the trial court by written motion . . . shall not be considered on appeal as grounds for reversal"). Instead, he and his employer initially proposed that accusing one of encouraging another's engagement in criminal conduct is not a crime. Section 7.02(a)(2) of the Texas Penal Code illustrates otherwise. It provides that one is criminally responsible for an offense committed by another where the former "acting

4

with intent to promote or assist the commission of the offense . . . solicits, ***encourages***, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN. § 7.02(a)(2) (West 2011) (Emphasis added). So encouraging others to make and throw Molotov cocktails at police officers may indeed be a crime itself.

The movants also asserted that no crime was involved because Darby was acting as an informant for the FBI and he enjoyed immunity from prosecution as an informant or lacked the *mens rea* to be a co-conspirator. Interestingly omitted from this argument, though, is citation to authority holding that one must be subject to actual prosecution before a false assertion about engaging in criminal activity can be considered defamatory *per se*. Also missing is citation to authority holding that immunity somehow washes away the criminal character of criminal acts or somehow cleanses a dirty *mens rea* of its taint. This omission may arise from the fact that immunity simply insulates one from prosecution or lawsuit; it does not cleanse the act of its character. *See Leach v. Texas Tech University*, 335 S.W.3d 386, 392 (Tex. App.—Amarillo 2011, pet. denied) (wherein the court explained that while immunity bars a lawsuit for breach of contract the contract parties remain responsible for their breach).

Nor can one reasonably extrapolate from the authority cited by McKinley, *e.g.,* *Boyer v. State*, 801 S.W.2d 897 (Tex. Crim. App. 1991), the premise that an informant's action cannot be classified as criminal. Admittedly, the *Boyer* court held that when an informant serves as an intermediary and acts as an agent for a law enforcement officer in carrying out his official duties, the intermediary cannot be held criminally responsible for his conduct. *Id.* at 899. Yet, the court did not say that the

5

intermediary's conduct was not a crime. Indeed, if the status of being an intermediary or informant somehow meant his act was not criminal, then the *Boyer* court had no reason to decide whether the informant could be held criminally responsible for it; after all, it matters not whether one may be criminally prosecuted for acts that are not crimes.

Furthermore, the very same court has since held, and quite repeatedly, that this freedom from criminal responsibility exists as long as "their actions do not rise to a level of illegal conduct." *Reese v. State*, 877 S.W.2d 328, 336 (Tex. Crim. App. 1994) (and cases cited therein). That is, "state agents [used] in ferreting out crime are not themselves parties to the crime as long as they do not bring about the crime." *Id.*; *see also Burns v. State,* 473 S.W.2d 19, 20 (Tex. Crim. App. 1971). So, as can be seen, an informant may well be convicted of crimes arising from his performance as an informant.

As for the argument involving the *mens rea* of an informant, it may well be that an informant can escape prosecution as a co-conspirator because he lacks the "intent to further the objective" as suggested by McKinley. Yet, lacking *mens rea* for purposes of being a co-conspirator is not the same as saying that being an informant means, as a matter of law, he commits no crime. *Reese*, *Burns* and their progeny illustrate otherwise.

In view of the foregoing, we cannot say that Darby's status as an informant entitled McKinley to summary judgment as a matter of law. We know of no authority saying that one cannot defame an informant simply because the informant, in certain

6

situations, may not be subject to criminal prosecution, and we do not wish to create such authority now.

*Constitutionally Protected Nature of the Statement*

McKinley next sought summary judgment on the ground that the statement was constitutionally protected due to its status as an unverifiable fact. In other words, the word "encourage" or "encouraged" is too vague and actually expresses nothing more than one's opinion, according to McKinley. The argument did not entitle him to summary judgment as a matter of law.

Opinions may be actionable if they imply false statements of objective fact. *Simmons v. Ware*, 920 S.W.3d 438, 449 (Tex. App.—Amarillo 1996, no writ). Furthermore, "the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements." *Bentley v. Bunton*, 94 S.W.3d 561, 571 (Tex. 2002), *quoting Turner v. KTRK TV, Inc.*, 38 S.W.3d 103 (Tex. 2000). The same is no less true when determining if the utterance is an actionable statement of fact or a constitutionally protected expression of opinion. *Id.* All depends on a reasonable person's perception of the entirety of a publication and its verifiability. *Id*. at 582.

The article wherein the statement at issue appeared concerned the arson of the Texas Governor's mansion. It spoke of the Texas Rangers "finally closing in on the person responsible" and the link between that person and a group of local anarchists. Reference was then made to purported members of that local group who pled guilty to "making and possessing gasoline bombs during the 2008 Republican Convention . . . ."

7

The author then returned to describing the investigation into the arson of the Governor's mansion and how the investigators engaged in "old-fashioned police work," such as watching video footage, "penetrat[ing] counter culture hangouts" whereat "fashion accessories tend toward piercings and tattoos" and "globalization is a dirty word," and offering cash in exchange for "leads." At that point, effort was taken to describe how the viewpoints of some local anarchists had changed. Some no longer attacked all forms of government, the author wrote, but instead engaged in social causes such as food distribution, recycling, and the like.

Discussion of the two individuals who "plead guilty to making and possessing gasoline bombs during the . . . Convention" then became the focal point of the article once again. McKinley alluded to them "plotting to make firebombs" and throw the bombs at the police cars. He then named the individuals (that is, Crowder and McKay), revealed their respective prison sentences, alluded to Darby as being an F.B.I. informant who travelled with them, and followed that by stating that Darby "told authorities of the plot" that he "encouraged."

Mention was also made of Crowder denying involvement in the "mansion fire" and ridiculing the idea that a local anarchist group was "behind both crimes." McKinley closed his story by quoting an Austin anarchist who knew Crowder and McKay and also belittled the notion that a cohesive Austin anarchist group was involved in the incident at the Republican Convention.

From the context described above, "a reasonable person's perception of the entirety of a publication" would be that McKinley was discussing crime, its commission in both Austin and Minnesota, and the identity of those responsible for its commission.

And, in disclosing the identity of two individuals known to have committed the Minnesota crime, McKinley described Darby as encouraging their criminal "plot." A reasonable person reading the allusion to Darby in the context of the article as a whole could rationally perceive it as attributing criminal conduct to Darby. This is especially so given the aforementioned statute expressing that one who "encourages" another to commit a crime is also guilty of that crime.

In short, McKinley was not speaking of unverifiable fact or proffering vague rhetoric. Rather, he was speaking of particular crimes and the identity of those to whom the crimes could be attributed. The scope of his attribution included Darby, and the identity of those engaged in specific crimes is verifiable fact, as illustrated by the numerous convictions emanating from our criminal courts.

*True or Substantially True*

McKinley also sought summary judgment on the ground that the statement was true or substantially true. Upon reviewing the record, we find the presence of a material issue of fact on the matter.

That the utterance is true or substantially true is a defense to a defamation claim. *Neely v. Wilson*, 2013 Tex. LEXIS 1082, at *17-18. Specific statements that err in the details but correctly convey the gist of a story are substantially true. *Id.* at *22. However, a statement "'can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory.'" *Id.* at 22-23, *quoting Turner v. KTRK TV, Inc.*, 38 S.W.3d 103 (Tex. 2000). And, as we do when determining whether speech is mere opinion or verifiable fact, we focus on the gist of the broadcast or

writing as viewed through the eyes of a person of ordinary intelligence when assessing its truth or substantial truth. *Id.* at 23.

Again, McKinley wrote of arson and those committing it. In asserting that Darby "encouraged" the plot to make "firebombs" and "hurl them" at police cars, he charged Darby with helping Crowder and McKay further the particular bit of arson and assault they planned, or so a reasonable person could interpret the statement's gist. As for evidence illustrating the statement's accuracy, some does appear of record. For example, one acquaintance of Darby disclosed how Darby described himself as a "militant revolutionary," sought to burn down a bookstore in Austin, provoked and encouraged others to do violent acts in the past, and often talked about taking violent action encompassing arson and the use of guns. Another acquaintance who worked with Darby in New Orleans remembered driving with Darby when Darby suggested that "we use Molotov cocktails to bomb an insurance company" and for help in recruiting people to do the bombing. Furthermore, Darby told McKay and Crowder, when discussing the RNC, that 1) he "was going to shut that fucker down," 2) any group he went with was "going to be successful in their efforts," 3) he views "process as something that is developed through working together . . .," 4) they all needed to have their "voices heard," 5) each needed a say to assure that none "of us were doing something we weren't comfortable with," 6) he "wasn't there to fuck around," 7) "direction action is intense and that we could all expect to have violence used against us," 8) "we could all expect to be intimidated in jail and that the cops would probably put us into cells with people who would try to ass rape us or hurt us," 9) he was "ready to deal with the potential for violence and that if . . . [they] were not then they shouldn't

10

work with [him]," and 10) McKay and Crowder looked like they ate "tofu" and needed to eat "beef" so they "could put on muscle mass" and they "weren't going to be able to fight anybody until . . . [they] did so." Darby also said such things as they had to carry arms to support what they believed and asked McKay if he was that type of person and whether he was willing to burn people for his beliefs. Other evidence attributes to Darby such comments as how he thought he could "reach" Crowder and McKay, how he acted as their mentor, how he sought permission from the FBI to violate certain laws, and how he spoke with McKay and Crowder about training techniques and techniques they could use while in a protest. So too is there evidence of Darby admitting to knowing that McKay bought items to make Molotov cocktails and had a meeting with him to see with his own eyes whether McKay had manufactured explosive devices.

Upon reading the transcript of McKay's plea hearing before a federal judge, one would also encounter evidence about Darby providing him money to acquire the components for the Molotov cocktails and discussing the number of bombs involved and their deployment. And, though Crowder (at his own federal plea hearing) denied that Darby had any direct involvement with the decision to make incendiary devices, Crowder nevertheless told the judge of a story Darby imparted. It concerned an Italian man who made and threw his own Molotov cocktails. The story concluded with Darby saying that "if you want to do this, [that] is how it's done."

To this, we add evidence of McKay growing hesitant once the incendiary devices were built. Apparently Darby became aware of this and texted him such things as 1) "'You be trippin'. All jimmy hendrix style and shit,'" 2) "'It's your call. I support you

11

making whatever choice you are comfortable with. Be proud of yourself for your work and take a chill,'" and 3) "'Its all good bro. I respect the work youve [sic] done here. Youre [sic] going to get up and feel bad. I've done that many, many times. Sometimes its best to fight another day. I respect and care for you . . . . '"

On the other hand, the record also contains evidence absolving Darby of any supposed encouragement and placing into question whether McKinley's utterance was accurate. For instance, Darby denied encouraging the plot. He also said he attempted to dissuade McKay and Crowder from pursuing it and considered the two "some strange form of collateral damage" in his effort to gain access to plans involving the RNC protests and as he played his role as informant. And, it is this mix of evidence which prevents us from concluding that the trial court could have legitimately awarded McKinley and his employer summary judgment on the basis that the comment was true or substantially true. The record before us presents a material issue of fact on the matter necessitating resolution outside the summary process of Texas Rule of Civil Procedure 166a. *See Halsell v. Dehoyos,* 810 S.W.2d 371, 372 (Tex. 1991) (holding that material issues of fact must be resolved by a jury).

*Actual Malice*

McKinley also argued that Darby was a public figure, which Darby conceded. Consequently, the latter had to prove that the statement at issue was made with actual malice to entitle him to recover. According to McKinley, however, the record disproved the existence of such malice, as a matter of law. We agree.

It has long been true that one cannot be held liable for false statements uttered about a public figure unless the falsehoods were made with actual malice. *New York*

12

*Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[2]

Furthermore, the burden to prove such malice lies with the complainant; it is his obligation to satisfy that burden via clear and convincing evidence. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 116 (Tex. 2000). Because the issue was raised via a motion for summary judgment, the movants (McKinley and the New York Times) had the obligation to present evidence disproving malice, as a matter of law.

Next, actual malice is a term of easy definition but difficult application. It denotes a statement uttered with actual knowledge of its falsity or with reckless disregard as to its truth or falsity. *Hearst Corp. v. Skeen,* 159 S.W.3d 633, 637 (Tex. 2005); *Bentley v. Bunton*, 94 S.W.3d at 591. One acts recklessly when his statements are ". . . made with a high degree of awareness of probable falsity" or when the ". . . defamer entertained serious doubts that his declaration was true." *Doubleday & Co. v. Rogers*, 674 S.W.2d 751, 756 (Tex. 1984). Thus, the standard or test is a subjective one. *Hearst Corp. v. Skeen*, 159 S.W.3d at 637. And, the focus lies upon what the writer knew or thought at the time the article was written or published. *Id.* And, therein lies the reason for its difficulty in application.

Experience shows that seldom do those to whom improper conduct is attributed admit to engaging in such conduct. Nor do they tend to admit to having the type of *mens rea* needed to inculpate the individual. So too may one have the propensity to view an accused's utterances about his innocence with a dubious eye. That may be why summary judgment procedure authorizes entry of judgment based upon testimonial evidence of an interested party only if that evidence is uncontested, clear,

---

[2] We treat the issue of whether the purportedly defamed individual is a public figure as a question of law. *Neely v. Wilson*, No. 11- 228, 2013 Tex. App. LEXIS 511, at *13 (Tex. June 28, 2013).

13

positive, direct, credible, free from inconsistency, and of the type that could be readily controverted. TEX. R. CIV. P. 166a(c). Yet, if the testimony is of that ilk, it may indeed provide the basis for summary judgment. And, most importantly, the accused in a defamation proceeding is free to testify about his thoughts at the time and reasons for saying what he did. *Bentley v. Bunton*, 94 S.W.3d at 596. If his affidavit illustrates his belief in the statement's truth and provides a plausible basis for that belief it may well be sufficient to negate actual malice as a matter of law. *Huckabee v. Times Warner Entertainment Co., L.P.,* 19 S.W.3d 413, 424 (Tex. 2000).

Again, McKinley's statement underlying this libel suit was:

> federal agents accused two men [Crowder and McKay] . . . of plotting to make firebombs and hurl them at police cars during the convention. An F.B.I. informant from Austin, Brandon Darby, was traveling with the group and told the authorities of the plot, *which he had encouraged*.

(Emphasis added). According to the writer, as disclosed in his affidavit, he had not previously written any articles on Brandon Darby, Bradley Crowder, or David McKay. While researching his story, the writer contacted Stephen McCraw, Director of the Texas Department of Public Safety, Tom Vineger, spokesperson for the Texas Department of Public Safety, Jeffrey DeGree (McKay's attorney), Bradley Crowder, and Scott Crow who was an Austin activist who knew McKay, Crowder, and Darby. Effort was made to also contact Darby, but it proved unfruitful. Toby Lyles, of the research desk at the New York Times, also provided him with background research.

According to McKinley, his statement about Darby encouraging the plot was based upon "then-recent conversations with Jeffrey DeGree and Scott Crow." They

14

"discussed Brandon Darby's involvement with David McKay and Bradley Crowder leading up to and during the 2008 RNC and Brandon Darby's role as an undercover informant." DeGree purportedly "told . . . [him] that . . . Darby had encouraged . . . McKay and . . . Crowder's behavior and that was the basis for the statement at issue." Scott Crow also told him that Darby encouraged McKay and Crowder "to take actions beyond peaceful demonstrations during the protest at the 2008 RNC." McKinley further attested that he 1) believed the utterance to be true at the time of its publication, 2) had no feelings of hatred, ill will, or spite toward Darby, and 3) had never heard of Darby prior to writing the article.

Charles Strum, the Deputy National Editor for the New York Times, also executed an affidavit wherein he stated that 1) he believed the statement about Darby's encouragement to be true at the time of publication, 2) he still believed it to be true, 3) at no time prior to filing a lawsuit did Darby contact the New York Times to request a retraction or correction or to assert that the article contained an inaccurate statement, 4) he had no feelings of hatred, ill will, or spite toward Darby and nothing he learned while editing the story caused him to have any negative feeling toward Darby, and 5) he did not entertain any serious doubts about the statement in question and if he had reason to believe it was untrue, he would not have allowed it to be published without further verification.

A third affidavit was also appended to the motion for summary judgment. It was that of Scott Crow. In it, Crow mentioned that McKinley interviewed him and that he (Crow) believed that Darby had encouraged Crowder and McKay. His belief, the affiant continued, was based upon his past activist experiences with Darby.

As previously mentioned, DeGree represented McKay in the criminal prosecutions related to his action at the Republican Convention. During the first of the two criminal proceedings,[3] McKay contended that Darby had entrapped him into planning the Molotov cocktail assault. The allegation was recanted before the second trial began, however. At that point, McKay admitted that Darby had not "induced" him to act and admitted to having a predisposition to engage in the conduct at issue. Nevertheless, Darby's involvement in the plan remained an aspect of his defense. McKay described the extent of Darby's involvement at a plea hearing held before the commencement of the second trial. He told the trial court that 1) the three individuals (*i.e.*, McKay, Crowder, and Darby) engaged in a conversation around a "computer," 2) the conversation "involve[ed] Molotov cocktails," 3) though Darby did not broach the subject, Darby's "suggestions were about the tactics we were going to use with them, about having enough to hand out, [and about] a . . . specified meeting point in the park." And, in response to questioning by DeGree about whether Darby gave him "20 to 30 dollars to make—to buy the materials to get the Molotov cocktails," McKay also answered, "Brandon gave me money to contribute, yes."

Relying on a single source of information which source reflects only one side of the story is not actual malice. *New Times, Inc. v. Wamstad,* 106 S.W.3d 916, 928 (Tex. App.—Dallas 2003, pet. denied). Here, McKinley had several sources saying the same thing. And, while he did not attest to reading the transcription of McKay's plea hearing before writing his article, the transcript nonetheless contained information supporting DeGree's representation that Darby had encouraged the activity. Knowing that DeGree represented McKay at the proceeding, McKinley had basis to believe that

---

[3] The initial trial resulted in a hung jury.

16

DeGree knew of what he said. In other words, McKinley understood that DeGree was privy to relevant information underlying his observation about Darby encouraging the plot. And, aside from Darby's factually unsubstantiated insinuation within his appellate brief that an attorney representing a criminal defendant cannot be believed when proclaiming the innocence of his client, we have been cited to no evidence of record suggesting that McKinley should have disbelieved DeGree. Couple that with Crow's own disclosure about his activist experiences with Darby and Crow's belief that Darby encouraged McKay and Crowder, McKinley had at least two viable sources upon which to make the utterance. As stated, a reporter may rely on statements by a single source. *See New Times, Inc. v. Wamstad,* 106 S.W.3d at 928 (stating that a reporter may rely on statements by a single source even though they reflect only one side of the story without showing a reckless disregard for the truth).

Again, affidavits are sufficient to support a summary judgment in their favor if they state the affiants' belief in the truth of those statements and describe the sources underlying that belief. *Nelson v. Pagan,* 377 S.W.3d 824, 834 (Tex. App.—Dallas 2012, no pet.) (finding affidavits of editors sufficient which stated that the subject postings were based on discussions with a particular reporter, documents provided by the reporter, and a review of related articles and that they believed the statements to be true); *see also Freedom Newspapers v. Cantu,* 168 S.W.3d 847, 853 (Tex. 2005) (holding that affidavits from a publisher and copy editor averring that neither had knowledge of inaccuracies or any reason to doubt the accuracy of the articles was some evidence that the newspaper acted without malice and shifted the burden to the defendant to produce contrary evidence). The affidavits of McKinley and Strum do just

17

that. They illustrate that neither the writer nor his employer's representative knew the utterance about Darby encouraging the plot was false.[4] They illustrate that neither harbored serious doubt about the accuracy of the utterance at the time it was made. They also illustrate the foundation underlying McKinley's utterance about Darby encouraging the plot.[5] So too were the affidavits clear, positive, direct, and free from inconsistency. And, most importantly, they were of a type that could be readily controverted. That is, Darby could have deposed McKinley and Strum to test their representations, but he did not. So too could he have questioned or deposed DeGree, Crow, or any of the other individuals alluded to in the documents to determine what they may have told McKinley and whether McKinley prevaricated in the least bit, but he did not.

Instead, Darby counters by referring to emails sent to McKinley by other reporters after the article was published. That the comments were made after the fact render them inconsequential to the issue before us. We reiterate that actual malice is determined by what the writer knew or thought at the time of the writing or publication, not what was discovered thereafter.[6] *Hearst Corp. v. Skeen*, 159 S.W.3d at 637. And,

---

[4] We need not delve into the rather interesting proposition about whether a purported defamer can know a statement is false when evidence exists allowing a rational jury to find the statement true or harbor serious doubt about its truthfulness given like evidence.

[5] That McKinley's affidavit mentioned his belief about the accuracy of what he said, who he spoke with prior to making the statement, and that two of those sources said Darby encouraged the conduct negates Darby's assertion that the document was conclusory. Though more could have been included, it provided factual data underlying his conclusion about why he thought as he did. *See Thompson v. Curtis*, 127 S.W.3d 446, 450 (Tex. App.—Dallas 2004, no pet.) (holding a conclusory affidavit is one that fails to allege facts that support the conclusion).

[6] In one email, the reporter states that he spent six months covering the story about Crowder and McKay, spoke with Crowder who allegedly told him that Darby learned of the Molotov cocktails "'after the fact,'" and wondered why McKinley would state that Darby encouraged the plot "'without attributing it to someone.'" What was meant by "after the fact" went unexplained. Again, Darby himself admitted to knowing of the cocktails before effort was made to deploy them. So too did his own texts

that other reporters may have disagreed with McKinley's proposition is not evidence illustrating a subjective awareness of or presence of serious doubt regarding the accuracy of the statement. *See New Times, Inc. v. Wamstad*, 106 S.W.3d at 927-28 (stating that because the plaintiff and a judge disagreed with a source's characterization of a statement is not evidence that the media defendant reiterating the statement acted with actual malice).

Another effort missing the mark is Darby's assertion that a "complete picture of the newspaper's internal research process is essential because the information that . . . would have [been] found with even a cursory search would raise serious doubts about the truth of this article." He fails to cite us to anything of record suggesting what such a search would have uncovered; nor may we guess at that. Additionally, our Supreme Court has held the "[f]ailure to investigate the truth or falsity of a statement before it is published" is no evidence of actual malice. *Dun & Bradstreet, Inc. v. O'Neil,* 456 S.W.2d 896, 901 (Tex. 1970), *quoting El Paso Times, Inc. v. Trexler*, 447 S.W.2d 403

---

reveal that he supported McKay in "whatever" course of action he opted to pursue; one such course could have been the use of the bombs. This alone could lead one to question the accuracy of what the reporter was insinuating in his email. We further note that after the reporter commented about the lack of attribution, New York Times published a corrected version of the story. Therein, the newspaper wrote that while both Crowder and McKay pled guilty, one of the two "implicated Mr. Darby, saying Mr. Darby had persuaded him to make the bombs. He later conceded that Mr. Darby had not entrapped him." The latter comports with McKay's testimony at the federal plea hearing.

As for the second email sent by a different reporter, it states that McKay "'admitted he lied'" about Darby once he realized "'Crowder was going to testify against him.'" That was followed by the statement that "'[i]t has never been proven that Darby was anything more than an informant along for the ride.'" Yet, the testimony captured within the transcript of McKay's plea hearing reveals that McKay never recanted his accusation about Darby encouraging his plan. Rather, he simply retracted his allegations about being entrapped. And, as will be discussed *infra*, they are two different matters. As for the reference to Darby never having been proven to be complicit in the activity, we again refer to Darby's texts to McKay and his admission about knowing of the bombs and contacting McKay about them. Yes, Darby may well have just been an informant as suggested by the reporter. But evidence of Darby's complicity as more than an informant appears of record, as previously described. And, that evidence tends to erode the premise offered by Darby that had McKinley read the emails he would have somehow been required to believe his statement was false.

19

(Tex. 1969); *see also Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 497-98 (Tex. App.—Dallas 2003, no pet.) (holding the same). Nor is the "failure of defendant to perform verification required by its own standards" such evidence. *Doubleday & Co. v. Rogers*, 674 S.W.2d at 756. It may evince negligence or activity below that expected of a reasonable person, but not actual malice. *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d at 901.

Nor can we ignore Darby's attempt to paint McKinley with the brush of malice by attempting to confuse the distinction between the words "encourage" and "entrap". McKinley knowing McKay recanted the entrapment allegation (assuming McKinley knew that in the first place) is no evidence of a subjective belief about the accuracy of the statement that Darby encouraged the misconduct. To conclude otherwise would be to say that an apple must be as sour or bitter as a quince because both look the same and grow on trees. Because two things have similarities does not mean they are the same. Entrapment is a legal theory providing a defense to one being criminally prosecuted. It consists of two elements, the first being the accused's lack of predisposition to commit the offense and the second being the government's inducing the accused to engage in the crime. *United States v. Nelson*, 732 F.3d 504, 513-14 (5th Cir. 2013); *accord Thomas v. State*, No. 07-12-00446-CR, 2013 Tex. App. LEXIS 13614, at *3 (Tex. App.—Amarillo November 4, 2013, no pet. h.) (stating that entrapment is a defense requiring proof that "the 1) accused engaged in the conduct charged, 2) he was induced to do so by a law enforcement agent, and 3) the agent used persuasion or other means likely to cause persons to commit the offense"). As stated by the court in *Nelson,* the ultimate question revolves around "'whether criminal

20

intent ***originated*** with the defendant or with government agents.'" *United States v. Nelson*, 732 F.3d at 514, *quoting United States v. Bradfield*, 113 F.3d 515, 521 (5th Cir. 1997) (Emphasis added). As such, the focus lies upon what was said and done when the relationship between the government and its eventual dupe began. If the accused was predisposed or had already decided to engage in the activity before government intervention, then he was not entrapped. And, McKay ultimately conceded those to be the circumstances involved; Darby did not entrap him.

On the other hand, "encourage" connotes "to inspire with courage, spirit, or hope," "to hearten," "to attempt to persuade," and "to give help". MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 410 (11th ed. 2003); *see e.g.*, *Pete v. State*, No. 07-03-00037-CR, 2004 Tex. App. LEXIS 2576, at *12-13 (Tex. App.—Amarillo March 23, 2004, no pet.) (not designated for publication) (holding that Pete encouraged the commission of the crime for purposes of rendering him a party by driving the party possessing the drugs to the place where the drugs were acquired and to another location where they were sold). Unlike entrapment, nothing in the plain meaning of that word restricts its focus solely to the circumstances existent at the inception of the relationship between two parties. Indeed, one can inspire, persuade, help, or advise another even after the other already committed to act.

This distinction between the two words or concepts is of import because McKinley did not say in his article that Darby "entrapped" McKay or Crowder. Rather, he said Darby "encouraged" the plot. All Darby's allusions to evidence about McKay recanting or being found to have obstructed justice by lying are irrelevant, since they relate to McKay's claim of entrapment. In short, potentially knowing that Darby did not

21

entrap McKay does not mean he also had doubts about whether Darby encouraged him. The trial court did not err in granting McKinley and his employer summary judgment on the issue of actual malice. This coupled with Darby's undisputed status as a public figure relieves us from having to address any other issue raised by appellant. The summary judgment is affirmed.


Brian Quinn
Chief Justice


Campbell, J. Concurring and dissenting

Pirtle, J. Concurring and dissenting

# EXHIBIT 1

𝕰𝖍𝖊 𝕹𝖊𝖜 𝖄𝖔𝖗𝖐 𝕿𝖎𝖒𝖊𝖘• Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



February 22, 2011

# Anarchist Ties Seen in '08 Bombing of Texas Governor's Mansion

By JAMES C. McKINLEY Jr.

HOUSTON — It has been two and a half years since an arsonist tossed a firebomb into the governor's mansion in Austin and slipped into the night, but the Texas Rangers say they are finally closing in on the person responsible.

Steven C. McCraw, the head of the Department of Public Safety, said on Friday that investigators had linked the arsonist to a group of anarchists known as Austin Affinity. He said two members of the same group had pleaded guilty to making and possessing gasoline bombs during the 2008 Republican National Convention in St. Paul, Minn., three months later.

But one of the men who pleaded guilty in Minnesota said the anarchist group that the rangers are focusing on did not exist. The man, Bradley Crowder, said it was an ad hoc collection of young anarchists who had pooled resources to hire a van for the trip north.

"It was like an activist car pool," said Mr. Crowder, who is 25 and served two years in prison for his role in making eight gasoline bombs in wine bottles, which were never used.

The rangers, however, see things differently. A break in the case came several months ago, they said, when a ranger who was helping review thousands of hours of surveillance tapes from 11 cameras around the Capitol and mansion spotted something strange.

Four days before the fire, three men in a white Jeep Cherokee stopped in front of the mansion about 2 a.m. and a person in the back seat snapped photos of the building. The ranger thought the men might have been casing the place.

But the video camera did not capture the license plate number. So the police began a painstaking hunt through 3,000 similar Jeeps in Texas, eliminating them one by one, Mr. McCraw said. "Every one of them had to be looked at," he said, "and it had to be done in a way that you are not letting the person know."

"It was good, old-fashioned police work," he said. "Sometimes it's the minutiae and the tedious that links you to something."

000015

Months later, investigators found the car and interviewed the owner, who turned out to have a connection to people who were part of the Austin Affinity anarchist group, Mr. McCraw said. The owner also identified the two passengers, one of whom was near the mansion at the time of the fire.

All three men in the Jeep have been questioned in connection with the arson and are considered suspects, though they have denied involvement, the police said.

Mr. McCraw said the arsonist is believed to be a fourth person, whose shadowy figure can be seen in video taken by another camera the night of the fire. Released last week, the video shows the figure tossing a blazing gasoline bomb onto the porch of the mansion, then sprinting away. A third camera on an adjacent street captured a grainy image of his face. The police enhanced the picture electronically and released a sketch based on it.

The fire destroyed much of the historic two-story brick home across from the Texas Capitol where governors have lived since 1856. Renovations continue, but Gov. Rick Perry has been moved to other lodgings. For two years, the search for the culprit has been a priority for the rangers and the state police, and the lack of progress had been an embarrassment for the department.

In recent days, rangers in their trademark cowboy hats have fanned out across Austin and penetrated the city's counterculture hangouts, where the fashion accessories tend toward piercings and tattoos, the music is alternative rock and globalization is a dirty word. Toting pictures of suspects and offering a $50,000 reward for leads, the lawmen have questioned several self-described anarchists about the Affinity group and the identity of the bomber.

Not surprisingly, the investigation has been met with some suspicion. Many self-described anarchists in Austin do not advocate attacking all forms of government, a concept they regard as dated. Their vision of anarchism holds that people should take action themselves to fix social problems. Local anarchists run a recycling center, a food-distribution program, a bookstore, a cafe, and even a thrift shop.

Yet federal agents accused two men from these circles of plotting to make firebombs and hurl them at police cars during the convention. An F.B.I informant from Austin, Brandon Darby, was traveling with the group and told the authorities of the plot, which he had encouraged.

David Guy McKay, 24, pleaded guilty to firearms violations in the case and was sentenced to four years. Mr. Crowder, 25, received a two-year sentence after pleading guilty to aiding and abetting Mr. McKay in the possession of an illegal firearm, which is how the law classifies a gasoline bomb.

000016

Mr. Crowder, who is living and working in Austin, said he had nothing to do with the mansion fire. He called the theory that there was an anarchist organization behind both crimes "categorical nonsense." "It never existed," he said. "It's not a real entity."

Scott Crow, an Austin anarchist who knows Mr. Crowder and Mr. McKay but did not go to St. Paul, said the state police were "grasping at straws." He said the group that had traveled to Minnesota was never a coherent organization and split up on returning.

"Anarchist groups, you know, they have no leader," Mr. Crow said.

000017

# Tab C

**Concurrence and Dissent
(Justice Pirtle)**



In The

Court of Appeals

Seventh District of Texas at Amarillo

_____

No. 07-12-00193-CV

_____

BRANDON DARBY, APPELLANT

V.

THE NEW YORK TIMES COMPANY AND JAMES McKINLEY, JR., APPELLEES

On Appeal from the 274ᵀᴴ District Court
Hays County, Texas
Trial Court No. 11-0528; Honorable Gary L. Steel, Presiding

February 26, 2014

CONCURRING AND DISSENTING OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

The question in this case is this, did the Appellees, the New York Times Company and James McKinley, Jr. (hereinafter "McKinley"), establish, as a matter of law, that they acted *without* actual malice in publishing the prosecution statement the subject of this defamation cause of action? This question touches upon an issue lawyers have wrestled with for centuries—how do you prove a negative? Much less,

how do you prove it as a matter of law? The majority finds McKinley has stumbled upon the answer to this enigma. Respectfully disagreeing, I dissent.

The facts of this case are well stated in the majority, and I will not endeavor to repeat them here, other than to define the "prosecution statement." The Appellant, Brandon Darby, filed this suit against McKinley alleging he was defamed by a publication that linked him to an alleged conspiracy to commit arson at the 2008 Republican National Convention in Minnesota. The prosecution statement appeared in an article that delved into a mysterious fire that significantly damaged the Texas Governor's mansion. After discussing police investigation efforts seeking to link the mansion fire to an Austin-area anarchist group, and their disavowing of any connection to the fire, the article states:

> Yet, federal agents accused two men from these circles of plotting to make firebombs and hurl them at police cars during the convention. An F.B.I. informant from Austin, Brandon Darby, was traveling with the group and told the authorities of the plot, which he had encouraged.

Darby contends this statement defamed him by accusing him of criminal conduct and he filed suit. McKinley filed a *traditional* motion for summary judgment stating seven independent grounds:

(1) The prosecution statement is not libelous *per se.*

(2) The prosecution statement is constitutionally protected because it does not state a verifiable fact.

(3) The prosecution statement is literally true or substantially true and Darby cannot meet his burden of establishing material falsity.

2

(4) The prosecution statement is an accurate report of allegations made against Darby and therefore protected by the substantial truth doctrine.

(5) The prosecution statement is privileged and published without actual malice.

(6) Darby is a public figure and cannot sustain his burden of establishing actual malice.

(7) Darby has failed to establish evidence of actual damages.

The trial court granted summary judgment without specifying the grounds for its ruling. Therefore, applying traditional notions of summary judgment, Darby has the burden of establishing why none of those grounds support the trial court's decision. *Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995). In other words, on appeal an order granting summary judgment must be affirmed if any one of the grounds asserted is meritorious. *Western Investments, Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005). The majority opinion methodically deals with the first six grounds, pretermitting the seventh ground as being unnecessary to the final disposition of the appeal. *See* TEX. R. APP. P. 47.1. I agree with the majority's disposition of grounds one through four, disagree with the disposition of grounds five and six, and will briefly address ground seven to support my final conclusion.

GROUNDS ONE, TWO, THREE AND FOUR

As to the first ground asserted by McKinley, the majority finds, and I agree, the prosecution statement is libelous *per se.* As to the second ground, the majority finds, and again I agree, the prosecution statement is not constitutionally protected due to its status as an unverifiable fact. As stated by the majority, "[a] reasonable person reading the allusion to Darby in the context of the article as a whole could rationally perceive it

3

as attributing criminal conduct to Darby." The publication in question dealt with the commission of specific crimes and the identity of persons engaged in the commission of those crimes, clearly verifiable facts. Addressing the third ground contending the prosecution statement is literally true or substantially true and focusing on the gist of the broadcast as viewed through the eyes of a person of ordinary intelligence, the majority finds there to be a material question of fact. Again, I agree. Finally, concerning the fourth ground, McKinley contends the prosecution statement is an accurate report of allegations made against Darby and therefore protected by the substantial truth doctrine as a third-party allegation. The Texas Supreme Court recently rejected this third-party allegation argument in *Neely v. Wilson,* No. 11-0228, 2013 Tex. LEXIS 1082 at *2 (Tex. June 28, 2013)[1] (holding that the gist of a broadcast must be true in order to avail oneself of the truth defense).

GROUNDS FIVE AND SIX

We come then to McKinley's fifth and sixth grounds for summary judgment—the absence of actual malice. Here, the majority thoroughly examines the summary judgment affidavits and ultimately concludes McKinley's summary judgment evidence disproved the existence of malice, as a matter of law because McKinley's summary judgment evidence denies knowledge of any material inaccuracies and disavows any doubt as to the accuracy of any facts. The majority then concludes these denials constitute "some evidence that the [media defendant] acted without malice and shifted

---

[1] Dissenting opinion by Justice Lehrmann appearing at *Neely v. Wilson,* No. 11-0228, 2014 Tex. LEXIS 114 (Tex. Jan. 31, 2014).

4

the burden to the defendant to produce contrary evidence."[2]  This is where my view departs from the majority.  By shifting the burden to Darby, the majority's analysis misapplies the standards of review for a traditional summary judgment.

We do not have one set of summary judgment principles for defamation claims and another set of principles for everything else.  We apply the same standards of review to a summary judgment proceeding concerning defamation as we do any other case.  *Neely,* 2013 Tex. LEXIS 1082, at *11.  In that regard, we review a trial court's grant of summary judgment *de novo, Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005), the party moving for summary judgment bears the burden of proof in all cases, *Roskey v. Tex. Health Facilities Comm'n*, 369 S.W.2d 302, 303 (Tex. 1982), and we review the summary judgment record "in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion."  C*ity of Keller v. Wilson,* 168 S.W.3d 802, 824 (Tex. 2005).

Where, as here, a defendant seeks a traditional summary judgment without further seeking a no-evidence summary judgment, the motion should be granted only if the movant disproves at least one essential element of the non-movant's cause of action, or establishes all the elements of an affirmative defense as a matter of law.  *Shaw v. Moss*, 67 S.W.3d 836, 842 (Tex. 2001).  McKinley's summary judgment relies

---

[2] In the context of a trial, the United States Supreme Court, the Texas Supreme Court, and even this Court have afforded media defendants greater protections by shifting to the claimant the burden of proving that the alleged defamatory statement is false when the statement was made by a media defendant over a matter of public concern. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986); *McIlvain v. Jacobs*, 794 S.W.2d 14 (Tex. 1990); *McAlister TV Enters. v. Blue,* No. 07-99-00458-CV, 2001 Tex. App. LEXIS 188 (Tex. App.—Amarillo 2001, no pet.)(mem. op.); *Simmons v. Ware*, 920 S.W.2d 438 (Tex. App.—Amarillo 1996, no writ).  However, the fact that we shift the burden to the claimant at trial does not mean that the burden is shifted to the non-movant in a summary judgment proceeding.  *Neely,* 2013 Tex. LEXIS 1082, at *18-19.  While Darby will have to prove actual malice at trial, at this stage of the proceeding, it is McKinley's burden to prove, as a matter of law, the absence of actual malice.

5

upon the premise that an essential element of Darby's cause of action, to-wit: actual malice, was *disproved* as a matter of law. And thus, we come face to face with the question—how do you prove a negative, particularly in the context of a motion for summary judgment where every reasonable inference and any doubts must be resolved against the movant? Relying on *Freedom Newspapers v. Cantu*, 168 S.W.3d 847, 853 (Tex. 2005), the majority finds McKinley's affidavits sufficiently negate actual malice because the prosecution statement was published without knowledge of the falsity or reckless disregard of the truth. In reaching this conclusion, the majority focuses on the question of whether Darby "encouraged" the criminal conduct in question. However, in determining the "truth" of a statement, the assessment of a broadcast's "gist" must be the critical focus. *Neely*, 2013 Tex. LEXIS 1082, at *23.

A broadcast with specific statements that err in the details but correctly convey the gist of a story is a "substantially true" statement. *Id.* On the other hand, a broadcast "can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory." *Id.*

McKinley argues that the prosecution statement is substantially true because there is undisputed summary judgment evidence that Darby "encouraged" the two militants ultimately convicted in connection with the firebombs at the Republican National Convention. While this individual statement considered in isolation may be true, the gist of the statement—i.e., that Darby participated in the commission of a criminal act—is equally controverted by Darby's summary judgment evidence. The majority as much as says so in its analysis of grounds two and three. Reviewing the

6

summary judgment record "in the light most favorable to the nonmovant" and "indulging every reasonable inference and resolving any doubts against the motion," there exists a fact question regarding a material issue.

GROUND SEVEN

The majority did not address the merits of McKinley's seventh and final ground for summary judgment—the absence of evidence establishing actual damages. Because Darby has established a cause of action for defamation *per se*, he is entitled to recover general damages without specific proof of the existence of harm. *Bentley v. Bunton*, 94 S.W.3d 561, 604 (Tex. 2002) ("Our law presumes that statements that are defamatory *per se* injure the victim's reputation and entitle him to recover general damages, including damages for loss of reputation and mental anguish."); *Exxon Mobil Corp. v. Hines,* 252 S.W.3d 496, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Accordingly, this ground too does not provide a basis upon which the trial court could have granted McKinley's motion for summary judgment.

**CONCLUSION**

While McKinley might ultimately prevail on the issue of actual malice at trial, he certainly has not done so here—at least not as a matter of law. Accordingly, I would reverse the judgment of the trial court and remand the case for further proceedings.

Patrick A. Pirtle
Justice

7

# Tab D

**Concurrence and Dissent
(Justice Campbell)**



No. 07-12-00193-CV

BRANDON DARBY, APPELLANT

V.

THE NEW YORK TIMES COMPANY AND
JAMES C. MCKINLEY, JR., APPELLEES

On Appeal from the 274th District Court
Hays County, Texas
Trial Court No. 11-0528, Honorable Gary L. Steel, Presiding

February 26, 2014

CONCURRING AND DISSENTING OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

I join in Chief Justice Quinn's opinion, with the exception of its section addressing the first ground for summary judgment asserted by appellees The New York Times Company and James C. McKinley, Jr.[1] By that ground, appellees contended that the statement referring to Brandon Darby in McKinley's article did not constitute libel *per se*. Chief Justice Quinn and Justice Pirtle find summary judgment for appellees cannot be

_____

[1] Like my colleagues, for brevity I sometimes will refer to appellees jointly as McKinley.

supported on that ground. I respectfully disagree with my colleagues, and would hold that the trial court's summary judgment is supported by that meritorious ground, as well as by the "actual malice" ground Chief Justice Quinn finds meritorious. I thus join in the judgment affirming the trial court's judgment for appellees, but dissent from my colleagues' conclusion regarding appellees' first ground for summary judgment.

There are two types of defamation: *per quod* and *per se*. *Tex. Disposal Sys. Landfill, Inc. v. Waste Mgmt. Holdings, Inc.,* 219 S.W.3d 563, 580 (Tex. App.—Austin 2007, pet. denied), citing *Moore v. Waldrop,* 166 S.W.3d 380, 384 (Tex. App.—Waco 2005, no pet.). Darby does not dispute that his suit asserted McKinley's article was defamatory *per se*.

Like the initial determination whether a statement is reasonably capable of a defamatory meaning, the determination whether a statement is defamatory *per se* is "first an inquiry for the court." *Hancock v. Variyam,* 400 S.W.3d 59, 66 (Tex. 2013). Conducting such an inquiry, the trial court "should consider the statements and determine whether, even without proof of harm, the statements were so obviously injurious to the plaintiff that, as a matter of law, the plaintiff is entitled to recover damages." *Tex. Disposal Sys.,* 219 S.W.3d at 581. "A false statement will typically be classified as defamatory per se if it . . . charges a person with the commission of a crime . . . ." *Id.*; *see Main v. Royall,* 348 S.W.3d 381, 389 (Tex. App.—Dallas 2011, no pet.) (libel *per se* includes written statements that "unambiguously charge a crime").[2]

---

[2] *See* Tex. Civ. Prac. & Rem. Code Ann. § 73.001 (West 2011) (defining libel to include a written defamation that tends to injure a person's reputation and thereby

A statement's defamatory meaning is determined "from the perspective of an ordinary reader in light of the surrounding circumstances." *Hancock,* 400 S.W.3d at 66, citing *Musser v. Smith Protective Servs., Inc.,* 723 S.W.2d 653, 655 (Tex. 1987); *see Turner v. KTRK Television, Inc.,* 38 S.W.3d 103, 114 (Tex. 2000) (allegedly defamatory publication should be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it). "The person of 'ordinary intelligence' described in [*Turner v. KTRK Television, Inc.*] is a prototype of a person who exercises care and prudence, but not omniscience, when evaluating allegedly defamatory communications." *New Times, Inc. v. Isaacks,* 146 S.W.3d 144, 157 (Tex. 2004). The court in *Turner* cited *Kapellas v. Kofman,* 1 Cal. 3d 20, 459 P.2d 912, 81 Cal. Rptr. 360 (Cal. 1969) (en banc), for the proposition that a publication should be viewed "not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural probable effect on the mind of the average reader." *Turner,* 38 S.W.3d at 114.

McKinley's article refers to Darby only in one sentence. The sentence identifies Darby by name, and describes him as an FBI informant from Austin. In the context of the article as a whole, it further tells the reader that Darby travelled to Minnesota with the anarchist group, and told the authorities of McKay and Crowder's plot to make firebombs and throw them at police cars. The sentence ends with the statement Darby had encouraged the plot. The article further tells the reader that McKay and Crowder were prosecuted, plead guilty and sentenced.

---

expose the person to public hatred, contempt, ridicule, or financial injury, or to impeach the person's honesty, integrity, virtue, or reputation).

In my opinion, an "ordinary reader" or "average reader" of the article is not going to perceive it as charging Darby with a crime. Nor can I agree that such a reader, untrained in the law, will read the article as charging Darby with criminal liability for the conduct of McKay and Crowder, especially given the information Darby was acting as an FBI informant. The trial court reasonably could have concluded the article did not, as a matter of law, constitute libel *per se*, and thus properly granted summary judgment to appellees on that asserted ground.[3]

James T. Campbell
Justice

---

[3] In his response to appellees' motion for summary judgment, Darby also asserted the article was damaging to his reputation among law enforcement authorities and among community activists. *See Hancock,* 400 S.W.3d at 66 (statement constitutes defamation *per se* if it injures a person in his office, profession or occupation) (citing *Tex. Disposal Sys.,* 219 S.W.3d at 581). Here again, in my view, the trial court properly could have concluded that an "ordinary reader" would not have so perceived the article.

# Tab E

**Court of Appeals Judgment**

FILE COPY

No. 07-12-00193-CV

| | | |
|---|---|---|
| Brandon Darby<br>  Appellant | § | From the 274th District Court<br>  of Hays County |
| | § | |
| v. | § | February 26, 2014 |
| | § | |
| The New York Times Company and<br>James C. McKinley, Jr.<br>  Appellees | § | Opinion by Chief Justice Quinn<br>  Concurring and Dissenting Opinion<br>  by Justice Campbell |
| | § | |
| | § | Concurring and Dissenting Opinion<br>  by Justice Pirtle |

## **J U D G M E N T**

Pursuant to the opinion of the Court dated February 26, 2014, it is ordered, adjudged and decreed that the judgment of the trial court be affirmed.

It is further ordered that appellant pay all costs in this behalf expended for which let execution issue.

It is further ordered that this decision be certified below for observance.

o O o

# Tab F

**Excerpts from the Clerk's Record**

# REDACTED

Withheld based on
TEX. R. CIV. P. 193.3(c)

From: NYTimes.com [emailus@ms2.lga2.nytimes.com]
Sent: Thursday, February 24, 2011 11:20 AM
To: McKinley, Jim
Subject: READER MAIL: James C. Mckinley Jr.

Email: may@texasobserver.org
URL:Anarchist Ties Seen in '08 Texas Bombing
Comments:Dear James,

I'm a fellow journalist who spent six months in 2009 tracing the convoluted story of Brandon Darby and the two men (Crowder and McKay) who made firebombs at the 2008 RNC for the show This American Life.

http://www.thisamericanlife.org/radio-archives/episode/381/turncoat

I read your article on the mansion fire with interest. But I was very surprised by this sentence:

An F.B.I informant from Austin, Brandon Darby, was traveling with the group and told the authorities of the plot, which he had encouraged.

I spoke to Brad Crowder yesterday and he told me that Brandon only learned they'd made the Molotov cocktails after the fact. My investigation uncovered that Darby may have encouraged them to prepare for a violent confrontation with a police, and I basically argued this was inappropriate for an older activist who was working for the FBI. But this is quite different

1

NYT/McKinley00151

001253

from saying he encouraged &quot;the plot&quot; to build Molotov cocktails. I'm not sure why you would make a statement like that without attributing it to someone.

Sincerely,

Michael May
Managing Editor
Texas Observer

NYT/McKinley00162

001254

REDACTED

Attorney/Client
Privileged Communication

·-·---Original Message-----
From: NYTimes.com [mailto:emailus@ms2.lga2.nytimes.com]
Sent: Thursday, March 03, 2011 10:09 AM
To: McKinley, Jim
Subject: READER MAIL: James C. Mckinley Jr.


Email: jim.walsh@startribune.com
URL:Texas Gov. mansion arson
Comments:James,

I cover federal courts and federal agencies for the Star Tribune in Minneapolis.

In your story, you state:

Yet federal agents accused two men from these circles of plotting to make firebombs and hurl
them at police cars during the convention. An F.B.I informant from Austin, Brandon Darby, was
traveling with the group and told the authorities of the plot, which he had encouraged.

I covered the this case from beginning to end, including the trial. Darby repeatedly
testified that he NEVER encouraged violence or the making of Molotov cocktails. That was a
defense of McCabe's, that Darby talked him into it. McCabe won a hung jury with his
entrapment defense, but later admitted he lied when Crowder was going to testify against him.

It has never been proven that Darby was anything more than an informant along for the ride.

NYT/McKinley00013

001256

REDACTED

---



Attorney/Client
Privileged Communication

-----Original Message-----
From: McKinley, Jim
Sent: Thursday, March 03, 2011 10:28 AM
To: 'jim.walsh@startribune.com'
Subject: Thanks

For you letter and for straightening us out on that point.  Yours. Jim

NYT/McKinley00176

001257

CAUSE NO. 11-0528

| | | |
|---|---|---|
| BRANDON DARBY, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | HAYS COUNTY, TEXAS |
| | § | |
| THE NEW YORK TIMES COMPANY, | § | |
| And JAMES C. McKINLEY, JR., | § | |
| | § | |
| Defendants. | § | 274TH JUDICIAL DISTRICT |

## AFFIDAVIT OF CHARLES STRUM

Before me, the undersigned notary public, personally appeared CHARLES

STRUM, who being duly sworn upon his oath did depose and state as follows:

1.  My name is Charles Strum. I am over the age of eighteen and am fully competent to make this affidavit. The facts stated herein are within my personal knowledge and are true and correct.

2.  I am currently a Deputy National Editor for *The New York Times*. I have been the Deputy National Editor since February 2011. Prior to that time, I was an Associate Managing Editor and, before that, obituaries editor. I have been employed by *The New York Times* since 1979.

3.  I graduated from Dickinson College in 1970.

4.  I was a Deputy National Editor in the days leading up to February 22, 2011, and I was the editor of the article at issue in this lawsuit, which was posted online on *The New York Times*'s website on February 22, 2011 and which appeared in the print edition of *The New York Times* on February 23, 2011 ("the Article").

5.  The Article concerned an alleged link between arson at the Texas Governor's Mansion and some Austin anarchists.

6.  I believed the statement "which he had encouraged," in reference to Brandon Darby, to be true at the time the article was published. I believe it to be true still.

7.  At no time prior to the date of this lawsuit did Brandon Darby or anyone asserting to be acting on his behalf contact any person at *The New York Times* to request a retraction or correction – or even to advise that he believed the Article contained an inaccurate or defamatory statement.

8.  Once *The Times* received communication that Mr. Darby considered the article to contain a defamatory statement (through the service of the lawsuit), we

000903

immediately investigated whether a clarification or correction was in order, and, if so, what it should state. On March 16, 2011, a clarification was issued.

9.  I did not (and do not) harbor any feelings of hatred, ill will, or spite toward Brandon Darby. Additionally, nothing I learned in the process of editing the story caused me to have any negative feelings towards Mr. Darby.

10. I did not entertain any serious doubts about the statement in question. If I had believed the statement "which he had encouraged," to be untrue, or had reason to believe that the statement might be untrue, I would not have allowed it to be published without further verification.

Further Affiant sayeth not.

_____
Charles Strum

SWORN TO AND SUBSCRIBED before me on the 7th day of Nov, 2011.

[Seal]

_____

Notary Public, State of New York

DAVID EDWARD McCraw
[printed name]

My Commission Expires:

Dec. 6, 2013

DAVID EDWARD McCRAW
Notary Public, State of New York
No. 02MC6033872
Qualified in Westchester County
Commission Expires Dec. 6, 2013

2

000904

CAUSE NO. 11-0528

| | | |
|---|---|---|
| BRANDON DARBY, | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | HAYS COUNTY, TEXAS |
| | § | |
| THE NEW YORK TIMES COMPANY, | § | |
| And JAMES C. McKINLEY, JR., | § | |
| | § | |
| Defendants. | § | 274TH JUDICIAL DISTRICT |

## AFFIDAVIT OF JAMES C. MCKINLEY

Before me, the undersigned notary public, personally appeared James C. McKinley, who being duly sworn upon his oath did depose and state as follows:

1. My name is James C. McKinley Jr., I am over the age of eighteen and am fully competent to make this affidavit. The facts stated herein are within my personal knowledge and are true and correct.

2. I am currently a writer for the arts section of *The New York Times*. I have been employed by *The New York Times* since 1986 and have been a reporter for *The New York Times* since 1989. I was the Houston Bureau Chief from 2008 until June 2011. I am now based in New York City covering culture and popular music for *The New York Times*.

3. Prior to that time, I was a reporter in Ithaca, N.Y., with WTKO from 1981-1984 and with Q104 in 1985. I graduated from Cornell University in 1984.

4. I am the author of the article at issue in this lawsuit, which was posted online on *The New York* Times's website on February 22, 2011 and which appeared in the print edition of *The New York Times* on February 23, 2011 ("the Article").

5. The article concerned an alleged link between arson at the Texas Governor's Mansion and some Austin anarchists. I had previously done a story on the mansion fire, but had not done any articles (or research) on the RNC or the Texas Two, or on Brandon Darby.

6. In doing research for the Article, I contacted a number of persons familiar with the story and with the Texas Two. Among others, I interviewed Steven McCraw, Director of the Texas Department of Public Safety; Tom Vinger, spokesperson for the Texas Department of Public Safety; Jeffrey DeGree, David McKay's attorney in his criminal case; Bradley Crowder; and, Scott Crow, an Austin activist who was very familiar with David McKay, Bradley Crowder, and Brandon Darby.

000767

Additionally, Toby Lyles, at *The Times's* research desk, provided me with background research for the article.

7. I also attempted to get in touch with Brandon Darby to interview him regarding the article, but was unsuccessful in ever reaching him.

8. When I spoke with Jeffrey DeGree in the course of my research, Mr. DeGree told me that Brandon Darby had encouraged David McKay and Bradley Crowder's behavior and that was the basis for the statement at issue. This was also supported by Scott Crow, who told me that Brandon Darby had encouraged David McKay and Bradley Crowder to take actions beyond peaceful demonstrations during the protest at the 2008 RNC.

9. My inclusion of the statement in the article at issue was based on my then-recent conversations with Jeffrey DeGree and Scott Crow, where they discussed Brandon Darby's involvement with David McKay and Bradley Crowder leading up to and during the 2008 RNC and Brandon Darby's role as an undercover informant.

10. I believed the statement to be true at the time the article was published.

11. At no time prior to the date of this lawsuit did Plaintiff Brandon Darby (or anyone asserting to be acting on his behalf) contact me to advise me that he believed that the Article was defamatory or contained inaccurate information.

12. At no time prior to the date of this lawsuit did Brandon Darby (or anyone asserting to be acting on his behalf) ever contact me to request that I publish a correction to, or issue a retraction of, the Article.

13. At no time prior to the date of this lawsuit did Brandon Darby or anyone asserting to be acting on his behalf contact any other person at *The New York Times* to request a retraction or correction – or even to advise that he believed the Article contained an inaccurate or defamatory statement.

14. On or around March 3, 2011, I received an email from a Jim Walsh, who stated he was a reporter at the Minnesota Star-Tribune. At that time, I was very busy with other stories and did not read most of my emails, which sometimes numbered as many as a hundred on any given day. But, I did briefly see Mr. Walsh's email and, out of professional courtesy, responded immediately to thank him for contacting me about the story. In the email, Mr. Walsh advised that he had covered the trial of McKay and gave a brief outline of what he saw at the McKay (repeatedly incorrectly spelled as "McCabe" in his email) trial. He did not advise me that he believed a correction to my story was in order. Instead, his email reported on details about the trial testimony concerning Darby's influence on McKay and Crowder. I had not written about the trial in the Article but thought his points might be worth researching if I covered the anarchists or the mansion bombing in the future. Thus, I simply thanked him for his response and for setting out the facts about what the trial showed about McKay's claim of entrapment.

2

000768

15. Mr. Walsh's email provided no notice that Mr. Darby or anyone else was requesting a retraction, correction, or clarification. Mr. Walsh did not say that he thought there should be a correction or clarification.

16. Once we received communication that Mr. Darby considered the article to contain a defamatory statement (through the service of the lawsuit), we immediately investigated whether a clarification or correction was in order, and, if so, what it should state. On March 16, 2011, a clarification was issued.

17. I did not (and do not) harbor any feelings of hatred, ill will or spite toward Brandon Darby. Prior to writing the article in question, I had never heard of Brandon Darby and knew nothing about him. Additionally, nothing I learned in the process of reporting the story caused me to have any negative feelings towards Mr. Darby.

Further Affiant sayeth not.

_James C. McKinley_

SWORN TO AND SUBSCRIBED before me on the ___4__ day of _11_, 2011.

[Seal]

Notary Public, State of New York

_David Edward McCraw_
[printed name]

My Commission Expires:

Dec 6, 2013

DAVID EDWARD McCRAW
Notary Public, State of New York
No. 02MC6033872
Qualified in Westchester County
Commission Expires Dec. 6, 2013

000769



**The New York Times** Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



February 22, 2011

# Anarchist Ties Seen in '08 Bombing of Texas Governor's Mansion

By JAMES C. McKINLEY Jr.

HOUSTON — It has been two and a half years since an arsonist tossed a firebomb into the governor's mansion in Austin and slipped into the night, but the Texas Rangers say they are finally closing in on the person responsible.

Steven C. McCraw, the head of the Department of Public Safety, said on Friday that investigators had linked the arsonist to a group of anarchists known as Austin Affinity. He said two members of the same group had pleaded guilty to making and possessing gasoline bombs during the 2008 Republican National Convention in St. Paul, Minn., three months later.

But one of the men who pleaded guilty in Minnesota said the anarchist group that the rangers are focusing on did not exist. The man, Bradley Crowder, said it was an ad hoc collection of young anarchists who had pooled resources to hire a van for the trip north.

"It was like an activist car pool," said Mr. Crowder, who is 25 and served two years in prison for his role in making eight gasoline bombs in wine bottles, which were never used.

The rangers, however, see things differently. A break in the case came several months ago, they said, when a ranger who was helping review thousands of hours of surveillance tapes from 11 cameras around the Capitol and mansion spotted something strange.

Four days before the fire, three men in a white Jeep Cherokee stopped in front of the mansion about 2 a.m. and a person in the back seat snapped photos of the building. The ranger thought the men might have been casing the place.

But the video camera did not capture the license plate number. So the police began a painstaking hunt through 3,000 similar Jeeps in Texas, eliminating them one by one, Mr. McCraw said. "Every one of them had to be looked at," he said, "and it had to be done in a way that you are not letting the person know."

"It was good, old-fashioned police work," he said. "Sometimes it's the minutiae and the tedious that links you to something."

000424

Months later, investigators found the car and interviewed the owner, who turned out to have a connection to people who were part of the Austin Affinity anarchist group, Mr. McCraw said. The owner also identified the two passengers, one of whom was near the mansion at the time of the fire.

All three men in the Jeep have been questioned in connection with the arson and are considered suspects, though they have denied involvement, the police said.

Mr. McCraw said the arsonist is believed to be a fourth person, whose shadowy figure can be seen in video taken by another camera the night of the fire. Released last week, the video shows the figure tossing a blazing gasoline bomb onto the porch of the mansion, then sprinting away. A third camera on an adjacent street captured a grainy image of his face. The police enhanced the picture electronically and released a sketch based on it.

The fire destroyed much of the historic two-story brick home across from the Texas Capitol where governors have lived since 1856. Renovations continue, but Gov. Rick Perry has been moved to other lodgings. For two years, the search for the culprit has been a priority for the rangers and the state police, and the lack of progress had been an embarrassment for the department.

In recent days, rangers in their trademark cowboy hats have fanned out across Austin and penetrated the city's counterculture hangouts, where the fashion accessories tend toward piercings and tattoos, the music is alternative rock and globalization is a dirty word. Toting pictures of suspects and offering a $50,000 reward for leads, the lawmen have questioned several self-described anarchists about the Affinity group and the identity of the bomber.

Not surprisingly, the investigation has been met with some suspicion. Many self-described anarchists in Austin do not advocate attacking all forms of government, a concept they regard as dated. Their vision of anarchism holds that people should take action themselves to fix social problems. Local anarchists run a recycling center, a food-distribution program, a bookstore, a cafe, and even a thrift shop.

Yet federal agents accused two men from these circles of plotting to make firebombs and hurl them at police cars during the convention. An F.B.I informant from Austin, Brandon Darby, was traveling with the group and told the authorities of the plot, which he had encouraged.

David Guy McKay, 24, pleaded guilty to firearms violations in the case and was sentenced to four years. Mr. Crowder, 25, received a two-year sentence after pleading guilty to aiding and abetting Mr. McKay in the possession of an illegal firearm, which is how the law classifies a gasoline bomb.

000425

Mr. Crowder, who is living and working in Austin, said he had nothing to do with the mansion fire. He called the theory that there was an anarchist organization behind both crimes "categorical nonsense." "It never existed," he said. "It's not a real entity."

Scott Crow, an Austin anarchist who knows Mr. Crowder and Mr. McKay but did not go to St. Paul, said the state police were "grasping at straws." He said the group that had traveled to Minnesota was never a coherent organization and split up on returning.

"Anarchist groups, you know, they have no leader," Mr. Crow said.

000426

**The New York Times** Reprints

This copy is for your personal, noncommercial use only. You can order presentation-ready copies for distribution to your colleagues, clients or customers here or use the "Reprints" tool that appears next to any article. Visit www.nytreprints.com for samples and additional information. Order a reprint of this article now.



February 22, 2011

# Anarchist Ties Seen in '08 Bombing of Texas Governor's Mansion

By JAMES C. McKINLEY Jr.

**Correction Appended**

HOUSTON — It has been two and a half years since an arsonist tossed a firebomb into the governor's mansion in Austin and slipped into the night, but the Texas Rangers say they are finally closing in on the person responsible.

Steven C. McCraw, the head of the Department of Public Safety, said on Friday that investigators had linked the arsonist to a group of anarchists known as Austin Affinity. He said two members of the same group had pleaded guilty to making and possessing gasoline bombs during the 2008 Republican National Convention in St. Paul, Minn., three months later.

But one of the men who pleaded guilty in Minnesota said the anarchist group that the rangers are focusing on did not exist. The man, Bradley Crowder, said it was an ad hoc collection of young anarchists who had pooled resources to hire a van for the trip north.

"It was like an activist car pool," said Mr. Crowder, who is 25 and served two years in prison for his role in making eight gasoline bombs in wine bottles, which were never used.

The rangers, however, see things differently. A break in the case came several months ago, they said, when a ranger who was helping review thousands of hours of surveillance tapes from 11 cameras around the Capitol and mansion spotted something strange.

Four days before the fire, three men in a white Jeep Cherokee stopped in front of the mansion about 2 a.m. and a person in the back seat snapped photos of the building. The ranger thought the men might have been casing the place.

But the video camera did not capture the license plate number. So the police began a painstaking hunt through 3,000 similar Jeeps in Texas, eliminating them one by one, Mr.

McCraw said. "Every one of them had to be looked at," he said, "and it had to be done in a way that you are not letting the person know."

"It was good, old-fashioned police work," he said. "Sometimes it's the minutiae and the tedious that links you to something."

Months later, investigators found the car and interviewed the owner, who turned out to have a connection to people who were part of the Austin Affinity anarchist group, Mr. McCraw said. The owner also identified the two passengers, one of whom was near the mansion at the time of the fire.

All three men in the Jeep have been questioned in connection with the arson and are considered suspects, though they have denied involvement, the police said.

Mr. McCraw said the arsonist is believed to be a fourth person, whose shadowy figure can be seen in video taken by another camera the night of the fire. Released last week, the video shows the figure tossing a blazing gasoline bomb onto the porch of the mansion, then sprinting away. A third camera on an adjacent street captured a grainy image of his face. The police enhanced the picture electronically and released a sketch based on it.

The fire destroyed much of the historic two-story brick home across from the Texas Capitol where governors have lived since 1856. Renovations continue, but Gov. Rick Perry has been moved to other lodgings. For two years, the search for the culprit has been a priority for the rangers and the state police, and the lack of progress had been an embarrassment for the department.

In recent days, rangers in their trademark cowboy hats have fanned out across Austin and penetrated the city's counterculture hangouts, where the fashion accessories tend toward piercings and tattoos, the music is alternative rock and globalization is a dirty word. Toting pictures of suspects and offering a $50,000 reward for leads, the lawmen have questioned several self-described anarchists about the Affinity group and the identity of the bomber.

Not surprisingly, the investigation has been met with some suspicion. Many self-described anarchists in Austin do not advocate attacking all forms of government, a concept they regard as dated. Their vision of anarchism holds that people should take action themselves to fix social problems. Local anarchists run a recycling center, a food-distribution program, a bookstore, a cafe, and even a thrift shop.

Yet federal agents accused two men from these circles of plotting to make firebombs and hurl them at police cars during the convention. An F.B.I informant from Austin, Brandon

000582

Darby, was traveling with the group and told the authorities of the plot, which he had encouraged.

David Guy McKay, 24, pleaded guilty to firearms violations in the case and was sentenced to four years. Mr. Crowder, 25, received a two-year sentence after pleading guilty to aiding and abetting Mr. McKay in the possession of an illegal firearm, which is how the law classifies a gasoline bomb.

Mr. Crowder, who is living and working in Austin, said he had nothing to do with the mansion fire. He called the theory that there was an anarchist organization behind both crimes "categorical nonsense." "It never existed," he said. "It's not a real entity."

Scott Crow, an Austin anarchist who knows Mr. Crowder and Mr. McKay but did not go to St. Paul, said the state police were "grasping at straws." He said the group that had traveled to Minnesota was never a coherent organization and split up on returning.

"Anarchist groups, you know, they have no leader," Mr. Crow said.

*Correction: March 16, 2011*

*An article on Feb. 23 about developments in the investigation of a 2008 arson fire at the Texas governor's mansion misstated the role played by an F.B.I. informer, Brandon Darby, in an earlier case in Minnesota. In that case, two men were accused of making and possessing gasoline bombs at the Republican National Convention in St. Paul in 2008. Both men eventually pleaded guilty. Initially, however, one of them implicated Mr. Darby, saying Mr. Darby had persuaded him to make the bombs. He later conceded that Mr. Darby had not entrapped him.*

From:    jim mckinley [james.c.mckinley@gmail.com]
Sent:    Friday, February 18, 2011 2:41 PM
To:      Lyles, Toby
Subject:      Re: McKay and Crowder

Great. This is great.
Did you find any listings for Bradley Crowder or Scott Crow in Austin?
Jim


On Fri, Feb 18, 2011 at 12:34 PM, Lyles, Toby <tobylyles@nytimes.com> wrote:


The name of the group is the Austin Affinity Group.

1.      Trial of GOP convention protester may hinge on informant: Activist accused
of making Molotov cocktails for RNC
Pioneer Press (St. Paul, Minnesota), January 25, 2009 Sunday, STATE AND REGIONAL
NEWS, 1418 words, David Hanners, Pioneer Press, St. Paul, Minn.

2.        In wake of Molotov case, radicals say peace is their way
Austin American-Statesman (Texas), March 1, 2009 Sunday, MAIN; Pg. A01, 1743 words,
Steven Kreytak AMERICAN-STATESMAN STAFF
3.      TEXAS MAN SENTENCED ON FIREARMS CHARGES CONNECTED TO THE REPUBLICAN NATIONAL
CONVENTION
Justice Department Documents and Publications, May 21, 2009, JUSTICE DEPARTMENT
PRESS RELEASES, 892 words



———


Pioneer Press (St. Paul, Minnesota)

Distributed by McClatchy-Tribune Business News

January 25, 2009 Sunday

Trial of GOP convention protester may hinge on informant: Activist accused of making
Molotov cocktails for RNC

BYLINE: David Hanners, Pioneer Press, St. Paul, Minn.

SECTION: STATE AND REGIONAL NEWS

LENGTH: 1418 words



Jan. 25--The government and defense agree on at least this much: David Guy McKay is
23; he's from Midland, Texas; and last summer, he came to St. Paul to protest at the
Republican National Convention.


Beyond that, there is plenty of dispute about his actions and motives. In a
courtroom in Minneapolis on Monday, federal prosecutors will try to prove McKay
built eight Molotov cocktails and told a fellow activist -- who was working

NYT/McKinley00066
001231

undercover for the FBI -- that he might use them against police.

His defense attorney will try to show McKay had no intention of hurting anyone; McKay was arrested just three hours before he planned to board a flight to Texas, and the Molotov cocktails sat unused in the basement of the house he'd been staying in.

The defense might also try to convince jurors that were it not for the informant's influence, the firebombs would never have been assembled.

"I'm pretty confident that we will prove that," said Michael McKay, the defendant's father. "We hope to prove that this has been an entrapment case. This is somebody who had preplanned to have somebody arrested. Somebody was going to get arrested, and unfortunately, it was my son and Brad Crowder."

McKay and Bradley Neil Crowder, also 23 and from Texas, have been dubbed "the Texas 2" by activists concerned about their arrests. Their supporters have issued regular statements and have set up a web site in the pair's defense, asserting the two did nothing wrong.

Those claims

lost a bit of weight earlier this month when Crowder stood before Chief U.S. District Judge Michael J. Davis and pleaded guilty of possessing the Molotov cocktails. Under questioning by a prosecutor, his lawyer and Davis, Crowder said he and McKay, alone, built the devices and nobody influenced their decision to do so.

It isn't certain Crowder will testify against McKay, and the U.S. attorney's office declined to comment for this article. While a promise to provide testimony or aid in other prosecutions is often a part of plea bargains, the six-page plea agreement Crowder signed Jan. 8 lacks such a clause.

The elder McKay said he expects his son to testify in his own defense.

"Absolutely, because he has nothing to hide," Michael McKay said.

Jeffrey DeGree, the attorney representing McKay, did not return a call for comment.

David McKay, who was a graphic designer in Austin, Texas, was indicted with Crowder in September, accused of making and possessing an unregistered firearm, which is how federal law classifies a Molotov cocktail. They were also charged with possessing a

Page 5

NYT/McKinley00067

001232

firearm with no serial number.

The two were among a group of activists who lived in Austin and traveled to St. Paul to protest at the Republican National Convention, which began Sept. 1. The convention drew thousands of activists from across the country, and while most were nonviolent, some violence broke out, and more than 800 people were arrested.

The people from Austin, who had rented a van and a U-Haul trailer, were, by most accounts, part of a loose-knit group of social-justice activists, community organizers and others. In court documents, the FBI has said it considered Crowder, who worked at a sandwich shop, a leader of the group, but the agency hasn't provided details on what leadership activities, if any, he engaged in.

The trailer the van was pulling contained 35 riot shields that Crowder and McKay had allegedly made out of stolen orange plastic highway safety barrels.

What McKay and Crowder didn't know was that the FBI had infiltrated the group. Brandon Darby, of Austin, an activist who had gained attention for his relief work in New Orleans following Hurricane Katrina, had agreed to keep the FBI informed of the group's plans.

Darby had told the FBI about the trailer. Police found it parked in a St. Paul alley Aug. 31 and seized it without a warrant.

The FBI claims McKay and Crowder wanted revenge for the seizure, so they built Molotov cocktails. That evening, members of the group went to the Wal-Mart on University Avenue and bought materials to make the devices: a two-gallon gas can, motor oil, rubber bands and tampons. Tampons are commonly used as fuses in Molotov cocktails, and rubber bands are used to affix the tampons to the neck of bottles, according to an affidavit by FBI Special Agent Christopher Langert.

McKay and Crowder allegedly assembled the Molotov cocktails late Aug. 31 and early Sept. 1. They worked in the basement of an apartment building in the 200 block of Dayton Avenue, where they had been staying; the building is six-tenths of a mile from the Xcel Energy Center, where the convention was held.

Darby told officials about the Molotov cocktails and their location Sept. 1, according to Langert's affidavit, although St. Paul police didn't apply for a warrant to search the house until two days later.

McKay and Crowder took part in a massive and sometimes violent street demonstration later Sept. 1, the convention's opening day. Both were taken into custody and charged with disorderly conduct. McKay was processed quickly and released from custody, but Crowder was not.

NYT/McKinley00068

001233

McKay was incensed that police hadn't released Crowder, and that's why he started thinking about using the Molotov cocktails, the FBI claims.

During a conversation Sept. 2, McKay allegedly told Darby that he and Crowder had assembled the Molotov cocktails (although details of the assembly differ between this conversation and the one the day before, according to Langert's affidavit) and that the devices "would be lit and thrown at vehicles parked in a parking lot," Langert wrote.

The parking lot was used by law enforcement agencies and contained marked and unmarked cars.

"What if there's a cop sleeping in the car?" Darby asked McKay, according to the affidavit.

"He'll wake up," McKay allegedly replied.

"What if he doesn't?"

At one point, according to the affidavit, McKay said: "It's worth it if an officer gets burned or maimed."

At 3:43 a.m. Sept. 3, St. Paul police applied for a search warrant for the Dayton Avenue apartment building, and they raided the place about 5 a.m. Paperwork filed after the search said officers found eight "Molotov cocktail devices in wine bottles," an empty gas can, a backpack, a lighter, bolt cutters and one "Notebook w/manifesto -- yellow."

Langert says in his affidavit that he questioned McKay and, after waiving his right to remain silent, McKay told him he and Crowder had assembled the Molotov cocktails.

The government's case is relatively straightforward: Did McKay make and then possess the Molotov cocktails?

DeGree has talked little about his defense strategy, but it has been clear from McKay's father and other Austin-area activists that they hope the trial will focus not on McKay but on Darby.

"There's a potential provocateur and informant working for the FBI, and he could've

NYT/McKinley00069

001234

stopped them along the way," said Scott Crow, an activist who lives in Austin and worked with Darby in New Orleans.

When the Pioneer Press first disclosed Darby's involvement in the case in October, Crow and others called the articles lies, staunchly defended Darby and said he would never work as an informant.

But when Darby acknowledged his role in an open letter to friends Dec. 31, the activist community quickly turned on him. At the web site freethetexas2.com <http://freethetexas2.com/> , a group known as the Austin People's Legal Collective placed a notice looking for anyone "willing to testify as to their personal knowledge of Brandon Darby suggesting, encouraging or engaging in activities involving explosives, weapons, property destruction or violence."

Citing the coming trial, Darby declined to discuss details of the case. "I look forward to getting on the stand, and I look forward to speaking and saying what I know," he said.

In an earlier interview, he defended his activities, saying he helped stop violence and felt he had done the morally correct thing.

The elder McKay doesn't buy that, though, and says his son is innocent.

"Even though Mr. Darby had taunted him and repeatedly asked him to use those devices, my son was never going to use those devices."

David Hanners can be reached at 612-338-6516.

To see more of the Pioneer Press, or to subscribe to the newspaper, go to http://www.twincities.com <http://www.twincities.com/> . Copyright (c) 2009, Pioneer Press, St. Paul, Minn. Distributed by McClatchy-Tribune Information Services. For reprints, email tmsreprints@permissionsgroup.com, call 800-374-7985 or 847-635-6550, send a fax to 847-635-6968, or write to The Permissions Group Inc., 1247 Milwaukee Ave., Suite 303, Glenview, IL 60025, USA.

———

Austin American-Statesman (Texas)

March 1, 2009 Sunday

NYT/McKinley00070
001235

Final Edition

In wake of Molotov case, radicals say peace is their way

BYLINE: Steven Kreytak AMERICAN-STATESMAN STAFF

SECTION: MAIN; Pg. A01

LENGTH: 1743 words

As eight Austin activists made the 1,200-mile drive to the Republican National Convention in St. Paul, Minn., in a rented van last summer, they talked about things like food, politics and protests, said 21-year-old Gabby Hicks, who was part of the group.

They also talked about ways, when protests seemed to be growing heated, to defuse the situation - by sitting down, for example, Hicks said. "There was no really serious conversation about destruction or hurting people or anything that I would view as violence. We were all under the impression that this was nonviolent civil disobedience."

But the van was hauling 34 homemade riot shields. And during the four-day convention in St. Paul, two members of the Austin contingent - Bradley Crowder and David McKay - were arrested, accused of building a cache of homemade firebombs.

Authorities say Crowder and McKay intended to use them on police vehicles and perhaps even police officers.

Media outlets around the nation reported on the charges that the two men manufactured and possessed Molotov cocktails.

McKay is scheduled for a retrial March 16 after a mistrial was declared in Minneapolis on Feb. 3.

Crowder pleaded guilty in January.

Reports also focused on how the men were part of the Austin Affinity Group, the name the FBI gave to the activists who went to St. Paul in the rented van.

In recent weeks, some self-described radical Austin activists, some of whom were in Minnesota for the convention, have spoken up in defense of the pair, who are both 23. They call McKay and Crowder naive young men who were talked into making the Molotov cocktails by Brandon Darby, 32, a more seasoned activist secretly working with the FBI. McKay used that defense at trial; Darby denied pushing the men to make the improvised bombs.

Page 9

NYT/McKinley00071

001236

The Austin activists also say their community is a nonviolent collection of people who dedicate themselves to changing a variety of societal ills and who think nonviolence is the best way to make those changes.

They protest corporations and governments, saying that those institutions impose their will without the consent of the people affected.

The same activists say they devote much of their lives working to find grass-roots solutions to community problems, such as creating community gardens to address hunger and promoting the use of bicycles as nonpolluting and healthy transportation.

They rally around a common set of efforts such as the Inside Books Project, which sends books to prison inmates, and Treasure City Thrift, a collectively owned and volunteer-run East 12th Street secondhand store that uses its profits to support other community organizations.

"We all share a vision of a society that can be different than the one we are currently living in," said Lisa Fithian, 47. "It's a society rooted in cooperation and not competition, where we are not driven by profit motive and greed. We are committed to building structures that fit people's needs, where we all have power."

McKay and Crowder grew up in Midland but were living in Austin last year. The larger group of area activists they mixed with is difficult to define and quantify - some of them say they number in the hundreds; others, the thousands. Some say that they share goals and work on projects with more mainstream politically active residents - such as minimizing environmental damage caused by development - but that they are different because they are willing to be arrested to make a statement and generally have little faith in government to solve problems.

They refer to themselves as a community or as part of a movement, but there is no formal structure. Some say they moved to Austin from other places because of the robust political scene here. The University of Texas keeps a steady flow of disaffected students feeding the ranks.

"What I am interested in is people realizing their own power," activist Scott Crow said, "and doing things block by block and neighborhood by neighborhood."

Crow, 42, said he moved to Austin from Dallas this decade to be among more politically like-minded people. He co-founded an activist training camp and has organized and participated in protests against things such as the Iraq war and in favor of animal rights.

NYT/McKinley00072

001237

He earns a living working at Ecology Action, a collective-run recycling center downtown.

Fithian has no permanent job but says she stays busy, whether it's organizing demonstrations against free-trade agreements in places such as Cancun or rallying janitors on strike in Houston or doing environmental work on behalf of Austin's Save Our Springs Alliance. Fithian said she lives frugally and sometimes is paid by environmental groups, for example, for her organizing support for specific issues.

"I have a passion for fairness and justice," she said. "My work is transformational work. It's helping people accessing their power."

Hicks, 21, pursues various causes as well, whether it's volunteering at Resistencia Bookstore in south Austin, an activist meeting center, or working for equal rights or immigrants' rights.

"I feel like not everyone in the radical community specifically protests. They might do other things like volunteering," she said.

Texas Civil Rights Project Director Jim Harrington, who has represented some frequent protesters in court, said the radical contingent of Austin's activist community is "very committed to social change and really works at the grass roots of it."

"They have a different political philosophy. They are more progressive with some socialist ideas about limited capitalism economic limitation," he said. "They do all this at considerable personal sacrifice."

Fred Burton, a former federal agent who is a vice president at the Austin-based global intelligence company Stratfor, said he thinks the Austin activists, given that they took shields with them to St. Paul and were caught with Molotov cocktails, "were intent on causing anarchist kind of disruptions."

Burton said that for a national event such as the Republican convention, federal authorities would have gathered intelligence on radical groups that were planning to attend.

The activists themselves and federal authorities often refer to small cells of activists who plan and travel together as "affinity groups," he said.

Such groups, Burton said, often communicate on public web sites or in e-mail blasts that are easy for authorities to intercept. In the case of the Austin activists, the FBI's decision to have Darby attend their meetings probably meant it suspected they

Page 11

NYT/McKinley0073

001238

were intent on violence, he said.

"Do I think that the activist community here are every day sitting around thinking about ways to plot against the government?" Burton said. "Probably not. But in this specific case, the evidence appears to be that they did."

FBI officials and federal prosecutors declined to comment for this story.

Assistant Police Chief David Carter, chief of staff for the Austin Police Department, said the department does not track local activists based on their political beliefs and does not want to interfere with groups' or citizens' free speech rights. "However, if we suspect any organization being involved in any criminal activity, we'll certainly investigate that," Carter said.

On a recent afternoon at Treasure City Thrift, a meeting place for local radical activists, area residents rummaged through boxes of clothing out front labeled "free," and members of the Yellow Bike Project, which is sharing the space, milled around the parking lot, fixing bicycles. Inside, next to the used clothes, were fliers for a variety of causes, including raising money to free former Black Panthers from a Louisiana prison, and a business card for an online store set up to raise money for Palestinians.

It was at Treasure City that Crow met Crowder, who worked at a ThunderCloud Subs shop and liked to talk about politics.

"He's a bookworm," Crow said. "We would talk about how to build sustainable communities."

Fithian also met Crowder at Treasure City and had similar recollections. "He knew I was a trainer, and he tried to just learn from me," she said.

Fithian said she regularly travels ahead of big events to plan the best ways to bring together disparate groups and to cause the biggest disruption.

She went to St. Paul for the first time in September 2007 to organize demonstrations for the 2008 convention, she said.

In early 2008, Hicks said, handfuls of local activists thinking of going to St. Paul to protest at the convention began meeting in homes, at MonkeyWrench Books and at Treasure City. The group was later dubbed the Austin Affinity Group by the FBI.

Page 12

NYT/McKinley00074

001239

Members of the RNC Welcoming Committee - a self-described anarchist and anti-authoritarian organizing group created to disrupt the convention - paid a visit to Austin and helped the Austin activists plan for the protests, Hicks said.

Criminal conspiracy to riot charges are pending against eight members of the RNC welcoming Committee, according to news reports.

At these gatherings, Crowder and McKay never talked about violence and instead were focused on coordinating logistics - funding, housing and transportation to St. Paul, Hicks said.

The day after the van arrived in St. Paul, authorities, working on a tip from Darby, found the trailer and seized 34 shields, helmets and batons that "looked like cut-off shovel handles," court documents say.

Prosecutors have said that McKay and Crowder built the firebombs in Minnesota because they were angry that police officers had seized the trailer.

In a conversation recorded by the FBI, McKay told the FBI informant later identified as Darby that he planned to throw the explosives at a parking lot used as a staging area for police and federal agents, an FBI affidavit said.

"What if there's a cop sleeping in the car?" Darby asked McKay, according to the affidavit.

"He'll wake up," McKay replied, according to the affidavit.

McKay also said, "It's worth it if an officer gets burned or maimed," the affidavit said.

On the third day of the convention, authorities raided an apartment building where McKay and Crowder were staying and seized eight assembled homemade firebombs in the basement.

Hicks said building bombs is not indicative of the goals of Austin's radical community, where "there's a strong belief in humanity."

"The idea is that, if you put your effort into the community and the building of personal relationships within community," she said, "that makes a community that does not need a government."

Page 13

NYT/McKinley00075

001240

skreytak@statesman.com; 912-2946

————

Justice Department Documents and Publications

May 21, 2009

TEXAS MAN SENTENCED ON FIREARMS CHARGES CONNECTED TO THE REPUBLICAN NATIONAL CONVENTION

SECTION: JUSTICE DEPARTMENT PRESS RELEASES

LENGTH: 892 words

THURSDAY, MAY 21, 2009

United States Attorney Frank J. Magill

District of Minnesota

TEXAS MAN SENTENCED ON FIREARMS CHARGES CONNECTED TO THE REPUBLICAN NATIONAL CONVENTION

MINNESOTA - A 23-year-old man from Austin, Texas, who was connected to a group that planned to disrupt the Republican National Convention in September 2008, was sentenced today in federal court on three firearms charges.

On May 21 in Minneapolis, U.S. District Court Chief Judge Michael Davis sentenced David Guy McKay to 48 months in prison and three years of supervised release on one count of possession of an unregistered firearm, one count of illegal manufacture of a firearm and one count of possession of a firearm with no serial number. McKay pleaded guilty on March 17.

Today's sentence included a finding by Judge Davis that McKay obstructed justice at his January trial by falsely accusing a government informant, Brandon Darby, of inducing him to manufacture the Molotov cocktails.

Judge Davis told McKay that while it was acceptable for people to peacefully protest, McKay's activities took him down a different path, one of anarchy. "I saw you on the videotape," Judge Davis added, referring to evidence shown of McKay during a recording of a violent protest. "You were leading the charge. You and Crowder were coming up here (to Minnesota) to do anarchy against the system."

NYT/McKinley00076

"This milestone today is another result of two years of diligent preparation for the 2008 Republican National Convention," said Ralph Boelter, Special Agent in Charge of the FBI's Minneapolis Field Office. "The successful outcome in this case is due in no small part to our strong working relationships with partner agencies like U.S. Secret Service, St. Paul Police Department, Ramsey County Sheriff's Office and the ATF."

McKay was indicted on Sept. 22, 2008, along with a second defendant, Bradley Neal Crowder, 24, Austin, Texas. Crowder was sentenced to 24 months in prison last week on one count of possession of an unregistered firearm. McKay was tried for the crimes in January, but the jury failed to reach a unanimous verdict.

During McKay's guilty plea hearing, he admitted that from Aug. 31 through Sept. 3, 2008, he knowingly possessed firearms, namely destructive devices, not registered to anyone in the National Firearms Registration and Transfer Record. McKay also admitted that he made the devices, as well as knowingly received and possessed destructive devices not identified by serial number as required by law.

Following a FBI Joint Terrorism Task Force investigation, McKay was arrested by the St. Paul Police Department during the execution of a search warrant on Sept. 3 at a residence on Dayton Avenue. Police found eight assembled Molotov cocktails in the basement. They consisted of bottles filled with gasoline with an attached wick made from tampons.

According to trial testimony, the FBI in Texas began investigating the group, labeled by law enforcement as the Austin Affinity Group, in February 2008. McKay and Crowder were members of the group.

McKay admitted that on Aug. 28, 2008, he, Crowder and other members of the Austin Affinity Group traveled from Austin, Texas, to Minnesota. The group brought a rental trailer with them that contained 35 riot shields, made from stolen traffic barrels. The intended use of the shields was to help demonstrators block streets near the Xcel Energy Center in order to prevent convention delegates from safely reaching the convention. St. Paul Police seized these shields on Aug. 31.

According to trial testimony, McKay and Crowder, angered by the loss of the shields, purchased supplies for constructing Molotov cocktails at a St. Paul Wal-Mart on Aug. 31, including a gas can, motor oil and tampons. They also purchased gasoline at a gas station. They then manufactured the eight Molotov cocktails at an apartment on Dayton Avenue where they were staying.

Law enforcement learned through an informant that McKay and Crowder had manufactured the Molotov cocktails.

NYT/McKinley00077

001242

During a conversation overheard by law enforcement through electronic surveillance on Sept. 2, McKay told an informant that he intended to throw the Molotov cocktails at police vehicles parked in a lot near the Dayton Avenue apartment. The parking lot was used as a checkpoint area for vehicles entering the security perimeter around the convention site. It was visibly patrolled by the U.S. Secret Service, various police agencies and the military.

During the execution of a search warrant by the St. Paul Police Department at the Dayton Avenue residence where McKay was staying when he was arrested, officers seized a variety of items, including gas masks, slingshots, helmets and knee pads. Under the kitchen sink, officers discovered a two-gallon gasoline container identical to the one purchased by McKay at the Wal-Mart on Aug. 31. In the basement of the residence, officers found eight assembled Molotov cocktails.

This case was the result of an investigation by the FBI Joint Terrorism Task Force, which includes in addition to the FBI, the Bureau of Alcohol, Tobacco, Firearms and Explosives, the Ramsey County Sheriff's Office, the Secret Service and the St. Paul Police Department. It was prosecuted by Assistant U.S. Attorneys Jeffrey S. Paulsen and W. Anders Folk.

CONTACT: DAVID ANDERSON

PHONE: (612) 664-5684 <tel:%28612%29%20664-5684>

HTTP://WWW.USDOJ.GOV/USAO/MN

FAX: (612) 664-5787

From:    jim mckinley [james.c.mckinley@gmail.com]
Sent:    Friday, February 18, 2011 12:53 PM
To:      Lyles, Toby
Subject:         link

http://www.statesman.com/news/texas-politics/dps-anarchists-linked-to-arson-at-gover
nors-mansion-1264031.html
From:    james.c.mckinley@gmail.com
Sent:    Friday, February 18, 2011 6:37 PM
To:      Lyles, Toby
Subject:         Re: Toby's leaving for the night

In good shape. Found brad and scott.

Sent via BlackBerry by AT&T

From: "Lyles, Toby" <tobylyles@nytimes.com>
Date: Fri, 18 Feb 2011 18:38:04 -0500
To: 'jim mckinley'<james.c.mckinley@gmail.com>
Subject: Toby's leaving for the night

Jim, I just want to let you know that I'll be out of the office on Monday, but I'll check email. So, if you really need to reach me, feel free to write.

Toby

NYT/McKinley00078

001243

Toby Ann Lyles | NY Times | News Research Desk | News Technology Unit
620 Eighth Avenue | NY NY 10018 | ph: 212.556.8832 | fx: 646.428.6176 | IM:
tobylyles@nytimes.com

NYT/McKinley00079

001244

REDACTED

From: McKinley, Jim
Sent: Tuesday, February 22, 2011 4:54 PM
To: Bagley, Marlene
Subject: RE: texas

First, thanks for catching McCraw.  He is Steven McCraw.

On the dropped words make it:  Toting photographs of suspects and offering a $50,000 reward, the lawmen....

I'll check on the legal question.  I know McKay pleaded guilty to possessing an illegal firearm and Crowder pleaded guilty to aiding and abetting, but they were accused somewhere, perhaps in the indictment or charging instrument, with plotting to throw the firebombs at police cars.

Jim McKinley
Houston Bureau Chief
The New York Times
mckinley@nytimes.com
347 753 4867 (Mobile)
713 752 2006 Ext. 1 (Office)

From: Bagley, Marlene
Sent: Tuesday, February 22, 2011 3:40 PM
To: McKinley, Jim
Subject: texas

Hey Jim

1

001149

First, seems like the Col. McGraw should be McCraw, right?

Then, I don't know if this makes a difference, but two previous Times Past references to the St. Paul convention case say the two men pleaded guilty to making and possessing bombs during the convention. I wondered if there was some legalese involved that might be a problem in your reference to a "plot to bomb the convention."

Last, there seems to be something missing from the following sentence from an insert:

Toting pictures of suspects ?????have been offering a $50,000 reward for leads in the case, the lawmen have grilled several self-described anarchists for leads about the Affinity group and identity of the bomber.

You can call me at 8341 or send answers by email.

Thanks,
Marlene

2

NYT/McKinley00169

001150

**REDACTED**

From: McKinley, Jim
Sent: Tuesday, February 22, 2011 5:02 PM
To: Bagley, Marlene
Subject: TEXAS SUBGRAPHS EXMCKINLEY

SUBGRAPHS TEXAS EXMCKINLEY
pls substitute thefollowing graphs to deal with M. Bagley's question....

Yet Federal agents accused two young men from these circles of plotting to make firebombs and hurl them at police cars during the Republican convention in 2008. An FBI informant from Austin, Brandon Darby, was traveling with the group and told the authorities of the plot, which he had encouraged.

David Guy McKay, 24, pleaded guilty to firearms violations in the case and was sentenced to four years. Mr. Crowder, 25, received a two-year sentence after pleading guilty to aiding and abetting Mr. McKay in the possession of an illegal firearm, which is how the law classifies a Molotov cocktail.

RETURN TO COPY

Jim McKinley
Houston Bureau Chief
The New York Times
mckinley@nytimes.com
347 753 4867 (Mobile)
713 752 2006 Ext. 1 (Office)

1

NYT/McKinley00170

001151


**Times**
past

March 18, 2009, Wednesday   Late Edition - Final
Section A   Page 15

**Desk:** National Desk   **Length:** 157 words
**Type:** Brief

## NATIONAL BRIEFING | MIDWEST; Minnesota: Plea in Convention Case

By COLIN MOYNIHAN

A Texas man pleaded guilty in Federal District Court to three counts of making and possessing a Molotov cocktail during the Republican National Convention in St. Paul in September. The plea by the man, David McKay, 22, of Austin, ended an investigation that began months before the Republican gathering and was based on evidence provided by an informant working for the Federal Bureau of Investigation. Another man from Austin, Bradley Crowder, 23, pleaded guilty in January to one count of possessing a Molotov cocktail. A trial ended in a hung jury in February after Mr. McKay testified that the informant, **Brandon Darby**, influenced him to assemble firebombs. On Tuesday, however, Mr. McKay told a federal district judge that he would have made bombs without knowing Mr. **Darby**, said David Anderson, a spokesman for the United States Attorney's Office. He said Mr. McKay faced a maximum penalty of 10 years in prison on each count.

Copyright 2009 The New York Times Company

NYT/McKinley00057

001133

# Tab G

**Selected Case Law**



# Harte-Hanks Communications v. Connaughton

Supreme Court of the United States

March 20, 1989, Argued ; June 22, 1989, Decided

No. 88-10

**Reporter**

491 U.S. 657; 109 S. Ct. 2678; 105 L. Ed. 2d 562; 1989 U.S. LEXIS 3133; 57 U.S.L.W. 4846; 16 Media L. Rep. 1881

HARTE-HANKS COMMUNICATIONS, INC. v. CONNAUGHTON

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT.

**Disposition:** 842 F. 2d 825, affirmed.

## Syllabus

Respondent was the unsuccessful challenger for the position of Municipal Judge of Hamilton, Ohio, in an election conducted on November 8, 1983. A local newspaper, the Journal News, published by petitioner supported the reelection of the incumbent. A little over a month before the election, the incumbent's Director of Court Services resigned and was arrested on bribery charges, and a grand jury investigation of those charges was in progress on November 1, 1983. On that day, the Journal News ran a front-page story quoting a grand jury witness (Thompson) as stating that respondent had used "dirty tricks" and offered her and her sister jobs and a trip to Florida "in appreciation" for their help in the investigation. Respondent filed a diversity action against petitioner for libel in Federal District Court, alleging that the story was false, had damaged his personal and professional reputation, and had been published with actual malice. After listening to six days of testimony and three taped interviews -- one conducted by respondent and two by Journal News reporters -- and reviewing the contents of 56 exhibits, the jury was given instructions defining the elements of public figure libel and directed to answer three special verdicts. It found by a preponderance of the evidence that the story in question was defamatory and false, and by clear and convincing proof that the story was published with actual malice, and awarded respondent $ 5,000 in compensatory damages and $ 195,000 in punitive damages. The Court of Appeals affirmed. It separately considered the evidence supporting each of the jury's special verdicts, concluding that neither the finding that the story was defamatory nor the finding that it was false was clearly erroneous. In considering the actual malice issue, but without attempting to make an independent evaluation of the credibility of conflicting oral testimony concerning the subsidiary facts underlying the jury's finding of actual malice, the court identified 11 subsidiary facts that the jury "could have"

found and held that such findings would not have been clearly erroneous, and, based on its independent review, that when considered cumulatively they provided clear and convincing evidence of actual malice.

*Held:*

1. A showing of ″'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers'″ cannot alone support a verdict in favor of a public figure plaintiff in a libel action. Rather, such a plaintiff must prove by clear and convincing evidence that the defendant published the false and defamatory material with actual malice, *i. e.*, with knowledge of falsity or with a reckless disregard for the truth. Although there is language in the Court of Appeals' opinion suggesting that it applied the less severe professional standards rule, when read as a whole, it is clear that this language is merely supportive of the court's ultimate conclusion that the Journal News acted with actual malice. Pp. 663-668.

2. A reviewing court in a public figure libel case must ″exercise independent judgment and determine whether the record establishes actual malice with convincing clarity″ to ensure that the verdict is consistent with the constitutional standard set out in *New York Times Co.* v. *Sullivan*, 376 U.S. 254, and subsequent decisions. See *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U.S. 485. Based on this Court's review of the entire record, the Court of Appeals properly held that the evidence did in fact support a finding of actual malice, but it should have taken a somewhat different approach in reaching that result. While the jury *may* have found each of the 11 subsidiary facts, the case should have been decided on a less speculative ground. Given the trial court's instructions, the jury's answers to the three special interrogatories, and an understanding of those facts not in dispute, it is evident that the jury *must* have rejected (1) the testimony of petitioner's witnesses that Thompson's sister, the most important witness to the bribery charges against the Director of Court Services, was not contacted simply because respondent failed to place her in touch with the newspaper; (2) the testimony of the editorial director of the Journal News that he did not listen to the taped interviews simply because he thought that they would provide him with no new information; and (3) the testimony of Journal News employees who asserted that they believed Thompson's allegations were substantially true. When those findings are considered alongside the undisputed evidence, the conclusion that the newspaper acted with actual malice inexorably follows. The evidence in the record in this case, when reviewed in its entirety, is ″unmistakably″ sufficient to support a finding of actual malice. Pp. 685-693.

**Counsel:** Lee Levine argued the cause for petitioner. With him on the briefs were Richard L. Creighton, Jr., Kevin E. Irwin, Michael D. Sullivan, and James E. Grossberg.

John A. Lloyd, Jr., argued the cause for respondent. With him on the brief were Sallie Conley Lux and Jeanette H. Rost. *

**Judges:** Stevens, J., delivered the opinion of the Court, in which Rehnquist, C. J., and Brennan, White, Marshall, Blackmun, O'Connor, and Kennedy, JJ., joined. White, J., filed a concurring opinion, in which Rehnquist, C. J., joined, post, p. 694. Blackmun, J., post, p. 694, and Kennedy, J., post, p. 696, filed concurring opinions. Scalia, J., filed an opinion concurring in the judgment, post, p. 696.

**Opinion by:** STEVENS

# Opinion

[*659] [***571] [**2681] JUSTICE STEVENS delivered the opinion of the Court.

[1A] [2A]A public figure may not recover damages for a defamatory falsehood without clear and convincing proof that the false "statement was made with 'actual malice' -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279-280 (1964). See *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130, 162 (1967) (opinion of Warren, C. J.). In *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U.S. 485 (1984), we held that judges in such cases have a constitutional duty to "exercise independent judgment and determine whether the record establishes actual malice with convincing clarity." *Id.*, [**2682] at 514. In this case the Court of Appeals affirmed a libel judgment against a newspaper without attempting to make an independent evaluation of the credibility of conflicting oral testimony concerning the subsidiary facts underlying the jury's finding of actual malice. We [***572] granted certiorari to consider whether the Court of Appeals' analysis was consistent with our holding in *Bose*. 488 U.S. 907 (1988).

[*660] I

Respondent, Daniel Connaughton, was the unsuccessful candidate for the office of Municipal Judge of Hamilton, Ohio, in an election conducted on November 8, 1983. Petitioner is the publisher of the Journal News, a local newspaper that supported the reelection of the incumbent, James Dolan. A little over a month before the election, the incumbent's Director of Court Services resigned and was arrested on bribery charges. A grand jury investigation of those charges was in progress on November 1, 1983. On that date, the Journal News ran a front-page story quoting Alice Thompson, a grand jury witness, as stating that Connaughton had used "dirty tricks" and offered her and her sister jobs and a trip to Florida "in appreciation" for their help in the investigation.

---

* A brief of *amici curiae* urging reversal was filed for the Associated Press et al. by *P. Cameron DeVore, Daniel M. Waggoner, Douglas P. Jacobs, Alice N. Lucan, Mark L. Tuft, Harvey L. Lipton, Jeffrey N. Paule, Lois J. Schiffer, Robert D. Sack, E. Susan Garsh, William A. Niese, Deborah R. Linfield, Samuel E. Klein, W. Terry Maguire, Rene P. Milam, Richard M. Schmidt, Roslyn A. Mazer, Lawrence Gunnels, Steven R. Shapiro, Robert J. Brinkmann, J. Laurent Scharff, Jane Kirtley*, and *Bruce W. Sanford*.

[3A]Invoking the federal court's diversity jurisdiction, Connaughton filed an action for damages, alleging that the article was false, that it had damaged his personal and professional reputation, and that it had been published with actual malice. After discovery, petitioner filed a motion for summary judgment relying in part on an argument that even if Thompson's statements were false, the First Amendment protects the accurate and disinterested reporting of serious charges against a public figure. The District Court denied the motion, noting that the evidence raised an issue of fact as to the newspaper's interest in objective reporting and that the "neutral reportage doctrine" did not apply to Thompson's statements. [1] The case accordingly proceeded to trial.

[3B]

 [*661]  After listening to six days of testimony and three taped interviews -- one conducted by Connaughton and two by Journal News reporters -- and reviewing the contents of 56 exhibits, the jury was given succinct instructions accurately defining the elements of public figure libel and directed to answer three special verdicts. [2] It  [**2683]  unanimously found by a  [***573] preponderance of the evidence that the November 1 story was defamatory and that it was false. It also found by clear and convincing proof that the story was published with actual malice. After a separate hearing on damages, the jury awarded Connaughton $ 5,000 in compensatory damages and $ 195,000 in punitive damages. Thereafter, the District Court denied a motion for judgment notwithstanding the verdict, App. to Pet. for Cert. 83a, and petitioner appealed.

 [*662]  The Court of Appeals affirmed. 842 F. 2d 825 (CA6 1988). In a lengthy opinion, the majority detailed why its "independent examination of the entire record" had demonstrated that "the judgment does not pose a forbidden intrusion into the First Amendment rights of free

---

[1]   The District Court explained that the neutral reportage doctrine, as defined by the Ohio Court of Appeals, see *J. V. Peters & Co.* v. *Knight Ridder Co.*, 10 Media L. Rptr. 1576 (1984), and the United States Court of Appeals for the Second Circuit, see *Edwards* v. *National Audubon Society, Inc.*, 556 F. 2d 113, cert. denied, 434 U.S. 1002 (1977), "immunizes from liability the accurate and disinterested reporting of serious charges made against a public figure by a responsible, prominent organization." App. to Pet. for Cert. 78a. Because the court was convinced that Thompson did not qualify as "a responsible, prominent organization on a par with the State Attorney General's Office in *J. V. Peters* or the National Audubon Society in *Edwards*," it concluded that the defense was unavailable. *Ibid.*

Petitioner did not argue in its petition for a writ of certiorari, and does not now argue, that the neutral reportage doctrine immunized its coverage of Thompson's allegations. Accordingly, we do not review this aspect of the District Court's judgment.

[2]   The jury was asked:

1. "Do you unanimously find by a preponderance of the evidence that the publication in question was defamatory toward the plaintiff?"

2. "Do you unanimously find by a preponderance of the evidence that the publication in question was false?"

3. "Do you unanimously find by clear and convincing proof that the publication in question was published with actual malice?" App. 201.

There is some debate as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence. Compare *Firestone* v. *Time, Inc.*, 460 F. 2d 712, 722-723 (CA5) (Bell, J., specially concurring), cert. denied, 409 U.S. 875 (1972), with *Goldwater* v. *Ginzburg*, 414 F. 2d 324, 341 (CA2 1969), cert. denied, 396 U.S. 1049 (1970). See also *Tavoulareas* v. *Piro*, 260 U. S. App. D. C. 39, 63-64, n. 33, 817 F. 2d 762, 786, n. 33 (en banc), cert. denied, 484 U.S. 870 (1987); Franklin & Bussel, The Plaintiff's Burden in Defamation: Awareness and Falsity, 25 Wm. & Mary L. Rev. 825, 863-865 (1984). We express no view on this issue.

expression." *Id.*, at 828. The opinion identified the "core issue" as "simply one of credibility to be attached to the witnesses appearing on behalf of the respective parties and the reasonableness and probability assigned to their testimony." *Id.*, at 839-840. It separately considered the evidence supporting each of the jury's special verdicts, concluding that neither the finding that the article was defamatory [3] nor the finding that it was false [4] was clearly erroneous.

The Court of Appeals' review of the actual malice determination involved four steps. It first noted the wide disparity between the respective parties' versions of the critical evidence, pointing out that if the jury had credited petitioner's evidence it "could have easily concluded that Thompson's [*663] charges were true and/or that the *Journal*'s conduct in determining Thompson's credibility was not a highly unreasonable departure from the standards of investigation and reporting ordinarily adhered to by reasonable publishers." *Id.*, at 840. Second, it [***574] inferred from the jury's answers to the three special interrogatories that "it obviously elected to assign greater credibility to the plaintiff's witnesses and proof [and that] the jury simply did not believe the defendants' witnesses, its evidentiary presentations or its arguments." *Ibid.* Third, having considered what it regarded as the "subsidiary or operative facts" that constituted the plaintiff's theory of the case, it concluded that the jury's findings concerning those operative facts were not clearly erroneous. *Id.*, at 843-844. Fourth, "in the exercise of its independent judgment" based on its evaluation of the "cumulative impact of the subsidiary facts," the court concluded that "Connaughton proved, by clear and convincing evidence, that the *Journal* demonstrated its actual malice when it published the November 1, 1983, article despite the existence of serious doubt which attached to Thompson's veracity and the accuracy of her reports." *Id.*, at 846.

Judge Guy dissented. In his opinion the admissions made by Connaughton in his [**2684] interview with Journal News reporters the day before the story was published sufficiently corroborated Thompson's charges to preclude a finding of actual malice. *Id.*, at 853-854. He was satisfied, as a matter of law, that respondent had failed to prove actual malice by clear and convincing evidence, regardless of whether determinations of credibility made by the jury are subject to a *de novo* standard of review. *Id.*, at 855.

---

[3] The Court of Appeals observed that "the article was defamatory in its implication that Connaughton was an unethical lawyer and an undesirable candidate for the Hamilton Municipal judgeship who was capable of extortion, who was a liar and an opportunist not fit to hold public office, particularly a judgeship." 842 F. 2d, at 840-841.

[4] As to the finding of falsity, the Court of Appeals wrote:

"Equally apparent from the jury's answer to the second special interrogatory is that it considered the published Thompson charges to be false. Its finding is understandable in light of the plaintiff's proof which disclosed that the *Journal*'s effort to verify her credibility ended in an avalanche of denials by knowledgeable individuals; [and] its inability to produce a single person who supported Thompson's accusations. . . .

"Moreover, the jury obviously refused to credit the *Journal*'s construction of Connaughton's interview of October 31. It accepted Connaughton's express denials of each Thompson charge and considered the significant language interpreted by the *Journal* to constitute his admissions of those charges, when read in context, as nothing more than conjecture elicited by structured questions calculated to evoke speculation. Thus, upon reviewing the record in its entirety, this court concludes that the jury's determinations of the operational facts bearing upon the falsity of the article in issue were not clearly erroneous." *Id.*, at 841.

II

Petitioner contends that the Court of Appeals made two basic errors. First, while correctly stating the actual malice standard announced in *New York Times Co.* v. *Sullivan*, 376 U.S. 254 (1964), the court actually applied a less severe [*664] standard that merely required a showing of ″'highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.'″ 842 F. 2d, at 845 (quoting *Curtis Publishing Co.* v. *Butts*, 388 U.S., at 155 (opinion of Harlan, J.)). Second, the court failed to make an independent *de novo* review of the entire record and therefore incorrectly relied on subsidiary facts implicitly established by the jury's verdict instead of drawing its own inferences from the evidence.

There is language in the Court of Appeals' opinion that supports petitioner's first contention. For example, the Court of Appeals did expressly state that the Journal News' decision to publish Alice Thompson's allegations constituted an extreme departure from professional standards. [5] Moreover, the opinion attributes [***575] considerable weight to the evidence that the Journal News was motivated by its interest in the reelection of the candidate it supported and its economic interest in gaining a competitive advantage over the Cincinnati [*665] Enquirer, its bitter rival in the local market. [6] [**2685] Petitioner is plainly correct in recognizing that a public figure plaintiff must prove more than an extreme departure from

[5] The Court of Appeals wrote:

″In *Curtis Publishing Co.* v. *Butts*, the Supreme Court accorded public figures as well as public officials recovery of damages for the publication of 'defamatory falsehood whose substance makes substantial danger to reputation apparent, on a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers.' 388 U.S. at 155.″ *Id.*, at 845.

At another point, the court wrote:

″Accordingly, this court concludes that the *Journal*'s decision to rely on Thompson's highly questionable and condemning allegations without first verifying those accusations through her sister, [Stephens], and without independent supporting evidence constituted *an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers* which demonstrated a reckless disregard as to the truth or falsity of Thompson's allegations and thus provided clear and convincing proof of 'actual malice' as found by the jury. *Butts*, 388 U.S. at 153.″ *Id.*, at 847 (emphasis supplied).

See also *id.*, at 840.

[6] As to the newspaper's motives, the Court of Appeals asserted:

″A review of the entire record of the instant case discloses substantial probative evidence from which a jury could have concluded (1) that the *Journal* was singularly biased in favor of [the incumbent] and prejudiced against Connaughton as evidenced by the confidential personal relationship that existed between [the incumbent] and Blount, the *Journal* Editorial Director, and the unqualified, consistently favorable editorial and daily news coverage received by [the incumbent] from the *Journal* as compared with the equally consistent unfavorable news coverage afforded Connaughton; (2) that the *Journal* was engaged in a bitter rivalry with the *Cincinnati Enquirer* for domination of the greater Hamilton circulation market as evidenced by Blount's vituperous public statements and criticism of the *Enquirer;* (3) that the *Enquirer*'s initial expose of the questionable operation of the [incumbent's] court was a high profile news attraction of great public interest and notoriety that had 'scooped' the *Journal* and by Blount's own admission was the most significant story impacting the . . . campaign[;] (4) that by discrediting Connaughton the *Journal* was effectively impugning the *Enquirer* thereby undermining its market share of the Hamilton area.″ *Id.*, at 843.

Later in the opinion, the court again stressed that ″the evidence adduced at trial demonstrated that the *Journal* was motivated to publicize Thompson's allegations, not only by a desire to establish its preeminence in the reporting of Hamilton political news, but also by a desire to aid the [incumbent's] campaign.″ *Id.*, at 846.

professional standards and that a newspaper's motive in publishing a story -- whether to promote an opponent's candidacy or to increase its circulation -- cannot provide a sufficient basis for finding actual malice.

[1B]The language in the Court of Appeals' opinion discussing professional standards is taken from Justice Harlan's plurality opinion in *Curtis Publishing Co.* v. *Butts, supra*, at 155.In that case, Justice Harlan had opined that the *New York Times* actual malice standard should be reserved for cases brought by public officials. The *New York Times* decision, in his view, was primarily driven by the repugnance of seditious libel and a concern that public official libel "lay close" to [*666] this universally renounced, and long-defunct, doctrine. 388 U.S., at 153. In place of the actual malice standard, Justice Harlan suggested that a public figure need only make "a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Id.*, at 155. This proposed standard, however, was emphatically rejected by a majority of the Court in favor of the stricter *New York Times* actual malice rule. See 388 U.S., at 162 (opinion of Warren, C. J.); *id.*, at 170 (Black, J., dissenting); *id.*, at 172 (Brennan, J., dissenting). Moreover, [***576] just four years later, Justice Harlan acquiesced in application of the actual malice standard in public figure cases, see *Rosenbloom* v. *Metromedia, Inc.*, 403 U.S. 29, 69-70 (1971) (dissenting opinion), and by the time of the Court's decision in *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323 (1974), the Court was apparently unanimously of this view. Today, there is no question that public figure libel cases are controlled by the *New York Times* standard and not by the professional standards rule, which never commanded a majority of this Court.

[4A]It also is worth emphasizing that the actual malice standard is not satisfied merely through a showing of ill will or "malice" in the ordinary sense of the term. [7] See *Beckley* [*667] *Newspapers Corp.* v. *Hanks*, 389 U.S. 81 (1967)*(per curiam); Henry* v. *Collins*, 380 U.S. 356 (1965)*(per curiam)*. Indeed, just last Term we unanimously held that a public figure "may not recover for the tort of intentional infliction of emotional distress . . . without showing . . . that the publication contains a false statement of fact which was made . . . with knowledge that the statement was false or with reckless disregard as to whether or not it was true." *Hustler Magazine, Inc.* v. *Falwell*, 485 U.S. 46, 56 (1988). Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice. The allegedly defamatory statements at issue in the *New York Times* case were themselves published as part of a paid advertisement. [**2686] 376 U.S., at 265-266. If a profit motive could somehow strip communications of the otherwise available constitutional protection, our

---

[7]  The trial judge correctly instructed the jury that "[a]ctual malice may not be inferred alone from evidence of personal spite, ill will or intention to injure on the part of the writer." App. 199.

The phrase "actual malice" is unfortunately confusing in that it has nothing to do with bad motive or ill will. See *Rosenbloom* v. *Metromedia, Inc.*, 403 U.S. 29, 52, n. 18 (1971) (opinion of Brennan, J.). By instructing the jury "in plain English" at appropriate times during the course of the trial concerning the not-so-plain meaning of this phrase, the trial judge can help ensure that the *New York Times* standard is properly applied. *Tavoulareas*, 260 U. S. App. D. C., at 84, 817 F. 2d, at 807 (R. B. Ginsburg, J., concurring). See also *Westmoreland* v. *CBS Inc.*, 596 F. Supp. 1170, 1172-1173, n. 1 (SDNY 1984) (suggesting that jury confusion can be minimized if a less confusing phrase, such as "state-of-mind," "deliberate or reckless falsity," or "constitutional limitation" is used in the jury's presence).

cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels. Actual malice, instead, requires at a minimum that the statements were made with a reckless disregard for the truth. And although the concept of "reckless disregard" "cannot be fully encompassed in one infallible definition," *St. Amant* v. *Thompson*, 390 U.S. 727, 730 (1968), we have made clear that the defendant must have made the false publication with a "high degree of awareness of . . . probable falsity," *Garrison* v. *Louisiana*, 379 U.S. 64, 74 (1964), or must have "entertained serious doubts as to the truth of his publication," *St. Amant, supra*, at 731.

[4B]

[5][6]Certain statements in the [***577] Court of Appeals' opinion, when read in isolation, appear to indicate that the court at times substituted the professional standards rule for the actual malice requirement and at other times inferred actual malice from the newspaper's motive in publishing Thompson's story. Nevertheless, when the opinion is read as a whole, it is clear that the conclusion concerning the newspaper's departure [*668] from accepted standards and the evidence of motive were merely supportive of the court's ultimate conclusion that the record "demonstrated a reckless disregard as to the truth or falsity of Thompson's allegations and thus provided clear and convincing proof of 'actual malice' as found by the jury." 842 F. 2d, at 847. Although courts must be careful not to place too much reliance on such factors, a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence, see *Herbert* v. *Lando*, 441 U.S. 153, 160 (1979);*Tavoulareas* v. *Piro*, 260 U. S. App. D. C. 39, 66, 817 F. 2d 762, 789 (en banc), cert. denied, 484 U.S. 870 (1987), and it cannot be said that evidence concerning motive or care never bears any relation to the actual malice inquiry. Thus, we are satisfied that the Court of Appeals judged the case by the correct substantive standard.

The question whether the Court of Appeals gave undue weight to the jury's findings -- whether it failed to conduct the kind of independent review mandated by our opinion in *Bose* -- requires more careful consideration. A proper answer to that question must be prefaced by additional comment on some of the important conflicts in the evidence.

III

The most important witness to the bribery charges against the Director of Court Services was Patsy Stephens, Alice Thompson's older sister. In a tape-recorded interview conducted in Connaughton's home between 12:30 and 4:30 a.m. on September 17, 1983, Stephens explained how, on 40 or 50 occasions, she had visited with the Court Administrator, Billy Joe New, in his office and made cash payments to dispose of "DUI" and other minor criminal charges against her former husband and various other relatives and acquaintances. [8] On September 22,

---

[8] Early in September Connaughton's wife Martha was advised that Patsy Stephens was willing to disclose important information about the special treatment her former husband had received in the Hamilton Municipal Court. The source of this advice was the president of the local chapter of Mothers Against Drunk Driving. Martha Connaughton and her brother then visited with Patsy Stephens in her

pursuant to an arrangement [*669] made by Connaughton at the suggestion of the county prosecutor, Stephens took a lie detector test. After learning that she [**2687] had passed the test, Connaughton filed a written complaint against New. In due course, New was arrested, indicted, and convicted.

Alice Thompson was one of the eight persons present at the tape-recorded interview on September [***578] 17. [9] One of the cases Patsy Stephens described was a shoplifting charge against her sister. Thompson volunteered some comments about the incident, but otherwise had little to say during the long interview with Stephens. Thompson was also present on the 22d, when Stephens took the polygraph test, but Thompson declined to submit to such a test. App. 301. On that day, the two sisters spent several hours in the company of Connaughton, his wife, and two of his supporters. They discussed a number of subjects, including the fact that Billy Joe New had just resigned, the question whether there was reason to be concerned about the safety of the two sisters, the fact that Martha Connaughton might open an ice cream parlor sometime in the future, the possibility that the two sisters might be employed there as waitresses, and a vacation in Florida planned by the Connaughtons for after the election.

[*670] Late in October, New's lawyer, Henry Masana, met with Jim Blount, the editorial director of the Journal News, and Joe Cocozzo, the newspaper's publisher, to arrange a meeting with Alice Thompson. Masana explained that Thompson wanted to be interviewed about the "dirty tricks" Connaughton was using in his campaign. Thereafter, on October 27, Blount and Pam Long, a Journal News reporter, met with Thompson in the lawyer's office and tape-recorded the first of the two interviews that provided the basis for the story that Long wrote and the Journal News published on November 1.

The tape of Alice Thompson's interview is 1 hour and 20 minutes long. Significant portions of it are inaudible or incoherent. It is clear, however, that Thompson made these specific charges:

-- that Connaughton had stated that his purpose in taping the interview with Patsy Stephens was to get evidence with which he could confront New and Judge Dolan and "scare them into resigning" without making any public use of the tapes; [10]

---

mother's home for about 30 minutes and arranged for a later interview with Connaughton. Alice Thompson was present at a part of that meeting, as well as at the subsequent interview. Shortly before midnight on September 16, after Patsy Stephens and Alice Thompson had returned home from work, two of Connaughton's supporters (Berry and Cox) picked the two sisters up and drove them to Connaughton's home where they remained until about 4:30 a.m. on September 17.

[9] The other seven were: Patsy Stephens, Dan and Martha Connaughton, Martha Connaughton's brother Dave Berry, Connaughton's campaign manager, Joe Cox, and two of Connaughton's neighbors, Jeanette and Ernest Barnes.

[10] "A. They started asking me a bunch of questions so I asked Dan Connaughton. . . . I said why are you doing this. . . . And of course, he turned off the tape recorder. And he said, I'll tell you the truth. He said, all I want is to get enough evidence on Billy, he said, and have Billy resign. And he said, of course, if Billy resigns, Dolan will resign, and he said, then I can just step up on the bench. . . . But he said right out of his own mouth, all I want to do is to get a story in evidence on them, to meet them face to face, and show them what evidence he had against him, or whatever, to get them to resign, and no more would be said about it.

. . .

[*671]  -- that he would pay the expenses for a 3-week vacation in Florida for the two sisters; [11]

--  [***579]   [**2688]  that he would buy a restaurant for the two sisters' parents to operate; [12]

[*672]  -- that he would provide jobs for both Patsy Stephens and Alice Thompson; [13]

---

"Q. Okay. So in other words, based on what he said to you, you believed him?

"A. Blackmail. I mean, you know, the way he phrased it, the way he said it, you know. He said all he wanted to do was get enough evidence on Billy, and he also used Dolan's name, which I don't know what he was going to get on Dolan -- to scare them into resigning. I said what happens when they resign? Nothing more will be said about anything. He said when I take the bench nothing will be said." App. 291-292.

[11]  "A. . . . I asked them what I was going to get out of it.

"Q. What did they promise you? Or what did they say when you asked them?

"A. They said my help would be deeply appreciated. And they went on to talk about the three weeks vacation they was planning on taking when the election was . . .

"Q. He was planning to take three weeks vacation?

"A. Yes, the family -- Dave Berry and Martha, and Dan.

"MR. BLOUNT: They wanted you to go along?

"A. Me and my sister would be welcome to go along with Dave . . .

"(By Mrs. Long)

"Q. Did they say they would pay your expenses?

"A. Yeah. I made it clear to them that I couldn't afford a trip to Florida.

"MR. BLOUNT: Was the tape recorder on at that time?

"A. Oh, no.

"(By Mrs. Long)

"Q. Now where were they going to go?

"A. Three weeks in Florida.

"Q. And they added Disneyworld?

"A. (Inaudible) a three weeks trip to Florida. And they had a friend in Florida that wouldn't be home at the time, that we could stay at their condominium." Id., at 293-294.

[12]  "A. . . . [Connaughton] said he was thinking about putting a restaurant in there, and he was wanting to know if my mother and father [Zella and Brownie Breedlove] would run it for him. And I said oh yeah, my mother would love to get back into the restaurant business. He said good, when the lease is up, he said, we'll tear the inside out and put a restaurant in there, and he said, your mother and father can run it, and he said that way, he said you girls can help run it too, and put your sisters in there working too; he said just . . . he even made up a name -- Breedlove's Lunch or something like that. Ma Breedlove's Cooking, you know. He had the names figured out and everything. He offered to buy us a restaurant, you know, and put us in that building.

"Q. Okay. So it would just be your parents being a manager, they wouldn't have to buy -- did you understand him that they wouldn't have to . . .

"A. Oh, they was going to do everything, you know. They was just going to put us in there to work, or to run it. They wanted my mother to run the business for them." Id., at 307.

[13]  "Q. Did he promise you to find a job?

-- that he would take them out to a victory dinner at an expensive French restaurant after the election; [14] and

-- that Connaughton would not allow knowledge of the sisters' involvement to become public. [15]

[*673] [***580] During the course of the interview, Thompson indicated that she had told her story to the Cincinnati Enquirer, which declined to print it, *id.*, at 284, and that the local police, likewise, were not interested, *id.*, at 310. [16] Thompson indicated that she was "against" Connaughton becoming a judge. *Id.*, at 311. She also asserted that since Connaughton had made public that she and her sister had provided evidence against New, friends had accused her "of being a snitch and a rat" -- epithets to [**2689] which she took great offense -- and that one reason she came to the Journal News was "to get that cleared up." [17] In her description of the interview in Connaughton's home on September 17, Thompson stated that Connaughton

"A. Yeah.

"Q. Why did he offer to find you a job?

"A. Because the day at the house, going back to the first time I met them, Martha was asking me did I work, or anything, and I was telling her I was looking for work. I had been out of a job. Evidently she must have talked to her husband about it, and that night over at his home, he said are you employed now, you know, . . . and I said no. So he said, we'll see if we can't do something about that. I told him I wanted away from bartending and stuff; he said we'll see if we can't do something about it. You know, a decent job." *Id.*, at 295-296.

"MR. MASANA: I'm going to interject. What about the job you were promised?

"A. Oh, when they promised me, you know, the secure job and everything, they also promised -- they promised Patsy a job too.

(By Mrs. Long)

"Q. That she would be in with Breedlove's Lunch, or cafe?

"A. No, they promised Patsy a decent job, you know.

"Q. That she would be (inaudible).

"A. That she would be good up in Court. That come out of his own mouth. That come out of Dan's mouth; he said we need somebody like you up at the courthouse. Municipal Court." *Id.*, at 309.

[14] "A. . . . And he said he wanted me and Pat to definitely be there, and for a victory dinner he wanted to take me and Patsy to dinner at the Maisonette.

"Q. This would be after he wins the election?

"A. Ummm-hmmm." *Id.*, at 306.

[15] "A. . . . But as far as anybody else, the public, or anything like that -- or it going to Court, we wouldn't have to worry about it; we wouldn't have to go to Court and our names wouldn't be on there." *Id.*, at 296.

"A. [T]hey had already promised that our names wouldn't be mentioned that nobody would know about us . . . ." *Id.*, at 302.

[16] The transcript of the interview quotes Thompson as saying: "I explained to them the whole story, how it got off to this, or that, you know. They was embarrassed evidently." *Id.*, at 310. However, the tape recording of the interview, which the jury heard, makes clear that Thompson actually stated: "I explained to them the whole story, how I got offered this and that, you know. They wasn't interested in this evidently." Defendant's Exh. J.

[17] "A. . . . Can't get any worse than what Dan (inaudible). Makes it sound like I'm the bad guy.

"Q. Have you had any repercussions from this?

"A. I've been under a lot of (inaudible) strain. I guess.

had frequently turned off the tape recorder, [18] that his voice would not be heard [*674] on the tape, [19] and, somewhat inconsistently (and in response to a leading question), that most of her comments had been made in response to leading questions by Connaughton. [20]

[***581] Toward the end of the interview, Blount made two significant comments. He announced that "Pam will, of course, write the story," *id.*, at 314, and he asked "[w]hat would happen if we called your sister," *id.*, at 316. In response to the first comment, Thompson volunteered a somewhat improbable explanation for her motivation in seeking the interview,

---

"Q. Other people calling you besides the Enquirer?

"A. Yeah. I've had people that I thought were my friends call me and accuse me of being a snitch and a rat. I don't like to carry that name, and that's what a lot of people is thinking. That knows me.

"MR. BLOUNT: They were just mad, they didn't threaten you?

"A. (inaudible) a snitch. You name it, and I'm that. I just want to get that cleared up." App. 320.

[18] "A. . . . I said, what's the whole deal? And of course, he turned off the tape recorder. . . .

. . .

"MR. BLOUNT: Was being questioned by the Connaughtons tougher than going to Court?

"A. Ummm-hmmm. They turned that tape recorder on and off so many times, you know, left out what they wanted to.

. . .

"MR. BLOUNT: Was the tape recorder on at that time?

"A. Oh, no." *Id.*, at 291-293.

[19] "MR. BLOUNT: They had it on when you were talking and off when they were talking?

"A. I don't think Dan Connaughton's voice is on it." *Id.*, at 293.

"MR. BLOUNT: Was it Dan Connaughton himself who talked about the trip?

"A. Yeah. He did most of the talking in the living room. Like I said though the tape recorde[r] was off when Dan spoke." *Id.*, at 295.

[20] "MR. MASANA: Off the record -- you were saying something about Dan was encouraging you to say things in a certain way?

"A. Oh, yeah. He was leading me in questions, you know.

(By Mrs. Long)

"Q. Can you give us an example?

"A. Well, he kept on trying to get me to say that Dolan had something to do with this, you know?

"Q. Would he phrase it in a question? Like, did Judge Dolan have anything to do with it?

"MR. BLOUNT: Wasn't it true that Judge Dolan did this, or something?

"A. Yeah, you know, and so on. But like I say, if you listen to the tapes you're not going to hear it, because his voice ain't on the tape.
. . .

. . .

"Q. Sure. So it was a yes, no, situation for you in that he'd phrase it a certain way and all you had to do was yes or no?

"A. Ummm-hmmm. And then, you know, he'd say to repeat that." *Id.*, at 296-298.

[21] [*675] and in response to the second she gave an equivocal answer, [22] even though she had previously assured Blount that Stephens would [**2690] confirm everything she had said. [23]

On Sunday, October 30, an editorial appeared in the Journal News under the headline "Municipal Court Race will have More than One Loser." [24] App. to Pet. for Cert. 45a. In the column, Blount observed that the campaign "battle has been all it was expected to be and more," and predicted that "[a] lot could still happen in the next eight to nine days." *Ibid.* He went on to discuss the charges pending against New, stating that the "array of charges and counter charges probably has taken some votes from Dolan." *Ibid.* He cautioned, however, that the race was still wide open and quoted an unidentified voter as saying, "I resent voting for a person who I later find has been deceitful or dishonest [*676] in campaigning." *Id.*, at 46a. Significantly, this unidentified person did not express indignation at dishonesty in the administration of the Municipal Court -- a concern one would think the arrest of New might have prompted -- but rather, a distaste for dishonesty *in campaigning* -- a concern that the then-uninvestigated and unwritten November 1 story would soon engender. After questioning the Cincinnati Enquirer's coverage of a story critical of Dolan and suggesting that "the Connaughton forces have a wealthy, influential link to *Enquirer* decisionmakers," the column indicated that the Journal News had not yet decided [***582] which candidate it favored, but implied that an endorsement was forthcoming. *Id.*, at 48a.

On October 31, a reporter for the Journal News telephoned Connaughton and asked him to attend a meeting with Jim Blount, stating "that the endorsement may hang in the balance." Tr. 457 (Aug. 9, 1985). Connaughton met with the reporter, Blount, and Cocozzo that afternoon and discussed a variety of subjects. One of the subjects was the rumor that Connaughton had an influential link to the Cincinnati Enquirer. Connaughton asserted that he had "no extraordinary pull or any inside track to anybody down there," and that any rumor to the contrary was "a lie." *Id.*, at 458. Another subject was Connaughton's participation in the investigation of Billy Joe New. Connaughton provided a chronology of the events that led to

---

[21] "A. I just want people to know. Because they shouldn't vote for a man that is this dirty, you know, because I call it blackmail, what he was trying to do." *Id.*, at 314.

There is some tension between this civic interest in fair procedure and Thompson's reluctant participation in the exposure of the corrupt procedures at the Municipal Court, her assertion that although she realized that Connaughton's offers were improper, she would have accepted them if her name had never been mentioned because "that's the way [the system] works," *id.*, at 315, and her displeasure at being called a "snitch and a rat," *id.*, at 320.

[22] "A. I think she's scared right now to talk to anyone, because the Cincinnati Enquirer has been trying to get her to talk to them. She's getting scared now since this is all reality. My sister is . . . she's kind of weakminded when it comes to anything like that. She won't do nothing for nobody unless she thinks she's benefiting from it. And she honestly thought she was a getting a job out of this, and would make something of herself out of this. And the Connaughtons just used her all the way. And now since she's seeing that it's coming down to where she ain't going to get nothing out of it, she's brought up in the middle of all this and everything, she's scared." *Id.*, at 316.

[23] "MR. BLOUNT: Obviously, we can't quote your sister from you (inaudible). What's your sister's position in this, would she support you or would she support him? In other words, if somebody said to her, who's telling the truth here?

"A. She'll tell you about the trips, the dinner at the Maisonette, the jobs and everything. She'll tell you that's the truth, because they was offered to her too." *Id.*, at 313.

[24] The full text of this editorial is reprinted as Appendix A to the Court of Appeals' opinion. 842 F. 2d, at 848-849.

his filing of the complaint against New and explained that he believed that he had an obligation "as an attorney and officer of the court to report [New's] crimes." *Id.*, at 458-459. No mention was made of Thompson's interview or her charges against Connaughton. *Id.*, at 460. After about an hour, Jim Blount received a telephone call and then told Connaughton that a reporter wanted to interview him. *Id.*, at 462.

Connaughton then went to another office where Blount and Long advised him that they had interviewed Alice Thompson [*677] and were "trying to find out . . . how much of her statement was true." App. 256. The ensuing tape-recorded interview lasted 55 minutes. Connaughton acknowledged that the meetings that Thompson described had taken place and that there had been some speculative discussion about each of the subjects that Thompson mentioned. He stated, however, that Thompson's account of their meetings was "obviously shaded and bizarre," *id.*, at 276, and that there was "absolutely" no "*quid pro quo* for information." [25]

[**2691] Thus, while categorically denying that he intended to confront New and Judge Dolan with the tape of the Stephens interview to scare them into resigning, Connaughton admitted that he might well have speculated about what they would say or do if they heard the tapes. [26] Similarly, while denying [*678] that he had promised Stephens and Thompson anonymity, he agreed that he had [***583] told them that he had hoped that they could remain anonymous. [27] He also categorically denied that he had promised Thompson a job as a waitress, promised Stephens a job at the Municipal Court, or promised to set their parents up in a restaurant, although he did acknowledge a general conversation in which his wife had discussed the possibility that if her dream of opening "a gourmet ice cream shop" should materialize, the

---

[25] The transcript of the Connaughton interview states:

"MR. CONNAUGHTON: No, and it had nothing to do with (inaudible) for information or something, i[f] that's what the point of this question is. That's absolutely no, if that's that question. Well, the tape will speak for itself." App. 265.

The tape recording of this interview makes clear that Connaughton said, "No, and it had nothing to do with a *quid pro quo* for information. . . ." Defendant's Exh. I.

[26] "A. . . . I think it would be fair to say, sometime during those three or four hours that they were there, that I probably made a remark along the lines that I just can't believe what I'm hearing, and, you know, I would think if they could hear what we're hearing, they would probably resign. I mean, I thought the allegation was that serious. But to tell her that -- to answer that -- and if she's saying that was my announced purpose of what I had them there for and what we were going to do with the information, my answer would be no.

"MR. BLOUNT: You didn't tell her you were going to take the tapes to him? And play them for them?

"A. No. No. What I might have said is, boy, I'd sure like to let them hear these tapes and see what they've got to say for themselves, you know, in a fashion such as that.

"MR. BLOUNT: In an expression of shock.

"MR. CONNAUGHTON: Yeah. Yeah, as I almost fell off of the fireplace. Right." App. 262-263.

[27] "Q. Did you ever promise Alice Thompson anonymity?

"A. That question was discussed, and I was hoping to her, and I told her it would be my intention and hope that she could remain anonymous, yes. But did I promise her anonymity, the answer would be no. Did we discuss it, we sure did, and I expressed to her my desire as well as her desire that she could remain anonymous." *Id.*, at 264.

sisters might work there. [28] There were similar acknowledgments of references [*679] to a possible Florida trip and postelection victory dinner, but denials of any promises. [29] At the end [***584] of [**2692] the interview, Long went back -- stressing that Thompson's charge was

---

[28] "Q. Did you ever talk to Alice about getting a job for her in appreciation for her help with your investigation of New and Dolan?

"A. No.

"Q. Not a waitress job?

"A. No.

"Q. Did you promise a Municipal Court job for her sister Patsy Stephens?

"A. No.

"Q. Did you offer to have 'the sisters go on a post election trip to Florida with you and your family to stay in a condominium?'

"A. No.

"Q. Did you offer to set up Thompson's parents, the Breedloves, in what is now Walt's Chambers, which you own and lease?

"A. Absolutely not.

"Q. Why would she say this to us?

"A. What was discussed in an off-handed way, the people who own that bar, who we're not very pleased with, their lease expires next September. My wife has the idea that she wants to open an ice cream type shop like Graeters, or some such thing as that, and I heard her discussing with them that maybe, since Patty had run this Homette Restaurant or something of that nature, that maybe she would help out and participate in the operation of this -- whatever you want to call it -- deli shop or gourmet ice cream shop. Yes, and I was present when that took place.

"Q. And when was that?

"A. Well, I don't think it was that night. As I recall, this was a later time that we had seen them.

"Q. But that would only be for Patty (unclear)?

"A. I guess Alice was there, and the offer may have been extended to her in that fashion, that she could work there or something -- I wouldn't be surprised if that was said." *Id.*, at 264-265.

[29] "Q. What about this post election trip to Florida? . . .

"MR. BLOUNT: Did you talk about anything like that?

"A. Ummm-hmmm. After getting over the initial shock it became a little clearer to me of -- kind of how scary this thing was with the information they gave to us, as far as, if their personal safety was at stake. . . . I do remember in an off-handed way it being discussed . . . they could go down to Hilton Head or Florida, or something like that, or maybe hide out or something like that, I don't know. But I own no property and have nothing to offer them.

"Q. But there was talk about a friend that had a condominium that would be vacant and it was in terms of a full blown trip, you know, you, the Berrys, the whole group going down to Florida and they were welcome to go along. . . .

"A. No. The only conversation I remember along those lines was in connection with, if their personal safety might be in question because of going out on the line and making these serious allegations. . . ." *Id.*, at 266.

"Q. One last statement. At lunch Thompson said that you promised to take her and her sister out to a post election victory dinner at the Maisonette?

"A. I promised to take them to the Maisonette? Hell, I haven't been to the Maisonette for years.

"MR. BLOUNT: Was it discussed? . . .

"A. It may have been. It may have been. I won't deny that some loose discussion in a kidding way was . . .

. . .

a "hefty" [*680] one -- and asked for a second time whether Connaughton had promised Stephens a job at the Municipal Court if he was elected. He once again unequivocally denied the allegation. [30]

The following day the lead story in the Journal News -- under the headline "Bribery case witness claims jobs, trip offered" -- reported that "[a] woman called to testify before the . . . Grand Jury in the Billy Joe New bribery case claims Dan Connaughton, candidate for Hamilton Municipal Judge, offered her and her sister jobs and a trip to Florida 'in appreciation' for their help." [31] *Id.*, at 329. The article, which carried Pam Long's byline, stated that Thompson accused Connaughton of using "'dirty tricks'" to gain her cooperation in investigating New and that Connaughton, although admitting that he did meet with Thompson, "denied any wrongdoing." *Ibid.* Each of Thompson's allegations was accurately reported, including her claims that Connaughton had promised to "protect her anonymity," *id.*, at 330, that he had promised Stephens "a municipal court job" and Thompson some other sort of work, that he had invited both sisters on "a post-election trip to Florida," and that he had offered "to set up Thompson's parents . . . in the restaurant business," *id.*, at 333. The article conveyed Thompson's allegation that "the tapes were turned off and on during a session [that] lasted until 5:30 a.m.," and that these promises were [*681] made "[w]hen the tape was turned off." *Ibid.* In addition, Long wrote, "Thompson claimed Connaughton had told her the tapes he made of her . . . statement . . . were to be presented to Dolan" with the hope that Dolan might resign, thereby allowing Connaughton to assume the municipal judgeship. *Id.*, at 335. Connaughton's contrary version of the events was also accurately reported.

As the Court of Appeals correctly noted, there was evidence in the record -- both in the Thompson tape and in the Connaughton tape -- that would have supported the conclusion that Thompson was telling the truth and that Connaughton was dissembling. See 842 F. 2d, at 840. On the other hand, notwithstanding the partial confirmation of Thompson's charges in the Connaughton tape, there remained a sharp conflict between their respective versions of the critical events. There was unquestionably ample evidence in the record to support a finding that Thompson's principal charges were false, either because she misinterpreted remarks by Connaughton and his wife, or because Thompson was deliberately lying.

---

"A. . . . If she says that I made a firm statement that we were going to definitely plan a party at the Maisonette, that's not true. . . ." *Id.*, at 272-273.

[30] "Q. So her sister Patty, again getting back and going over the promises -- pardon me for going back to them but that seems to be a hefty charge against you.

"A. That's alright.

"Q. Her sister Patty is not going to get a job in the Municipal Court if you're elected?

"A. Not that I know of.

"Q. And she's not going to be disappointed to find that out, right?

"[A. She's not going to be disappointed at that. Right.]" *Id.*, at 277.

The bracketed response does not appear in the written transcript, but can be heard on the tape recording. Defendant's Exh. I.

[31] The full text of this article is reprinted as Appendix B to Judge Guy's dissenting opinion. 842 F. 2d, at 858-859.

[7] [8A]The jury listened to the tape recordings of the two conflicting [***585] interviews and also observed the demeanor of the two witnesses as they testified in open court. They found that Connaughton was telling the truth and that Thompson's charges [**2693] were false. The fact that an impartial jury unanimously reached that conclusion does not, however, demonstrate that the Journal News acted with actual malice. Unlike a newspaper, a jury is often required to decide which of two plausible stories is correct. Difference of opinion as to the truth of a matter -- even a difference of 11 to 1 -- does not alone constitute clear and convincing evidence that the defendant acted with a knowledge of falsity or with a "high degree of awareness of . . . probable falsity," *Garrison*, 379 U.S., at 74. The jury's verdict in this case, however, derived additional support from several critical pieces of information that strongly support the inference that the Journal [*682] News acted with actual malice in printing Thompson's false and defamatory statements.

IV

[8B]On October 27, after the interview with Alice Thompson, the managing editor of the Journal News assembled a group of reporters and instructed them to interview all of the witnesses to the conversation between Connaughton and Thompson with one exception -- Patsy Stephens. No one was asked to interview her and no one made any attempt to do so. See App. 56-57, 61, 83-85. This omission is hard to explain in light of Blount's and Long's repeated questions during the Connaughton and Thompson interviews concerning whether Stephens would confirm Thompson's allegations. See *id.*, at 277, 313, 316. It is utterly bewildering in light of the fact that the Journal News committed substantial resources to investigating Thompson's claims, yet chose not to interview the one witness who was most likely to confirm Thompson's account of the events. However, if the Journal News had serious doubts concerning the truth of Thompson's remarks, but was committed to running the story, there was good reason not to interview Stephens -- while denials coming from Connaughton's supporters might be explained as motivated by a desire to assist Connaughton, a denial coming from Stephens would quickly put an end to the story.

The remaining six witnesses, including Connaughton, were all interviewed separately on October 31. Each of them denied Alice Thompson's charges and corroborated Connaughton's version of the events. Thus, one Journal News reporter testified at trial that Jeanette and Ernest Barnes denied that any promises, offers, or inducements were made and that he had known the Barneses for several years and considered them both credible. *Id.*, at 89-90. Another reporter testified that she interviewed Dave Berry and that Berry stated that absolutely no promises or offers were made. *Id.*, at 91-92. By the time the November 1 story appeared, [*683] six witnesses had consistently and categorically denied Thompson's allegations, yet the newspaper chose not to interview the one witness that both Thompson and Connaughton claimed would verify their conflicting accounts of the relevant events.

The newspaper's decision not to listen to the tapes of the Stephens interview in Connaughton's home [***586] also supports the finding of actual malice. During the Connaughton interview,

Long and Blount asked if they could hear the tapes. *Id.*, at 259. Connaughton agreed, *ibid.*, and later made the tapes available, *id.*, at 48, 142. Much of what Thompson had said about the interview could easily have been verified or disproved by listening to the tapes. Listening to the tapes, for example, would have revealed whether Thompson accurately reported that the tape recorders were selectively turned on and off and that Connaughton was careful not to speak while the recorders were running. Similarly, the tapes presented a simple means of determining whether Stephens and Thompson had been asked leading questions, as Thompson claimed. Furthermore, if Blount was truly in equipoise about the question whether to endorse the incumbent judge for reelection -- as he indicated in the column that he published on Sunday, October 30 -- it is difficult to understand his lack of interest in a detailed description of the [**2694] corrupt disposition of 40 to 50 cases in Judge Dolan's court. Even though he may have correctly assumed that the account did not reflect on the integrity of the judge himself, surely the question whether administrative shortcomings might be revealed by the tapes would be a matter in which an editor in the process of determining which candidate to endorse would normally have an interest. [32] Although simply one piece of [*684] evidence in a much larger picture, one might reasonably infer in light of this broader context that the decision not to listen to the tapes was motivated by a concern that they would raise additional doubts concerning Thompson's veracity.

Moreover, although also just a small part of the larger picture, Blount's October 30 editorial can be read to set the stage for the November 1 article. Significantly, this editorial appeared before Connaughton or any of the other witnesses were interviewed. Its prediction that further information concerning the integrity of the candidates might surface in the last few days of the campaign can be taken to indicate that Blount had already decided to publish Thompson's

---

[32]   Blount testified at trial as follows:

"Q. . . . Did you listen to any of the tapes of the interview conducted by Dan Connaughton with Miss Stephens and Miss Thompson on the 17th of September? Did you listen to any of those tapes before you approved and published the article about Dan Connaughton on the figures of November 18, 1983?

"A. No, because we had from several sources what was on the tape, there was several sources including Mr. Connaughton, that there was no mention of things we were exploring at this time[.]

. . .

"Q. You were, I presume, concerned that you were dealing with a credible person in Alice Thompson, were you not?

"A. Correct.

"Q. Wouldn't one of the simplest ways to determine her credibility be to play the tape to see whether her statement that Dan's voice is not on it is true?

"A. No, because we had been told from other sources that this matter, as I previously said, saying it was not on the tape. This was not discussed on the tape. We had been told by other persons that the tape was junk as far as evidence.

"Q. The tape was what?

"A. Junk." App. 30-31.

Blount further testified that by the time of trial, almost two years after he received the tapes, he had only listened to 15 minutes of the 2 1/2 hours of tape. *Id.*, at 33.

allegations, regardless of how the evidence developed and regardless of whether or not Thompson's story was credible upon ultimate reflection.

Finally, discrepancies in the testimony [***587] of Journal News witnesses may have given the jury the impression that the [*685] failure to conduct a complete investigation involved a deliberate effort to avoid the truth. Thus, for example, Blount's superiors testified that they understood that Blount had directed reporter Tom Grant to ask the police whether Thompson had repeated her charges against Connaughton to them and whether they considered her a credible witness. *Id.*, at 86-87 (Walker), 95 (Cocozzo). Blount also so testified. *Id.*, at 37-38. Grant, however, denied that he had been given such an assignment. *Id.*, at 88. Similarly, at the early stages of the proceeding, there was testimony that on October 31 Pam Long had tried to arrange a meeting with Patsy Stephens over the telephone, *id.*, at 94, that Blount was standing at her desk during the conversation and overheard Long talking to Stephens, *id.*, at 36-37, and that Connaughton had volunteered that he would have Stephens get in touch with them, *id.*, at 57. Connaughton categorically denied that the issue of getting in touch with Stephens was even discussed, *id.*, at 142, and ultimately Blount and Long agreed that there was no contact -- and no attempt to make contact -- with Stephens on the 31st or at any other time before the story was published, *id.*, at 48-49 (Blount), 56-57 (Long).

V

[9][10]The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law. *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U.S., at 510-511.This rule is not simply premised on common-law [**2695] tradition, [33] but on the [*686] unique character of the interest protected by the actual malice standard. Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of ″'breathing space'″ so that protected speech is not discouraged. *Gertz*, 418 U.S., at 342 (quoting *NAACP* v. *Button*, 371 U.S. 415, 433 (1963)); *New York Times Co.*, 376 U.S., at 272 (same). The meaning of terms such as ″actual malice″ -- and, more particularly, ″reckless disregard″ -- however, is not readily captured in ″one infallible definition.″ *St. Amant* v. *Thompson*, 390 U.S., at 730. Rather, only [***588] through the course of case-by-case adjudication can we give content to these otherwise elusive constitutional standards. *Bose, supra*, at 503. Moreover, such elucidation is particularly important in the area of free speech for precisely the same reason that the actual malice standard is itself necessary. Uncertainty as to the scope of the constitutional protection can only dissuade protected speech -- the more elusive the standard, the less protection it

---

[33] The following cases are illustrative of this tradition: *Bose*, 466 U.S., at 510-511 (actual malice); *Jenkins* v. *Georgia*, 418 U.S. 153, 161 (1974) (obscenity); *Hess* v. *Indiana*, 414 U.S. 105, 108-109 (1973) *(per curiam)* (incitement); *Miller* v. *California*, 413 U.S. 15, 25 (1973) (obscenity); *Time, Inc.* v. *Pape*, 401 U.S. 279, 284 (1971) (actual malice); *Greenbelt Cooperative Publishing Assn., Inc.* v. *Bresler*, 398 U. S. 6, 11 (1970) (defamation); *Street* v. *New York*, 394 U.S. 576, 589, 592 (1969) (fighting words); *Beckley Newspapers Corp.* v. *Hanks*, 389 U.S. 81, 83 (1967) *(per curiam)* (actual malice); *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 285 (1964) (actual malice); *Edwards* v. *South Carolina*, 372 U.S. 229, 235 (1963) (peaceful assembly); *Niemotko* v. *Maryland*, 340 U.S. 268, 271 (1951) (failure to issue license for religious meeting in public park); *Pennekamp* v. *Florida*, 328 U.S. 331, 335 (1946) (clear and present danger to integrity of court).

affords. Most fundamentally, the rule is premised on the recognition that "[j]udges, as expositors of the Constitution," have a duty to "independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" *Bose, supra*, at 511.

[11][12A]There is little doubt that "public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the *New York Times* rule," *Ocala Star-Banner Co.* v. *Damron*, 401 U.S. 295, 300 (1971), and the strongest possible case for independent [*687] review. As Madison observed in 1800, just nine years after ratification of the First Amendment:

> "Let it be recollected, lastly, that the right of electing the members of the government constitutes more particularly the essence of a free and responsible government. The value and efficacy of this right depends on the knowledge of the comparative merits and demerits of the candidates for public trust, and on the equal freedom, consequently, of examining and discussing these merits and demerits of the candidates respectively." 4 J. Elliot, Debates on the Federal Constitution 575 (1861).

This value must be protected with special vigilance. When a candidate enters the political arena, he or she "must expect that the debate will sometimes be rough and personal," *Ollman* v. *Evans*, 242 U. S. App. D. C. 301, 333, 750 F. 2d 970, 1002 (1984) (en banc) (Bork, J., concurring), cert. denied, 471 U.S. 1127 (1985), and cannot "'cry Foul!' when an opponent or an industrious reporter attempts to demonstrate" that he or she lacks the "sterling integrity" trumpeted in campaign literature and speeches, *Monitor Patriot Co.* v. *Roy*, 401 U.S. 265, 274 [**2696] (1971). Vigorous reportage of political campaigns is necessary for the optimal functioning of democratic institutions and central to our history of individual liberty. [34]

[12B]

[*688] [1C][13]We have not gone so far, [***589] however, as to accord the press absolute immunity in its coverage of public figures or elections. If a false and defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail. See *Curtis Publishing Co.* v. *Butts*, 388 U.S., at 162 (opinion of Warren, C. J.). A "reckless disregard" for the truth, however, requires more than a departure from reasonably prudent conduct. "There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant*, 390

---

[34] Of course, the protection of "calculated falsehoods" does not promote self-determination. As we observed in *Garrison* v. *Louisiana*, 379 U.S. 64 (1964):

"At the time the First Amendment was adopted, as today, there were those unscrupulous enough and skillful enough to use the deliberate or reckless falsehood as an effective political tool to unseat the public servant or even topple an administration. Cf. Riesman, Democracy and Defamation: Fair Game and Fair Comment I, 42 Col. L. Rev. 1085, 1088-1111 (1942). That speech is used as a tool for political ends does not automatically bring it under the protective mantle of the Constitution. For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected." *Id.*, at 75.

U.S., at 731. The standard is a subjective one -- there must be sufficient evidence to permit the conclusion that the defendant actually had a "high degree of awareness of . . . probable falsity." *Garrison* v. *Louisiana*, 379 U.S., at 74. As a result, failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard. See *St. Amant, supra*, at 731, 733. See also *Hunt* v. *Liberty Lobby*, 720 F. 2d 631, 642 (CA11 1983); *Schultz* v. *Newsweek, Inc.*, 668 F. 2d 911, 918 (CA6 1982). In a case such as this involving the reporting of a third party's allegations, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant, supra*, at 732.

[2B][14]In determining whether the constitutional standard has been satisfied, the reviewing court must consider the factual record in full. Although credibility determinations are reviewed under the clearly-erroneous standard because the trier of fact has had the "opportunity to observe the demeanor of the witnesses," *Bose*, 466 U.S., at 499-500, the reviewing court must "'examine for [itself] the statements in issue and the circumstances under which they were made to see . . . whether they are of a character which the principles of the First Amendment . . . protect,'" *New York Times Co.*, 376 U.S., at 285 (quoting *Pennekamp* v. *Florida*, 328 U.S. 331, 335 [*689] (1946)).[35] Based on our review of the entire record, we agree with the Court of Appeals that the evidence did in fact support a finding of actual malice. Our approach, however, differs somewhat from that taken by the Court of Appeals.

[2C]In considering the actual malice [***590] issue, the Court of Appeals identified 11 subsidiary [**2697] facts that the jury "could have" found.[36]842 F. 2d, at 843-844. The court

---

[35]  Petitioner concedes that "when conducting the independent review mandated by *New York Times* and *Bose*, a reviewing court should properly hesitate to disregard a jury's opportunity to observe live testimony and assess witness credibility." Brief for Petitioner 36, n. 45. It contends, however, that this Court did reject the trial court's credibility determination in *Bose*. We disagree with this reading of *Bose*. In *Bose* we accepted the trial court's determination that the author of the report at issue did not provide credible testimony concerning the reason for his choice of words and his understanding of the meaning of the word "about." 466 U.S., at 511-512. Unlike the District Court, however, we were unwilling to infer actual malice from the finding that the witness "refused to admit [his mistake] and steadfastly attempted to maintain that no mistake had been made -- that the inaccurate was accurate." *Id.*, at 512.

[36]  The Court of Appeals asserted:

"A review of the entire record of the instant case disclosed substantial probative evidence from which a jury could have concluded (1) that the *Journal* was singularly biased in favor of Dolan and prejudiced against Connaughton as evidenced by the confidential personal relationship that existed between Dolan and Blount, the *Journal* Editorial Director, and the unqualified, consistently favorable editorial and daily news coverage received by Dolan from the *Journal* as compared with the equally consistently unfavorable news coverage afforded Connaughton; (2) that the *Journal* was engaged in a bitter rivalry with the *Cincinnati Enquirer* for domination of the greater Hamilton circulation market as evidenced by Blount's vituperous public statements and criticism of the *Enquirer;* (3) that the *Enquirer*'s initial expose of the questionable operation of the Dolan court was a high profile news attraction of great public interest and notoriety that had 'scooped' the *Journal* and by Blount's own admission was the most significant story impacting the Connaughton-Dolan campaign[;] (4) that by discrediting Connaughton the *Journal* was effectively impugning the *Enquirer* thereby undermining its market share of the Hamilton area; (5) that Thompson's emotional instability coupled with her obviously vindictive and antagonistic attitudes toward Connaughton as displayed during an interview on October 27, 1983, arranged by Billy New's defense attorney, afforded the *Journal* an ideal vehicle to accomplish its objectives; (6) that the *Journal* was aware of Thompson's prior criminal convictions and reported psychological infirmities and the treatment she had received for her mental condition; (7) that every witness interviewed by *Journal* reporters discredited Thompson's accusations; (8) that the *Journal* intentionally avoided interviewing Stephens between October 27, 1983, the date of its initial meeting with Thompson, and November 1, 1983 when it printed its first story even though it knew that

held that such  [*690]  findings would not have been not clearly erroneous, *id.*, at 844, and, based on its independent review, that when considered cumulatively they provide clear and convincing evidence of actual malice, *id.*, at 847. We agree that the jury *may* have found each of those facts, but conclude that the case should be decided on a less speculative ground. Given the trial court's instructions, the jury's answers to the three special interrogatories, and an understanding of those facts not in dispute, it is evident that the jury *must* have rejected (1) the testimony of petitioner's witnesses that Stephens was not contacted simply because Connaughton failed to place her in touch with the newspaper; (2) the testimony of Blount that he did not listen to the tapes simply because he thought they would provide him with no new information; and (3) the testimony of those Journal News employees who asserted that they believed Thompson's allegations were substantially true. When these findings are considered alongside the undisputed  [*691]  evidence, the conclusion that the newspaper acted with actual malice inexorably follows.

[8C] [15A] [16A]There is no dispute that Thompson's charges had been denied not only by Connaughton, but also by five other witnesses before the story was published. Thompson's most serious charge -- that Connaughton  [***591]  intended to confront the incumbent judge with the tapes to scare him into resigning and otherwise not to disclose the existence of the tapes -- was not only highly improbable, but inconsistent with the fact that Connaughton had actually arranged a lie detector test for Stephens and then delivered the tapes to the police. These facts were well known to the Journal News before the story was published. Moreover, because the newspaper's interviews of Thompson and Connaughton were captured on tape, there can be no dispute as to what was communicated, nor how it was said. The hesitant, inaudible, and sometimes unresponsive and improbable tone of Thompson's answers to various leading questions raise obvious doubts about her veracity. Moreover, contrary to petitioner's contention  [**2698]  that the prepublication interview with Connaughton confirmed the factual basis of Thompson's statements, Brief for Petitioner 47, review of the tapes makes clear that Connaughton unambiguously denied each allegation of wrongful conduct. Connaughton's acknowledgment, for instance, that his wife may have discussed with Stephens and Thompson the possibility of working at an ice cream store that she might someday open, hardly confirms the allegations that Connaughton had promised to buy a restaurant for the sister's parents to operate, that he would provide Stephens with a job at the Municipal Court, or even that he would provide Thompson with suitable work. [37] It is

___

Stephens could either credit or discredit Thompson's statements; (9) that the *Journal* knew that publication of Thompson's allegations charging Connaughton with unethical conduct and criminal extortion and her other equally damaging statements would completely discredit and irreparably damage Connaughton personally, professionally and politically; (10) that its prepublication legal review was a sham; (11) that the *Journal* timed the release of the initial story so as to accommodate follow-up stories and editorial comments in a manner calculated to peak immediately before the election in an effort to maximize the effect of its campaign to discredit Connaughton and the *Enquirer.*" 842 F. 2d, at 843-844.

[37]   Nor can petitioner claim immunity from suit because portions of Thompson's account of the relevant events were confirmed by Connaughton. "[T]he defamer may be [all] the more successful when he baits the hook with truth." *Afro-American Publishing Co.* v. *Jaffe*, 125 U. S. App. D. C. 70, 76, 366 F. 2d 649, 655 (1966) (en banc). See also *Tavoulareas*, 260 U. S. App. D. C., at 64, 817 F. 2d, at 787. Of course, the press need not accept "denials, however vehement; such denials are so commonplace in the world of polemical

extraordinarily unlikely that the [*692] reporters missed Connaughton's denials simply because he confirmed certain aspects of Thompson's story.

[15B] [16B]

[8D]It is also undisputed that Connaughton made the tapes of the Stephens interview available to the Journal News and that no one at the newspaper took the time to listen to them. Similarly, there is no question that the Journal News was aware that Patsy Stephens was a key witness and that they failed to make any effort to interview her. Accepting the jury's determination that petitioner's explanations for these omissions were not credible, it is likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges. Although failure to investigate will not alone support a finding of actual malice, see *St. Amant*, 390 U.S., at 731, 733, the purposeful avoidance of the truth is in a different category.

There is a remarkable similarity between this case -- and in particular, the newspaper's failure to interview Stephens and failure to listen to the tape recording of the September 17 interview at Connaughton's home -- and the facts that supported the Court's judgment in *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130 (1967). In [***592] *Butts* the evidence showed that the Saturday Evening Post had published an accurate account of an unreliable informant's false description of the Georgia athletic director's purported agreement to "fix" a college football game. Although there was reason to question the informant's veracity, just as there was reason to doubt Thompson's story, the editors did not interview a witness who had the same access to the facts as the informant and did not look at films that revealed what actually happened [*693] at the game in question. [38] This evidence of an intent to avoid the truth was not only sufficient to convince the plurality that there had been an extreme departure from professional publishing standards, but it was also sufficient to satisfy the more demanding *New York Times* standard applied by Chief Justice [**2699] Warren, [39] Justice Brennan, and Justice White. [40]

charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Edwards* v. *National Audubon Society, Inc.*, 556 F. 2d, at 121.

[38] As Justice Harlan observed in *Butts:*

"Burnett's notes were not even viewed by any of the magazine's personnel prior to publication. John Carmichael who was supposed to have been with Burnett when the phone call was overheard was not interviewed. No attempt was made to screen the films of the game to see if Burnett's information was accurate, and no attempt was made to find out whether Alabama had adjusted its plans after the alleged divulgence of information." 388 U.S., at 157.

In this passage, "Stephens" might easily be substituted for "Carmichael," "Thompson" for "Burnett," and "the tapes" for "Burnett's notes" and "the films of the game."

[39] Chief Justice Warren wrote:

"The slipshod and sketchy investigatory techniques employed to check the veracity of the source and the inferences to be drawn from the few facts believed to be true are detailed at length in the opinion of Mr. Justice Harlan. Suffice it to say that little investigative effort was expended initially, and no additional inquiries were made even after the editors were notified by respondent and his daughter that the account to be published was absolutely untrue. Instead, the Saturday Evening Post proceeded on its reckless course with full knowledge of the harm that would likely result from publication of the article." *Id.*, at 169-170.

[2D] [8E]As in *Butts*, the evidence in the record in this case, when reviewed in its entirety, is "unmistakably" sufficient to support a finding of actual malice. The judgment of the Court of Appeals is accordingly

*Affirmed*.

**Concur by:** WHITE; BLACKMUN; KENNEDY; SCALIA

## Concur

[*694]  JUSTICE WHITE, with whom THE CHIEF JUSTICE joins, concurring.

In my view, in cases like this the historical facts -- *e. g.*, who did what to whom and when -- are reviewable only under the clearly-erroneous standard mandated by Federal Rule of Civil Procedure 52. Credibility determinations fall in this category, as does the issue of knowledge of falsity. But as I observed in dissent in *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U.S. 485, 515 (1984), the reckless disregard component of the *New York Times Co.* v. *Sullivan* "actual malice" standard is not a question of historical fact. A trial court's determination of that issue therefore is to be reviewed independently by the appellate court.

[***593]  As I read it, the Court's opinion is consistent with these views, and -- as Justice Kennedy observes -- is consistent with the views expressed by Justice Scalia in his concurrence. Based on these premises, I join the Court's opinion.

JUSTICE BLACKMUN, concurring.

I agree with the majority's analysis and with the result it reaches. I write separately, however, to stress two points.

First, the case reaches us in an odd posture, one which stands in the way of giving full consideration to aspects of the content of the article under attack that perhaps are of constitutional significance. Petitioner has abandoned the defense of truth, see *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U.S. 767 (1986), despite the fact that there might be some support for that defense. We therefore must presume that the jury correctly found that the article was false, see *ante*, at 681, and decide whether petitioner acted with knowledge or reckless disregard of its falsity. In addition, petitioner has eschewed any reliance on the "neutral reportage" defense. Cf. *Edwards* v. *National Audubon Society, Inc.*, 556 F. 2d 113, 120 (CA2), cert. denied, 434 U.S. 1002 (1977). This strategic decision appears to have been unwise in light of the facts of this case. The article accurately reported [*695] newsworthy allegations that Daniel Connaughton, a political candidate, had used "dirty tricks" to elicit information from Alice Thompson and her sister, information that had become central to the political

---

40    Although concluding that the case should be remanded for a new trial, Justice Brennan, joined by Justice White, agreed with Chief Justice Warren that the evidence presented at the original trial "unmistakably would support a judgment for Butts under the *New York Times* standard." *Id.*, at 172.

campaign, and also accurately reported Connaughton's response, which confirmed the existence of discussions with Thompson that touched upon the subject matter of her allegations but claimed that Thompson's version of these discussions was incorrect. Were this Court to adopt the neutral reportage theory, the facts of this case arguably might fit within it. That question, however, has also not been squarely presented.

Second, I wish to emphasize that the form and content of the story are relevant not only to the falsity and neutral reportage questions, but also to the question of actual malice. In the past, this Court's [**2700] decisions dealing with actual malice have placed considerable emphasis on the manner in which the allegedly false content was presented by the publisher. See *Greenbelt Cooperative Publishing Assn., Inc.* v. *Bresler*, 398 U.S. 6, 12-13 (1970) (truthful and accurate reporting of what was said at public meeting on issues of public importance not actionable); *Time, Inc.* v. *Pape*, 401 U.S. 279, 290-292 (1971) (erroneous interpretation of Government report not "actual malice"). Under our precedents, I find significant the fact that the article in this case accurately portrayed Thompson's allegations *as* allegations, and also printed Connaughton's partial denial of their truth. The form of the story in this case is markedly different from the form of the story in *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130 (1967), where the informant's description of the events was presented as truth rather than as contested allegations. These differences in presentation are relevant to the question whether the publisher acted in reckless disregard [***594] of the truth: presenting the content of Thompson's allegations as though they were established fact would have shown markedly less regard of their possible falsity.

[*696] Several aspects of the majority's opinion in this case might be interpreted as breaking with our practice of considering the form and content of the article in making malice determinations. The majority notes the form of the story, see *ante*, at 680-681, but its account of the evidence it finds probative of actual malice, *ante*, at 682-685, deals exclusively with evidence extrinsic to the story itself. The absence of any discussion of *Pape* and *Bresler* also might be understood as a suggestion that the manner in which the contested statements are presented is irrelevant to the malice inquiry. Finally, the majority relies upon *Butts* in the course of its discussion of petitioner's purposefully incomplete investigation of its story, *ante*, at 692-693, in a manner that suggests it might not have accorded significance to the difference between the forms of the respective stories in *Butts* and in this case.

I am confident, however, that these aspects of the majority's opinion are omissions in explanation rather than in analysis, and that the majority's opinion cannot fairly be read to hold that the content of the article is irrelevant to the actual malice inquiry. Because I am convinced that the majority has considered the article's content and form in the course of its painstaking "review of the entire record," see *ante*, at 689, and because I conclude that the result the majority reaches is proper even when the contents of the story are given due weight, I concur.

JUSTICE KENNEDY, concurring.

I join the opinion of the Court, for in my view it is not inconsistent with the analysis set out in Justice Scalia's separate concurrence.

JUSTICE SCALIA, concurring in the judgment.

I agree with the Court's disposition of this case, and with its resolution of the second legal issue on which we granted certiorari, namely whether "highly unreasonable conduct constituting an extreme departure from ordinary standards of investigation and reporting" is alone enough to establish [*697] (rather than merely evidence of) the malice necessary to assess liability in public figure libel cases.

I disagree, however, with the Court's approach to resolving the first and most significant question upon which certiorari was granted, which was the following:

> "Whether, in a defamation action instituted by a candidate for public office, the First and Fourteenth Amendments obligate an appellate court to conduct an independent review of the entire factual basis for a jury's finding of actual malice -- a review that examines both the subsidiary facts underlying the jury's finding of actual malice and the jury's ultimate finding of actual malice itself."

[**2701] That question squarely raised the conflict that the Sixth Circuit perceived it had created with an earlier decision of the District of Columbia Circuit, en banc, concerning the requirement we set forth in *Bose Corp.* v. [***595] *Consumers Union of United States, Inc.*, 466 U.S. 485 (1984), that judges "exercise independent judgment" on the question "whether the record establishes actual malice with convincing clarity," *id.*, at 514. The nub of the conflict, which is of overwhelming importance in libel actions by public figures, is whether this means, as the Sixth Circuit understood the District of Columbia Circuit to have held in *Tavoulareas* v. *Piro*, 260 U. S. App. D. C. 39, 817 F. 2d 762 (1987) (en banc), that the trial judge and reviewing courts must make their own "independent" assessment of the facts allegedly establishing malice; or rather, as the Sixth Circuit held here (explicitly rejecting *Tavoulareas*), that they must merely make their own "independent" assessment that, *assuming all of the facts that could reasonably be found in favor of the plaintiff were found in favor of the plaintiff*, clear and convincing proof of malice was established.

Today's opinion resolves this issue in what seems to me a peculiar manner. The Court finds it sufficient to decide the present case to accept, not all the favorable facts that the [*698] jury *could reasonably* have found, but rather only the adequately supported favorable facts that the jury *did* find. Exercising its independent judgment just on the basis of those facts (and the uncontroverted evidence), it concludes that malice was clearly and convincingly proved. The crucial passage of the Court's opinion is the following:

> "Given the trial court's instructions, the jury's answers to the three special interrogatories, and an understanding of those facts not in dispute, it is evident that the jury *must* have rejected (1) the testimony of petitioner's witnesses that Stephens was not contacted simply because Connaughton failed to place her in touch with the newspaper; (2) the testimony of Blount that he did not listen to the tapes simply because he thought they

would provide him with no new information; and (3) the testimony of those Journal News employees who asserted that they believed Thompson's allegations were substantially true. When these findings are considered alongside the undisputed evidence, the conclusion that the newspaper acted with actual malice inextricably follows." *Ante*, at 690-691 (emphasis in original).

This analysis adopts the most significant element of the Sixth Circuit's approach, since it accepts the jury's determination of at least the necessarily found controverted facts, rather than making an independent resolution of that conflicting testimony. Of course the Court examines the evidence pertinent to the jury determination -- as a reviewing court always must -- to determine that the jury *could reasonably* have reached that conclusion. But the Court does not purport to be exercising its own independent judgment as to whether Stephens was not contacted simply because Connaughton failed to place her in touch with the newspaper, whether Blount did not listen to the tapes because he thought they would provide no new information, or whether the Journal News employees believed Thompson's allegations to be substantially true.

[*699] While I entirely agree with this [***596] central portion of the Court's analysis, I do not understand the Court's approach in conducting that analysis only on the basis of the three factual determinations the Court selects. To begin with, I am dubious of the Court's conclusion that the jury *must* have made all three of those findings in order to bring in the verdict that it did under the judge's instructions, and in order to answer as it did the only relevant "special interrogatory," which was "Do you unanimously find by clear and convincing proof that the publication in question was published with actual malice?" It seems to me, for example, that even if one believed Blount's explanation of why he did not listen to the tapes, it would still be reasonable to find [**2702] (and I would find) clear and convincing proof of malice from the utterly inexplicable failure to interview Stephens plus the uncontroverted evidence.

More important, however, even if each of these factual findings happened to be *necessary* to the verdict and interrogatory response, I see no reason to make them the exclusive focus of our analysis, instead of consulting (as the Sixth Circuit did, and as courts invariably do when reviewing jury verdicts) all the reasonably supported findings that the jury could have made. It may well be true that "we need only consider those factual findings that were essential to the jury verdict" in the sense that referring to those alone is enough to decide the case -- *i. e.*, those alone establish clear and convincing proof of malice. But one could pick out any number of categories of permissible jury findings that would meet that test. For example, it might be true that we could find the requisite proof of malice by considering, not all the evidence in its light most favorable to the plaintiff, but only that evidence produced by a particular witness. We could then say "we need only consider the findings the jury might have made based on the testimony of Mr. Smith to decide this case." I see no more logic in limiting the inquiry the way the Court has done than in limiting it in this latter fashion.

[*700] That can be made plain by applying the Court's approach to a situation in which the facts essential to the jury verdict happen *not* to establish clear and convincing proof of malice.

Assume a case in which there are innumerable controverted allegations, dozens of which, if the plaintiff's version is credited, would suffice to establish malice; but in which only *one* controverted allegation -- the defendant's allegation that he knew firsthand the truth of the libelous charges -- could not *possibly* have been found against the plaintiff if the jury was to come in with the verdict that it did. If we applied today's analysis to that situation, we would then proceed to ask whether the fact that the defendant did not know firsthand the truth of the charges, and that he lied about that, is alone enough to establish clear and convincing proof of malice. It clearly would not be. Surely, however, we would not reverse the judgment for the plaintiff, when dozens of other disputed contentions which the jury might have resolved in the plaintiff's favor *would* establish clear and convincing proof. We would, as the Sixth Circuit did, assume that all those disputes were resolved in the plaintiff's favor -- unless, of course, we again devised some nonfunctional category of the remaining disputes that we could look to, perhaps [***597] those pertaining to testimony by Mr. Smith.

In sum, while the Court's opinion is correct insofar as the critical point of deference to jury findings is concerned, I see no basis for consulting only a limited number of the permissible findings. I would have adopted the Sixth Circuit's analysis in its entirety, making our independent assessment of whether malice was clearly and convincingly proved on the assumption that the jury made all the supportive findings it reasonably could have made. That is what common-law courts have always done, and there is ultimately no alternative to it.

## References

32 Am Jur 2d, Federal Practice and Procedure 363; 50 Am Jur 2d, Libel and Slander 135, 296-303, 4622 Federal Procedure, L Ed, Appeal, Certiorari, and Review 3:649; 33 Federal Procedure, L Ed, Trial 77:243-77:24616 Am Jur Pl & Pr Forms (Rev), Libel and Slander, Forms 29, 184, 29714 Am Jur Proof of Facts 2d 49, Defamation with Actual Malice17 Am Jur Trials 223, Libel Actions by Public OfficialsUSCS, Constitution, Amendment 1US L Ed Digest, Appeal 1673; Constitutional Law 948; Evidence 918Index to Annotations, Findings of Fact; Libel and Slander; New York Times Rule     Annotation References:Supreme Court's views as to what constitutes factual issue under "clearly erroneous" standard of Federal Rule of Civil Procedure 52(a), providing that findings of fact shall not be set aside unless clearly erroneous. 72 L Ed 2d 890. Progeny of New York Times v Sullivan in the Supreme Court. 61 L Ed 2d 975.The Supreme Court and the right of free speech and press. 93 L Ed 1151, 2 L Ed 2d 1706, 11 L Ed 2d 1116, 16 L Ed 2d 1053, 21 L Ed 2d 976.Criticism or disparagement of character, competence, or conduct of candidate for office as defamation. 37 ALR4th 1088.What constitutes actual malice, within federal constitutional rule requiring public officials and public figures to show actual malice. 20 ALR3d 988.Constitutional aspects of libel or slander of public officials. 95 ALR2d 1450.



# Huckabee v. Time Warner Entertainment Co., L.P.

Supreme Court of Texas

November 3, 1999, Argued ; May 4, 2000, Delivered

No. 98-1018

**Reporter**

19 S.W.3d 413; 2000 Tex. LEXIS 43; 43 Tex. Sup. J. 674; 28 Media L. Rep. 2158

DEAN HUCKABEE, PETITIONER v. TIME WARNER ENTERTAINMENT COMPANY, L.P., RESPONDENT

**Prior History:** [**1] ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS.

**Disposition:** Judgment of court of appeals affirmed.

**Counsel:** For Petitioner: Mr. James Tynan Kelly, The Marshall Law Firm, Houston, TX, Ms. Diana E. Marshall, The Marshall Law Firm, Houston, TX, Mr. Paul J. Franzetti, The Marshall Law Firm, Houston, TX.

For Respondent: Ms. Julie A. Ford, Haynes and Boone, Austin, TX, Mr. R. James George, Jr., George & Donaldson, Austin, TX, Mr. Ben Jay Cunningham, George & Donaldson, Austin, TX.

**Judges:** CHIEF JUSTICE PHILLIPS delivered the opinion of the Court, in which JUSTICE ENOCH, JUSTICE BAKER, JUSTICE ABBOTT, JUSTICE HANKINSON, JUSTICE O'NEILL, and JUSTICE GONZALES joined. JUSTICE HECHT filed a dissenting opinion. JUSTICE OWEN did not participate in the decision.

**Opinion by:** THOMAS R. PHILLIPS

## Opinion

[*416] We must decide whether a media defendant sued for defamation by a public official is entitled on the facts of this record to summary judgment on the issue of actual malice. Because the defendant produced [*417] evidence negating actual malice as a matter of law, and because the plaintiff did not produce controverting evidence raising a fact issue, we affirm the summary judgment granted [**2] by the court of appeals. 995 S.W.2d 152.

I

When this claim arose, Charles Dean Huckabee was presiding judge of the 247th District Court of Harris County, which by statute gives preference to family law matters. *See* TEX. GOV'T

CODE § 24.424. Judge Huckabee claims that Respondent, HBO, defamed him by broadcasting the documentary *Women on Trial* on its premium cable channel. This hour-long program chronicled four southeast Texas cases in which family courts granted custody of a child to the father after the mother accused the father of child abuse. Three of these cases arose in Harris County, and Judge Huckabee presided over two of them. Judge Huckabee principally claims that the documentary defamed him in its report on his decision regarding the custody of four-year-old Wayne Hebert. *See In re the Marriage of Sandra Hebert and Michael Hebert*, No. 84-13392, *In re John Hebert and Wayne Hebert, Minor Children*, No. 88-14873 (consolidated cases)(247th Dist. Ct., Harris County, Tex. Mar. 13-15, 1988)(″*Hebert*″).

The *Hebert* case began in 1988, when Sandra Hebert discovered that Wayne had sustained an injury to his penis. The [**3] day before, Wayne had returned from visiting Michael Hebert, his father and Sandra's ex-husband. Wayne had gone with Michael to visit his grandmother's home in Louisiana. Believing that Michael caused Wayne's injury, Sandra consulted with her friend Sherry Turner, a Houston police officer who specialized in sexual abuse cases. Turner, interviewing Wayne alone, videotaped Wayne's statement that Michael had injured him while taking a bath. In two other videotaped interviews, Wayne also told social worker Cheryl Bennett and Child Protective Services caseworker Wilma Smith that Michael caused the injury. After investigating further, Smith concluded that Wayne had been abused, but that the abuser could not be identified. Because Michael was a Houston police officer, the Houston Police Department's Internal Affairs Department also investigated the incident and likewise determined that the abuser could not be identified.

Alleging that Michael had abused Wayne, Sandra moved to modify the custody order to restrict Michael's visitation rights. After a three-day hearing in March 1988, Judge Huckabee rendered a temporary order that not only made Michael rather than Sandra the managing conservator [**4] of Wayne, but went on to deny Sandra all access to her child, even though Michael had not sought either of these changes. Sandra unsuccessfully sought a writ of mandamus from the court of appeals to overturn the temporary order. *See Hebert v. Huckabee*, 1988 Tex. App. LEXIS 1623, No. A14-88-00511-CV, 1988 WL 73789 (Tex. App.-- Houston [14th Dist.], July 14, 1988, orig. proceeding)(not designated for publication). She did not seek a subsequent modification of the order, and it was still in effect when *Women on Trial* was broadcast in 1992.

In late 1990, Lee Grant, the director of *Women on Trial*, first began work on a documentary about divorce. Hoping to examine how once happily married couples later ended up in bitter divorces, Grant secured her husband's production company, Joseph Feury Productions (JFP), to produce the film. Grant assigned JFP employee Virginia Cotts to find suitable stories for the program. In March 1991, Cotts met in Houston with Joleen Reynolds, the leader of Citizens Organized for Divorce Ethics and Solutions (CODES), a support group for men and women who felt that the Houston family courts had treated them unfairly. Reynolds discussed a number of cases with Cotts, [**5] including the *Hebert* case. After meeting with [*418] Reynolds, Cotts wrote a three-page summary of Sandra Hebert's situation.

Sandra Hebert's story was included along with several others submitted by Cotts and Grant to HBO in April 1991. In her summary of the Hebert story, Cotts included the following bullet points: (1) "Police ex-husband abused son"; (2) "Corrupt Judge gave custody to father/abuser"; (3) and "Sandy lost all rights to see her child." Sandra Hebert's story particularly impressed the HBO executives. After reading it, HBO vice-president Sheila Nevins wrote on her copy: "Great story. Do at once." Nevins's assistant, Cis Wilson, wrote: "Great, sad story." After considering the proposal, HBO agreed to purchase the film. Throughout the rest of the film's production, Cotts and Grant regularly met with Wilson and Nevins.

Cotts and Grant both came to Houston to film interviews. In addition to Joleen Reynolds, Sandra Hebert, and her current and former attorneys, they also interviewed Ivy Raschke, another woman who had been denied access to her children by Judge Huckabee after accusing the children's father of abuse. Cotts also continued her research into other allegations of impropriety [**6] in the Harris County family courts, including those reported by local print and broadcast media.

In September 1991, JFP delivered a "rough cut" of the film to HBO. Cotts's contemporaneous status report revealed tension between Lee Grant and Sheila Nevins over the film's direction. Grant apparently wanted to present a broad picture of divorce that showed both the fathers' and the mothers' perspectives, but Nevins wanted a narrower piece that focused on mothers who believed the family court system had treated them unfairly. Nothing in the status report, however, indicated that Grant, Cotts, or anyone at HBO believed anything in the documentary to be false or entertained serious doubts about the truth of any of the film's allegations.

In November 1991, Grant and Cotts returned to Houston and videotaped Judge Huckabee. While Judge Huckabee stated that he could not talk specifically about the *Hebert* case because it was pending in his court, he did agree to talk about it in "hypothetical" terms. He then explained that all of his decisions in this and other cases were based on the best interests of the children. HBO did not include these statements in the final version. Instead, it [**7] aired this response by Judge Huckabee to a question about a "hypothetical" version of the *Hebert* case:

I have to do what's best for the child. If someone, is, uh, brainwashing the a child to the same extent that it causes psychological and emotional problems with the child, especially coupled with some physical abuse, in my opinion the child has to be removed from that situation.

The broadcast also aired Judge Huckabee's explanation of his criteria for determining when a mother in that situation could see her children again:

Well, if its [sic] a person who has mental health problems, they're going to have to seek mental health, uh, care. If its [sic] a person sexually abusing a child, they're probably going to have to seek mental health care.

Finally, the broadcast aired Judge Huckabee's statement that he took the decision to deny access to a parent very seriously, but that he was satisfied that he had made the correct decision in every case in which he had done so.

The filmmakers also interviewed Dr. Kit Harrison, a psychologist appointed by Judge Huckabee in *Hebert* and in many other cases. Four months after Judge Huckabee rendered the temporary order [**8] denying Sandra Hebert access to Wayne, Dr. Harrison issued a report concluding that Michael had not caused Wayne's injury. Rather, the report concluded that Wayne's older brother John committed the abuse while Wayne was in Sandra's custody. Based on this belief, Dr. Harrison agreed with Judge Huckabee's decision to [*419] transfer Wayne to his father's custody and deny Sandra access to the child. Although the final version mentioned Dr. Harrison's recommendation approving of the judge's order, it did not detail Dr. Harrison's reasons.

Finally, Cotts and Grant interviewed Houston attorney Randy Burton, an outspoken critic of the Houston family courts. Among other things, Burton accused the Harris County family court judges of practicing cronyism and disregarding the best interests of the children before them.

After these interviews, Cotts and Grant recut the film to include some of the new footage. From April to September 1991, HBO and JFP's lawyers reviewed the film, finally allowing the film to air in October 1991. HBO also agreed to indemnify JFP should a judgment arise from the film in excess of JFP's errors-and-omissions insurance coverage.

*Women on Trial* aired on October 28, 1992. In [**9] addition to the Sandra Hebert and Ivy Raschke segments, the film included two other stories. In one, another Harris County family district court judge, Allen Daggett, had transferred custody of Mary Frances Parker's child to her ex-husband, a convicted rapist, even though she claimed that he was abusing the child. In the other, Sherry Nance was convicted of murdering her ex-husband and his father after a Bee County jury awarded custody of her son to the ex-husband. Nance claimed that she killed her ex-husband to save her son from continuing sexual abuse. The documentary did not name the judge in the Bee County case.

Judge Huckabee sued HBO, JFP, Grant, and Burton, claiming that they had defamed him both by particular statements and by portraying him in general as a judge who knowingly disregarded children's best interests. In addition to his claim that the entire documentary defamed him, Judge Huckabee alleged as false and defamatory these statements: (1) the Houston family courts were "filled" with cases "irrational in their decisions" and "medieval in their punishment"; (2) "women who charge their husbands with abuse are often viewed as mentally unstable and routinely lose custody [**10] of their children"; (3) all the rulings depicted in the documentary happened in one courthouse; and (4) Randy Burton's conclusions in the film that the Houston family courts "were the last bastion of the good ole' boy system" and that the judges in those courts were guilty of "conscious indifference to the child" and "legalized child abuse." Judge Huckabee also alleged that the film's description of the *Hebert* case omitted important facts that would have led viewers to conclude that his *Hebert* order was justified.

After discovery, HBO moved for summary judgment asserting that: (1) HBO published the film without actual malice; (2) Judge Huckabee's claim actually pleaded a cause of action for

false light invasion of privacy, which Texas law does not recognize; (3) all the statements concerning Judge Huckabee were literally or substantially true; (4) these statements were constitutionally protected statements of opinion; and (5) *Women on Trial* was privileged as a fair and reasonable comment on, or criticism of, an official act of a public official and a matter of public concern. *See* TEX. CIV. PRAC. & REM. CODE § 73.002(b)(2). After [**11] the trial court denied HBO's motion for summary judgment, HBO appealed as a media defendant who was denied a motion for summary judgment "arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article 1, Section 8, of the Texas Constitution, or Chapter 73" of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM. CODE § 51.014(a)(6). The court of appeals, whose jurisdiction was not challenged, reversed and rendered judgment for HBO on the sole ground that HBO negated one essential element of Judge Huckabee's case by conclusively proving that it broadcast *Women on Trial* without actual [*420] malice. 995 S.W.2d 152. We granted Judge Huckabee's petition for review under our jurisdiction to hear cases appealed under section 51.014(a)(6). *See* TEX. GOV'T CODE § 22.225(d).

II

To recover for defamation, a public figure or public official, such as Judge Huckabee, must prove that the defendant published a false and defamatory statement with actual malice. *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989); [**12] *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964). As we resolve this case solely on the issue of whether HBO negated actual malice as a matter of law, we assume without deciding that the documentary either expressly or implicitly made false statements about Judge Huckabee. We also do not reach the issue of whether any of these statements, even if false, were not defamatory because the documentary's overall portrayal of Judge Huckabee was substantially true. *See McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990).

Actual malice in a defamation case is a term of art. Unlike common-law malice, it does not include ill-will, spite, or evil motive. *Casso v. Brand*, 776 S.W.2d 551, 558 (Tex. 1989). Rather, to establish actual malice, a plaintiff must prove that the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was true or not." *New York Times*, 376 U.S. at 279-80. Reckless disregard is also a term of art. To establish reckless disregard, a public official or public figure must prove that the publisher "entertained serious [**13] doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968). Finally, to prevail at trial, a plaintiff must establish actual malice by clear and convincing evidence. *See Bose Corp. v. Consumers Union, Inc.*, 466 U.S. 485, 511, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984); *Casso*, 776 S.W.2d at 558.

In Texas, under our traditional summary judgment procedure, defendants can obtain summary judgment only if they conclusively negate one of the elements of the plaintiff's claim. TEX. R. CIV. P. 166a(c); *Phan Son Van v. Pena*, 990 S.W.2d 751, 753 (Tex. 1999); *Casso*, 776

S.W.2d at 556. [1] A libel defendant can negate actual malice as a matter of law by presenting evidence that he or she did not publish the statement with knowledge of its falsity or reckless disregard for its truth. *McLemore*, 978 S.W.2d at 574; *Casso*, 776 S.W.2d at 559. Once the defendant has produced evidence negating actual malice as a matter of law, the burden shifts to the plaintiff to present controverting proof raising a genuine issue of material [**14] fact. *See* TEX. R. CIV. P. 166a(c); *Phan Son Van*, 990 S.W.2d at 754; *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

Respondents and various amici aligned with their position suggest that we abandon our traditional summary judgment standard in public-figure defamation cases and adopt the federal summary judgment standard established in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Under this standard, "the appropriate summary judgment question will be whether the evidence in the record could support a reasonable jury finding that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Anderson*, 477 U.S. at 255-56. [**15] Respondents and amici reason that because a plaintiff must satisfy [*421] the clear-and-convincing standard to prevail at trial, logic dictates that this standard should also apply at the summary judgment stage. Adopting the clear-and-convincing standard at the summary judgment stage, they argue, would also align Texas practice with most other states. [2] Finally, they contend that the heightened evidentiary standard is needed at the summary judgment stage to protect media defendants from the costs associated with defending groundless defamation actions. Failure to protect media organizations against these costs, they assert, will lead to self-censorship, thereby compromising the First Amendment's guarantee of a free press.

[**16] We decline to adopt the clear-and-convincing requirement at the summary judgment stage. In *Casso v. Brand*, 776 S.W.2d 551 (Tex. 1989), we held that neither the United States Constitution nor the Texas Constitution mandated a special summary judgment procedure in public-figure defamation cases. *Casso*, 776 S.W.2d at 555-57. We concluded that the United

---

[1] HBO's motion for summary judgment in this case was a traditional motion for summary judgment. *See* TEX. R. CIV. P. 166a(b). Therefore, HBO bears the burden of negating actual malice as a matter of law. *See Casso*, 776 S.W.2d at 556.

[2] *See Pemberton v. Birmingham News Co.*, 482 So. 2d 257, 260 (Ala. 1985); *Read v. Phoenix Newspapers, Inc.*, 169 Ariz. 353, 819 P.2d 939, 942 (Ariz. 1991)(en banc); *Southall v. Little Rock Newspapers, Inc.*, 332 Ark. 123, 964 S.W.2d 187, 193 (Ark. 1998); *Reader's Digest Ass'n v. Superior Court*, 37 Cal. 3d 244, 690 P.2d 610, 614, 208 Cal. Rptr. 137 (Cal. 1984)(en banc); *DiLeo v. Koltnow*, 200 Colo. 119, 613 P.2d 318, 323 (Colo. 1980)(en banc); *Gardner v. Boatright*, 216 Ga. App. 755, 455 S.E.2d 847, 848 (Ga. Ct. App. 1995); *Jenkins v. Liberty Newspapers Ltd. Partnership*, 89 Haw. 254, 971 P.2d 1089, 1093 (Haw. 1999); *Wiemer v. Rankin*, 117 Idaho 566, 790 P.2d 347, 357 (Idaho 1990); *Heeb v. Smith*, 613 N.E.2d 416, 420 (Ind. Ct. App. 1993); *Carr v. Bankers Trust Co.*, 546 N.W.2d 901, 904-05 (Iowa 1996); *Knudsen v. Kansas Gas & Elec. Co.*, 248 Kan. 469, 807 P.2d 71, 81 (Kan. 1991); *Sassone v. Elder*, 626 So. 2d 345, 351 (La. 1993); *Tucci v. Guy Gannett Publishing Co.*, 464 A.2d 161, 167 (Me. 1983); *ELM Med. Laboratory, Inc. v. RKO General, Inc.*, 403 Mass. 779, 532 N.E.2d 675, 680 (Mass. 1989); *Foley v. WCCO Television, Inc.*, 449 N.W.2d 497, 503 (Minn. Ct. App. 1989); *Johnson v. Delta-Democrat Publishing Co.*, 531 So. 2d 811, 815 (Miss. 1988); *Scacchetti v. Gannett Co.*, 123 A.D.2d 497, 507 N.Y.S.2d 337, 339 (N.Y. App. Div. 1986); *Proffitt v. Greensboro News & Record, Inc.*, 91 N.C. App. 218, 371 S.E.2d 292, 293-94 (N.C. Ct. App. 1988); *Perez v. Scripps-Howard Broadcasting Co.*, 35 Ohio St. 3d 215, 520 N.E.2d 198, 202 (Ohio 1988); *Ertel v. Patriot-News Co.*, 544 Pa. 93, 674 A.2d 1038, 1040 (Pa. 1996); *Krueger v. Austad*, 1996 SD 26, 545 N.W.2d 205, 211 (S.D. 1996); *Palmer v. Bennington Sch. Dist., Inc.*, 159 Vt. 31, 615 A.2d 498, 504 (Vt. 1992); *Herron v. Tribune Publishing Co.*, 108 Wn.2d 162, 736 P.2d 249, 255 (Wash. 1987) (en banc); *Long v. Egnor*, 176 W. Va. 628, 346 S.E.2d 778, 785-86 (W. Va. 1986); *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 563 N.W.2d 472, 480 (Wis. 1997); *Oil, Chem. & Atomic Workers Int'l Union v. Sinclair Oil Corp.*, 748 P.2d 283, 289 (Wyo. 1987).

States Supreme Court's requirement that a plaintiff come forward with sufficient proof to allow a jury finding of actual malice by clear-and-convincing evidence was based merely on federal procedure. *See Casso*, 776 S.W.2d at 555-56. Although we recognized the importance of "encouraging free and untrammeled expression on matters of public concern or interest," we believed that the plaintiff's heavy burden of proving actual malice at trial adequately protected these important liberty interests. *Id.* at 557. To some extent, we based our holding in *Casso* on the different role of summary judgment in the Texas and federal systems. *See id.* at 556. At that time, our state's summary judgment practice served only the limited purpose of "eliminating patently unmeritorious claims and untenable [**17] defenses,'" *id.* (quoting *Clear Creek Basin Auth.*, 589 S.W.2d at 678 n.5), while in the federal system it played an "integral part" in "securing the just, speedy and inexpensive determination of every action.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986) (quoting FED. R. CIV. P. 1)). Although our recent adoption of the no-evidence summary judgment as an alternate procedure in Texas obviated, to some extent, the differences in summary judgment procedure between the two systems, our holding in *Casso* was also consistent with practical considerations, which remain valid today.

One consideration is the difficulty in adapting review under a heightened evidentiary standard to Texas summary judgment practice. Requiring the trial court to determine at the summary judgment stage whether a reasonable juror could find the evidence to be clear and convincing [*422] suggests that the trial court must weigh the evidence. *See Anderson*, 477 U.S. at 266 (Brennan, J., dissenting); *Moffatt v. Brown*, 751 P.2d 939, 944 (Alaska 1988) ("The clear-and-convincing test inevitably implicates [**18] a weighing of the evidence, an exercise that intrudes into the province of the jury.'" (quoting *Dairy Stores, Inc. v. Sentinel Publishing Co.*, 104 N.J. 125, 516 A.2d 220, 236 (N.J. 1986))). Texas law has always emphasized that trial courts must not weigh the evidence at the summary judgment stage. *See Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 931 (Tex. 1952); 3 MCDONALD, TEXAS CIVIL PRACTICE § 18.26, at 499 (Allen et al., eds. 1992). Instead, a trial court's only duty at the summary judgment stage is to determine if a material question of fact exists. *See Gulbenkian*, 252 S.W.2d at 931. Unless constitutionally mandated, we see no reason to upset this traditional demarcation between fact-finder and judge by requiring trial courts to weigh the evidence at the summary judgment stage.

We are reminded that the majority in *Anderson* insisted that its standard did not require trial courts to weigh evidence at the summary judgment stage. With all due respect, we agree with Justice Brennan's dissenting opinion on this point:

I simply cannot square the [majority's] direction that the judge "is not himself to weigh the evidence" [**19] with the direction that the judge also bear in mind the "quantum" of proof required and consider whether the evidence is of sufficient "caliber or quantity" to meet that "quantum." I would have thought that a determination of the "caliber and quantity," i.e., the importance and value, of the evidence in light of the "quantum," i.e., the amount "required," could *only* be performed by weighing the evidence.

*Anderson*, 477 U.S. at 266 (Brennan, J., dissenting)(emphasis in original). Several commentators have agreed that trial judges cannot determine the "caliber and quantity" of evidence without performing some of the functions of a finder of fact. *See* Issacharoff & Loewenstein, *Second Thoughts About Summary Judgment*, 100 YALE L.J. 73, 85 (1990); Mullenix, *Summary Judgment: Taming the Beast of Burdens*, 10 AM. J. TRIAL ADVOC. 433, 462 (1987); ("So replete is the decision with contradictory pronouncements that opposing counsel can in the future legitimately cite *Anderson*'s dicta for completely repugnant propositions."); Stempel, *A Distorted Mirror: The Supreme Court's Shimmering View of Summary Judgment, Directed Verdict,* [**20] *and the Adjudication Process*, 49 OHIO ST. L.J. 95, 115-16 (1988).

Furthermore, the clear-and-convincing standard provides little guidance regarding what evidence is sufficient for a plaintiff to avoid summary judgment. *See Anderson*, 477 U.S. at 270 (Rehnquist, J., dissenting). We have defined clear and convincing evidence as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980)(quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); *see also* TEX. CIV. PRAC. & REM. CODE § 41.001(2). Clearly, this standard is vague. Accordingly, we have been reluctant to require it except in those "extraordinary circumstances" when that degree of proof is mandated by constitutional or statutory requirements. *Ellis County State Bank v. Keever*, 888 S.W.2d 790, 792 (Tex. 1994)(clear and convincing proof not required for malicious prosecution); *accord Rhodes v. Cahill*, 802 S.W.2d 643, 645 n.2 (Tex. 1990) [**21] (adverse possession); *Sanders v. Harder*, 148 Tex. 593, 227 S.W.2d 206, 209 (Tex. 1950)(trespass to try title). On a cold summary judgment record, without having observed a single witness, it would take keen insight to forecast accurately whether probative evidence would or would not produce a "firm belief or conviction" in the mind of the trier of fact. The distinction, in a paper record, [*423] between evidence that will merely raise a fact issue and evidence that will be clear and convincing is generally subtle, if not wholly subjective.

Because of the difficulty faced by a trial judge in applying the clear-and-convincing standard at the summary judgment stage, Justice Rehnquist predicted that *Anderson* would "cause the decisions of trial judges on summary judgment motions in libel cases to be more erratic and inconsistent than before." *Anderson*, 477 U.S. at 272-73 (Rehnquist, J., dissenting); *see also Anderson*, 477 U.S. at 258 (Brennan, J., dissenting)("I am unable to divine from the Court's opinion *how* these evidentiary standards are to be considered, or what a trial judge is actually to do in ruling on a motion for summary judgment." (emphasis [**22] in original)); Mullenix, 10 AM. J. TRIAL ADVOC. at 461; Stempel, 49 OHIO ST. L.J. at 180-81. Although we cannot empirically determine whether this prediction has in fact come to pass, we see no reason to risk such an outcome by departing from our traditional summary judgment standard, especially when the heightened standard of proof adequately safeguards the First Amendment rights of defamation defendants at the trial and appellate stages. After a record has been established at trial, courts must independently review the record to determine if the jury's finding of actual malice was, as a matter of law, supported by clear and convincing evidence. *See Doubleday & Co. v. Rogers*, 674 S.W.2d 751, 755 (Tex. 1984)(citing *Bose Corp.*, 466 U.S. at 511). We

believe it obvious that this determination may be more easily and accurately made after a trial on the merits. *Cf.* Stempel, 49 OHIO ST. L.J. at 177 (″A judicial decision overturning a jury verdict after trial and deliberation is based on a far more extensive data base than a grant of summary judgment . . . .″).

We therefore believe that if a fact issue exists at the summary judgment stage, the evaluation about whether a reasonable [**23] jury would find the plaintiff's evidence to be clear and convincing is best made after the facts are fully developed at trial. That most other jurisdictions have accepted *Anderson* should not compel us to adopt a standard that is contrary to our traditional jurisprudence and difficult to apply in practice. As Respondents and amici have presented no authority that would constitutionally require it, we decline to adopt the clear-and-convincing standard at the summary judgment stage of a public-figure defamation case. To the extent that they hold or suggest to the contrary, we disapprove of the decisions in *Rogers v. Cassidy*, 946 S.W.2d 439, 446 (Tex. App.--Corpus Christi 1997, no writ); *Hill v. Herald-Post Publishing Co.*, 877 S.W.2d 774, 781 (Tex. App.--El Paso), *rev'd in part on other grounds*, 891 S.W.2d 638 (Tex. 1994); *Schauer v. Memorial Care Sys.*, 856 S.W.2d 437, 446 (Tex. App.--Houston [1st Dist.] 1993, no writ).

III

HBO supported its motion for summary judgment with affidavits from Lee Grant, Sheila Nevins, Cis Wilson, and Virginia Cotts. Grant's affidavit stated that she neither believed the film to have [**24] contained a false statement nor entertained any doubts about the truth of any statement regarding Judge Huckabee. Her sources for the Sandra Hebert story included the transcript of the March 1988 hearing, information from Sandra's current and former lawyers, and research by Virginia Cotts.

Sheila Nevins's affidavit stated that as vice-president for documentaries and family programming for HBO, she relied on the favorable reputations for accuracy and truthfulness of both Grant and JFP and her own favorable personal experience with their earlier work. She was aware of Grant and Cotts's efforts to ensure the film's accuracy, and she neither believed any statement in the documentary to be untrue nor harbored any doubts about the film's truthfulness. Cis Wilson's affidavit contained similar statements.

[*424] HBO presented two extensive affidavits from Virginia Cotts. In her first affidavit, Cotts explained the steps she took in researching the stories presented in *Women on Trial*. To ensure that the film's account of the *Hebert* case was accurate, she (1) reviewed the transcript from the March 1988 hearing, (2) interviewed Sandra and her attorneys, (3) viewed all three videotapes of Wayne [**25] Hebert, (4) reviewed articles in the Houston press describing problems in the family courts, and (5) read Dr. Harrison's deposition in the *Hebert* case. In all, Cotts reviewed over two thousand pages of documents in connection with the Texas cases. From this extensive review, Cotts stated that she believed that the film's depiction of the *Hebert* case was accurate and that she had no doubts regarding this account.

Cotts's second affidavit detailed her reasons for doubting Dr. Harrison's conclusion that Wayne's brother was the abuser, such as (1) her own viewing of the videotapes in which Wayne identified his father as the abuser; (2) the improbability of Harrison's theory that Wayne's older brother John had injured him using a favorite toy; (3) the fact that Wayne's initial description of events was similar to stories that John had told Cotts about abuse from his father; (4) Dr. Harrison's own statement in a scholarly paper that children often recant after disclosing sexual abuse; and (5) the fact that Wayne had sustained a similar injury once before. Cotts buttressed her conclusion by attaching her own notes from the Harrison interview, indicating that she did not believe [**26] his explanation even as the interview was in progress.

Because these affidavits are from interested witnesses, they will negate actual malice as a matter of law only if they are "clear, positive, and direct, otherwise credible and free from contradictions and inconsistencies, and [able to be] readily controverted." TEX. R. CIV. P. 166a(c); *see also Casso*, 776 S.W.2d at 558. In actual malice cases, such affidavits must establish the defendant's belief in the challenged statements' truth and provide a plausible basis for this belief. *See McLemore*, 978 S.W.2d at 574; *Carr*, 776 S.W.2d at 571. As all four of HBO's affidavits satisfied the Rule 166a(c) requirements, HBO negated actual malice as a matter of law.

Thus, the burden shifted to Judge Huckabee to present evidence to raise a fact issue. He offered six categories of allegedly controverting evidence: (1) HBO and JFP's alleged desire to portray him in an unflattering light; (2) editorial choices by HBO and JFP that left a false impression of events; (3) the filmmakers' disregard for Judge Huckabee's and Dr. Harrison's explanations for Judge Huckabee's order; (4) JFP's and HBO's [**27] alleged purposeful avoidance of the truth; (5) HBO's extensive legal review of the film, the film's many rewrites, and the indemnification agreement between HBO and JFP; and (6) HBO's and JFP's decision to air the film despite the knowledge that it contained inaccurate statements. In determining whether the evidence presents a fact issue, we assume that all facts favorable to the nonmovant are true and indulge all reasonable inferences in that party's favor. *See Phan Son Van*, 990 S.W.2d at 753. Even under this lenient standard, we are persuaded that Judge Huckabee has not raised a genuine issue of material fact on any of his categories.

1. HBO's desire to portray Judge Huckabee in an unflattering light.

In claiming that JFP and HBO intended to portray him unfairly, Judge Huckabee first points to Virginia Cotts's three-page summary of the *Hebert* case describing him to HBO executives Sheila Nevins and Cis Wilson as a "corrupt judge." He also points to Cotts's September 1991 status report regarding the disagreement between Grant and Nevins over the film's artistic direction. Neither of these documents, however, indicates actual malice. While Cotts's original memo [**28] might suggest personal ill-will toward [*425] Judge Huckabee, nothing in either of these documents suggests that Cotts or Grant had any doubts about the truth of the broadcast. *See Carr*, 776 S.W.2d at 571; *Casso*, 776 S.W.2d at 558.

Likewise, Nevins's insistence that the filmmakers focus on divorce from the women's perspective is no evidence of actual malice. Without more, mere evidence of pressure to

produce stories from a particular point of view, even when they are hard-hitting or sensationalistic, is no evidence of actual malice. *See Tavoulareas v. Piro*, 260 U.S. App. D.C. 39, 817 F.2d 762, 796 (D.C. Cir. 1985)(en banc); *Perez v. Scripps-Howard Broadcasting* Co., 35 Ohio St. 3d 215, 520 N.E.2d 198, 204 (Ohio 1988)(both holding that editorial pressure to produce sensationalistic stories is not evidence of actual malice); *see also Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667, 105 L. Ed. 2d 562, 109 S. Ct. 2678 (1989)("Nor can the fact that the defendant published the defamatory material in order to increase its profits suffice to prove actual malice."). Although evidence that HBO directed [**29] Grant to produce a sensational story *without regard for its truth* would raise a fact question, Judge Huckabee has not produced any such evidence. *See Tavoulareas*, 817 F.2d at 796.

## 2. Editorial choices.

Next, Judge Huckabee complains of HBO's choice of material for the documentary. His principal complaint is that *Women on Trial* did not discuss much of the evidence presented at the 1988 *Hebert* hearing, including (1) Wayne's initial treating physician's testimony that Wayne had denied that his father caused the injury; (2) Child Protective Services case worker Wilma Smith's testimony that in his videotaped interview Wayne said that his mother told him to say that his father had abused him (although Wayne still maintained that such abuse occurred); (3) Smith's further testimony that in a subsequent interview with Wayne, he told her that his father had not abused him during the Christmas holidays, but that his father had touched his private area in July 1987; (4) Smith and social worker Cheryl Bennett's testimony that Wayne and his brother John often fought after Wayne returned from Michael; (5) Bennett's testimony that Sandra told her that she preferred that [**30] Michael not be allowed visitation rights and had inquired about what was necessary to terminate them; and (6) Wayne's grandmother's testimony that Michael had not bathed Wayne during their visit to her home. By failing to include this evidence, Judge Huckabee claims that HBO intentionally made it look like he was presented with an open-and-shut case against Michael Hebert, when in fact much of the evidence justified his order.

Further, Judge Huckabee complains about the film's failure to clarify two facts: first, that his statements in the interview with Grant came in response to questions about a "hypothetical" case; and second, that Sandra did not move to modify the temporary order in the three years after the court of appeals denied her petition for mandamus. Because of all these omissions, Judge Huckabee claims that the viewers saw him falsely as a judge who flouted his legal duty to render decisions in the best interests of children. *See* TEX. FAM. CODE § 153.002.

A broadcaster's omission of facts may be actionable if it so distorts the viewers' perception that they receive a substantially false impression of the event. *See Golden Bear Distrib. Sys. v. Chase Revel, Inc.*, 708 F.2d 944, 949 (5th Cir. 1983) [**31] (applying Texas law); *Express Publishing Co. v. Gonzalez*, 350 S.W.2d 589, 592 (Tex. Civ. App.--Eastland 1961, writ ref'd n.r.e.); *see also Toney v. WCCO Television Cable & Satellite, Inc.*, 85 F.3d 383, 395 (8th Cir.

1996)(Byron White, J.)(applying Minnesota law); *Memphis Publishing Co. v. Nichols*, 569 S.W.2d 412, 419-20 (Tenn. 1975); KEETON ET AL., PROSSER & KEETON: LAW OF TORTS, § 116, at 117 (5th ed. Supp. 1988). *But see American Broad. Cos. v. Gill*, 6 S.W.3d 19, 43 [*426] (Tex. App.--San Antonio 1999, pet. denied); *Evans v. Dolcefino*, 986 S.W.2d 69, 77 (Tex. App.--Houston [1st Dist.] 1999, no pet.); *Hardwick v. Houston Lighting & Power*, 943 S.W.2d 183, 185 (Tex. App.--Houston [1st Dist.] 1997, no writ)(all holding that there is no claim for implied libel if all the facts in a story are literally true). As a public official, however, Judge Huckabee may recover for such an omission only by making the familiar showing that the publisher selected the material with actual malice, *i.e.*, the awareness that the omission could create a substantially false impression. *See Perez v. Scripps-Howard Broadcasting Co.*, 35 Ohio St. 3d 215, 520 N.E.2d 198, 204 (Ohio 1988); [**32] *Dixon v. Ogden Newspapers, Inc.*, 187 W. Va. 120, 416 S.E.2d 237, 244 (W. Va. 1992); *see also Brasslett v. Cota*, 761 F.2d 827, 843 (1st Cir. 1985); *Pierce v. Capital Cities Communications, Inc.*, 427 F. Supp. 180, 186 (E.D. Pa. 1977), *aff'd*, 576 F.2d 495 (3d Cir. 1978); *Diesen v. Hessburg*, 455 N.W.2d 446, 453-54 (Minn. 1990)(dicta). This standard does not, therefore, prevent liability if a media organization selectively omits facts from the record to portray falsely a judge's opinion as arbitrary and unreasonable. Even if a defamation defendant is not persuaded by the evidence which supports a judge's decision, he or she may not deliberately omit all reference to this evidence in order to portray the decision as arbitrary, when in fact it was not. But in the absence of evidence that the defendant selected the material to portray the judge's record falsely, the First Amendment protects the organization's choice of which material to include in its broadcast. *See Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 258, 41 L. Ed. 2d 730, 94 S. Ct. 2831 (1974)(striking down a law requiring [**33] newspapers to give political candidates a right to reply to negative editorials); *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1243 (11th Cir. 1999).

In this case, there is no evidence that HBO chose its material for the broadcast with actual malice. We recognize that an omission may be so glaring and may result in such a gross distortion that by itself it constitutes some evidence of actual malice. For example, when an article reported that an FBI memorandum mentioned plaintiff several times in connection with Jimmy Hoffa's disappearance, the newspaper's decision not to report that the memorandum also cleared plaintiff of wrongdoing was held to be evidence of actual malice. *See Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1092 (3d Cir. 1987). In such a case, the omission so changes the character of the story that one could infer that the defendant knew, or at least suspected, that the omission would convey a false impression. Here, HBO's omissions did not change the character of the story to such an extent. Although the facts omitted might or might not have led a reasonable viewer to suspend judgment or even to reach an opposite conclusion [**34] regarding Judge Huckabee's order, their omission did not grossly distort the story. At most, HBO's failure to capture accurately all the story's details suggests an error in judgment, which is no evidence of actual malice. *See Time, Inc. v. Pape*, 401 U.S. 279, 290, 292, 28 L. Ed. 2d 45, 91 S. Ct. 633 (1971)(magazine's failure to convey all the subtleties of a long, complicated government document was no evidence of actual malice); *El Paso Times, Inc. v.*

*Trexler*, 447 S.W.2d 403, 406 (Tex. 1969). Moreover, the broadcasters did acknowledge Judge Huckabee's explanation for his decision when they aired the portion of the interview responding to questions about the "hypothetical" *Hebert* case. Although the documentary did not convey Judge Huckabee's position as strongly as it could have, the law did not require it to do so. *See Levan*, 190 F.3d at 1243; *Brown v. Herald Co.*, 698 F.2d 949, 951 (8th Cir. 1983)(per curiam).

Judge Huckabee also complains about HBO's editing choices in the Raschke segment. There, Grant interviewed Steve Raschke, Ivy Raschke's husband, about Dr. Charles Martin, the court-appointed psychologist [**35] in the *Roberts/Raschke* [*427] case. During the discussion, Steve claimed that Dr. Martin had himself been accused of child abuse. [3] After this discussion, the documentary cut immediately to Judge Huckabee's photo, which led into a segment of Grant's interview with the judge. Judge Huckabee claims that this quick juxtaposition reflected HBO's attempt to paint him falsely as a child abuser. Despite the sudden cut to Judge Huckabee's photo, the documentary made it clear that the alleged abuser was Dr. Martin, not the judge. On these facts, there is no evidence of actual malice.

3. Harrison and Huckabee interviews.

Next, Judge Huckabee argues that after Grant and Cotts interviewed [**36] him and Dr. Harrison, they should have been put on notice that the documentary was false. That HBO nevertheless persisted in broadcasting it, they contend, is evidence of actual malice.

That Judge Huckabee offered an explanation for his decision, however, is not evidence that the filmmakers or HBO either believed it or had reason to doubt the truth of their broadcast. Denials by public figures to media charges are part and parcel of free discussion about public affairs. The mere fact that a defamation defendant knows that the public figure has denied harmful allegations or offered an alternative explanation of events is not evidence that the defendant doubted the allegations. As the United States Supreme Court has noted, "such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error.'" *Harte-Hanks*, 491 U.S. at 692 n.37 (quoting *Edwards v. National Audubon Soc'y,* 556 F.2d 113, 121 (2d Cir. 1977)). Moreover, as we noted earlier, the filmmakers did not reject Judge Huckabee's position entirely, but broadcast a portion of the interview in [**37] which he explained the reasons for denying parents access to their children.

Dr. Harrison's opinion that Judge Huckabee's order was justified also did not raise a fact issue as to actual malice. Because Dr. Harrison was an expert in the field of child psychology, Judge

---

[3] The relevant part of the transcript reads as follows.

Steve Raschke: His own child was taken away. I believe the papers said that, that he'd beat him with a dog leash or something like that.

Grant: So he turned out to be an abuser?

Steve Raschke: He was really an abuser himself. Yes.

[Cut to photo of Judge Huckabee.]

Huckabee argues that his report should have given the filmmakers doubts about the film's suggestion that Judge Huckabee's decision to take Wayne away from Sandra was unjustified. But the mere fact that an expert has a view on a dispute is not evidence that a defamation defendant who offers a different view does so with actual malice, unless the record shows that the expert's reasoning caused the defendant to experience substantial doubts regarding the story's truthfulness. *See Peter Scalamandre & Sons, Inc. v. Kaufman*, 113 F.3d 556, 562 (5th Cir. 1997)(fact that an expert holds a belief does not foreclose debate on that belief). Here, Cotts's second affidavit and her notes after interviewing Dr. Harrison make it clear that she had credible reasons for rejecting Dr. Harrison's view of the case. Nor did the filmmakers' failure to discuss Dr. Harrison's theory that Wayne's brother was the real abuser amount [**38] to a false characterization of the evidence before Judge Huckabee. *See supra* Part III(2). To the contrary, Dr. Harrison did not file the report containing this theory with the court until four months after the initial hearing.

4. Purposeful avoidance.

Next, Judge Huckabee contends that the filmmakers purposefully avoided discovering the truth about the *Hebert* case. Under *Harte-Hanks*, evidence [*428] showing that HBO purposefully avoided the truth would be some evidence of actual malice. *See* 491 U.S. at 692. In *Harte-Hanks*, a newspaper published a story claiming that Daniel Connaughton, a candidate for municipal judge, had promised two sisters, Alice Thompson and Patsy Stephens, jobs and vacations in return for making allegations of corruption against the incumbent judge's court administrator. *Harte-Hanks*, 491 U.S. at 660. The newspaper's only source for this story was Thompson. Before the newspaper published the story, Connaughton produced five witnesses who were present when Thompson claimed that Connaughton offered her and Stephens the gifts. All the witnesses denied Thompson's story. *Harte-Hanks*, 491 U.S. at 691. Connaughton also produced a tape recording [**39] of the conversation in which Thompson accused the administrator of corruption. *Harte-Hanks*, 491 U.S. at 683. The newspaper failed to listen to this recording even though it would have confirmed or denied many of Thompson's claims, such as her claims that Connaughton had selectively turned the recorder on and off during various parts of the interview and that her allegations of corruption against Xthe court administrator had come in response to leading questions from him. *Id.* More importantly, the newspaper failed to interview Stephens, the one person not associated with Connaughton who could have confirmed or denied Thompson's allegations against Connaughton. *Harte-Hanks*, 491 U.S. at 691-92. According to the Court, the newspaper's failure to consult the two sources that could have objectively verified the story was evidence that the newspaper purposefully avoided learning facts that would have shown the story to be false. *Harte-Hanks*, 491 U.S. at 692. Upholding a jury verdict against the newspaper, the Court held that this purposeful avoidance of the truth was enough to suggest that the newspaper doubted the story's accuracy, and hence was evidence of actual malice. *Id.*

Judge [**40] Huckabee has not presented a purposeful avoidance case. Unlike *Harte-Hanks*, in which the newspaper based its story on the testimony of a single unreliable source, here the

summary judgment evidence reveals that the filmmakers interviewed several people on both sides of the story, including Judge Huckabee and Dr. Harrison. They also read, among other documents, the transcript of the *Hebert* hearing. Such extensive research precludes a finding of purposeful avoidance. *See Levan*, 190 F.3d at 1243; *Perk v. Reader's Digest Ass'n*, 931 F.2d 408, 411-12 (6th Cir. 1991)(both distinguishing *Harte-Hanks* on the ground that the stories at issue were supported by many sources). Although the filmmakers did not interview Michael Hebert, Robert Roberts, or their lawyers, they were not required to continue their research until they could find one more person who agreed with Judge Huckabee's *Hebert* order. [4] *See Levan*, 190 F.3d at 1243 (failure to track down every possible source is not purposeful avoidance). Further, unlike *Harte-Hanks*, no source could have easily proved or disproved the documentary's allegations. Thus, the purposeful [**41] avoidance theory does not apply. *See Levan*, 190 F.3d at 1243; *Perk*, 931 F.2d at 412.

5. Legal Review, Rewrites, and Indemnification

Next, we turn to the evidence that Judge Huckabee believes established "institutional doubt" on the part of HBO regarding the truth of *Women on Trial*. According to Judge Huckabee, HBO's extensive legal review of the film, the editorial rewrites that accompanied this review, and the indemnification agreement between HBO and JFP all suggest that HBO entertained serious doubts about the film's content. We disagree.

 [*429]  That the film underwent a lengthy legal review does not by itself provide evidence of actual malice. HBO could have wished merely to confirm the film's controversial and potentially damaging allegations before its [**42]  release. *See McFarlane v. Sheridan Square Press, Inc.*, 320 U.S. App. D.C. 40, 91 F.3d 1501, 1512 (D.C. Cir. 1996)(lawyers' review was not evidence of actual malice). This same conclusion also applies to the indemnification agreement. Judge Huckabee can point to no evidence that JFP and HBO entered into the agreement because they entertained serious doubts about the film's truthfulness. Individuals and business organizations enter into indemnification agreements for various reasons; doing so, without more, simply presents no evidence of actual malice.

6. Knowing inaccuracies.

Finally, Judge Huckabee claims that inaccuracies in *Women on Trial* present evidence of actual malice. First, Judge Huckabee points to this language in the film's conclusion: "If these rulings can happen in one family courthouse in one county of one great state, what is happening in the rest of this country?" In fact, one of these cases occurred in Bee County, not Harris County. As proof that HBO knew this statement was false, Judge Huckabee points to Cis Wilson's notes on a memo discussing HBO's promotional strategy for the film, which stated that the rulings in the film had occurred in a [**43]  "single family court." On her copy, Wilson circled the "single family court" statement and wrote the words "Daggatt" [sic] and "Huckaby" [sic].

---

[4] In her deposition, Grant claims that she did attempt to schedule an interview with Michael Hebert, but that this interview fell through because Hebert would not agree to be interviewed without his attorney present.

Wilson stated in her deposition that these notations indicated her knowledge that the memo's "single family court" statement could be false.

Judge Huckabee claims that Wilson's knowledge that the memo's "single family court" statement could be false implies that she knew that the documentary's "one family courthouse" statement could be false. [5] Regardless of the falsity of the statement, however, it was not defamatory to Judge Huckabee. The documentary neither stated nor implied that Judge Huckabee presided over all of these cases. In fact, the film as a whole made it clear that different judges were responsible for the rulings portrayed therein. *See Goodrich v. Reporter Publishing Co.*, 199 S.W.2d 228, 229 (Tex. App.--El Paso 1946, writ ref'd)(to determine whether a statement is defamatory, one must consider the publication as a whole). The statement was thus a criticism of the family courts in general and not of Judge Huckabee in particular and, as a result, was not defamatory. *See Newspapers, Inc. v. Matthews*, 161 Tex. 284, 339 S.W.2d 890, 893 (Tex. 1960) [**44] (to be defamatory, a statement must be directed at the plaintiff). Because the statement was not defamatory, Wilson's alleged knowledge of its falsity was irrelevant. *See Tavoulareas*, 817 F.2d at 794 (actual malice must be in conjunction with a defamatory statement).

A second knowing inaccuracy, Judge Huckabee claims, is the film's statement that, in the Houston family courts, "women who charge their husbands with abuse are often viewed as mentally unstable and routinely lose custody of their children." Judge Huckabee charges that the filmmakers knew that [**45] this statement was false because he had told them that in only four cases had he entered an order denying all access to one parent, only two of which were against the mothers. Despite Judge Huckabee's protests to the contrary, media accounts on which the filmmakers had relied reported that such denials of custody were routine. [6] [**46] The filmmakers' interviews [*430] with Burton, Reynolds, and other advocates of family-court reform confirmed these accounts. The filmmakers reasonably could have concluded, therefore, that such denials of custody occurred routinely. As we have already noted, Judge Huckabee's denial of this allegation is no evidence that the filmmakers experienced substantial doubts about the film's truth. Because Judge Huckabee did not offer

---

[5] It is not entirely clear that the statement was false. The documentary stated that all the *rulings* it portrayed occurred in a single family courthouse. The Nance segment arguably did not concern a *ruling* because that segment discussed the mother's reaction to a *jury verdict* awarding custody to the father, whom she believed to have been abusive. Nevertheless, for purposes of this opinion, we assume the statement to have been false.

[6] For example, an article that Cotts relied upon stated that "mothers who make claims of sexual abuse in divorce proceedings often lose custody as a result . . . . The courts rule the mothers are the real abusers for making their children undergo physical and psychological evaluation." Leslie Sowers, *Courts, Investigators Make Uneasy Partners*, HOUS. CHRON., Nov. 11, 1990, at 1G. Another article reported that according to Randy Burton, charges of sexual abuse are "presumed not true." Ruth Piller, *Family Courts Pose Financial Burden in Divorce Cases*, HOUS. CHRON., Aug. 25, 1991, at 38A. The article went on to report that Marie Munier, the head of the Harris County District Attorney's family criminal law division, stated that she had "spoken to several women who said their attorneys advised them to keep allegations of child abuse out of court." *Id.* Several other media accounts which the filmmakers consulted made similar charges.

any other evidence that the filmmakers seriously doubted this allegation, he failed to raise a fact issue on actual malice. [7]

\*\*\*

Because HBO's affidavits negated actual malice as a matter of law, and because none of Judge Huckabee's proffered evidence raised a fact issue regarding actual malice, we affirm the judgment of the court of appeals.

Thomas R. Phillips

Chief Justice

Opinion delivered:

May 4, 2000

**Dissent by:** NATHAN [**47] L. HECHT

## Dissent

JUSTICE HECHT, dissenting.

Since a public figure cannot recover damages for defamation without clear and convincing evidence that the defendant acted with actual malice, [1] [**48] I would hold, like the United States Supreme Court [2] and the courts of thirty-seven states, [3] that he likewise [*431] cannot

---

[7] Further, it is not clear that Judge Huckabee's statement that he had only denied mothers *access* in two cases actually rebuts the documentary's charge that mothers who claim child abuse routinely lose *custody* of their children. Losing all access to one's children affects a parent's rights to a much greater degree than merely losing primary custody. *See* TEX. FAM. CODE § 153.192 (establishing the rights of a possessory conservator). Moreover, the documentary's claim that these mothers routinely lose custody was directed at the Harris County family courts in general and not only Judge Huckabee. Even if the filmmakers had believed Judge Huckabee, they still may have believed that denials of custody routinely occurred in the family-court system.

[1] *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 659, 105 L. Ed. 2d 562, 109 S. Ct. 2678 (1989) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-56, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

[3] *Camp v. Yeager*, 601 So. 2d 924, 927 (Ala. 1992); *Read v. Phoenix Newspapers, Inc.*, 169 Ariz. 353, 819 P.2d 939, 942 (Ariz. 1991); *Southall v. Little Rock Newspapers, Inc.*, 332 Ark. 123, 964 S.W.2d 187, 193 (Ark. 1998); *Reader's Digest Ass'n, Inc. v. Superior Court*, 37 Cal. 3d 244, 690 P.2d 610, 614, 208 Cal. Rptr. 137 (Cal. 1984) (predating *Liberty Lobby*); *DiLeo v. Koltnow*, 200 Colo. 119, 613 P.2d 318, 323 (Colo. 1980) (predating *Liberty Lobby*); *Jones v. New Haven Register, Inc.*, 2000 Conn. Super. LEXIS 220, No. 393657, 2000 WL 157704, at *8 (Conn. Super. Ct. Jan. 31, 2000); *United Vanguard Fund, Inc. v. Takecare, Inc.*, 693 A.2d 1076, 1080 n. 15 (Del. 1997) (applying substantive evidentiary burden at summary judgment stage in breach of contract suit, relying on *Liberty Lobby*); *Cronley v. Pensacola News-Journal, Inc.*, 561 So. 2d 402, 405 (Fla. Dist. Ct. App. 1990); *Gardner v. Boatright*, 216 Ga. App. 755, 455 S.E.2d 847, 848 (Ga. Ct. App. 1995); *Jenkins v. Liberty Newspapers Ltd. Partnership*, 89 Haw. 254, 971 P.2d 1089, 1093 (Haw. 1999); *Wiemer v. Rankin*, 117 Idaho 566, 790 P.2d 347, 355-57 (Idaho 1990); *Davis v. Keystone Printing Serv., Inc.*, 155 Ill. App. 3d 309, 507 N.E.2d 1358, 1367, 108 Ill. Dec. 17 (Ill. 1987); *Carr v. Bankers Trust Co.*, 546 N.W.2d 901, 904 (Iowa 1996); *Knudsen v. Kansas Gas & Elec. Co.*, 248 Kan. 469, 807 P.2d 71, 81 (Kan. 1991); *Warford v. Lexington Herald-Leader Co.*, 789 S.W.2d 758, 771 (Ky. 1990); *Sassone v. Elder*, 626 So. 2d 345, 352 (La. 1993); *Tucci v. Guy Gannett Publishing Co.*, 464 A.2d 161, 166 (Me. 1983) (predating *Liberty Lobby*); *Chesapeake Publishing Corp. v. Williams*, 339 Md. 285, 661 A.2d 1169, 1178 (Md. 1995); *ELM Medical Lab., Inc. v. RKO Gen., Inc.*,

defeat a motion for summary judgment without evidence of the same quality and quantity. This does not mean that the plaintiff in such a case must prove actual malice in response to the defendant's motion for summary judgment. It means only that once the defendant has adduced summary judgment evidence that it did not act with actual malice, the plaintiff, in order to raise a genuine issue of material fact precluding summary judgment, must produce some evidence that if believed, and without regard to the defendant's evidence, would clearly and convincingly show that the defendant did act with actual malice. It is not enough for the plaintiff to produce merely *some* evidence -- more than a scintilla -- as it would be in other contexts.

 [**49]   This holding is, in my view, dictated by Rule 166a of the Texas Rules of Civil Procedure, which requires evidence showing a genuine issue of material fact to defeat a motion for summary judgment that should otherwise be granted. [4] Evidence at trial that is less than clear and convincing does not raise an issue of actual malice for a fact finder to decide, and the same evidence should have no greater effect in summary judgment proceedings. In keeping with Rule 166a's policy of conserving the resources of litigants and courts by sparing them a trial when a party cannot show how he is going to raise an issue to be determined by a fact finder, a public figure should not be able to avoid summary judgment in a defamation suit without clear and convincing evidence of actual malice.

The Court's answer to these arguments is that applying an elevated evidentiary standard in summary judgment proceedings is too difficult for Texas trial judges to do. Yet the federal courts and courts in  [**50]   thirty-seven of thirty-nine states in which the issue has been decided are doing just that, and they seem to be managing. Only two states, Texas and Alaska, refuse to assess summary judgment evidence by the clear-and-convincing standard. I do not see why state trial judges in Texas cannot do what federal trial judges in Texas and state trial judges across America are doing. I would abandon the position the Court maintains today and allow Alaska the distinction of being the last adherent to a rule thoroughly repudiated by American jurisprudence.

---

403 Mass. 779, 532 N.E.2d 675, 680 (Mass. 1989) (abrogated by statute on other grounds, *see United Truck Leasing Corp. v. Geltman* 406 Mass. 811, 551 N.E.2d 20 (Mass. 1990)); *Ireland v. Edwards*, 230 Mich. App. 607, 584 N.W.2d 632, 640 (Mich. Ct. App. 1998); *Foley v. WCCO Television, Inc.*, 449 N.W.2d 497, 504 (Minn. Ct. App. 1989); *Johnson v. Delta-Democrat Publishing Co.*, 531 So. 2d 811, 815 (Miss. 1988); *Lopez-Vizcaino v. Action Bail Bonds, Inc.*, 3 S.W.3d 891, 893 (Mo. Ct. App. 1999) (applying "clear and convincing" standard to summary-judgment motion in a punitive damages case, relying on *Liberty Lobby*); *Brill v. Guardian Life Ins. Co. of America*, 142 N.J. 520, 666 A.2d 146, 153 (N.J. 1995); *Freeman v. Johnston*, 84 N.Y.2d 52, 637 N.E.2d 268, 270, 614 N.Y.S.2d 377 (N.Y. 1994); *Gaunt v. Pittaway*, 135 N.C. App. 442, 520 S.E.2d 603, 608 (N.C. Ct. App. 1999); *State Bank of Kenmare v. Lindberg*, 471 N.W.2d 470, 475 (N.D. 1991) (applying "clear and convincing" standard to summary-judgment motion in a fraud case, relying on *Liberty Lobby*); *Perez v. Scripps-Howard Broadcasting Co.*, 35 Ohio St. 3d 215, 520 N.E.2d 198, 202 (Ohio 1988); *Herbert v. Oklahoma Christian Coalition*, 1999 OK 90, 992 P.2d 322, 328 (Okla. 2000); *Ertel v. Patriot-News Co.*, 544 Pa. 93, 674 A.2d 1038, 1042 (Pa. 1996); *Krueger v. Austad*, 1996 SD 26, 545 N.W.2d 205, 211 (S.D. 1996); *Stewart v. Peterson*, 1988 Tenn. App. LEXIS 784, No. 1184, 1988 WL 130313, at *5 (Tenn. Ct. App. Dec. 7, 1988); *Andalex Resources, Inc. v. Myers*, 871 P.2d 1041, 1046 (Utah Ct. App. 1994) (applying "clear and convincing" standard to summary-judgment motion in a fraud case, relying on *Liberty Lobby*); *Palmer v. Bennington Sch. Dist.*, 159 Vt. 31, 615 A.2d 498, 504 (Vt. 1992); *Herron v. Tribune Publishing Co.*, 108 Wn.2d 162, 736 P.2d 249, 255 (Wash. 1987); *Crain v. Lightner*, 178 W. Va. 765, 364 S.E.2d 778, 782 n.1 (W. Va. 1987); *Oil, Chem. & Atomic Workers Int'l Union v. Sinclair Oil Corp.*, 748 P.2d 283, 288-89 (Wyo. 1987).

[4]   TEX. R. CIV. P. 166a(c), (i).

 [*432]  The Court's extended analysis of the summary judgment record in this case shows, I think, that the plaintiff produced *some* evidence that the defendant acted with actual malice. To reach the contrary conclusion, the Court without admitting it applies a clear-and-convincing standard which, I agree, plaintiff has not met. Because I would raise the standard, I would remand the case to give the plaintiff a fair opportunity to produce clear and convincing evidence of actual malice. Accordingly, I respectfully dissent.

# I

The United States Supreme Court has held that the First Amendment does not permit "[a] public figure [to] recover [**51]  damages for a defamatory falsehood without clear and convincing proof that the false 'statement was made with "actual malice" -- that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" [5] Moreover, the Supreme Court has held, "judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.'" [6] [**52]  Thus, judges must apply the elevated evidentiary standard in deciding motions for judgment as a matter of law (including motions for directed or instructed verdict and for judgment notwithstanding the verdict) and on appeal. Because these rules are entailed by the United States Constitution, they govern proceedings in state as well as federal courts. [7]

In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court held that Rule 56 of the Federal Rules of Civil Procedure requires application of this same clear-and-convincing standard to motions for summary judgment in defamation suits by public figures. [8] The Court explained:

Just as the "convincing" clarity requirement is relevant in ruling on a motion for directed verdict, it is relevant in ruling on a motion for summary judgment. When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under [*New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)]. For example, [**53]  there is no genuine issue [of material fact precluding summary judgment] if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.

Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. This conclusion is mandated by the nature of this determination. The question here is whether a jury could reasonably find *either*

---

[5]    *Harte-Hanks*, 491 U.S. at 659 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964)).

[6]    *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 511, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984).

[7]    U.S. CONST. art. VI, P 2.

[8]    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing what evidence would enable the jury to find for either the plaintiff or the defendant: It makes no sense to say that a jury could reasonably find for either party without some benchmark as to what standards govern its deliberations and within what boundaries [*433] its ultimate decision must fall, and these standards and boundaries are in fact provided by the applicable evidentiary standards. [9]

[**54] Because application of the clear-and-convincing standard of proof to summary judgment proceedings in public-figure defamation cases is required only by federal procedural rules and not by the First Amendment, state courts are free to apply a lesser standard in denying a defendant summary judgment, even though they must apply the elevated standard in finally awarding damages. But because the basic logic of *Liberty Lobby* is sound -- that a genuine issue of fact cannot be raised without evidence tending to prove that fact, which for actual malice is evidence that is clear and convincing -- courts in thirty-seven states [10] assess the evidence in summary judgment proceedings by the same standard applicable at trial in libel cases or other actions in which plaintiffs face an elevated standard of proof. Nine states have not addressed the issue, [11] and the decisions in two others are inconclusive. [12] Only this Court, and the courts of one other state, Alaska, [13] stubbornly adhere to the rule that a public-figure plaintiff in a defamation case may defeat a defendant's motion for summary judgment with evidence of actual malice that is less than clear and convincing, even though a plaintiff [**55] cannot prevail at trial with such evidence.

## II

This Court first declined to follow *Liberty Lobby* eleven years ago in *Casso* [**56] *v. Brand*. [14] [**57] Although the relevant language of the Texas summary judgment rule, Rule 166a, [15]

---

[9] *Anderson*, 477 U.S. at 254-255.

[10] *See supra* note 3.

[11] The nine states that have not addressed the issue are Montana, Nebraska, Nevada, New Hampshire, New Mexico, Oregon, Rhode Island, South Carolina and Virginia.

[12] *See Kitco, Inc. v. Corporation for General Trade*, 706 N.E.2d 581, 588 n.1 (Ind. Ct. App. 1999) (noting split between *Heeb v. Smith*, 613 N.E.2d 416, 420 (Ind. Ct. App. 1993) (following *Liberty Lobby*), and *Chester v. Indianapolis Newspapers, Inc.*, 553 N.E.2d 137, 140-41 (Ind. Ct. App. 1990) (not following *Liberty Lobby*)); *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 563 N.W.2d 472, 480 (Wis. 1997) (assuming, as parties agreed, without deciding that the clear-and-convincing-evidence standard applied at summary judgment).

[13] *Moffatt v. Brown*, 751 P.2d 939, 943 (Alaska 1988).

[14] 776 S.W.2d 551 (Tex. 1989); *cf. Channel 4, KGBT v. Briggs*, 759 S.W.2d 939, 942 (Tex. 1988) (Gonzalez, J., concurring) (urging application of the clear-and-convincing standard to summary judgment proceedings in defamation cases, although the Court found it unnecessary to address the issue).

[15] TEX. R. CIV. P. 166a.

is identical to that of the federal summary judgment rule, Rule 56, [16] the federal rule had been construed to shift the burden of producing evidence to the party responding to the motion if the movant asserted that no evidence favorable to the respondent existed, [17] while the Texas rule had not. [18] Thus, in Texas a plaintiff was never required to respond at all to a defendant's motion for summary judgment until the defendant conclusively established his position. Because application of the *Liberty Lobby* rule to Texas procedure was therefore impossible in many cases, the Court declined to follow *Liberty Lobby*. In 1997, however, the Court added subsection (i) to Rule 166a to align Texas procedure with federal procedure, and now, as the Court acknowledges, any relevant differences are all but "obviated". [19] Consequently, the basis for the Court's decision in *Casso* no longer exists.

[*434] Nevertheless, the Court now says, "*Casso* was also consistent with practical considerations which remain valid today." [20] The Court cites two such considerations. The first is that applying the clear-and-convincing-evidence standard necessarily involves a weighing of evidence that judges cannot do in ruling on motions for summary judgment. This is simply untrue. Application of a clear-and-convincing standard no more requires a weighing of evidence than application of the usual scintilla standard. In cases in which there is no elevated evidentiary standard, a trial judge in deciding a motion for summary judgment must decide whether the respondent has adduced evidence that amounts to more than a surmise or suspicion. When the evidentiary standard is elevated, trial judges must decide whether the respondent's evidence meets the higher standard. The [**58] issue is not, as the Court seems to think, whether the respondent has proved his case or will prevail at trial; the issue is only whether the respondent has adduced evidence in quantity and quality sufficient to satisfy the elevated standard, assuming that the evidence is true, and disregarding the movant's evidence. This is the very same process that a trial judge uses in every summary judgment proceeding, only the bar is raised from evidence that is more than a scintilla to evidence that is clear and convincing.

For its assertion that application of the clear-and-convincing standard necessarily involves a weighing of evidence, the Court cites two authorities. The first is Justice Brennan's dissent in *Liberty Lobby*. The Court completely ignores the majority opinion in *Liberty Lobby*, which explained:

Our holding that the clear-and-convincing standard of proof should be taken into account in ruling on summary judgment motions does not denigrate the role of the jury. It by no means [**59] authorizes trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,

---

[16] FED. R. CIV. P. 56.

[17] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

[18] *Casso*, 776 S.W.2d at 556.

[19] *Ante*, 19 S.W.3d 413, 421, 2000 Tex. LEXIS 43, *17.

[20] *Ante*, 19 S.W.3d at 421, 2000 Tex. LEXIS 43, *17.

whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial. [21]

Justice Brennan's dissent in *Liberty Lobby* is not the law; the majority opinion is. The Court's refusal to notice the majority opinion is inexplicable. The only other authority on which the Court relies is a quote from an opinion of the Alaska Supreme Court, which in turn quoted an opinion of [**60] the New Jersey Supreme Court. [22] But the New Jersey Supreme Court has since taken the opposite view. [23] Thus, the Court's conclusion that applying the clear-and-convincing evidentiary standard in summary judgment proceedings requires a weighing of evidence that is directly contradicted by the United States Supreme Court in *Liberty Lobby* and has for its sole support a dissenting opinion in that case and a sentence from an opinion of a court that has since changed its mind. This Court should follow the New Jersey Supreme Court and recant.

Moreover, the Court's conclusion is at odds with reality. The Court acknowledges that judges must apply a clear-and-convincing standard in deciding [**61] a motion [*435] for judgment notwithstanding the verdict, [24] and that appellate judges must apply the same standard on appeal. [25] In neither situation is a judicial weighing of the evidence any more appropriate than with motions for summary judgment. How is it that a judge can decide without weighing the evidence whether it is clear and convincing to defeat a motion for instructed verdict, but cannot decide without weighing the evidence whether it is clear and convincing to defeat a motion for summary judgment? [26] And how have the federal courts and the courts of thirty-seven states managed to apply the clear-and-convincing-evidence standard in deciding motions for summary judgment? Can it really be that what is standard practice for trial judges in thirty-eight American jurisdictions is impossible for trial judges in Texas and Alaska?

 [**62] Second, the Court says that the clear-and-convincing-evidence standard is too "vague" to be applied to motions for summary judgment. [27] The standard has long been applied in

---

[21]   *Liberty Lobby*, 477 U.S. at 255 (citations omitted).

[22]   *Ante*, 19 S.W.3d at 421 (citing *Moffatt v. Brown*, 751 P.2d 939, 944 (Alaska 1988) (quoting *Dairy Stores, Inc. v. Sentinel Publishing Co.*, 104 N.J. 125, 516 A.2d 220, 235-236 (N.J. 1986))).

[23]   *Brill v. Guardian Life Ins. Co. of America*, 142 N.J. 520, 666 A.2d 146, 153 (N.J. 1995).

[24]   *Ante*, 19 S.W.3d at 423.

[25]   *See Doubleday & Co. v. Rogers*, 674 S.W.2d 751, 755 (Tex. 1984).

[26]   *See Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 563 N.W.2d 472, 478-80 (Wis. 1997) (suggesting that the problem of judicial weighing of evidence on motions for summary judgment cannot be so great if the same process is required on appeal by judges who also cannot weigh evidence).

[27]   *Ante*, 19 S.W.3d at 422, 2000 Tex. LEXIS 43, *20.

contexts numerous and varied, [28] and today is the first time of which I am aware that it has been criticized as "vague". The Court does not bother to explain why the standard is vague, pronouncing only that its conclusion is clear. [**64] The use of the standard in so many different contexts seems to me to indicate rather strongly that it is as understandable and manageable as such things can be. But assuming the standard is vague, how does it suddenly become more definite mid-trial, when the defendant moves for an instructed verdict, or after trial, when the defendant moves for judgment notwithstanding the verdict, or on appeal? The Court says that a judge who has witnessed the trial can apply the standard more easily, but acknowledges in the same paragraph that appellate justices, who of course have not witnessed the trial, must also apply the standard. [29] An appellate court, of course, has all the evidence before it, but it cannot assess the credibility and demeanor of witnesses. How is an appellate court's review [**63] of a "cold" record so different from a trial judge's review of summary judgment evidence that one must apply an elevated evidentiary standard and the other cannot do so? If there is an explanation, the Court does not attempt it.

[*436] Again, the experience in three-fourths of American jurisdictions, and the necessity of applying the clear-and-convincing-evidence standard in many contexts that do not permit a weighing of evidence, come as close as possible to conclusively establishing that the Court's concerns are completely unfounded. One simply cannot maintain in the face of vast national experience to the contrary that applying an elevated evidentiary standard for summary judgment is unworkable. Why, then, does the Court persist in its refusal to apply the plaintiff's proof standard to motions for summary judgment? Only two explanations suggest themselves. One is that the Court simply does not trust trial judges to apply the law. The other is that the Court believes that it is appropriate to put defendants in defamation cases to the burden and expense of trial even though the public-figure plaintiff cannot win. Neither of these explanations can justify the Court's decision.

## III

After rejecting an elevated evidentiary standard for plaintiff's response in this case to defendants' motion for summary [**65] judgment, the Court then assesses the evidence by what can only be an elevated standard. Not without a lengthy explanation can the Court

---

[28] *E.g.*, *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 223 (Tex. 1988) (paternity of illegitimate person in a wrongful death case); *Doubleday & Co. v. Rogers*, 674 S.W.2d 751, 755-756 (Tex. 1984) (actual malice in a defamation case involving public officials and public figures); *State v. Addington*, 588 S.W.2d 569, 569-570 (Tex. 1979) (civil commitment proceedings); *In re G.M.*, 596 S.W.2d 846, 846-847 (Tex. 1980) (involuntary termination of parental rights); TEX. FAM. CODE §§ 11.15, 15.024-.025 (same); *id.* § 5.02 (separate property); *id.* §§ 12.02(b), 13.05 (paternity); *id.* § 21.32 (court-ordered child support); TEX. HEALTH & SAFETY CODE §§ 81.169, .171-.173, .190 (court-ordered management of persons with communicable diseases); *id.* §§ 462.067-.069, .075 (court-ordered treatment for chemically dependent persons); *id.* §§ 574.031, .033-.035, .069, .106 (court-ordered mental health services); TEX. PROP. CODE §§ 92.0563, .058 (landlord/tenant statutory remedies); TEX. TAX CODE §§ 151.159, .307 (tax exemption for export goods); TEX. PROB. CODE § 42 (paternity); *id.* § 145 (approval of independent estate administration); *id.* §§ 222, 761 (removal of personal representative, guardian); *id.* §§ 236, 236A, 776-77 (use of estate/trust corpus); *id.* § 684 (appointment of guardian); *id.* § 438 (presumption of revocable trust); TEX. R. DISCIPLINARY P. 9.04 (1992), reprinted in TEX. GOV'T CODE, tit. 2, subtit. G app. (Supp. 1999) (defense available to attorneys to avoid reciprocal discipline).

[29] *Ante*, 19 S.W.3d at 421-422.

conclude that the plaintiff failed to produce *any* evidence of actual malice. This was not evidence, the Court says, and neither was this, or this, or this, or even this, and certainly not this. Judge Huckabee's position, quite simply, is that given the conflicting evidence before him regarding the parents' conduct, his decision was justified, and since the defendants knew what that evidence was and acknowledged in their affidavits that it was important, they cannot have disregarded it without actual malice. I do not think Judge Huckabee's position is clear and convincing, given the several other sources the defendants consulted before airing their broadcast. But if every inference must be indulged in Judge Huckabee's favor, as with any other respondent to a motion for summary judgment, I do not see how the Court can conclude that Judge Huckabee has failed to produce more than a scintilla of evidence that the defendant acted with actual malice, thereby precluding summary judgment on that issue, as the trial court concluded.

Conspicuously, the [**66] Court does not conclude that the defendants' statements were substantially true -- because, I think, the Court does not believe that. Rather, the Court concludes, even if some of the defendants' statements were not true and every inference is indulged in Judge Huckabee's favor, there is not a scintilla of evidence of actual malice. I do not find Judge Huckabee's evidence clear and convincing, but the Court's assessment of the record under an ordinary standard of proof is far from convincing.

\* \* \* \* \*

I would remand the case to the court of appeals to consider the respondent's other arguments. Should they fail to persuade, that court should remand the case to the trial court for further proceedings.

Nathan L. Hecht

Justice

Opinion delivered: May 4, 2000



# Masson v. New Yorker Magazine

Supreme Court of the United States

January 14, 1991, Argued ; June 20, 1991, Decided

No. 89-1799

**Reporter**

501 U.S. 496; 111 S. Ct. 2419; 115 L. Ed. 2d 447; 1991 U.S. LEXIS 3630; 59 U.S.L.W. 4726; 18 Media L. Rep. 2241; 91 Cal. Daily Op. Service 4683; 91 Daily Journal DAR 7272

JEFFREY M. MASSON, PETITIONER v. NEW YORKER MAGAZINE, INC., ALFRED A. KNOPF, INC. AND JANET MALCOLM

**Prior History:** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**Disposition:** 895 F.2d 1535, reversed and remanded.

## Syllabus

Petitioner Masson, a psychoanalyst, became disillusioned with Freudian psychology while serving as projects director of the Sigmund Freud Archives, and was fired after advancing his own theories. Thereafter, respondent Malcolm, an author and contributor to respondent New Yorker Magazine, taped several interviews with Masson and wrote a lengthy article on his relationship with the archives. One of Malcolm's narrative devices consists of enclosing lengthy passages attributed to Masson in quotation marks. Masson allegedly expressed alarm about several errors in those passages before the article was published. After its publication, and with knowledge of Masson's allegations that it contained defamatory material, respondent Alfred A. Knopf, Inc., published the work as a book, which portrayed Masson in a most unflattering light. He brought an action for libel under California law in the Federal District Court, concentrating on passages alleged to be defamatory, six of which are before this Court. In each instance, the quoted statement does not appear in the taped interviews. The parties dispute whether there were additional untaped interviews, the notes from which Malcolm allegedly transcribed. The court granted respondents' motion for summary judgment. It concluded that the alleged inaccuracies were substantially true or were rational interpretations of ambiguous conversations, and therefore did not raise a jury question of actual malice, which is required when libel is alleged by a public figure. The Court of Appeals affirmed. The court found, among other things, that one passage -- in which Masson was quoted as saying that archives officials had considered him an "intellectual gigolo" while the tape showed that he said he "was much too junior within the hierarchy of analysis for these important . . . analysts to be caught dead with [him]" -- was not defamatory and would not be actionable under the "incremental harm" doctrine.

*Held:*

1. The evidence presents a jury question whether Malcolm acted with requisite knowledge of falsity or reckless disregard as to the truth or falsity of five of the passages. Pp. 509-525.

(a) As relevant here, the First Amendment limits California's libel law by requiring that a public figure prove by clear and convincing evidence that the defendant published the defamatory statement with actual malice. However, in place of the term actual malice, it is better practice that jury instructions refer to publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity. Pp. 509-511.

(b) A trier of fact in this case could find that the reasonable reader would understand the quotations attributed to Masson to be nearly verbatim reports of his statements. In general, quotation marks indicate a verbatim reproduction, and quotations add authority to a statement and credibility to an author's work. A fabricated quotation may injure reputation by attributing an untrue factual assertion to the speaker, or by indicating a negative personal trait or an attitude the speaker does not hold. While some quotations do not convey that the speaker actually said or wrote the quoted material, such is not the case here. Malcolm's work gives the reader no clue that the quotations are anything but the reproductions of actual conversations, and the work was published in a magazine that enjoyed a reputation for scrupulous factual inquiry. These factors could lead a reader to take the quotations at face value. Pp. 511-513.

(c) The common law of libel overlooks minor inaccuracies and concentrates upon substantial truth. Thus, a deliberate alteration of a plaintiff's words does not equate with knowledge of falsity for purposes of *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279-280, 11 L. Ed. 2d 686, 84 S. Ct. 710, and *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 341, 342, 41 L. Ed. 2d 789, 94 S. Ct. 2997, unless it results in a material change in the statement's meaning. While the use of quotations to attribute words not in fact spoken is important to that inquiry, the idea that any alteration beyond correction of grammar or syntax by itself proves falsity is rejected. Even if a statement has been recorded, the existence of both a speaker and a reporter, the translation between two media, the addition of punctuation, and the practical necessity to edit and make intelligible a speakers' perhaps rambling comments, make it misleading to suggest that a quotation will be reconstructed with complete accuracy. However, if alterations give a different meaning to a speaker's statements, bearing upon their defamatory character, then the device of quotations might well be critical in finding the words actionable. Pp. 513-518.

(d) Although the Court of Appeals applied a test of substantial truth, it erred in going one step further and concluding that an altered quotation is protected so long as it is a "rational interpretation" of the actual statement. The protection for rational interpretation serves First Amendment principle by allowing an author the interpretive license that is necessary when relying upon ambiguous sources; but where a writer uses a quotation that a reasonable reader would conclude purports to be a verbatim repetition of the speaker's statement, the quotation marks indicate that the author is not interpreting the speaker's ambiguous statement, but is

attempting to convey what the speaker said. *Time, Inc.* v. *Pape*, 401 U.S. 279, 28 L. Ed. 2d 45, 91 S. Ct. 633; *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U.S. 485, 80 L. Ed. 2d 502, 104 S. Ct. 1949, distinguished. Pp. 518-520.

(e) In determining whether Masson has shown sufficient falsification to survive summary judgment, it must be assumed, except where otherwise evidenced by the tape recordings' transcripts, that he is correct in denying that he made the statements Malcolm attributed to him, and that Malcolm reported with knowledge or reckless disregard of the differences between what he said and what was quoted. Malcolm's typewritten notes should not be considered, since Masson denied making the statements, and since the record contains substantial additional evidence to support a jury determination under a clear and convincing evidence standard that Malcolm deliberately or recklessly altered the quotations. While she contests Masson's allegations, only a trial on the merits will resolve the factual dispute. Pp. 520-521.

(f) Five of the six published passages differ materially in meaning from the tape-recorded statements so as to create an issue of fact for a jury as to falsity. Whether the "intellectual gigolo" passage is defamatory is a question of California law, and to the extent that the Court of Appeals based its conclusion on the First Amendment, it was mistaken. Moreover, an "incremental harm" doctrine -- which measures the incremental reputational harm inflicted by the challenged statements beyond the harm imposed by the nonactionable remainder of the publication -- is not compelled as a matter of First Amendment protection for speech, since it does not bear on whether a defendant has published a statement with knowledge of falsity or reckless disregard of whether it was false or not. Pp. 521-525.

2. On remand, the Court of Appeals should consider Masson's argument that the District Court erred in granting summary judgment to the New Yorker Magazine, Inc., and Alfred A. Knopf, Inc., on the basis of their respective relations with Malcolm or the lack of any independent actual malice, since the court failed to reach his argument because of its disposition with respect to Malcolm. P. 525.

**Counsel:** Charles O. Morgan, Jr., argued the cause for petitioner. With him on the briefs was Paul Richard Kleven.

H. Bartow Farr III argued the cause for respondents. With him on the brief were Paul M. Smith, Richard G. Taranto, Charles W. Kenady, and Karl Olson. [*]

**Judges:** KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and MARSHALL, BLACKMUN, STEVENS, O'CONNOR, and SOUTER, JJ., joined, and in

---

[*]   Briefs of amici curiae urging reversal were filed for Certain Journalists and Academics by Stewart Abercrombie Baker and Michael P. McDonald; and for the Mountain States Legal Foundation by William Perry Pendley.

Briefs of amici curiae urging affirmance were filed for the Association of American Publishers, Inc., et al. by Robert G. Sugarman, R. Bruce Rich, Slade R. Metcalf, and Laura R. Handman; for Home Box Office, Inc., et al. by P. Cameron DeVore, Daniel M. Waggoner, and Ronald E. Guttman; for the Reporters Committee for Freedom of the Press et al. by Joseph R. Bankoff, James D. Miller, Jane E. Kirtley, J. Laurent Scharff, W. Terry Maguire, Rene P. Milam, and Bruce W. Sanford; and for The Time Inc. Magazine Co. et al. by Roslyn A. Mazer, Paul R. Taskier, Richard M. Schmidt, Jr., Charles S. Sims, Lee Levine, James E. Grossberg, and Mark Goodman.

Parts I, II-A, II-D, and III-A of which WHITE and SCALIA, JJ., joined. WHITE, J., filed an opinion concurring in part and dissenting in part, in which SCALIA, J., joined, post, p. 525.

**Opinion by:** KENNEDY

## Opinion

 [\*499]   [\*\*\*461]   [\*\*2424]   JUSTICE KENNEDY delivered the opinion of the Court.

[1A] [2A] [3A] [4A] [5A] [6A]In this libel case, a public figure claims he was defamed by an author who, with full knowledge of the inaccuracy, used quotation marks to attribute to him comments he had not made. The First Amendment protects authors and journalists who write about public figures by requiring a plaintiff to prove that the defamatory statements were made with what we have called "actual malice," a term of art denoting deliberate or reckless falsification. We consider in this opinion whether the attributed quotations had the degree of falsity required  [\*\*\*462]  to prove this state of mind, so that the public figure can defeat a motion for summary judgment and proceed to a trial on the merits of the defamation claim.

I

Petitioner Jeffrey Masson trained at Harvard University as a Sanskrit scholar, and in 1970 became a professor of Sanskrit & Indian Studies at the University of Toronto. He spent eight years in psychoanalytic training, and qualified as  [\*500]  an analyst in 1978. Through his professional activities, he came to know Dr. Kurt Eissler, head of the Sigmund Freud Archives, and Dr. Anna Freud, daughter of Sigmund Freud and a major psychoanalyst in her own right. The Sigmund Freud Archives, located at Maresfield Gardens outside of London, serves as a repository for materials about Freud, including his own writings, letters, and personal library. The materials, and the right of access to them, are of immense value to those who study Freud and his theories, life, and work.

In 1980, Eissler and Anna Freud hired petitioner as projects director of the archives. After assuming his post, petitioner became disillusioned with Freudian psychology. In a 1981 lecture before the Western New England Psychoanalytical Society in New Haven, Connecticut, he advanced his theories of Freud. Soon after, the board of the archives terminated petitioner as projects director.

Respondent Janet Malcolm is an author and a contributor to respondent The New Yorker, a weekly magazine. She contacted petitioner in 1982 regarding the possibility of an article on his relationship with the archives. He agreed, and the two met in person and spoke by telephone in a series of interviews. Based on the interviews and other sources, Malcolm wrote a lengthy article. One of Malcolm's narrative devices consists of enclosing lengthy passages in quotation marks, reporting statements of Masson, Eissler, and her other subjects.

During the editorial process, Nancy Franklin, a member of the fact-checking department at The New Yorker, called petitioner to confirm some of the facts underlying the article. According to

petitioner, he expressed alarm at the number of errors in the few passages Franklin discussed with him. Petitioner contends that he asked permission to review those portions of the article which attributed quotations or information to him, but was brushed off with a never-fulfilled [**2425] promise [*501] to "get back to [him]." App. 67. Franklin disputes petitioner's version of their conversation. *Id.*, at 246-247.

The New Yorker published Malcolm's piece in December 1983, as a two-part series. In 1984, with knowledge of at least petitioner's general allegation that the article contained defamatory material, respondent Alfred A. Knopf, Inc., published the entire work as a book, entitled In the Freud Archives.

Malcolm's work received complimentary reviews. But this gave little joy to Masson, for the book portrays him in a most unflattering light. According to one reviewer:

> "Masson the promising psychoanalytic scholar emerges gradually, as a grandiose egotist -- mean-spirited, self-serving, full of braggadocio, impossibly arrogant and, in the end, a self-destructive fool. But it [***463] is not Janet Malcolm who calls him such: his own words reveal this psychological profile -- a self-portrait offered to us through the efforts of an observer and listener who is, surely, as wise as any in the psychoanalytic profession." Coles, Freudianism Confronts Its Malcontents, Boston Globe, May 27, 1984, pp. 58, 60.

Petitioner wrote a letter to the New York Times Book Review calling the book "distorted." In response, Malcolm stated:

> "Many of [the] things Mr. Masson told me (on tape) were discreditable to him, and I felt it best not to include them. Everything I do quote Mr. Masson as saying was said by him, almost word for word. (The 'almost' refers to changes made for the sake of correct syntax.) I would be glad to play the tapes of my conversation with Mr. Masson to the editors of The Book Review whenever they have 40 or 50 short hours to spare." App. 222-223.

Petitioner brought an action for libel under California law in the United States District Court for the Northern District of California. During extensive discovery and repeated [*502] amendments to the complaint, petitioner concentrated on various passages alleged to be defamatory, dropping some and adding others. The tape recordings of the interviews demonstrated that petitioner had, in fact, made statements substantially identical to a number of the passages, and those passages are no longer in the case. We discuss only the passages relied on by petitioner in his briefs to this Court.

Each passage before us purports to quote a statement made by petitioner during the interviews. Yet in each instance no identical statement appears in the more than 40 hours of taped interviews. Petitioner complains that Malcolm fabricated all but one passage; with respect to that passage, he claims Malcolm omitted a crucial portion, rendering the remainder misleading.

[1B](a) *"Intellectual Gigolo."* Malcolm quoted a description by petitioner of his relationship with Eissler and Anna Freud as follows:

"'Then I met a rather attractive older graduate student and I had an affair with her. One day, she took me to some art event, and she was sorry afterward. She said, "Well, it is very nice sleeping with you in your room, but you're the kind of person who should never leave the room -- you're just a social embarrassment anywhere else, though you do fine in your own room." And you know, in their way, if not in so many words, Eissler and Anna Freud told me the same thing. They like me well enough "in my own room." They loved to hear from me what creeps and dolts analysts are. I was like an intellectual gigolo -- you get your pleasure from him, but you don't take him out in public. . . .'" In the Freud Archives 38.

The tape recordings contain the substance of petitioner's reference to his graduate student friend, App. 95, but no suggestion that Eissler or Anna Freud considered him, or that [**2426] he considered himself, an "'intellectual gigolo.'" Instead, petitioner said:

[*503] "They felt, in a sense, I was a private asset but a public liability. . . . They liked me when I was alone in their living room, and I [***464] could talk and chat and tell them the truth about things and they would tell me. But that I was, in a sense, much too junior within the hierarchy of analysis, for these important training analysts to be caught dead with me." *Id.*, at 104.

[2B](b) *"Sex, Women, Fun."* Malcolm quoted petitioner as describing his plans for Maresfield Gardens, which he had hoped to occupy after Anna Freud's death:

"'It was a beautiful house, but it was dark and sombre and dead. Nothing ever went on there. I was the only person who ever came. I would have renovated it, opened it up, brought it to life. Maresfield Gardens would have been a center of scholarship, but it would also have been a place of sex, women, fun. It would have been like the change in *The Wizard of Oz*, from black-and-white into color.'" In the Freud Archives 33.

The tape recordings contain a similar statement, but in place of the references to "sex, women, fun" and The Wizard of Oz, petitioner commented:

"It is an incredible storehouse. I mean, the library, Freud's library alone is priceless in terms of what it contains: all his books with his annotations in them; the Schreber case annotated, that kind of thing. It's fascinating." App. 127.

Petitioner did talk, earlier in the interview, of his meeting with a London analyst:

"I like him. So, and we got on very well. That was the first time we ever met and you know, it was buddy-buddy, and we were to stay with each other and [laughs] we were going to pass women on to each other, and we were going to have a great time together when I lived in the Freud house. We'd have great parties there and we were [laughs] --

. . . .

[*504] ″. . . going to really, we were going to live it up.″ *Id.*, at 129.

[3B](c) ″*It Sounded Better.*″ Petitioner spoke with Malcolm about the history of his family, including the reasons his grandfather changed the family name from Moussaieff to Masson, and why petitioner adopted the abandoned family name as his middle name. The article contains the passage:

> ″'My father is a gem merchant who doesn't like to stay in any one place too long. His father was a gem merchant, too -- a Bessarabian gem merchant, named Moussaieff, who went to Paris in the twenties and adopted the name Masson. My parents named me Jeffrey Lloyd Masson, but in 1975 I decided to change my middle name to Moussaieff -- it sounded better.'″ In the Freud Archives 36.

In the most similar tape-recorded statement, Masson explained at considerable length that his grandfather had changed the family name from Moussaieff to Masson when living in France, ″just to hide his Jewishness.″ Petitioner had changed his last name back to Moussaieff, but his then-wife Terry objected that ″nobody could pronounce it and nobody knew how to spell it, and it wasn't the name that she knew me by.″ Petitioner had changed his name to Moussaieff because he ″just liked it.″ ″It was sort of part of analysis: a return to the roots, and [***465] your family tradition and so on.″ In the end, he had agreed with Terry that ″it wasn't her name after all,″ and used Moussaieff as a middle instead of a last name. App. 87-89.

[4B](d) ″*I Don't Know Why I Put It In.*″ The article recounts part of a conversation between Malcolm and petitioner about the paper petitioner presented at his 1981 New Haven lecture:

> ″[I] asked him what had happened between the time of the lecture and the present to change him from a Freudian [*505] psychoanalyst with somewhat outre views into the bitter and belligerent anti-Freudian he had become.

> [**2427] ″Masson sidestepped my question. 'You're right, there was nothing disrespectful of analysis in that paper,' he said. 'That remark about the sterility of psychoanalysis was something I tacked on at the last minute, and it was totally gratuitous. I don't know why I put it in.'″ In the Freud Archives 53.

The tape recordings instead contain the following discussion of the New Haven lecture:

> Masson: ″So they really couldn't judge the material. And, in fact, until the last sentence I think they were quite fascinated. I think the last sentence was an in, [sic] possibly, gratuitously offensive way to end a paper to a group of analysts. Uh, --″

> Malcolm: ″What were the circumstances under which you put it [in]? . . .″

> Masson: ″That it was, was true.

> . . . .

″. . . I really believe it. I didn't believe anybody would agree with me.

. . . .

″. . . But I felt I should say something because the paper's still well within the analytic tradition in a sense. . . .

. . . .

″. . . It's really not a deep criticism of Freud. It contains all the material that would allow one to criticize Freud but I didn't really do it. And then I thought, I really must say one thing that I really believe, that's not going to appeal to anybody and that was the very last sentence. Because I really do believe psychoanalysis is entirely sterile . . . .″ App. 176.

[5B](e) *″Greatest Analyst Who Ever Lived.″* The article contains the following self-explanatory passage:

> [*506] ″A few days after my return to New York, Masson, in a state of elation, telephoned me to say that Farrar, Straus & Giroux has taken *The Assault on Truth* [Masson's book]. 'Wait till it reaches the best-seller list, and watch how the analysts will crawl,' he crowed. 'They move whichever way the wind blows. They will want me back, they will say that Masson is a great scholar, a major analyst -- after Freud, he's the greatest analyst who ever lived. Suddenly they'll be calling, begging, cajoling: ″Please take back what you've said about our profession; our patients are quitting.″ They'll try a short smear campaign, then they'll try to buy me, and ultimately they'll have to shut up. Judgment will be passed by history. There is no possible refutation of this book. It's going to [***466] cause a revolution in psycho-analysis. Analysis stands or falls with me now.'″ In the Freud Archives 162.

This material does not appear in the tape recordings. Petitioner did make the following statements on related topics in one of the taped interviews with Malcolm:

> ″. . . I assure you when that book comes out, which I honestly believe is an honest book, there is nothing, you know, mean-minded about it. It's the honest fruit of research and intellectual toil. And there is not an analyst in the country who will say a single word in favor of it.″ App. 136.

> ″Talk to enough analysts and get them right down to these concrete issues and you watch how different it is from my position. It's utterly the opposite and that's finally what I realized, that I hold a position that no other analyst holds, including, alas, Freud. At first I thought: Okay, it's me and Freud against the rest of the analytic world, or me and Freud and Anna Freud and Kurt Eissler and Vic Calef and Brian Bird and Sam [*507] Lipton against the rest of the world. Not so, it's me. it's me alone.″ *Id.*, at 139.

The tape of this interview also contains the following exchange between petitioner and

Malcolm:

> Masson: ″. . . analysis stands or falls with me now.″
>
> Malcolm: ″Well that's a very grandiose thing to say.″
>
> [**2428]  Masson: ″Yeah, but it's got nothing to do with me. It's got to do with the things I discovered.″ *Id.*, at 137.

[6B](f) ″*He Had The Wrong Man.*″ In discussing the archives' board meeting at which petitioner's employment was terminated, Malcolm quotes petitioner as giving the following explanation of Eissler's attempt to extract a promise of confidentiality:

> ″'[Eissler] was always putting moral pressure on me. ″Do you want to poison Anna Freud's last days? Have you no heart? You're going to kill the poor old woman.″ I said to him, ″What have I done? *You're* doing it. *You're* firing me. What am I supposed to do -- be grateful to you?″ ″You could be silent about it. You could swallow it. I know it is painful for you. But you could just live with it in silence.″ ″Why should I do that?″ ″Because it is the honorable thing to do.″ Well, he had the wrong man.'″ In the Freud Archives 67.

From the tape recordings, on the other hand, it appears that Malcolm deleted part of petitioner's explanation (italicized below), and petitioner argues that the ″wrong man″ sentence relates to something quite different from Eissler's entreaty that silence was ″the honorable thing.″ In the tape recording, petitioner states:

> ″But it was wrong of Eissler to do that, you know. He was constantly putting various kinds of moral pressure on me and, 'Do you want to poison Anna Freud's last days? Have you no heart?' He called me: 'Have you no heart? You're going to kill the poor old woman. [*508]  Have you no heart? Think of what she's done for you and you are now willing to do this to her.' I said, 'What have I, what have I done? *You* did it. You fired me. [***467]  What am I supposed to do: thank you? be grateful to you?' He said, 'Well you could never talk about it. You could be silent about it. You could swallow it. I know it's painful for you but just live with it in silence.' 'Fuck you,' I said, 'Why should I do that? Why? You know, why should one do that?' 'Because it's the honorable thing to do *and you will save face. And who knows? If you never speak about it and you quietly and humbly accept our judgment, who knows that in a few years if we don't bring you back?*' Well, he had the wrong man.″ App. 215-216.

Malcolm submitted to the District Court that not all of her discussions with petitioner were recorded on tape, in particular conversations that occurred while the two of them walked together or traveled by car, while petitioner stayed at Malcolm's home in New York, or while her tape recorder was inoperable. She claimed to have taken notes of these unrecorded sessions, which she later typed, then discarding the handwritten originals. Petitioner denied

that any discussion relating to the substance of the article occurred during his stay at Malcolm's home in New York, that Malcolm took notes during any of their conversations, or that Malcolm gave any indication that her tape recorder was broken.

Respondents moved for summary judgment. The parties agreed that petitioner was a public figure and so could escape summary judgment only if the evidence in the record would permit a reasonable finder of fact, by clear and convincing evidence, to conclude that respondents published a defamatory statement with actual malice as defined by our cases. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255-256, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). The District Court analyzed each of the passages and held that the alleged inaccuracies did not raise a jury question. The court found that the allegedly fabricated quotations were either substantially true, or were "'one of a number of possible [*509] rational interpretations' of a conversation or event that 'bristled with ambiguities,'" and thus were entitled to constitutional protection. 686 F. Supp. 1396, 1399 (ND Cal. 1987) (quoting *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U.S. 485, 512, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984)). The court also ruled [**2429] that the "he had the wrong man" passage involved an exercise of editorial judgment upon which the courts could not intrude. 686 F. Supp. at 1403-1404.

The Court of Appeals affirmed, with one judge dissenting. 895 F.2d 1535 (CA9 1989). The court assumed for much of its opinion that Malcolm had deliberately altered each quotation not found on the tape recordings, but nevertheless held that petitioner failed to raise a jury question of actual malice, in large part for the reasons stated by the District Court. In its examination of the "intellectual gigolo" passage, the court agreed with the District Court that petitioner could not demonstrate actual malice because Malcolm had not altered the substantive content of petitioner's self-description, but went on to note that it did not consider the "intellectual gigolo" passage defamatory, as the quotation merely reported Kurt Eissler's and Anna Freud's opinions about petitioner. In any event, concluded the court, the statement would not be [***468] actionable under the "'incremental harm branch' of the 'libel-proof' doctrine," *id.*, at 1541 (quoting *Herbert* v. *Lando*, 781 F.2d 298, 310-311 (CA2 1986)).

The dissent argued that any intentional or reckless alteration would prove actual malice, so long as a passage within quotation marks purports to be a verbatim rendition of what was said, contains material inaccuracies, and is defamatory. 895 F.2d at 1562-1570. We granted certiorari, 498 U.S. 808 (1990), and now reverse.

II

A

[7]Under California law, "libel is a false and unprivileged publication by writing . . . which exposes any person to hatred, [*510] contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." Cal. Civ. Code Ann. § 45 (West 1982). False attribution of statements to a person may constitute libel,

if the falsity exposes that person to an injury comprehended by the statute. See *Selleck* v. *Globe International, Inc.*, 166 Cal. App. 3d 1123, 1132, 212 Cal. Rptr. 838, 844 (1985); *Cameron* v. *Wernick*, 251 Cal. App. 2d 890, 60 Cal. Rptr. 102 (1967); *Kerby* v. *Hal Roach Studios, Inc.*, 53 Cal. App. 2d 207, 213, 127 P.2d 577, 581 (1942); cf. *Baker* v. *Los Angeles Herald Examiner*, 42 Cal. 3d 254, 260-261, 721 P.2d 87, 90-91, 228 Cal. Rptr. 206 (1986). It matters not under California law that petitioner alleges only part of the work at issue to be false. "The test of libel is not quantitative; a single sentence may be the basis for an action in libel even though buried in a much longer text," though the California courts recognize that "while a drop of poison may be lethal, weaker poisons are sometimes diluted to the point of impotency." *Washburn* v. *Wright*, 261 Cal. App. 2d 789, 795, 68 Cal. Rptr. 224, 228 (1968).

[8]The First Amendment limits California's libel law in various respects. When, as here, the plaintiff is a public figure, he cannot recover unless he proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice, *i. e.*, with "knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279-280, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964). Mere negligence does not suffice. Rather, the plaintiff must demonstrate that the author "in fact entertained serious doubts as to the truth of his publication," *St. Amant* v. *Thompson*, 390 U.S. 727, 731, 20 L. Ed. 2d 262, 88 S. Ct. 1323 (1968), or acted with a "high degree of awareness of . . . probable falsity," *Garrison* v. *Louisiana*, 379 U.S. 64, 74, 13 L. Ed. 2d 125, 85 S. Ct. 209 (1964).

[9]Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will. See *Greenbelt Cooperative* [*511] *Publishing Assn., Inc.* v. *Bresler*, 398 U.S. 6, 26 [**2430] L. Ed. 2d 6, 90 S. Ct. 1537 (1970).We have used the term actual malice as a shorthand to describe the First Amendment protections for speech injurious to reputation, and we continue to do so here. But the term can confuse as well as enlighten. In this respect, the phrase may be an unfortunate one. See *Harte-Hanks Communications, Inc.* v. *Connaughton*, 491 U.S. 657, 666, n. 7, 105 L. Ed. 2d 562, 109 S. Ct. 2678 [***469] (1989). In place of the term actual malice, it is better practice that jury instructions refer to publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity. This definitional principle must be remembered in the case before us.

B

In general, quotation marks around a passage indicate to the reader that the passage reproduces the speaker's words verbatim. They inform the reader that he or she is reading the statement of the speaker, not a paraphrase or other indirect interpretation by an author. By providing this information, quotations add authority to the statement and credibility to the author's work. Quotations allow the reader to form his or her own conclusions and to assess the conclusions of the author, instead of relying entirely upon the author's characterization of her subject.

[10]A fabricated quotation may injure reputation in at least two senses, either giving rise to a conceivable claim of defamation. First, the quotation might injure because it attributes an

untrue factual assertion to the speaker. An example would be a fabricated quotation of a public official admitting he had been convicted of a serious crime when in fact he had not.

Second, regardless of the truth or falsity of the factual matters asserted within the quoted statement, the attribution may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold. John Lennon once was quoted as saying of [*512] the Beatles, "We're more popular than Jesus Christ now." Time, Aug. 12, 1966, p. 38. Supposing the quotation had been a fabrication, it appears California law could permit recovery for defamation because, even without regard to the truth of the underlying assertion, false attribution of the statement could have injured his reputation. Here, in like manner, one need not determine whether petitioner is or is not the greatest analyst who ever lived in order to determine that it might have injured his reputation to be reported as having so proclaimed.

A self-condemnatory quotation may carry more force than criticism by another. It is against self-interest to admit one's own criminal liability, arrogance, or lack of integrity, and so all the more easy to credit when it happens. This principle underlies the elemental rule of evidence which permits the introduction of statements against interest, despite their hearsay character, because we assume "that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true." Advisory Committee's Notes on Fed. Rule Evid. 804(b)(3), 28 U. S. C. App., p. 789 (citing *Hileman* v. *Northwest Engineering Co.*, 346 F.2d 668 (CA6 1965)).

Of course, quotations do not always convey that the speaker actually said or wrote the quoted material. "Punctuation marks, like words, have many uses. Writers often use quotation marks, yet no reasonable reader would assume that such punctuation automatically implies the truth of the quoted material. [***470] " *Baker* v. *Los Angeles Examiner*, 42 Cal. 3d at 263, 721 P.2d at 92. In *Baker*, a television reviewer printed a hypothetical conversation between a station vice president and writer/producer, and the court found that no reasonable reader would conclude the plaintiff in fact had made the statement attributed to him. *Id.*, at 267, 721 P.2d at 95. Writers often use quotations as in *Baker*, and a reader will not reasonably understand the quotations to indicate reproduction of a conversation [**2431] that took place. In other [*513] instances, an acknowledgment that the work is so-called docudrama or historical fiction, or that it recreates conversations from memory, not from recordings, might indicate that the quotations should not be interpreted as the actual statements of the speaker to whom they are attributed.

[11]The work at issue here, however, as with much journalistic writing, provides the reader no clue that the quotations are being used as a rhetorical device or to paraphrase the speaker's actual statements. To the contrary, the work purports to be nonfiction, the result of numerous interviews. At least a trier of fact could so conclude. The work contains lengthy quotations attributed to petitioner, and neither Malcolm nor her publishers indicate to the reader that the quotations are anything but the reproduction of actual conversations. Further, the work was published in The New Yorker, a magazine which at the relevant time seemed to enjoy a

reputation for scrupulous factual accuracy. These factors would, or at least could, lead a reader to take the quotations at face value. A defendant may be able to argue to the jury that quotations should be viewed by the reader as nonliteral or reconstructions, but we conclude that a trier of fact in this case could find that the reasonable reader would understand the quotations to be nearly verbatim reports of statements made by the subject.

C

The constitutional question we must consider here is whether, in the framework of a summary judgment motion, the evidence suffices to show that respondents acted with the requisite knowledge of falsity or reckless disregard as to truth or falsity. This inquiry in turn requires us to consider the concept of falsity; for we cannot discuss the standards for knowledge or reckless disregard without some understanding of the acts required for liability. We must consider whether the requisite falsity inheres in the attribution of words to the petitioner which he did not speak.

 [*514]  [12]In some sense, any alteration of a verbatim quotation is false. But writers and reporters by necessity alter what people say, at the very least to eliminate grammatical and syntactical infelicities. If every alteration constituted the falsity required to prove actual malice, the practice of journalism, which the First Amendment standard is designed to protect, would require a radical change, one inconsistent with our precedents and First Amendment principles. Petitioner concedes that this absolute definition of falsity in the quotation context is too stringent, and acknowledges that "minor changes to correct for grammar or syntax" do not amount to falsity for purposes of proving actual malice. Brief for Petitioner 18, 36-37. We agree, and must determine what, in  [***471]  addition to this technical falsity, proves falsity for purposes of the actual malice inquiry.

Petitioner argues that, excepting correction of grammar or syntax, publication of a quotation with knowledge that it does not contain the words the public figure used demonstrates actual malice. The author will have published the quotation with knowledge of falsity, and no more need be shown. Petitioner suggests that by invoking more forgiving standards the Court of Appeals would permit and encourage the publication of falsehoods. Petitioner believes that the intentional manufacture of quotations does not "represent the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies," *Bose Corp.*, 466 U.S. at 513, and that protection of deliberate falsehoods would hinder the First Amendment values of robust and well-informed public debate by reducing the reliability of information available to the public.

We reject the idea that any alteration beyond correction of grammar or syntax by itself proves falsity in the sense relevant to determining actual malice under the First [**2432] Amendment. An interviewer who writes from notes often will engage in the task of attempting a reconstruction of the speaker's statement. That author would, we may assume,  [*515]  act with knowledge that at times she has attributed to her subject words other than those actually used.

Under petitioner's proposed standard, an author in this situation would lack First Amendment protection if she reported as quotations the substance of a subject's derogatory statements about himself.

Even if a journalist has tape-recorded the spoken statement of a public figure, the full and exact statement will be reported in only rare circumstances. The existence of both a speaker and a reporter; the translation between two media, speech and the printed word; the addition of punctuation; and the practical necessity to edit and make intelligible a speaker's perhaps rambling comments, all make it misleading to suggest that a quotation will be reconstructed with complete accuracy. The use or absence of punctuation may distort a speaker's meaning, for example, where that meaning turns upon a speaker's emphasis of a particular word. In other cases, if a speaker makes an obvious misstatement, for example by unconscious substitution of one name for another, a journalist might alter the speaker's words but preserve his intended meaning. And conversely, an exact quotation out of context can distort meaning, although the speaker did use each reported word.

In all events, technical distinctions between correcting grammar and syntax and some greater level of alteration do not appear workable, for we can think of no method by which courts or juries would draw the line between cleaning up and other changes, except by reference to the meaning a statement conveys to a reasonable reader. To attempt narrow distinctions of this type would be an unnecessary departure from First Amendment principles of general applicability, and, just as important, a departure from the underlying purposes of the tort of libel as understood since the latter half of the 16th century. From then until now, the tort action for defamation has existed to redress injury to the [***472] plaintiff's reputation by a statement that is defamatory and false. See [*516] *Milkovich* v. *Lorain Journal Co.*, 497 U.S. 1, 11, 111 L. Ed. 2d 1, 110 S. Ct. 2695 (1990). As we have recognized, "the legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood." *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 341, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974). If an author alters a speaker's words but effects no material change in meaning, including any meaning conveyed by the manner or fact of expression, the speaker suffers no injury to reputation that is compensable as a defamation.

These essential principles of defamation law accommodate the special case of inaccurate quotations without the necessity for a discrete body of jurisprudence directed to this subject alone. Last Term, in *Milkovich* v. *Lorain Journal Co.*, we refused "to create a wholesale defamation exemption for anything that might be labeled 'opinion.'" 497 U.S. at 18 (citation omitted). We recognized that "expressions of 'opinion' may often imply an assertion of objective fact." *Ibid.* We allowed the defamation action to go forward in that case, holding that a reasonable trier of fact could find that the so-called expressions of opinion could be interpreted as including false assertions as to factual matters. So too in the case before us, we reject any special test of falsity for quotations, including one which would draw the line at correction of grammar or syntax. We conclude, rather, that the exceptions suggested by petitioner for grammatical or syntactical corrections serve to illuminate a broader principle.

[13] [14]The common law of libel takes but one approach to the question of falsity, regardless of the form of the communication. See Restatement (Second) of Torts § 563, Comment *c* (1977); W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on [**2433] Law of Torts 776 (5th ed. 1984). It overlooks minor inaccuracies and concentrates upon substantial truth. As in other jurisdictions, California law permits the defense of substantial truth and would absolve a defendant even if she cannot "justify every word of the alleged defamatory matter; it is sufficient if the substance of the [*517] charge be proved true, irrespective of slight inaccuracy in the details." 5 B. Witkin, Summary of California Law § 495 (9th ed. 1988) (citing cases). In this case, of course, the burden is upon petitioner to prove falsity. See *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U.S. 767, 775, 89 L. Ed. 2d 783, 106 S. Ct. 1558 (1986). The essence of that inquiry, however, remains the same whether the burden rests upon plaintiff or defendant. Minor inaccuracies do not amount to falsity so long as "the substance, the gist, the sting, of the libelous charge be justified." *Heuer* v. *Kee*, 15 Cal. App. 2d 710, 714, 59 P.2d 1063, 1064 (1936); see also *Alioto* v. *Cowles Communications, Inc.*, 623 F.2d 616, 619 (CA9 1980); *Maheu* v. *Hughes Tool Co.*, 569 F.2d 459, 465-466 (CA9 1978). Put another way, the statement is not considered false unless it "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." R. Sack, Libel, Slander, and Related Problems 138 (1980); see, *e. g., Wehling* v. *Columbia Broadcasting System*, 721 F.2d 506, 509 (CA5 1983); see generally R. Smolla, Law of Defamation § 5.08 (1991). Our definition [***473] of actual malice relies upon this historical understanding.

[15]We conclude that a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity for purposes of *New York Times Co.* v. *Sullivan*, 376 U.S. at 279-280, and *Gertz* v. *Robert Welch, Inc., supra*, at 342, unless the alteration results in a material change in the meaning conveyed by the statement. The use of quotations to attribute words not in fact spoken bears in a most important way on that inquiry, but it is not dispositive in every case.

Deliberate or reckless falsification that comprises actual malice turns upon words and punctuation only because words and punctuation express meaning. Meaning is the life of language. And, for the reasons we have given, quotations may be a devastating instrument for conveying false meaning. In the case under consideration, readers of In the Freud Archives may have found Malcolm's portrait of petitioner especially [*518] damning because so much of it appeared to be a self-portrait, told by petitioner in his own words. And if the alterations of petitioner's words gave a different meaning to the statements, bearing upon their defamatory character, then the device of quotations might well be critical in finding the words actionable.

D

[16]The Court of Appeals applied a test of substantial truth which, in exposition if not in application, comports with much of the above discussion. The Court of Appeals, however, went one step beyond protection of quotations that convey the meaning of a speaker's statement with substantial accuracy and concluded that an altered quotation is protected so long as it is a "rational interpretation" of an actual statement, drawing this standard from our decisions in

*Time, Inc.* v. *Pape*, 401 U.S. 279, 28 L. Ed. 2d 45, 91 S. Ct. 633 (1971), and *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U.S. 485, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984). Application of our protection for rational interpretation in this context finds no support in general principles of defamation law or in our First Amendment jurisprudence. Neither *Time, Inc.* v. *Pape* nor *Bose Corp.* involved the fabrication of quotations, or any analogous claim, and because many of the quotations at issue might reasonably be construed to state or imply factual assertions that are both false and defamatory, we cannot accept the reasoning of the Court of Appeals on this point.

 [**2434]  In *Time, Inc.* v. *Pape*, we reversed a libel judgment which arose out of a magazine article summarizing a report by the United States Commission on Civil Rights discussing police civil rights abuses. The article quoted the Commission's summary of the facts surrounding an incident of police brutality, but failed to include the Commission's qualification that these were allegations taken from a civil complaint. The Court noted that "the attitude of the Commission toward the factual verity of the episodes recounted was anything but straightforward," and distinguished between a "direct account  [*519]  of events that speak for themselves," 401 U.S. at 285, 286, and an article descriptive of what the Commission had  [***474]  reported. *Time, Inc.* v. *Pape* took into account the difficult choices that confront an author who departs from direct quotation and offers his own interpretation of an ambiguous source. A fair reading of our opinion is that the defendant did not publish a falsification sufficient to sustain a finding of actual malice.

In *Bose Corp.*, a Consumer Reports reviewer had attempted to describe in words the experience of listening to music through a pair of loudspeakers, and we concluded that the result was not an assessment of events that speak for themselves, but "'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer." 466 U.S. at 512 (quoting *Time, Inc.* v. *Pape, supra*, at 290). We refused to permit recovery for choice of language which, though perhaps reflecting a misconception, represented "the sort of inaccuracy that is commonplace in the forum of robust debate to which the *New York Times* rule applies." 466 U.S. at 513.

The protection for rational interpretation serves First Amendment principles by allowing an author the interpretive license that is necessary when relying upon ambiguous sources. Where, however, a writer uses a quotation, and where a reasonable reader would conclude that the quotation purports to be a verbatim repetition of a statement by the speaker, the quotation marks indicate that the author is not involved in an interpretation of the speaker's ambiguous statement, but attempting to convey what the speaker said. This orthodox use of a quotation is the quintessential "direct account of events that speak for themselves." *Time, Inc.* v. *Pape, supra*, at 285. More accurately, the quotation allows the subject to speak for himself.

The significance of the quotations at issue, absent any qualification, is to inform us that we are reading the statement  [*520]  of petitioner, not Malcolm's rational interpretation of what petitioner has said or thought. Were we to assess quotations under a rational interpretation

standard, we would give journalists the freedom to place statements in their subjects' mouths without fear of liability. By eliminating any method of distinguishing between the statements of the subject and the interpretation of the author, we would diminish to a great degree the trustworthiness of the printed word and eliminate the real meaning of quotations. Not only public figures but the press doubtless would suffer under such a rule. Newsworthy figures might become more wary of journalists, knowing that any comment could be transmuted and attributed to the subject, so long as some bounds of rational interpretation were not exceeded. We would ill serve the values of the First Amendment if we were to grant near absolute, constitutional protection for such a practice. We doubt the suggestion that as a general rule readers will assume that direct quotations are but a rational interpretation of the speaker's words, and we decline to adopt any such presumption in determining the permissible interpretations of the quotations in question here.

III

A

[17]We apply these principles to [***475] the case before us. On summary judgment, we must [**2435] draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded particular evidence. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. at 255. So we must assume, except where otherwise evidenced by the transcripts of the tape recordings, that petitioner is correct in denying that he made the statements attributed to him by Malcolm, and that Malcolm reported with knowledge or reckless disregard of the differences between what petitioner said and what was quoted.

[*521] [18]Respondents argue that, in determining whether petitioner has shown sufficient falsification to survive summary judgment, we should consider not only the tape-recorded statements but also Malcolm's typewritten notes. We must decline that suggestion. To begin with, petitioner affirms in an affidavit that he did not make the complained of statements. The record contains substantial additional evidence, moreover, evidence which, in a light most favorable to petitioner, would support a jury determination under a clear and convincing standard that Malcolm deliberately or recklessly altered the quotations.

First, many of the challenged passages resemble quotations that appear on the tapes, except for the addition or alteration of certain phrases, giving rise to a reasonable inference that the statements have been altered. Second, Malcolm had the tapes in her possession and was not working under a tight deadline. Unlike a case involving hot news, Malcolm cannot complain that she lacked the practical ability to compare the tapes with her work in progress. Third, Malcolm represented to the editor in chief of The New Yorker that all the quotations were from the tape recordings. Fourth, Malcolm's explanations of the time and place of unrecorded conversations during which petitioner allegedly made some of the quoted statements have not been consistent in all respects. Fifth, petitioner suggests that the progression from typewritten notes, to manuscript, then to galleys provides further evidence of intentional alteration.

Malcolm contests petitioner's allegations, and only a trial on the merits will resolve the factual dispute. But at this stage, the evidence creates a jury question whether Malcolm published the statements with knowledge or reckless disregard of the alterations.

B

We must determine whether the published passages differ materially in meaning from the tape-recorded statements so as to create an issue of fact for a jury as to falsity.

[*522] [1C](a) *"Intellectual Gigolo."* We agree with the dissenting opinion in the Court of Appeals that "fairly read, intellectual gigolo suggests someone who forsakes intellectual integrity in exchange for pecuniary or other gain." 895 F.2d at 1551. A reasonable jury could find a material difference between the meaning of this passage and petitioner's tape-recorded statement that he was considered "much too junior within the hierarchy of analysis, for these important training analysts to be caught dead with [him]."

[19]The Court of Appeals majority found it difficult to perceive how the " [***476] intellectual gigolo" quotation was defamatory, a determination supported not by any citation to California law, but only by the argument that the passage appears to be a report of Eissler's and Anna Freud's opinions of petitioner. *Id.*, at 1541.We agree with the Court of Appeals that the most natural interpretation of this quotation is not an admission that petitioner considers himself an intellectual gigolo but a statement that Eissler and Anna Freud considered him so. It does not follow, though, that the statement is harmless. Petitioner is entitled to argue that the passage should be analyzed as if Malcolm had reported falsely that *Eissler* had given this assessment (with the added level of complexity that the quotation purports to represent petitioner's understanding of Eissler's view). An admission that two well-respected senior colleagues [**2436] considered one an "intellectual gigolo" could be as, or more, damaging than a similar self-appraisal. In all events, whether the "intellectual gigolo" quotation is defamatory is a question of California law. To the extent that the Court of Appeals based its conclusion in the First Amendment, it was mistaken.

[20][21]The Court of Appeals relied upon the "incremental harm" doctrine as an alternative basis for its decision. As the court explained it: "This doctrine measures the incremental reputational harm inflicted by the challenged statements beyond the harm imposed by the nonactionable remainder of the publication." *Ibid.;* see generally Note, 98 Harv. L. [*523] Rev. 1909 (1985); R. Smolla, Law of Defamation § 9.10[4]d (1991). The court ruled, as a matter of law, that "given the . . . many provocative, bombastic statements indisputably made by Masson and quoted by Malcolm, the additional harm caused by the 'intellectual gigolo' quote was nominal or nonexistent, rendering the defamation claim as to this quote nonactionable." 895 F.2d at 1541.

This reasoning requires a court to conclude that, in fact, a plaintiff made the other quoted statements, cf. *Liberty Lobby, Inc.* v. *Anderson*, 241 U.S. App. D.C. 246, 251, 746 F.2d 1563,

1568 (1984), vacated and remanded on other grounds, 477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), and then to undertake a factual inquiry into the reputational damage caused by the remainder of the publication. As noted by the dissent in the Court of Appeals, the most "provocative, bombastic statements" quoted by Malcolm are those complained of by petitioner, and so this would not seem an appropriate application of the incremental harm doctrine. 895 F.2d at 1566.

Furthermore, the Court of Appeals provided no indication whether it considered the incremental harm doctrine to be grounded in California law or the First Amendment. Here, we reject any suggestion that the incremental harm doctrine is compelled as a matter of First Amendment protection for speech. The question of incremental harm does not bear upon whether a defendant has published a statement with knowledge of falsity or reckless disregard of whether it was false or not. As a question of state law, on the other hand, we are given no indication that California accepts this doctrine, though it remains free to do so. Of course, state tort law doctrines of injury, causation, and damages calculation might allow a defendant to press the argument [***477] that the statements did not result in any incremental harm to a plaintiff's reputation.

[2C](b) *"Sex, Women, Fun."* This passage presents a closer question. The "sex, women, fun" quotation offers a very different picture of petitioner's plans for Maresfield Gardens [*524] than his remark that "Freud's library alone is priceless." See *supra*, at 503. Petitioner's other tape-recorded remarks did indicate that he and another analyst planned to have great parties at the Freud house and, in a context that may not even refer to Freud house activities, to "pass women on to each other." We cannot conclude as a matter of law that these remarks bear the same substantial meaning as the quoted passage's suggestion that petitioner would make the Freud house a place of "sex, women, fun."

[3C](c) *"It Sounded Better."* We agree with the District Court and the Court of Appeals that any difference between petitioner's tape-recorded statement that he "just liked" the name Moussaieff, and the quotation that "it sounded better" is, in context, immaterial. Although Malcolm did not include all of petitioner's lengthy explanation of his name change, she did convey the gist of that explanation: Petitioner took his abandoned family name as his middle name. We agree with the Court of Appeals that the words attributed to petitioner did not materially alter the meaning of his statement.

[**2437] [4C](d) *"I Don't Know Why I Put It In."* Malcolm quotes petitioner as saying that he "tacked on at the last minute" a "totally gratuitous" remark about the "sterility of psychoanalysis" in an academic paper, and that he did so for no particular reason. In the tape recordings, petitioner does admit that the remark was "possibly [a] gratuitously offensive way to end a paper to a group of analysts," but when asked why he included the remark, he answered "[because] it was true . . . I really believe it." Malcolm's version contains material differences from petitioner's statement, and it is conceivable that the alteration results in a statement that could injure a scholar's reputation.

[5C](e) *"Greatest Analyst Who Ever Lived."* While petitioner did, on numerous occasions, predict that his theories would do irreparable damage to the practice of psychoanalysis, and did suggest that no other analyst shared his views, no tape-recorded statement appears to contain the substance or the [*525] arrogant and unprofessional tone apparent in this quotation. A material difference exists between the quotation and the tape-recorded statements, and a jury could find that the difference exposed petitioner to contempt, ridicule, or obloquy.

[6C](f) *"He Had The Wrong Man."* The quoted version makes it appear as if petitioner rejected a plea to remain in stoic silence and do "the honorable thing." The tape-recorded version indicates that petitioner rejected a plea supported by far more varied motives: Eissler told petitioner that not only would silence be "the honorable thing," but petitioner would "save face," and might be rewarded for that silence with eventual reinstatement. Petitioner described himself as willing to undergo a scandal in order to shine the light of publicity upon the actions of the Freud Archives, while Malcolm would have petitioner describe himself [***478] as a person who was "the wrong man" to do "the honorable thing." This difference is material, a jury might find it defamatory, and, for the reasons we have given, there is evidence to support a finding of deliberate or reckless falsification.

C

[22]Because of the Court of Appeals' disposition with respect to Malcolm, it did not have occasion to address petitioner's argument that the District Court erred in granting summary judgment to The New Yorker Magazine, Inc., and Alfred A. Knopf, Inc., on the basis of their respective relations with Malcolm or the lack of any independent actual malice. These questions are best addressed in the first instance on remand.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

**Concur by:** WHITE (In Part)

**Dissent by:** WHITE (In Part)

## Dissent

JUSTICE WHITE, with whom JUSTICE SCALIA joins, concurring in part and dissenting in part.

I join Parts I, II-A, II-D, and III-A, but cannot wholly agree with the remainder of the opinion. My principal disagreement [*526] is with the holding, *ante*, at 517, that "a deliberate alteration of the words uttered by a plaintiff does not equate with knowledge of falsity . . . unless the alteration results in a material change in the meaning conveyed by the statement."

Under *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710 (1964), "malice" means deliberate falsehood or reckless disregard for whether the fact asserted is true or false. *Id.*, at 279-280. As the Court recognizes, the use of quotation marks in reporting what a person said asserts that the person spoke the words as quoted. As this case comes to us, it is to be judged on the basis that in the instances identified by the Court, the reporter, Malcolm, wrote that Masson said certain things that she knew Masson did not say. By any definition of the term, this was " [**2438] knowing falsehood": Malcolm asserts that Masson said these very words, knowing that he did not. The issue, as the Court recognizes, is whether Masson spoke the words attributed to him, not whether the fact, if any, asserted by the attributed words is true or false. In my view, we need to go no further to conclude that the defendants in this case were not entitled to summary judgment on the issue of malice with respect to any of the six erroneous quotations.

That there was at least an issue for the jury to decide on the question of deliberate or reckless falsehood does not mean that plaintiffs were necessarily entitled to go to trial. If, as a matter of law, reasonable jurors could not conclude that attributing to Masson certain words that he did not say amounted to libel under California law, *i. e.*, "exposed [Masson] to hatred, contempt, ridicule, or obloquy, or which caused him to be shunned or avoided, or which had a tendency to injure him in his occupation," Cal. Civ. Code Ann. § 45 (West 1982), a motion for summary judgment on [***479] this ground would be justified. [*] I would suppose, for example, [*527] that if Malcolm wrote that Masson said that he wore contact lenses, when he said nothing about his eyes or his vision, the trial judge would grant summary judgment for the defendants and dismiss the case. The same would be true if Masson had said "I was spoiled as a child by my Mother," whereas, Malcolm reports that he said "I was spoiled as a child by my parents." But if reasonable jurors could conclude that the deliberate misquotation was libelous, the case should go to the jury.

This seems to me to be the straightforward, traditional approach to deal with this case. Instead, the Court states that deliberate misquotation does not amount to *New York Times* malice unless it results in a material change in the meaning conveyed by the statement. This ignores the fact that, under *New York Times*, reporting a known falsehood -- here the knowingly false attribution -- is sufficient proof of malice. The falsehood, apparently, must be substantial; the reporter may lie a little, but not too much.

This standard is not only a less manageable one than the traditional approach, but it also assigns to the courts issues that are for the jury to decide. For a court to ask whether a misquotation substantially alters the meaning of spoken words in a defamatory manner is a far different inquiry from whether reasonable jurors could find that the misquotation was different enough to be libelous. In the one case, the court is measuring the difference from its own point of view; in the other it is asking how the jury would or could view the erroneous attribution.

---

[*]   In dealing with the "intellectual gigolo" passage, the Court of Appeals ruled that there was no malice but in the alternative went on to say that as a matter of law the erroneous attribution was not actionable defamation. 895 F.2d 1535, 1540-1541 (CA9 1989).

The Court attempts to justify its holding in several ways, none of which is persuasive. First, it observes that an interviewer who takes notes of any interview will attempt to reconstruct what the speaker said and will often knowingly attribute to the subject words that were not used by the speaker. *Ante*, at 514-515. But this is nothing more than an assertion that authors may misrepresent because they cannot remember what the speaker actually said. This  [*528] should be no dilemma for such authors, for they could report their story without purporting to quote when they are not sure, thereby leaving the reader to trust or doubt the author rather than believing that the subject actually said what he is claimed to have said. Moreover, this basis for the Court's rule has no application where there is a tape of the interview and the author is in no way at a loss to know what the speaker actually said. Second, the Court speculates that even with the benefit of a recording, the author will find it necessary at times to reconstruct, *ante*, at 515, but again, in those cases why should the author be free to put his or her reconstruction in quotation marks, rather than report without them? Third, the Court  [**2439] suggests that misquotations that do not materially alter the meaning inflict no injury to reputation that is compensable as defamation. *Ante*, at 517. This may be true, but this is a question of defamation or  [***480]  not, and has nothing to do with whether the author deliberately put within quotation marks and attributed to the speaker words that the author knew the speaker did not utter.

As I see it, the defendants' motion for summary judgment based on lack of malice should not have been granted on any of the six quotations considered by the Court in Part III-B of its opinion. I therefore dissent from the result reached with respect to the "It Sounded Better" quotation dealt with in paragraph (c) of Part III-B, but agree with the Court's judgment on the other five misquotations.

## References

16 Am Jur 2d, Constitutional Law 506; 50 Am Jur 2d, Libel and Slander 173-175, 297, 30116A Am Jur Pl & Pr Forms (Rev), Libel and Slander, Forms 31, 204, 39414 Am Jur Proof of Facts 2d 49, Defamation With Actual Malice17 Am Jur Trials 223, Libel Actions by Public Officials; 19 Am Jur Trials 499, DefamationUSCS, Constitution, Amendment 1L Ed Digest, Constitutional Law 948; Summary Judgment and Judgment on Pleadings 5L Ed Index, Freedom of Speech and Press; Libel and Slander; New York Times RuleIndex to Annotations, Freedom of Speech and Press; Libel and Slander; Newspapers and Periodicals; New York Times Rule; Writers and Editors          Annotation References: Progeny of New York Times v Sullivan in the Supreme Court. 61 L Ed 2d 975.Constitutional aspects of libel and slander-- Supreme Court cases. 28 L Ed 2d 885.Libel and slander: Who is "public figure" in the light of Gertz v Robert Welch, Inc. (1974) 418 US 323, 41 L Ed 2d 789, 94 S Ct 2997. 75 ALR3d 616.Libel and slander: what constitutes actual malice, within federal constitutional rule requiring public officials and public figures to show actual malice. 20 ALR3d 988.Constitutional aspects of libel or slander of public officials. 95 ALR2d 1450.Necessity and sufficiency of plaintiff's allegations as to falsity in defamation action. 85 ALR2d 460.Sufficiency of plaintiff's allegations in defamation action as to defendant's malice. 76 ALR2d 696.



# Neely v. Wilson

Supreme Court of Texas

September 13, 2012, Argued; June 28, 2013, Opinion Delivered

No. 11-0228

**Reporter**
418 S.W.3d 52; 2013 Tex. LEXIS 1082; 57 Tex. Sup. J. 224

BYRON D. NEELY, INDIVIDUALLY, AND BYRON D. NEELY, M.D., P.A., PETITIONERS, v. NANCI WILSON, CBS STATIONS GROUP OF TEXAS, L.P., D/B/A KEYE-TV, AND VIACOM, INC., RESPONDENTS

**Subsequent History:** [**1] **Note:** Opinion corrected when rehearing was denied, 01/31/2014.

**Prior History:** ON PETITION FOR REVIEW FROM THE COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS.
Neely v. Wilson, 2013 Tex. LEXIS 511 (Tex., 2013)

**Judges:** JUSTICE GUZMAN delivered the opinion of the Court, in which JUSTICE JOHNSON, JUSTICE WILLETT, JUSTICE BOYD, and JUSTICE DEVINE joined. CHIEF JUSTICE JEFFERSON filed a dissenting opinion, in which JUSTICE GREEN and JUSTICE LEHRMANN joined. JUSTICE HECHT did not participate in the decision. CHIEF JUSTICE JEFFERSON, joined by JUSTICE GREEN and JUSTICE LEHRMANN, dissenting.

**Opinion by:** Eva M. Guzman

## Opinion

[*56] This is an appeal of a summary judgment granted to media defendants in a suit stemming from their investigative broadcast involving a physician. This suit, like all defamation suits, implicates the competing constitutional rights to seek redress for reputational torts and the constitutional rights to free speech and press. But we have long held that despite these concerns, we adhere to our well-settled summary judgment standards.[1] Thus, we decide here whether the physician raised a genuine issue of material fact to defeat summary judgment and proceed to trial on his defamation claim.

Truth is a defense to all defamation suits. Additionally, the Legislature has provided other specific defenses for media defendants, such as the official/judicial proceedings privilege, the

---

[1] *Casso v. Brand*, 776 S.W.2d 551, 555 n.3 (Tex. 1989) [**2] (noting that constitutional implications in defamation claims do not alter our summary judgment standards).

fair comment privilege, and the due care provision. Here, the media defendants raised various defenses in their summary judgment motion but focused primarily on the truth defense: there is no defamation liability if the gist of the broadcast is substantially true. In the court of appeals, the media defendants mainly argued that we created a rule in *McIlvain v. Jacobs*[2] that a media defendant's reporting of third-party allegations is substantially true if it accurately reports the allegations—even if the allegations themselves are false. We created no such rule in *McIlvain*, and the facts of this case likewise do not require us to create such a rule. While it is possible for the gist of a broadcast to be mere allegation reporting (such that the truth of such a broadcast might be measured by its accuracy), a person of ordinary intelligence could conclude that the gist of the broadcast at issue [**3] was that the physician was disciplined for operating on patients while taking dangerous [*57] drugs or controlled substances. We hold the physician raised a genuine issue of material fact as to the truth or falsity of that gist with evidence that he was not disciplined for taking dangerous drugs or controlled substances and had never performed surgery while taking them.[3]

As to the remaining defenses, the media defendants did not raise the due care provision in their summary judgment motion and have not conclusively proven the application of another defense or privilege. At trial, the media defendants may well prevail on the truth defense or on one or more of these other defenses and privileges, but they have not conclusively done so here. We therefore reverse the judgment of the court of appeals and remand the case to the trial court for further proceedings.

## I. Factual Background

Dr. Byron Neely is a neurosurgeon who practiced in Austin. In 1999, he installed a shunt to drain fluid from a tumor in Paul Jetton's brain. An enterobacterial infection set in, leaving Paul in a debilitated state even after [**5] 12 subsequent brain surgeries. Paul and his wife, Sheila, sued Neely and others, and Neely settled. In 2002, the Jettons filed a complaint with the Texas Medical Board (Board), and the Board investigation found no wrongdoing by Neely.

Neely also performed surgery on Wei Wu in 1999. After removing a brain tumor, Neely reported seeing small deposits of metastatic melanoma on the surface of Wu's brain during

---

2   794 S.W.2d 14 (Tex. 1990).

3   On rehearing, no party challenges our holding that we have not yet recognized a rule establishing accuracy as the test for the substantial truth of a broadcast that repeats third-party allegations. Briefing submitted in support of rehearing construes our opinion as foreclosing such a rule and as affirmatively requiring the underlying allegation be proven substantially true to prevail on the truth defense. That interpretation, however, misconstrues our holding. We conclude there is a fact issue as to the truth or falsity of the gist of the media defendants' broadcast indicating the physician was disciplined for operating on patients while taking dangerous drugs or controlled substances. Importantly, this fact issue as to truth is likewise a fact issue as to accuracy. Though the media defendants [**4] advocate for accuracy as the test for truthfulness of the gist, given our holding concerning the gist, such a rule would not shield the media defendants here. We thus, as we must, leave open the question of whether a broadcast whose gist is merely that allegations were made is substantially true if the allegations were accurately repeated. *See Heckman v. Williamson Cnty.*, 369 S.W.3d 137, 147 (Tex. 2012) (discussing prohibition on rendering advisory opinions).

surgery.[4] Soon after Wu recovered from the operation and learned of the melanoma deposits from his oncologist, he committed suicide. The autopsy report indicated "no residual metastatic melanoma on gross inspection," which the coroner later clarified to mean that he believed Wu no longer had any melanoma after the operation. Wu's ex-wife sued Neely on behalf of her minor son, but the suit was dismissed on procedural grounds.[5]

In 2003, after a separate investigation by the Board, Neely entered into an Agreed Order (Order). In the Order, the Board found that Neely had self-prescribed medications between 1999 and 2002 and had a prior history of hand tremors. Further, the Board found that he was subject to disciplinary action due to his "inability to practice medicine with reasonable [*58] skill and safety to patients, due to mental or physical condition" and his self-prescription of medications. The Order suspended Neely's license, but stayed the suspension, placed him on probation for three years, ordered physical and psychiatric evaluations, and prohibited Neely from prescribing medications to himself or his family.

In January 2004, KEYE-TV in Austin ran a 7-minute investigative report by Nanci Wilson (collectively "KEYE") regarding Neely. The transcript of the entire broadcast is attached as Appendix A. The broadcast began with anchor Fred Cantu asking:

> If [**7] you needed surgery would you want to know if your surgeon had been disciplined for prescribing himself and taking dangerous drugs, had a history of hand tremors and had been sued several times for malpractice in the last few years?

Co-anchor Judy Maggio continued:

> A central Texas couple says they didn't learn about this until it was too late. They're outraged the [Board] is allowing Dr. Byron Neely to continue to practice. KEYE news investigative reporter Nanci Wilson tells us if you go to St. David's Hospital with a head injury you could be Dr. Neely's next patient.

Wilson then interviewed Paul Jetton, who related that Neely recommended surgery after an MRI indicated he had a brain tumor. Wilson stated that the hospital discharged Jetton despite the fact that a bacterial infection set in at the surgical site. Wilson continued:

> The result: numerous surgeries and a life of disability. Paul's wife, Sheila, says what they learned from other doctors was the final blow.

Sheila Jetton then stated:

> Every neurosurgeon that's looked at Paul's MRIs from before Neely operated on him have [sic] said they would have never done surgery. They would have watched him with MRIs over years.

---

[4] "Metastatic cancer is cancer that has spread from the place where it first started to another place in the body." *Metastatic Cancer*, National Cancer Institute (Mar. 28, 2013), http://www.cancer.gov/cancertopics/factsheet/Sites-Types/metastatic (on file with Clerk's office).

[5] The Board also investigated the Wu case and found no wrongdoing, but that order issued [**6] after the broadcast in question.

Wilson segued to [**8] discuss the Wu case, relating that Neely discovered and removed malignant melanoma from Wu's brain during surgery and that Wu committed suicide after learning of the diagnosis. Wilson then stated that when

the Travis County Medical Examiner's office, analyz[ed] Wu's brain[], examiners noted no residual metastatic melanoma. Meaning Wei Wu did not have brain cancer.

Wilson continued:

The [Board] investigated Dr. Neely. The board found Neely had a history of hand tremors and that between 1999 and 2002, Dr. Neely was writing prescriptions, not only for his patients but for himself as well. Narcotics, muscle relaxers and pain killers. Something former patient Paul Jetton finds shocking.

Paul Jetton commented:

Narcotics, opiates, I mean it's just things that, I mean things that they don't even let people operate machinery or drive cars when they're, when they're taking them and this guy's doing brain surgery on people. I mean it's just, even now I'm just, it's just incredulous, you just can't even believe that it even happened.

Wilson then related that the Order placed Neely on probation, required him to see a psychiatrist, and prohibited him from prescribing to himself or his family. Wilson interviewed [**9] a Board representative and asked:

But how would they know if he is using? He can get somebody else to prescribe him. I mean he could say, "I've followed [*59] the order." . . . . How do we, how do we know that he's, that we're not putting somebody right back out there to do the same thing he was doing before?

The Board representative responded:

That's a very good question and why this order doesn't include drug testing, I, I honestly don't know the answer to that.

The broadcast then included a statement from Paul Jetton:

I think it's just deplorable, I mean if, if it was another profession, uh, the guy would be in jail.

Wilson related a comment from Neely's attorney that

two highly qualified neurosurgeons who reviewed the case agree with the medical decisions made by Dr. Neely. In addition, the [Board] investigated the Jetton case and found no wrong doing.

Wilson noted that Neely's hospital had a pending investigation regarding whether to continue Neely's privileges. The broadcast ended by noting that the Jettons settled their suit with Neely, Wu's suit was dismissed, the other suits remained pending, and the Board posts final decisions on its website.

After the report aired, Neely claims his practice [**10] collapsed. His referrals from other physicians dwindled, existing appointments cancelled (citing the broadcast as the reason for the cancellation), his income diminished, and his home went into foreclosure. He and his professional association (collectively "Neely") sued KEYE[6] for libel. KEYE moved for summary judgment, which the trial court granted without specifying the grounds. Neely raised seven issues in the court of appeals, three of which are relevant here: (1) the trial court erred generally by granting summary judgment; (2) the trial court erred because Neely had probative evidence on each element of his defamation claim; and (3) there is no rule in Texas shielding media defendants from liability simply because they accurately report defamatory statements made by a third party. 331 S.W.3d 900, 914. The court of appeals held that under *McIlvain v. Jacobs*, 794 S.W.2d 14 (Tex. 1990), none of the statements were actionable as a matter of law because KEYE accurately reported third-party allegations. 331 S.W.3d at 922, 926-28. The court of appeals affirmed the trial court's grant of summary judgment.[7] *Id.* at 928.

## II. Standard of Review

We review a trial court's grant of summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The party moving for summary judgment bears the burden of proof. *Roskey v. Tex. Health Facilities Comm'n*, 639 S.W.2d 302, 303 (Tex. 1982). Though these burdens vary for traditional and no-evidence motions, the summary judgment motion here was a hybrid motion and both parties brought forth summary judgment evidence; therefore, the differing burdens are immaterial and the ultimate issue is whether a fact issue exists. *Buck v. Palmer*, 381 S.W.3d 525, 527 & n.2 (Tex. 2012). A fact issue exists if there is more than a scintilla of probative evidence. *See id.* at 527; Tex. R. Civ. P. 166a(c),(i). We must review the summary judgment record "in [*60] the light most favorable to the nonmovant, indulging every reasonable inference and resolving [**12] any doubts against the motion." *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). "In reviewing a summary judgment, we consider all grounds presented to the trial court and preserved on appeal in the interest of judicial economy." *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005). We have held that the constitutional concerns over defamation, discussed below, do not affect these summary judgment standards of review. *Casso v. Brand*, 776 S.W.2d 551, 555 n.3 (Tex. 1989).

## III. Discussion

---

[6] Neely also sued Viacom, Inc., but the court of appeals held that Neely [**11] waived any challenge as to summary judgment dismissal of the claims against Viacom. 331 S.W.3d 900, 914. Neely does not contest that ruling here.

[7] The court of appeals also affirmed the trial court's exclusion of some of Neely's summary judgment evidence. 331 S.W.3d at 928-29. Neely does not challenge that ruling here.

## A. Competing Constitutional Concerns

The common law has long allowed a person to recover for damage to her reputation occasioned by the publication of false and defamatory statements. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 11, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990). Chief Justice Rehnquist noted that Shakespeare penned the rationale for the cause of action in Othello:

> Good name in man and woman, dear my lord,
>
> Is the immediate jewel of their souls.
>
> Who steals my purse steals trash;
>
> 'Tis something, nothing;
>
> 'Twas mine, 'tis his, and has been slave to thousands;
>
> But he that filches from me my good name
>
> Robs me of that which not enriches him,
>
> And makes me poor indeed.

WILLIAM SHAKESPEARE, [**13] OTHELLO, act 3 sc. 3, *quoted in Milkovich*, 497 U.S. at 12. Unlike the federal Constitution, the Texas Constitution twice expressly guarantees the right to bring suit for reputational torts. *See* TEX. CONST. art. I, §§ 8 ("Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege."), 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person *or reputation*, shall have remedy by due course of law." (emphasis added)).

The right to recover for defamation, however, is not the only constitutional concern at stake. Of significant import are the constitutional rights to free speech and a free press. *See Cain v. Hearst Corp.*, 878 S.W.2d 577, 582 (Tex. 1994). As the United States Supreme Court has articulated, "[w]hatever is added to the field of libel is taken from the field of free debate." *New York Times Co. v. Sullivan*, 376 U.S. 254, 272, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). To balance these competing interests, the United States Supreme Court through federal constitutional law, this Court through the common law, and the Legislature through statutes, have undertaken to [**14] tailor the tort of defamation so as to preserve the right to recover for reputational damages while minimally impinging on the rights to free speech and a free press. *Cain*, 878 S.W.2d at 582.

## B. Elements of Defamation

The tort of defamation includes libel and slander. Libel occurs when the defamatory statements are in writing. TEX. CIV. PRAC. & REM. CODE § 73.001. Slander occurs when the statements are spoken. *Milkovich*, 497 U.S. at 17. The broadcast of defamatory statements read from a script is libel, not slander. *Christy v. Stauffer Publ'ns, Inc.*, 437 S.W.2d 814, 815 (Tex. 1969). Libel

″tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation . . . .″ TEX. CIV. PRAC. & REM. CODE § 73.001.

 [*61]  We have revised the elements of the defamation cause of action in response to the United States Supreme Court's application of constitutional principles to defamation claims. Before *Sullivan*, 376 U.S. at 254, the defamation plaintiff generally prevailed by proving the defendant published a statement that defamed her unless the defendant proved the truth  [**15] of the statement. Pierre N. Leval, *The No-Money, No-Fault Libel Suit: Keeping Sullivan in Its Proper Place*, 101 HARV. L. REV. 1287, 1287 (1988). But the Supreme Court held in *Sullivan* that freedom of expression requires ″breathing space,″ and that if the plaintiff is a public official, she must prove the defendant had actual malice. 376 U.S. at 272, 279-80. The Court later held that public figures and limited purpose public figures must also prove actual malice, and that states may set their own level of fault for private plaintiffs.[8] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345, 347, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974). The Court left the precise standard of fault to the states, and we have chosen a negligence standard for a private figure seeking defamation damages from a media defendant.[9] *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998); *see also Gertz*, 418 U.S. at 353 (Blackmun, J., concurring) (″[T]he Court now conditions a libel action by a private person upon a showing of negligence, as contrasted with a showing of willful or reckless disregard.″); RESTATEMENT (SECOND) OF TORTS § 580B (1977). In light of these holdings, to recover defamation damages in Texas,  [**16] a plaintiff must prove the media defendant: (1) published a statement; (2) that defamed the plaintiff; (3) while either acting with actual malice (if the plaintiff was a public official or public figure) or negligence (if the plaintiff was a private individual) regarding the truth of the statement. *McLemore*, 978 S.W.2d at 571.

KEYE frames a central issue in this proceeding as the liability of a media defendant for republishing a third party's allegedly defamatory statements. We first observe that it is a well-settled legal principle that one is liable for republishing the defamatory statement of another.  [**17] *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 386, 93 S. Ct. 2553, 37 L. Ed. 2d 669 (1973) (noting that a ″newspaper may not defend a libel suit on the ground that the falsely defamatory statements are not its own″).[10] The rule's broad application has thus brought about efforts to soften its impact, such as the *Sullivan* and

---

[8]   The Court also determined actual malice requires proof by clear and convincing evidence. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974).

[9]   The majority of states have adopted a negligence standard for private figures, while Alaska, Colorado, Indiana, and New Jersey have adopted the actual malice standard for private figures. 1 RODNEY A. SMOLLA, LAW OF DEFAMATION § 3:31 (2d ed. 1991), *cited in* Kaitlin M. Gurney, *Myspace, Your Reputation: A Call to Change Libel Laws for Juveniles Using Social Networking Sites*, 82 TEMP. L. REV. 241, 251 & n.97 (2009).

[10]   *See also* RESTATEMENT (SECOND) OF TORTS § 578 (1977) (″[O]ne who repeats or otherwise republishes defamatory material is subject to liability as if he had originally published it.″);1 ROBERT D. SACK, SACK ON DEFAMATION § 2.7.1 (3d ed. 2009) (″'The common law of libel has long held that one who republishes a defamatory statement adopts it as his own and is liable [for false, defamatory statements] in equal measure to the original defamer.'″ (quoting *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1298, 267 U.S. App. D.C. 337 (D.C. Cir. 1988)) (alteration in original)).

*Gertz* decisions requiring a showing of fault as well as the privileges and defenses described [*62] below. 1 Robert D. Sack, Sack on Defamation § 2.7.1 (3d ed. 2009).

## C. Privileges and Defenses

The common law and statutes provide certain defenses and privileges to defamation [**18] claims. These include the defense of truth, Tex. Civ. Prac. & Rem. Code § 73.005, which we have interpreted to require defendants to prove the publication was substantially true, *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000). Moreover, statements that are not verifiable as false cannot form the basis of a defamation claim. *Milkovich*, 497 U.S. at 21-22. Further, the common law has recognized a judicial proceedings privilege since at least 1772 for parties, witnesses, lawyers, judges, and jurors.[11] Additionally, one cannot recover mental anguish damages for defamation of a deceased individual. *Renfro Drug Co. v. Lawson*, 138 Tex. 434, 160 S.W.2d 246, 250 (Tex. 1942); *see also* Restatement (Second) Of Torts § 560 (1977). And a qualified privilege exists under the common law when a statement is made in good faith and the author, recipient, a third person, or one of their family members has an interest that is sufficiently affected by the statement. *Diamond Shamrock Ref. & Mktg. Co. v. Mendez*, 844 S.W.2d 198, 210 (Tex. 1992) (Hightower, J., concurring).

The United States Supreme Court, this Court, and the Legislature have afforded additional protections to media defendants. The United States Supreme Court and this Court long ago shifted the burden of proving the truth defense to require the plaintiff to prove the defamatory statements were false when the statements were made by a media defendant over a public concern. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986); *McIlvain*, 794 S.W.2d at 15.[12] This distinction is less material at the summary judgment stage where, as here, the media defendant is the movant. *See Casso*, 776 S.W.2d at 555 n.3.

Additionally, the Legislature has crafted the official/judicial proceedings privilege, which shields periodical publications from republication [**20] liability for fair, true, and impartial accounts of judicial, executive, legislative, and other official proceedings.[13] Tex. Civ. Prac. & Rem. Code § 73.002(b)(1). And the Legislature has also adopted the fair comment privilege, shielding periodical publications from republication liability for reasonable and fair comment on or criticism of official acts of public officials or other public concerns. *Id*. § 73.002(b)(2).

---

[11] Sack, *supra* note 10, § 8.2.1 (citing *King v. Skinner*, 1 Lofft 55, 56, 98 Eng. Rep. 529, 530 (K.B. 1772), *quoted in Burns v. Reed*, 500 U.S. 478, 490, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991)). [**19] We have long recognized this privilege in Texas. *Reagan v. Guardian Life Ins. Co.*, 140 Tex. 105, 166 S.W.2d 909, 912 (Tex. 1942).

[12] Neely admitted in his deposition that the public has a right to know about the Board's findings. The parties do not dispute that the defendants are members of the media. Thus, we hold that Neely must prove the falsity of the broadcast to recover damages. *Hepps*, 475 U.S. at 777.

[13] We previously noted that "we are reluctant to afford greater constitutional protection to members of the print and broadcast media than to ordinary citizens" because the "First Amendment affords equal dignity to freedom of speech and freedom of the press." *Casso*, 776 S.W.2d at 554. But this understanding of the constitution is no impediment to the Legislature crafting additional protections for media defendants, which it has done in Chapter 73 of the Civil Practice and Remedies Code.

[*63]   Notably, the Legislature has also added the due care provision for broadcasters, shielding them from liability unless the plaintiff proves the broadcaster failed to exercise due care to prevent publication of a defamatory statement. *Id*. § 73.004. The provision requires that:

> A broadcaster  [**21] is not liable in damages for a defamatory statement published or uttered in or as a part of a radio or television broadcast by one other than the broadcaster unless the complaining party proves that the broadcaster failed to exercise due care to prevent the publication or utterance of the statement in the broadcast.

*Id*. We have previously commented that, under the due care provision, "[b]roadcasters are generally not liable in defamation for broadcasts made by third parties." *Cain*, 878 S.W.2d at 582. A number of other jurisdictions have enacted a due care provision, although some states require the defendant broadcaster to prove it used due care (as opposed to our statute, which requires the plaintiff to prove the defendant broadcaster did not use due care).[14] KEYE did not raise the due care provision at the summary judgment stage, and thus it is not at issue in this proceeding.

Moreover,  [**22] we note that this past regular session, the Legislature passed the Defamation Mitigation Act, which requires defamation plaintiffs to request a correction, clarification, or retraction from the publisher of a defamatory statement within the limitations period for the defamation claim. Tex. Civ. Prac.&Rem. Code §§ 73.051, .054-.055 (added by H.B. 1759, 83d Leg., R.S., § 2). Under this provision, a defamation plaintiff may only recover exemplary damages if she serves the request for a correction, clarification, or retraction within 90 days of receiving knowledge of the publication.[15] *Id*. § 73.055(c).

## D. Substantial Truth

Whether Neely raised a fact issue regarding the truth or falsity of the underlying statements is the primary issue in this appeal. We have developed the substantial truth doctrine to determine the truth or falsity of a broadcast: if a broadcast taken as a whole is more damaging to the plaintiff's reputation than a truthful broadcast would have been, the broadcast is not substantially true and is actionable. *Turner*, 38 S.W.3d at 115  [**23] ("the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements"); *McIlvain*, 794 S.W.2d at 16 ("The test used in deciding whether the broadcast is substantially true involves consideration of whether the alleged defamatory statement was more damaging to [the plaintiff's] reputation, in the mind of the average listener, than a truthful statement would have been. This evaluation involves looking to the 'gist' of the broadcast." (citations omitted));

---

[14]   *See, e.g*., Cal.Civ.Code § 48.5(1); Colo.Rev.Stat. § 13-21-106; Fla.Stat. § 770.04; Ga. Code Ann. § 51-5-10(a); Iowa Code § 659.5; Ky. Rev. Stat. Ann. § 411.062; Neb. Rev. Stat. § 25-840.02(1); Or. Rev. Stat. § 31.200(1); S.D. Codified Laws § 20-11-6; Utah Code Ann. § 45-2-7; Va. Code Ann. § 8.01-49; Wyo. Stat. Ann. § 1-29-101.

[15]   The Defamation Mitigation Act only affects publications published after its effective date and does not apply to this proceeding. H.B. 1759, 83d Leg., R.S., § 3.

*see also Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991) (applying substantial truth defense under California law).

Assessing a broadcast's gist is crucial. A broadcast with specific statements that err in the details but that [*64] correctly convey the gist of a story is substantially true. *Turner*, 38 S.W.3d at 115. On the other hand, a broadcast "can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory." *Id.* at 114. We determine a broadcast's [**24] gist or meaning by examining how a person of ordinary intelligence would view it.[16] *Id.* at 114-15. "If the evidence is disputed, falsity must be determined by the finder of fact." *Bentley v. Bunton*, 94 S.W.3d 561, 587 (Tex. 2002).

KEYE contends the trial court properly granted summary judgment because: (1) KEYE accurately reported third-party allegations, which satisfies our test for substantial truth; (2) the broadcast is privileged under the fair comment and official proceeding privileges; (3) Neely is a limited purpose public figure and there is no evidence of actual malice; (4) there is no evidence of negligence; and (5) Neely's professional association cannot maintain a defamation action. We address each argument in turn.

## 1. *McIlvain*

To address KEYE's first issue, we analyze our holding in *McIlvain*. KEYE contends that in *McIlvain*, we transformed the substantial truth doctrine to shield media defendants from defamation liability for publishing third-party allegations if the defendants show that the underlying allegations (1) were made, and (2) were accurately reported.

*McIlvain* concerned [**25] a broadcast about an investigation by the City of Houston into alleged misconduct by employees in its water maintenance division. 794 S.W.2d at 15. The broadcast indicated that the public integrity section was investigating allegations that: (1) employees cared for the elderly father of a manager on city time; (2) employees were putting in for overtime to complete their city duties later; (3) authorities were looking for a gun at a water treatment facility; and (4) employees had been drinking on the job. *Id.* Two of the employees sued the broadcasters for defamation. *Id.* The city's investigation later found all the allegations to be true. *Id.* at 16. The trial court granted summary judgment in favor of the media defendants. *Id.* at 15. We affirmed the trial court's ruling because the "broadcast statements are factually consistent with [the government's] investigation *and its findings*" and were thus "substantially correct, accurate, and not misleading." *Id.* at 16 (emphasis added).

Since *McIlvain*, several courts of appeals and the Fifth Circuit have interpreted it to mean that media reporting of third-party allegations under investigation is substantially true if the media

---

[16] We have also described this standard as the "average listener" standard. *McIlvain*, 794 S.W.2d at 16.

accurately reports [**26] the allegations and the existence of any investigation.[17] KEYE similarly asserts that our holding in *McIlvain* created a substantial truth defense for accurately reporting third-party allegations. But the [*65] parties do not assert and we cannot locate such a rule in any other jurisdiction. *See, e.g*., Restatement (Second) Of Torts § 581A, cmt. e (1977). We did not establish a third-party allegation rule in *McIlvain*. Rather, we measured the truth of the allegations in *McIlvain* against the government investigation that found them to be true. *Id*. In other words, a government investigation that finds allegations to be true is one of many methods of proving substantial truth. But we do not foreclose the possibility that the gist of some broadcasts may merely be allegation reporting, such that one measure for the truth of the broadcast could be whether it accurately relayed the allegations of a third party. *See, e.g., Global Relief Found., Inc. v. New York Times Co*., 390 F.3d 973, 986 (7th Cir. 2004) (broadcast that government was investigating a nonprofit organization's alleged funding of terrorism was substantially true based upon government affidavits indicating it was investigating the reported [**27] allegations). As addressed below, even if we adopted such a rule today, it could not enable KEYE to prevail here because there is a genuine issue of material fact as to whether Neely was disciplined for the conduct the broadcast suggests.[18]

## 2. Gist of the Broadcast

The broadcast at issue began by asking listeners if they would want to know "if your surgeon had been disciplined for prescribing himself and taking dangerous drugs."[19] The broadcast discusses the Jetton and Wu cases and then states that the Board "did discipline Neely." After discussing the Order, the broadcast contains the following statement by Paul Jetton:

> Narcotics, opiates, I mean it's just things that, I mean things that they don't even let people operate machinery or drive cars when they're, when they're taking them and this guy's doing brain surgery on people. I mean it's just, even now I'm just, it's just incredulous, you just can't even believe that it even happened.

Wilson then asked a Board representative how the Board would know Neely was not using the medications again: "But how would they know if he is using? He can get somebody else to prescribe him. I mean he [**29] could say, 'I've followed the order.'"

---

[17] *See Green v. CBS, Inc*., 286 F.3d 281, 284 (5th Cir. 2002); 331 S.W.3d at 922; *Grotti v. Belo Corp*., 188 S.W.3d 768, 775 (Tex. App.—Fort Worth 2006, pet. denied); *Associated Press v. Boyd*, No. 05-04-01172-CV, 2005 Tex. App. LEXIS 3715, 2005 WL 1140369, at *3 (Tex. App.—Dallas May 16, 2005, no pet.); *UTV of San Antonio, Inc. v. Ardmore, Inc*., 82 S.W.3d 609, 612 (Tex. App.—San Antonio 2002, no pet.); *Dolcefino v. Randolph*, 19 S.W.3d 906, 918 (Tex. App.—Houston [14th Dist] 2000, pet. denied); *Am. Broad. Cos., Inc. v. Gill*, 6 S.W.3d 19, 33 (Tex. App.—San Antonio 1999, pet. denied); *KTRK Television v. Felder*, 950 S.W.2d 100, 106 (Tex. App.—Houston [14th Dist.] 1997, no writ).

[18] As amicus The Dallas Morning News observes, our ruling that *McIlvain* did not create a third-party allegation rule does not necessarily mean the previous cases misinterpreting *McIlvain* reached incorrect results. Specifically, The Dallas Morning News observes that the following cases [**28] nonetheless properly held that the gist of the statements were substantially true: *Green*, 286 F.3d at 284-85; *Boyd*, 2005 Tex. App. LEXIS 3715, 2005 WL 1140369, at *3; *Ardmore, Inc*., 82 S.W.3d at 612; *Randolph*, 19 S.W.3d at 921. Amicus Br. of The Dallas Morning News on Rehearing, at 8-11.

[19] We have previously stated that an introduction can be especially misleading. *See Turner*, 38 S.W.3d at 118.

We determine the gist through the lens of a person of ordinary intelligence. *Turner*, 38 S.W.3d at 114-15. Neely asserts that a person of ordinary intelligence could conclude that the gist of the broadcast, based on the content and placement of these statements, was that Neely was disciplined for operating on patients while using dangerous drugs or controlled substances.[20] KEYE maintains that the gist [*66] of the broadcast ″concerned controversies and allegations surrounding Neely's care of Jetton and Wu, the malpractice lawsuits filed by Jetton and Wu's ex-wife, an autopsy report by the Travis County [Medical Examiner], a public disciplinary action by the Medical Board, and Neely's responses to the allegations.″ We agree with Neely that a person of ordinary intelligence could conclude the gist of the broadcast was that Neely was disciplined for operating on patients while using dangerous drugs or controlled substances.

### 3. Substantial Truth of the Broadcast's Gist

To prevail at summary judgment on the truth defense, KEYE must conclusively prove that this gist is substantially true.[21] *Turner*, 38 S.W.3d at 114-15. As we explained in *Turner*, although the specific statements in a broadcast may be substantially true when viewed in isolation, the gist can be false by omitting or juxtaposing facts. *Id*. We examine whether the gist was more damaging to the plaintiff's reputation, in the mind of a person of ordinary intelligence, than a truthful statement would have been. *Id*.

A reasonable view of the gist of the broadcast is that Neely was disciplined for operating on patients while using dangerous drugs or controlled substances. Unlike in *McIlvain*, the government investigation (here from the Board Order) does not indicate that this allegedly defamatory statement was correct. The Order disciplined Neely for prescribing himself dangerous drugs or controlled substances. It did not discipline Neely for *taking or using* dangerous drugs or controlled substances. The Board found that Neely's medications were ″legitimately and appropriately prescribed″ by treating physicians but that Neely ″began to refill the medications himself in lieu of scheduled visits.″ Further, section 164.051(a)(4) of the Occupations Code allows the Board to suspend a license if the physician is unable to practice medicine with reasonable skill and safety to patients because of ″excessive use of drugs″ or ″mental or physical condition.″ Tex. Occ. Code § 164.051(a)(4)(C)-(D). When citing to section 164.051(a)(4), the Order only noted Neely's ″mental or physical condition″ as grounds for discipline, not [**32] any excessive use of drugs. And rather than concluding that Neely's self-prescribing affected his ability to practice medicine (as it apparently did with his mental or physical condition), the Board concluded that Neely's self-prescribing instead violated a

---

[20] Neely also asserts the broadcast includes gists that he was performing unnecessary surgeries and was unsafely operating on patients [**30] while experiencing hand tremors. We need not assess the substantial truth of the gist that Neely was performing unnecessary surgery because these statements are protected by the official/judicial proceedings privilege. *See infra* Part III.E. And we need not assess the gist regarding Neely's hand tremors in light of our disposition regarding the gist that he was disciplined for operating on patients while using dangerous drugs and controlled substances. *See infra* Part III.D.3-III.F.

[21] When a private figure sues a media defendant over defamatory statements that are of public concern, the plaintiff has the burden of proving falsity. *Hepps*, 475 U.S. at 777. [**31] But this distinction is less material at summary judgment. *Casso*, 776 S.W.2d at 555 n.3.

then newly-created rule that self-prescribing dangerous drugs or controlled substances in certain situations is not "an acceptable professional manner consistent with public health and welfare." 22 TEX. ADMIN. CODE § 190.8(1)(M) (Tex. State Bd. of Med. Examiners, Disciplinary Guidelines) (added by 28 Tex. Reg. 10496 (2003)). Thus, the Order reflects that Neely was disciplined for self-prescribing dangerous drugs or controlled substances, not for taking them.

In addition, Neely brought forth evidence that he was not operating on patients while taking or using dangerous drugs or controlled substances:

[*67] • Neely swore in an affidavit that he had "never abused drugs or been addicted to drugs, prescription or otherwise" and had "never performed surgeries while impaired by drugs."[22]

• Wilson reported not finding any independent evidence that Neely performed surgery while impaired.

• Neely retained Dr. Edgar Nace—a former vice president of the Board who was board certified in clinical, addiction, and forensic psychiatry—to conduct a psychiatric and substance abuse evaluation of Neely during the Board investigation. Among other things, Nace reviewed Neely's pharmacy records and performed a drug test. Nace determined that Neely "has not been and is not currently diagnosable with a substance use disorder—neither abuse nor dependence." Nace noted that Neely's dosage of hydrocodone was lower than with emerging patterns of abuse or addiction and Neely's use of only one pharmacy was inconsistent with a pattern of abuse or addiction. Nace concluded [**34] that Neely's "prescriptions and subsequent refills have been appropriate to his documented diagnosis" for a torn rotator cuff, diverticulitis, and asthma.

• Neely used hydrocodone primarily in 2000 and part of 2001 to treat a torn rotator cuff. He ceased using hydrocodone in April 2003.

• Neely ceased using steroids, prescribed for asthma, in 2000, when he began using an inhaler.

• As of October 2003, Neely was using medications for asthma (Advair, Ventolin), allergies (Actifed, Benadryl, Flonase), high blood pressure (Cardura), and colon issues (Lomotil), none of which are controlled substances.

Based on Neely's responsive evidence,[23] we hold that a there is a fact issue regarding the truth or falsity of the gist that Neely was disciplined for operating on patients while taking or using

---

[22]   Uncontroverted summary judgment evidence from an interested witness is only sufficient to raise a fact issue, unless the evidence is clear, direct, positive, [**33] can be readily controverted, and there are no circumstances tending to impeach or discredit the testimony. *See* TEX. R. CIV. P. 166a(c); *Great Am. Reserve Ins. Co. v. San Antonio Plumbing Supply Co.*, 391 S.W.2d 41, 47 (Tex. 1965). Because Neely's evidence is only used to raise a fact issue here, we need not assess whether his testimony is clear, direct, positive, can be readily controverted, or could be impeached or discredited.

[23]   Neely also offered other evidence the trial court excluded, which Neely does not challenge on appeal. This evidence included: (1) the Board orders finding no wrongdoing with Neely's treatment in the Jetton and Wu cases; (2) Neely's statement that he only took narcotic medications at night; (3) the psychiatric evaluation conducted pursuant to the Board Order that concluded that Neely's "use of

dangerous drugs or controlled substances. *Turner*, 38 S.W.3d at 117-18 (holding that, especially in light of a broadcast's introduction, a viewer could believe in a gist of the broadcast that was not substantially true); *McIlvain*, 794 S.W.2d at 16. As in *Turner*, we note that even an accurate account of Neely that did not create a false impression "may have raised troubling questions." 38 S.W.3d at 118. [**35] But because the factfinder may conclude that the gist was more damaging to Neely's reputation than a truthful and accurate broadcast would have been, the substantial truth defense [*68] cannot support the trial court's summary judgment.

## E. Official/Judicial Proceedings Privilege

KEYE next asserts that the trial court's grant of summary judgment was proper because the broadcast was protected by the official/judicial proceedings privilege. The United States Supreme Court has long recognized a common law judicial privilege. *See Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492, 95 S. Ct. 1029, 43 L. Ed. 2d 328 (1975). [**36] Underpinning the judicial privilege is the notion that a "trial is a public event. What transpires in the court room is public property. If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt." *Craig v. Harney*, 331 U.S. 367, 374, 67 S. Ct. 1249, 91 L. Ed. 1546 (1947). In Texas, the Legislature codified the judicial proceedings privilege and expanded it to other official proceedings. Section 73.002 of the Civil Practice and Remedies Code provides that publications are privileged if they are "a fair, true, and impartial account of" judicial or other proceedings to administer the law. TEX. CIV. PRAC. & REM. CODE § 73.002(b)(1).

The official/judicial proceedings privilege assesses whether the reporter's account of the proceedings (not the underlying allegations made in those proceedings) was fair, true, and impartial. *Denton Publ'g Co. v. Boyd*, 460 S.W.2d 881, 883 (Tex. 1971). When construing a substantially similar prior version of the official/judicial proceedings privilege, we held that "[t]he publication would be within the privilege provided by statute as long as it purported to be, and was, only [**37] a fair, true and impartial report of what was stated at the meeting, regardless of whether the facts under discussion at such meeting were in fact true . . . ." *Id.* at 882; *see also Herald-Post Publ'g Co. v. Hill*, 891 S.W.2d 638, 639 (Tex. 1994) (comparing allegedly defamatory article to trial testimony to determine that judicial proceeding privilege applied).

But the privilege only extends to statements that: (1) are substantially true and impartial reports of the proceedings, and (2) are identifiable by the ordinary reader as statements that were made in the proceeding. *Boyd*, 460 S.W.2d at 884. In *Boyd*, there was a factual dispute as to whether a false statement that a contractor was bankrupt was made at a city council meeting. *Id.* at 884-85. When remanding to resolve the factual dispute, we concluded the privilege would

---

the self-prescribed opiates does not suggest that he ever had a problem with abuse or dependence;" and (4) the fact that the Board terminated its Order early, less than half way through the three-year probationary period.

apply if: (1) the statement was made at the city council meeting, and (2) an ordinary reader of the defendant's article would understand the statement was made at the meeting.[24] *Id*. at 885.

## 1. Unnecessary Surgery

One gist of the KEYE broadcast we have not previously addressed is that Neely was performing unnecessary surgeries.[25] This gist results from the inclusion of the statement by Sheila that "[e]very neurosurgeon that's looked at Paul's MRIs from before Neely operated on him have [sic] said they would have never done surgery. They would have watched him with MRIs over years." The placement of this statement within the broadcast was in the discussion of Neely's treatment of Paul and the resulting lawsuit. The allegation [*69] that Neely performed unnecessary surgery was one basis for the lawsuit, in which the Jettons alleged that, "[a]t the time [Neely and a fellow doctor] performed such procedure, they ostensibly did so to treat symptomatic hydrocephalus in Paul Jetton. However, Paul Jetton did not have symptomatic hydrocephalus." We hold that an ordinary viewer could conclude that Sheila's allegation regarding unnecessary surgery in the broadcast was made in the Jetton lawsuit. *Id*. at 884. Thus, KEYE met its initial burden of proving this statement is protected by the conditional judicial proceedings privilege. [**39] *See id*. (holding that the defendant has the initial burden of proving a publication is privileged).

But Neely can rebut the privilege by proving it is inapplicable. *Id*. The judicial/official proceedings privilege "does not extend to the republication of a matter if it is proved that the matter was republished with actual malice after it had ceased to be of public concern." TEX.CIV. PRAC.& REM.CODE § 73.002(a). Actual malice means the defendant made the statement "'with knowledge that it was false or with reckless disregard of whether it was true or not;'" and reckless disregard means "'the defendant in fact entertained serious doubts as to the truth of his publication.'" *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 162 (Tex. 2004) (quoting *Huckabee v. Time Warner Entm't Co*., 19 S.W.3d 413, 420 (Tex. 2000) and *Bentley*, 94 S.W.3d at 591); *see also Hearst Corp. v. Skeen*, 159 S.W.3d 633, 637 (Tex. 2005). Sheila's statement that every neurosurgeon would have not performed surgery was controverted by the two neurosurgeons who agreed with Neely's treatment of Paul and the Board order finding no wrongdoing in Neely's treatment of Paul. KEYE's inclusion of this disclaiming [**40] information negates any allegation that KEYE acted with actual malice as to the gist of the broadcast that Neely was performing unnecessary surgery and the record contains no other evidence that creates a fact issue on this point. Accordingly, the official/judicial proceedings privilege shields this portion of the broadcast. TEX. CIV. PRAC. & REM. CODE § 73.002(a); *Boyd*, 460 S.W.2d at 884.

## 2. Disciplined for Operating on Patients While Taking Dangerous Drugs or Controlled Substances

---

[24]  We see no substantive difference from our ordinary reader standard for the judicial proceedings privilege in *Boyd*, 460 S.W.2d at 884-85, and our person of ordinary intelligence [**38] standard for substantial truth in *Turner*, 38 S.W.3d at 114-15.

[25]  *See supra* note 20.

We next analyze whether the gist of the broadcast that Neely was disciplined for operating on patients while taking dangerous drugs or controlled substances is protected by the official/judicial proceedings privilege. This gist is explained in part by the anchor's introduction to the broadcast, which asked:

> If you needed surgery would you want to know if your surgeon had been disciplined for prescribing himself and taking dangerous drugs . . . ?

As previously addressed, the evidence creates a fact issue as to whether the assertion that Neely had been disciplined for "taking dangerous drugs" is a fair, true, and impartial account of the Board Order. The Board found Neely's *self-prescribing* [**41] to be inappropriate—not his taking or using the medications. The Board found that the medications were "legitimately and appropriately prescribed" but that Neely "began to refill the medications himself in lieu of scheduled visits." Accordingly, a jury may conclude that the Order disciplined Neely for his "inappropriate prescription of dangerous drugs or controlled substances to oneself." Thus, we cannot say that—as a matter of law—the statement that Neely was disciplined for taking or using dangerous drugs or controlled substances was a fair, true, and impartial account of an official or judicial proceeding. *Boyd*, 460 S.W.2d at 883.

### [*70] F. Fair Comment Privilege

KEYE also maintains that the fair comment privilege applies to the broadcast. Section 73.002(b)(2) provides that a broadcast is privileged if it is a "reasonable and fair comment on or criticism of an official act of a public official or other matter of public concern published for general information." Tex.Civ.Prac.&Rem.Code § 73.002(b)(2). Comments based on substantially true facts are privileged if fair; comments that assert or affirm false statements of fact are not privileged. We long ago stated that it "is the settled law [**42] of Texas, that a false statement of fact concerning a public officer, even if made in a discussion of matters of public concern, is not privileged as fair comment." *Bell Publ'g Co. v. Garrett Eng'g Co*., 141 Tex. 51, 170 S.W.2d 197, 204 (Tex. 1943); *see also Barbouti v. Hearst Corp*., 927 S.W.2d 37, 62 (Tex. App.—Houston [1st] 1996, writ. denied) (false statements not privileged as fair comments). The Legislature has extended the fair comment privilege to matters of public concern,[26] Tex.Civ.Prac.&Rem.Code § 73.002(b)(2), and we have come to interpret the truth defense as requiring only substantial truth, *Turner*, 38 S.W.3d at 115. Substantial truth assesses whether the gist of the broadcast is substantially true, and a broadcast can convey a substantially false meaning by juxtaposing facts that, viewed in isolation, are true. *Id*. Joining these principles, we conclude that a comment based on a substantially true statement of fact can qualify as a fair comment. Tex. Civ. Prac.&Rem. Code § 73.002(b)(2). But if a comment is based upon a substantially false statement of fact the defendant asserts or conveys as true, the comment is not protected by the fair comment privilege. *Bell*, 170 S.W.2d at 204.

KEYE's broadcast opened by asking viewers if they would want to know if their doctor "had been disciplined for prescribing himself and taking dangerous drugs . . . ." Wilson's

---

[26] As [**43] we noted above, this broadcast addressed a matter of public concern. *See supra* note 12.

questioning of whether the Order would prevent Neely from using the drugs was predicated on the statement that Neely had been disciplined for taking or using dangerous drugs or controlled substances—which the broadcast affirmed to be true. Because a fact issue exists on whether the statement was true, KEYE is not entitled to summary judgment based on the fair comment privilege. *Bell*, 170 S.W.2d at 204.

## G. Limited Purpose Public Figure

KEYE also asserts that Neely was a limited purpose public figure who therefore had to prove malice. We disagree.

Public figure status is a question of law for the court. *McLemore*, 978 S.W.2d at 571. We use a three-part test to assess whether an individual is a limited purpose public figure:

(1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution;

(2) [**44] the plaintiff must have more than a trivial or tangential role in the controversy; and

(3) the alleged defamation must be germane to the plaintiff's participation in the controversy.

*Id*. In *McLemore*, we expressly reserved the question of whether an individual may [*71] meet the public controversy requirement against her will. *Id*. at 571-72.

The distinction between public and private figures matters chiefly because public and limited purpose public figures must prove a defamation defendant acted with actual malice. *Gertz*, 418 U.S. at 342. The United States Supreme Court addressed this distinction in *Gertz*:

[p]ublic officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.

More important than the likelihood that private individuals will lack effective opportunities for rebuttal, there is a compelling normative consideration underlying the distinction between public and private defamation plaintiffs. [**45] An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs. He runs the risk of closer public scrutiny than might otherwise be the case. . . .

Those classed as public figures stand in a similar position. Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his

own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment.

*Id*. at 344-45. Thus, the Court was concerned with both access to communication to rebut a defamatory statement and the normative considerations of public figures typically having "thrust themselves to the forefront of particular public controversies." *Id*. at 345. [**46] The Court later stated that "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 135, 99 S. Ct. 2675, 61 L. Ed. 2d 411 (1979). In other words, the allegedly defamatory statement cannot be what brought the plaintiff into the public sphere; otherwise, there would be no private figures defamed by media defendants.

The Court's forecast that it would be "exceedingly rare" for a person to become a public figure involuntarily has proven true: neither the United States Supreme Court nor this Court has found circumstances in which a person involuntarily became a limited-purpose public figure. *See, e.g., Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 166, 99 S. Ct. 2701, 61 L. Ed. 2d 450 (1979) (holding an individual to not be a limited-purpose public figure who was "dragged unwillingly into the controversy"); *Time, Inc. v. Firestone*, 424 U.S. 448, 454-55, 96 S. Ct. 958, 47 L. Ed. 2d 154 (1976) (holding an individual to not be a public figure, in part, because she had done nothing voluntary to assume special prominence).

On these facts, we cannot say this is the exceedingly rare case [**47] in which a person has become a limited-purpose public figure against his will. Before the broadcast in question, Neely was mentioned in a 1996 newspaper article about [*72] settling a malpractice lawsuit and a December 2003 newspaper statement that Neely was placed on probation for self-prescribing medications. Neely was not quoted in either article. Neely also refrained from talking to Wilson regarding the broadcast at issue. Because Neely is not a limited-purpose public figure, he need not prove actual malice, and this ground cannot support the trial court's summary judgment.

## H. Evidence of Negligence

KEYE next argues that the trial court properly granted summary judgment because there was no evidence of negligence. For the purposes of defamation liability, a broadcaster is negligent if she knew or should have known a defamatory statement was false. *Foster v. Laredo Newspapers, Inc*., 541 S.W.2d 809, 820 (Tex. 1976). But that liability may not be predicated on "a factual misstatement whose content [would] not warn a reasonable prudent editor or broadcaster of its defamatory potential.'" *Id*. (quoting *Gertz*, 418 U.S. at 348) (alteration in original).

The broadcast opened by asking viewers if [**48] they would want to know if their doctor "had been disciplined for prescribing himself and taking dangerous drugs . . . ." Neely raised a fact issue as to the truth or falsity of the gist that he was disciplined for taking medications. *See supra* Parts III.D.3 and III.E. This creates a fact issue regarding whether the statement in the broadcast that Neely had been disciplined for taking medication would warn a reasonably prudent broadcaster of its defamatory potential. *Foster*, 541 S.W.2d at 820.

## I. Professional Association

Finally, KEYE argues that professional associations cannot maintain defamation claims and thus the claim by Neely's professional association must be dismissed. We disagree.

Our precedent makes clear that corporations may sue to recover damages resulting from defamation. *Gen. Motors Acceptance Corp. v. Howard*, 487 S.W.2d 708, 712 (Tex. 1972); *Newspapers, Inc. v. Matthews*, 161 Tex. 284, 339 S.W.2d 890, 893 (Tex. 1960). In *Howard*, Howard Motor Company, Inc. and its owner, Hugh Howard, both sued General Motors Acceptance Corporation (GMAC), alleging it had libeled them in a letter to Howard's bank. 487 S.W.2d at 709-10. GMAC argued that our holding in *Matthews* precludes corporations [**49] from maintaining causes of action for libel. *Id.* at 712. We rejected that assertion, pointing out that *Matthews* specifically recognized that a corporation may be libeled. *Id.* Accordingly, we permitted Howard Motor Company, Inc., a corporate entity, to maintain a libel suit against GMAC. *See id.*

The Legislature has endowed professional associations with many of the same privileges that corporations enjoy. Indeed, the Business Organizations Code specifies that, "[e]xcept as provided by Title 7, a professional association has the same powers, privileges, duties, restrictions, and liabilities as a for-profit corporation." Tex. Bus. Orgs. Code § 2.108. Nothing in Title 7 of the Business Organizations Code precludes professional associations from bringing defamation suits. *See id.* chs. 301-02. Because professional associations share the same rights as for-profit corporations as to maintaining defamation claims, Texas law does not preclude the professional association, Byron D. Neely, M.D., P.A., from maintaining a libel suit.[27]

[*73] **IV. Response to the Dissent**

The dissent would hold that the broadcast was substantially true as a matter of law because there was circumstantial evidence that Neely could have been under the influence of dangerous drugs and controlled substances while operating on patients, and that the Board, though not expressly disciplining Neely for taking medications, implicitly did so. __S.W.3d __, __(Jefferson,

---

[27] While professional associations may maintain defamation claims, recovery by the association and its members for the same particular injury is a precluded double recovery. [**50] *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 303 (Tex. 2006) ("There can be but one recovery for one injury, and the fact that . . . there may be more than one theory of liability[] does not modify this rule." (quoting *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 8 (Tex. 1991)) (alterations in original)). Instead, it is for the trier of fact to simply determine what portion, if any, of the total damages inflicted were incurred by each entity.

C.J., dissenting). But at summary judgment, "[w]e must review the record '*in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion.*'" *Buck*, 381 S.W.3d at 527 (quoting *City of Keller*, 168 S.W.3d at 824) (emphasis added). The dissent disregards these principles [**51] in two ways. First, the dissent ignores Neely's evidence, which includes the Board Order indicating its discipline of him was not for his use of medications, evidence that Neely never performed surgery while impaired, that his evaluation prior to the Board Order indicated he never had a drug abuse or dependence problem, and that Wilson never found any independent evidence that Neely performed surgery while impaired.[28]

Second, the dissent inverts our time-honored summary judgment [**52] standard by indulging every reasonable inference and resolving every doubt against Neely. Its foremost implicit finding against Neely is that the Board disciplined him for taking medications. __S.W.3d at ___(Jefferson, C.J., dissenting). The dissent indicates that it "is not hard to understand the Board's concerns" regarding Neely's use of medications. *Id*. But the Board Order did not discipline Neely for taking medications, it disciplined him for self-prescribing them. The Order states, in relevant part:

FINDINGS OF FACT

. . .

6. [Neely] suffered various injuries and ailments, which required a variety of medications. [Neely's] treating physician legitimately and appropriately prescribed a number of medications to treat these conditions. However, between 1999, and 2002, [Neely] began to refill the medications himself in lieu of scheduled visits.

7. Upon review of statements of [Neely] and the September 27, 2000 medical records of [Neely] obtained from his treating physician, the Panel concluded that [Neely] had a prior history of tremors.

. . .

[*74] CONCLUSIONS OF LAW

. . .

2. [Neely] is subject to action by the Board under Sections 164.051(a)(4) and 164.056 of the Act due to [Neely's] inability [**53] to practice medicine with reasonable skill and safety to patients, *due to mental or physical condition.*

---

[28] The dissent believes this evidence that Neely was not operating while impaired is immaterial to the gist of whether he was disciplined for operating on patients while taking dangerous drugs. _S.W.3d at _(Jefferson, C.J., dissenting). This is precisely why we first examined the Board Order itself to determine whether it disciplined Neely for the conduct the gist of the broadcast indicates. *See supra* Part III.D.3. Neely's additional evidence supports why the Order did not discipline him for operating on patients while taking dangerous drugs. And if evidence of Neely's use of medication is truly as irrelevant as the dissent suggests, one wonders why the dissent only finds support in this very type of evidence.

3. [Neely] is subject to disciplinary action pursuant to Section 164.051(a)(3) of the Act by committing a direct or indirect violation of a rule adopted under this Act, either as a principal, accessory, or accomplice, to wit, Board Rule 190.8(1)(M)—*inappropriate prescription of dangerous drugs or controlled substances* to oneself, family members, or others in which there is a close personal relationship.

(Emphases added.) The first conclusion of law above references section 164.051(a)(4) of the Occupations Code, which allows the Board to discipline a person for illness, drunkenness, "excessive use of drugs, narcotics, chemicals, or another substance," or "a mental or physical condition." Tex.Occ.Code § 164.051(a)(4). The Order states that it was disciplining Neely "due to mental or physical condition"—not excessive drug use as the dissent reads between the lines to infer.[29] At a minimum, the Order at least creates a fact issue in Neely's favor as to whether he was disciplined for taking medications. If one does endeavor to draw inferences and resolve doubts, they must be drawn and resolved [**54] in favor of Neely at this summary judgment stage.[30] *Buck*, 381 S.W.3d at 527.

In addition, the dissent further draws inferences against Neely by assuming that the Board's order for Neely to undergo a psychiatric evaluation indicates the Board must have been concerned about Neely's use of medications. On the contrary, the Board Order notes that Neely retained a doctor to perform a physical examination who detected no medically significant tremor but "felt unqualified to determine [Neely's] ability to perform surgery, and recommended a disability [**56] assessment or a Neuro-psyche evaluation." Neely then retained Dr. Nace to perform the psychiatric evaluation the physical examination recommended. The Board then followed the [*75] same model, "requesting independent physical and psychiatric evaluations to determine [Neely's] capacity to practice medicine in general, and specifically, to perform surgery." Far from disciplining Neely for operating on patients while taking medications, the Order simply confirmed a psychiatric evaluation was needed because a physical evaluation alone might not fully assess the impact of Neely's hand tremor on his ability to perform surgery. Constitution's free speech clause guarantees the right to bring reputational torts: "Every person shall be at liberty to speak, write or publish his opinions on any subject, *being*

---

[29]    The dissent relies on a statement by a Board investigator in its "summary of allegations" that Neely could be subject to disciplinary action under section 164.051(a)(4) for "[i]nability to practice medicine with reasonable skill and safety because of illness *or* substance abuse"(emphasis added), and a statement on the Board's website that its investigation of Neely "was based on *allegations* that Dr. Neely had self-prescribed medications with the *potential* to interfere with his ability to perform surgery." __S.W.3d at __(Jefferson, C.J., dissenting) (emphases added). The Board Order ultimately did not discipline Neely under section 164.051(a)(4) for substance abuse but only for a "mental or physical condition," which was his hand tremor. Though the Board did not discipline Neely for taking medications, a reasonable view of the gist of the broadcast was that Neely had been so disciplined.

[30]    Moreover, by inverting the standard of review for summary judgments, the dissent prematurely cuts off Neely's right to a trial on this reputational tort. Our constitution assures that the "right of trial by jury shall [**55] remain inviolate." Tex.Const. art. I, § 15. Additionally, the Texas

In its effort to indulge reasonable inferences against Neely, the dissent also relies on an Austin American Statesman article that indicates Neely was one of six Austin doctors the Board had recently disciplined for "violations involving either drug or alcohol abuse." __S.W.3d at __(Jefferson, C.J., dissenting). But the specific reference to Neely was that he was disciplined "for self-prescribing medications, according to board records." We find nothing questionable about this specific reference to Neely. Nor does the gist of the article appear to be that Neely was disciplined for operating on patients while using dangerous drugs and controlled substances.

*responsible for the abuse of that privilege . . . ."* TEX. CONST. art. I, § 8 (emphasis added). Likewise, the open courts provision guarantees the right to bring reputational torts: "All courts shall be open, and every person for an injury done him, in his lands, goods, person or *reputation*, shall have remedy by due course of law." TEX. CONST. art. I, § 13 (emphasis added). As we observed in *Casso*,

> While [**57] we have recently recognized the possibility that our state free speech guarantee may be broader than the corresponding federal guarantee, *that broader protection, if any, cannot come at the expense of a defamation claimant's right to redress*. Unlike the United States Constitution, which contains no explicit guarantee of the right to sue for defamation, the Texas Constitution expressly protects the bringing of reputational torts.

776 S.W.2d at 556 (emphasis added) (citation omitted). In short, the dissent's upending of our time-honored summary judgment principles infringes upon Neely's constitutional right to bring suit for reputational torts and to have a jury trial.

The dissent also attempts to use a discrete portion of the broadcast that, standing alone, could appear to be substantially true to vindicate the remainder of the broadcast. The dissent focuses on the portion of the broadcast addressing Neely's hand tremors as justification for the broadcast being substantially true as a matter of law. But the broadcast references Neely's hand tremors twice in the seven-minute segment. Drugs or medications are expressly referenced eight times and discussed without naming those precise terms [**58] a number of other times. The dissent's analysis falls short of respect for our precedent dictating the manner in which we review substantial truth. *Turner*, 38 S.W.3d at 115 ("[T]he meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements.").

Additionally, the dissent contends that a report about a government investigation is always substantially true. __S.W.3d at __(Jefferson, C.J., dissenting). In Texas, the Legislature long ago protected reports about government investigations under the official/judicial proceedings privilege. TEX. CIV. PRAC.&REM. CODE § 73.002(b)(1). But as explained above, the privilege only protects such reports if they are fair, true, and impartial accounts of such proceedings. *Id*. There is at least a fact issue on whether the broadcast was a fair, true, and impartial account of the Board Order because the gist of the broadcast to a person of ordinary intelligence could be that Neely was disciplined for taking dangerous [*76] drugs and controlled substances when the Order indicates he was not so disciplined.[31] *See* Part III.E, *supra*.

---

[31] The [**59] dissent's reliance on *Global Relief Foundation*, 390 F.3d at 973, only furthers our conclusion. There, the New York Times prevailed on the truth defense because it was substantially true that the government was suspicious about Global Relief funding terrorism. *Id*. at 986. Global Relief's affidavits indicating it did not fund terrorism did not render false the media statements about the government's suspicions. *Id*. at 983. The present case would be more akin to the New York Times reporting that Global Relief had been convicted of something it had not been convicted of. *See id*. at 987 ("none of the articles concluded that [Global Relief] was actually guilty of the conduct for which it was being investigated").

Finally, the dissent perceives that our holding "collides violently with the First Amendment." ___S.W.3d at ___(Jefferson, C.J., dissenting). But the United States Supreme Court has only discussed the truth defense as a creature of state common law and not the First Amendment. *Masson*, 501 U.S. at 516 ("The common law of libel . . . overlooks minor inaccuracies and concentrates upon substantial truth."). Accordingly, the only collision is between the dissent's implicit findings [**60] and our six-decade-old standard for reviewing summary judgments. *See Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 931 (Tex. 1952) (requiring a trial court at summary judgment to give the nonmovant "the benefit of every reasonable inference which properly can be drawn in favor of his position" and that if "a mere ground of inference" supports the motion, it will not be granted).

## V. Conclusion

The key question in this appeal is whether Neely raised a fact issue as to the truth or falsity of the broadcast at issue in his defamation suit. We examine substantial truth based on what a person of ordinary intelligence would understand the gist or meaning of the broadcast to be. Here, a person of ordinary intelligence could conclude that the gist of the broadcast was that Neely was disciplined for operating on patients while using dangerous drugs and controlled substances. Neely raised a genuine issue of material fact as to the truth or falsity of that gist with evidence that he was not disciplined for taking dangerous drugs or controlled substances and he never performed surgery while using dangerous drugs or controlled substances. We further conclude: (1) there are fact issues on whether [**61] part of the broadcast is protected by the judicial/official proceedings or fair comment privileges; (2) Neely was not a limited purpose public figure; (3) Neely raised a fact issue as to KEYE's negligence; and (4) Neely's professional association may maintain a cause of action for defamation. We reverse the judgment of the court of appeals and remand the case to trial court for further proceedings consistent with this opinion.

Eva M. Guzman

Justice

**OPINION DELIVERED**: June 28, 2013

[*88contd]

[EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published document.]

## Appendix A

## KEYE January 19, 2004 Broadcast

**Fred Cantu (Anchor)**: If you needed surgery would you want to know if your surgeon had been disciplined for prescribing himself and taking dangerous drugs, had a history of hand tremors and had been sued several times for malpractice in the last few years?

**Judy Maggio (Anchor)**: A central Texas couple says they didn't learn about this until it was too late. They're outraged the [Texas Medical Board] is allowing Dr. Byron Neely to continue to practice. KEYE news investigative reporter Nanci Wilson [*77] tells us if you go to St. David's Hospital with a head injury you could be Dr. Neely's next patient.

**Paul Jetton**: I've been in, in and out of the hospital, you know, for the last [**62] four years. Uh, I had twelve, I believe, I've even lost count, I believe twelve brain surgeries, one spinal surgery.

**Wilson**: This is Paul Jetton's life.

**Paul Jetton**: I can't walk. You know, I still, I can walk with a walker, but I still can't walk on my own.

**Wilson**: Each step is a struggle, but it wasn't always this way. In 1982 Paul Jetton was a linebacker for the University of Texas. He was so good he went on to play in the pros. His first year with the Cincinnati Bengals the team went to the Super Bowl. But in 1999 . . .

**Paul Jetton**: I just wasn't feeling well. When I went, you know, for I just wanted to get a physical.

**Wilson**: Something unusual showed up on the MRI scan of his brain.

**Paul Jetton**: He told me that I had this, this tumor in my brain and, and that I had to, had to have it operated on.

**Wilson**: His doctor, Austin neurosurgeon Byron Neely, who has been in practice since 1977, said an operation would help.

**Paul Jetton**: You know it would only be a two hour surgery and that I'd be in, I'd only be in the hospital for two or three days and I'd go on with the rest of my life.

**Wilson**: The two hour surgery stretched into almost eight hours and Paul was in the hospital for six weeks. While [**63] in the hospital Paul developed an infection in his brain. However, he was discharged from the hospital anyway. The result: numerous surgeries and a life of disability. Paul's wife, Sheila, says what they learned from other doctors was the final blow.

**Sheila Jetton**: Every neurosurgeon that's looked at Paul's MRIs from before Neely operated on him have [sic] said they would have never done surgery. They would have watched him with MRIs over years.

**Wilson**: The Jettons aren't the only patients to raise questions about Dr. Neely. Wei Wu, a software engineer with two PhDs was referred to Dr. Neely. Neely explains the case in this deposition from 2002.

**Dr. Neely**: [From the video of his deposition] He came in very confused one day, uh, was found to have a uh, very major brain tumor thought to be a meningioma at the time because it, of the

location in the brain. Uh, the patient was taken to the OR thereafter and found to malignant melanoma [sic].

**Wilson**: Peter Gao was a friend of Wei Wu's. Gao says Wu struggled with the diagnosis that Wu had only a few months to live.

**Peter Gao**: The doctor is more like persuasive say, well the doctor have seen when he open, when he opened your skull, seen everywhere. [**64] So, all we need to do right now I guess, is face, kind of like to face the music.

**Wilson**: It may have been too much for Wei Wu to handle. A few days later Gao found Wu's abandoned car near the 183 overpass at Mopac. Then discovered Wu had jumped off the overpass taking his own life. But when his body was sent to the Travis County Medical Examiner's office, analyzing Wu's brains, examiners noted no residual metastatic melanoma. Meaning Wei Wu did not have brain cancer. Both the Jetton and the Wu cases happened in 1999. Two other patients also filed suit against the doctor. The [Texas Medical Board] investigated Dr. Neely. The Board found Neely had a history of hand tremors and that between 1999 and [*78] 2002, Dr. Neely was writing prescriptions, not only for his patients but for himself as well. Narcotics, muscle relaxers and pain killers. Something former patient Paul Jetton finds shocking.

**Paul Jetton**: Narcotics, opiates, I mean it's just things that, I mean things that they don't even let people operate machinery or drive cars when they're, when they're taking them and this guy's doing brain surgery on people. I mean it's just, even now I'm just, it's just incredulous, you just can't even [**65] believe that it even happened.

**Wilson**: The [Texas Medical Board] did discipline Dr. Neely. This past December, they suspended his license but gave it right back by staying the suspension. Now he's on probation for three years. The only requirements are that he see a psychiatrist and not write prescriptions for himself or his family. A decision the Board defends.

**Jill Wiggins [caption identifies her as a Board representative]**: We have compliance officers and the compliance officers will definitely follow to make sure that he's doing the things that his order requires him to do.

**Wilson**: But how would they know if he is using? He can get somebody else to prescribe him. I mean he could say, "I've followed the order."

**Wiggins**: Right.

**Wilson**: I didn't prescribe myself.

**Wiggins**: Right, right.

**Wilson**: How do we, how do we know that he's, that we're not putting somebody right back out there to do the same thing he was doing before?

**Wiggins**: That's a very good question and why this order doesn't include drug testing, I, I honestly don't know the answer to that.

**Paul Jetton**: I think it's just deplorable, I mean if, if it was another profession, uh, the guy would be in jail.

**Wilson**: We contacted Dr. Neely [**66] for his side to the story. He declined to participate, but his attorney told us that two highly qualified neurosurgeons who reviewed the case agree with the medical decisions made by Dr. Neely. In addition, the [Texas Medical Board] investigated the Jetton case and found no wrong doing. We also contacted St. David's Medical Center, its chief medical officer believes they have a strong peer review process. That's where individual doctors review each other's work and decide who should have privileges.

**Steve Berkowitz, M.D.**: In this particular case the investigation is incomplete and when we actually find the, get the findings we will then be able to make a determination uh, as to whether the privileges should be continued or not. We strongly value quality of course, we value the due process and most importantly we value patient safety.

**Wilson**: Nanci Wilson, KEYE News investigates.

[The camera then returns to the anchors, Cantu and Maggio.]

**Maggio**: The Jettons settled their suit against Dr. Neely. The suit filed on behalf of Wu's son was dismissed because it was not filed by an attorney. The other suits are pending.

**Cantu**: The Texas Board of Medical Examiners does post final actions taken [**67] against doctors on its web site, but all other information about complaints is kept secret.

APPENDIX

LICENSE NO. D9588

IN THE MATTER OF THE COMPLAINT AGAINST BYRON DAVIS NEELY, M.D.

BEFORE THE TEXAS STATE BOARD OF MEDICAL EXAMINERS

AGREED ORDER

On the 12 day of December, 2003, came on to be heard before the Texas State Board of Medical Examiners ("the Board" or "the Texas Board"), duly in session, the matter of the license of BYRON DAVIS NEELY, M.D. ("Respondent").

On August 22, 2003, Respondent appeared in person and with counsels, Dan Ballard and Stacey J. Simmons, at an Informal Show Compliance Proceeding and Settlement Conference in response to a letter of invitation from the staff of the Board. Walter Mosher represented Board Staff. The Board's Representatives were David E. Garza, D.O., a member of the Board, and Kevin R. Smith, M.D., a member of fee District Review Committee.

Upon the recommendation of the Board's Representatives and with the consent of Respondent, the Board makes the following Findings of Fact and Conclusions of Law and enters this Agreed Order.

FINDINGS OF FACTS

The Board finds that:

1. Respondent received all notice required by law. All jurisdictional requirements have [**68] been satisfied. Respondent waives any defect in notice and any further right to notice or hearing under Tex. Occ. Code Ann. Title 3, Subtitle B (Vernon's 2002) (the "Act") or the Rales of the Board.

2. Respondent currently holds Texas Medical License No. D9588. Respondeat was originally issued this license to practice medicine in Texas on August 21, 1972, Respondent is also licensed to practice in Colorado.

3. Respondeat is primarily engaged in the practice of Neurological Surgery. Respondent is Board Certified by the American Board of Neurological Surgery.

4. Respondent is 57 years of age.

5. Respondent has not previously been the subject of disciplinary potion by the Board.

6. Respondent suffered various injuries and ailments, which required a variety of medications. Respondent's treating physician legitimately and appropriately prescribed a number of medications to treat [*89] these conditions. However, between 1999 and 2002, Respondent began to refill the medications himself in lieu of scheduled visits. The list of medications Respondent has self-prescribed include Hydrocodone, Soma, Darvocet, Paregoric, Propoxyphene, Carisoprodol, Medrol, Phenergan, Azmacort, Cardura, Prilosec, Lomotil, [**69] Ventolin, Norco, and Flonase.

7. Upon review of statements of Respondent and the September 27, 2000 medical had a prior history of tremors.

8. The Panel took notice of the fact that the Board's investigator claims to have witnessed a tremor daring the 2002 interview. Respondent asserted the tremor was the result of nervousness about the interview.

9. Respondent presented evidence he has undergone a full physical examination by R. Russell Thomas, D.O., Board certified Family Practitioner. Dr. Thomas found Respondent to be in relatively good health, with no need of chronic medications. Dr. Thomas did not detect a medically significant tremor, however, felt unqualified to determine Respondent's ability to perform surgery, and recommended a disability assessment or a Neuro-psyche evaluation. Additionally, Respondent presented evidence of a psychiatric evaluation by Edgar Nance,

M.D., Board certified Psychiatrist and Addictionologist to determine the possibility of substance abuse or addiction. Dr. Nance found no underlying psychiatric condition that would inhibit Respondent's ability to practice medicine. The Board is requesting independent physical and psychiatric evaluations to determine [**70] Respondent's capacity to practice medicine in general, and specifically, to perform surgery.

10 Respondent has cooperated in the investigation of the allegations related to this Agreed Order. Respondent's cooperation, through consent to this Agreed Order, pursuant to the provisions of Section 164.002 of the Act, will save money and resources for the State of Texas. To avoid farther investigation, hearings, and the expense and inconvenience of litigation, Respondent agrees to the entry of this Agreed Oder and to comply with its terms and conditions.

CONCLUSIONS OF LAW

Based on the above Findings of Fact, the Board concludes that:

1. The Board has jurisdiction over the subject matter and Respondent pursuant to the Act.

2. Respondent is subject to action by the Board under Sections 164.051(a)(4) and 164.056 of the Act due to Respondent's inability to practice medicine with reasonable skill and safety to patients, due to mental or physical condition.

3. Respondent is subject to disciplinary action pursuant to Section 164.051(a)(3) of the Act by committing a direct or indirect violation of a rule adopted under this Act, either as a principal, accessory, or accomplice, to wit, Board Rule 190.1(c)(1)(M) [**71] - inappropriate prescription of dangerous drugs or controlled substances to oneself family members, or others in which there is a dose personal relationship.

4. Section 164.001 of the Act authorizes the Board to impose a range of disciplinary actions against a person for violation of the Act or a Board rule. Such sanctions include: revocation, suspension, probation, public reprimand, limitation or restriction on practice, counseling or treatment, required educational or counseling programs, monitored practice, public service, and an administrative penalty.

[*90] 5. Section 164.002(a) of the Act authorizes the Board to resolve and make a disposition of this matter through an Agreed Order.

6. Section 164.002(d) of the Act provides that this Agreed Older is a settlement agreement under the Texas Rules of Evidence for purposes of civil litigation.

ORDER

Based on the above Findings of Fact and Conclusions of Law, the Board ORDERS that:

1. Based on the above Findings of Fact and Conclusions of Law, the Board ORDERS that Respondent's Texas license is hereby SUSPENDED; however, the suspension is STAYED and Respondent is placed on PROBATION under the following terms and conditions for 3 years from the [**72] date of the signing of this Order by the presiding officer of the Board:

2. Except as otherwise provided for by the leans of this Order, Respondent shall not treat or otherwise serve as a physician for Respondent's immediate family, and Respondeat shall not prescribe, dispense, administer or authorize controlled substances or dangerous drugs with addictive potential or potential for abuse to Respondent or Respondent's immediate family. Respondent may self-administer or administer to Respondent's immediate family only such drugs as prescribed by another physician for a legitimate medical purpose and in compliance with the orders and directions of such physician.

3. A psychiatrist board certified in forensic or addiction psychiatry shall be appointed by the Executive Director to serve as the evaluating psychiatrist Within thirty (30) days of notification by the Director of Compliance of appointed evaluating psychiatrist, Respondent shall submit to and obtain a complete forensic evaluation from the approved evaluating psychiatrist.

The psychiatric evaluation will include at a minimum: social history and background information, history of present illness, mental status exam, review of records [**73] and other pertinent collateral information, DSM IV multiaxial diagnosis, and treatment recommendations. The Board and Respondent shall furnish a copy of this Order to the approved evaluating psychiatrist as authorization to make a full report to the Board regarding Respondent's evaluation and any subsequent reports regarding Respondent's compliance with this Order. Respondent shall follow all recommendations made by the evaluating psychiatrist regarding continued care and treatment.

If the evaluating psychiatrist recommends continued psychiatric care and treatment, within thirty (30) days of that recommendation, Respondent shall submit in writing to the Director of Compliance of fee Board, for approval by fee Executive Director, the names of three (3) psychiatrists board certified in psychiatry to serve as the treating psychiatrist Respondent may submit the name of his current treating psychiatrist Respondent shall begin the recommended care and treatment with the approved treating psychiatrist within thirty (30) days of notification of approval by fee Director of Compliance. The Board and Respondent shall furnish a copy of this Order to the approved treating psychiatrist as authorization [**74] for the treating psychiatrist to make reports to fee evaluating psychiatrist regarding Respondent's compliance wife the terms of this Order. Respondent shall follow all recommendations made by the treating psychiatrist regarding continued care and treatment.

During any continued care and treatment, Respondent shall be monitored for purposes of compliance wife this Order. The evaluating forensic psychiatrist will [*91] monitor Respondent's treatment and rehabilitation, and provide progress reports to fee Board every six (6) months. The reports are doe on March IS and September 15. The monitoring reports shall

include current mental states examinations; pertinent history and social background information; progress with treatment and rehabilitation; and updated recommendation for Respondent's care. Respondent shall authorize fee evaluating and treating psychiatrists to obtain any collateral information necessary for preparation of the monitoring reports from any third party, including the treating psychiatrist. The collateral information obtained shall be strictly limited to the minimum information necessary to ensure adequate assessment of Respondent's rehabilitation and compliance wife fee [**75] terms of this Order.

Board staff may furnish to each approved psychiatrist any Board information that it determines in its discretion may be helpful or required for fee evaluation and treatment of Respondent.

Respondent's failure to cooperate wife either approved psychiatrist or failure to follow the recommendations of either approved psychiatrist shall constitute a violation of this Order.

4. Within thirty (30) days of the signing of this Order by the presiding officer of the Board, Respondent shall undergo a complete examination by a physician approved in advance in writing by the Executive Director of the Board, and Respondent shall undergo continuing care and treatment by the approved physician for the treatment of any condition which, without adequate treatment, could adversely affect Respondent's ability to sa&ly practice medicine.

Respondent shall authorize and request in writing that the approved physician provide written periodic reports no less than once each quarter during Respondent's treatment which reflect the states of Respondent's physical and mental condition, as well as Respondent's efforts at cooperation with treatment. Respondent shall authorize and request in writing [**76] that the approved physician provide such other written or oral reports as Board representatives and staff may request regarding Respondent's care and treatment within seven (7) days of the request. Respondent shall follow all recommendations of the approved physician to the extent that the recommendations are consistent with the terms of this Order as determined by the Board. Respondent shall not unilaterally withdraw from treatment, and shall request and authorize in writing that the approved physician report to the Board within forty-eight (48) hours any unilateral withdrawal from treatment by Respondent. Respondent shall provide a copy of this Order to the approved physician as a reference devaluation and treatment, and as authorization for the physician to provide to the Board any and all records and reports related to the evaluation and treatment conducted pursuant to this paragraph. Upon request, Respondent shall execute any and all releases for medical records necessary to effectuate the provisions of this paragraph and this Order.

5. The time period of this Order shall be tolled if (a) Respondent subsequently resides or practices outside the State of Texas, (b) Respondent subsequently [**77] is in official retired status with the Board, (c) Respondent's license is subsequently cancelled for nonpayment of licensure fees, or (d) this Order is stayed or enjoined by Court Order. If Respondent leaves Texas to live or practice elsewhere, Respondent shall immediately notify the Board in writing of the dates of Respondent's departure from and subsequent return to Texas. [*92] When the

period of tolling ends, Respondent shall be required to comply with the teams of this Order for the period of time remaining on the Order. Respondent shall pay all foes for reinstatement or renewal of a license covering the period of tolling.

6. Respondent shall comply with all the provisions of the Act and other statutes regulating the Respondent's practice.

7. Respondent shall fully cooperate with the Board and the Board staff, including Board attorneys, investigators, compliance officers, consultants, and other employees or agents of the Board in any way involved in investigation, review, or monitoring associated with Respondent's compliance with this Oder. Failure to fully cooperate shall constitute a violation of this order and a basis for disciplinary action against Respondent pursuant to the Act.

8. [**78] Respondent shall inform the Board in writing of any change of Respondent's mailing or practice address within ten days of the address change. This information shall be submitted to the Permits Department and the Director of Compliance for the Board, failure to provide such information in a timely manner shall constitute a basis for disciplinary action by the Board against Respondent pursuant to the Act.

9. Any violation of the terms, conditions, or requirements of this Order by Respondent shall constitute unprofessional conduct likely to deceive or defraud the public, end to injure the public, and shall constitute a basis for disciplinary action by the Board against Respondent pursuant to the Act.

10. Respondent is permitted to supervise physician assistants, advanced nurse practitioners, and surgical assistance.

11. The above-referenced conditions shall continue in full force and effect without opportunity for amendment, except for clear error in drafting, for 12 months following entry of this Order. If, after the passage of the 12-month period, Respondent wishes to seek amendment or termination of these conditions, Respondent may petition the Board in writing. The Board may inquire [**79] into the request, and may, in its sole discretion, grant or deny the petition without farther appeal or review. Petitions for modifying or terminating may be filed only once a year thereafter.

RESPONDENT WAIVES ANY FURTHER HEARINGS OR APPEALS TO THE BOARD OR TO ANY COURT IN REGARD TO ALL TERMS AND CONDITIONS OF THIS AGREED ORDBR, RESPONDENT AGREES THAT THIS IS A FINAL ORDER.

THIS ORDER IS A PUBLIC RECORD.

I, BYRON DAVIS NEELY, M.D., HAVE READ AND UNDERSTAND THE FOREGOING AGREED ORDER. I UNDERSTAND THAT BY SIGNING, I WAIVE CERTAIN RIGHTS. I SIGN IT VOLUNTARILY. I UNDERSTAND THIS AGREED ORDER CONTAINS THE

ENTIRE AGREEMENT AND THERE IS NO OTHER AGREEMENT OF ANY KIND, VERBAL, WRITTEN OR OTHERWISE.

DATED: 12/4, 2003.

/s/ Byron Davis Neely

BYRON DAVIS NEELY, M.D.

RESPONDENT

STATE OF TEXAS

COUNTY OF TRAVIS

SWORN TO AND ACKNOWLEDGED BEFORE ME, the undersigned Notary Public, on this 4th day of December, 2003.

/s/ Hopie Tello

Signature of Notary Public

/s/ Hopie Tello

Printed or typed name of Notary Public

My commission expires:

[*93] 6/10/2004

SIGNED AND ENTERED by the presiding officer of the Texas State Board of Medical Examiners on this 12 day of December, 2003.

/s/ Lee S. Anderson

Lee S. Anderson, M.D., President

TEXAS [**80] STATE BOARD OF MEDICAL EXAMINERS

**Dissent by:** Wallace B. Jefferson

## Dissent

[*79] The Court holds that the broadcast presented a false impression, an untenable "gist," that the doctor was disciplined for operating on patients while taking dangerous drugs. But that gist is reasonably derived from the medical board's findings, the doctor's testimony, and witness observations. If the news report is damning, it is because it conveys substantial truth. The doctor performed brain surgeries during a time he was ingesting seven narcotics, eight other

medications, and alcohol. He suffered hand tremors during the period he operated on patients' brains. The medical board investigator concluded that the doctor was subject to discipline based on his "[i]nability to practice medicine with reasonable skill and safety because of illness or substance abuse." The board not only suspended his medical license, but also ordered a psychiatric evaluation focused on addictive disorders. It required the doctor to undergo a physical examination to confirm whether he was, or was not, physically capable of operating safely.

The doctor denies he was an addict or that his drug use impaired his surgical skills. That is enough, the Court says, [**81] to raise a genuine issue on the broadcast's substantial truth. But that evidence is immaterial to the gist the Court has identified: that the Board disciplined the doctor for taking dangerous drugs during a time he performed sensitive surgeries. Because "the underlying facts as to the gist of [that] charge are undisputed, . . . we can disregard any variance with respect to items of secondary importance and determine substantial truth as a matter of law." *McIlvain v. Jacobs*, 794 S.W.2d 14, 16 (Tex. 1990).

We must decide whether the broadcast was more damaging to the doctor's reputation, in the mind of an average viewer, than a truthful statement would have been. *Id*. Here, the literal truth is as caustic as the gist, and the gist reasonably depicts literal truth. Whether it rejected the doctor's gist contention, or found that the broadcast was substantially true, the trial court properly granted summary judgment. The court of appeals properly affirmed that judgment. I would also affirm. The Court's conclusion to the contrary sanctions constitutionally protected speech. For these and other reasons, I respectfully dissent.

## I. The broadcast was substantially true.

"The common law of libel [**82] . . . . overlooks minor inaccuracies and concentrates upon substantial truth." *Masson v. New Yorker Magazine, Inc*., 501 U.S. 496, 516, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991) (internal citations omitted). Small discrepancies "do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" *Id*. at 517; *see also Turner v. KTRK Television, Inc*., 38 S.W.3d 103, 115 (Tex. 2000) (holding that substantial truth doctrine "precludes liability for a publication that correctly conveys a story's 'gist' or 'sting' although erring in the details"). "Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Masson*, 501 U.S. at 517 (quoting R. SACK, LIBEL, SLANDER, AND RELATED PROBLEMS 138 (1980)).

[*80] We must view the communication as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it. *Turner*, 38 S.W.3d at 114. We determine falsity based on "the meaning a reasonable person would attribute to a publication, and *not to a technical analysis of each statement*." *New Times, Inc. v. Isaacks*, 146 S.W.3d 144, 154 (Tex. 2004) [**83] (emphasis added). Rather than consider the broadcast as a whole, the Court parses it into several different gists, and then addresses only two of them, ironically presenting a certain juxtaposition that the Court itself decries.

The Court states that the broadcast incorrectly characterized Neely's sanction as based on the Board's conclusion that Neely operated on patients while using dangerous drugs. __S.W.3d at __. Because the Board's action was based only on self-prescribing, the Court holds that this gist was not substantially true.

We require substantial, not perfect, truth. With respect to substantiality, Neely admits he was using every one of the fifteen drugs identified in the Board order, plus a few more[1]:

> Q. And—and these are actually drugs that you were, I assume, taking. Correct?
>
> A. Yes, sir.
>
> Q. I mean, you weren't prescribing them to yourself to throw away, correct?
>
> A. No.[2]

Seven of these drugs are narcotics. Paregoric, a narcotic [**84] also known as camphorated tincture of opium,[3] contains morphine and is a controlled substance. The average adult dose is 5-10 milliliters one to four times per day; Neely concedes he was taking up to 70 milliliters daily. During 1999-2000 (the time of the Jetton and Wu surgeries), he took it regularly, at bedtime and again upon waking. He believes the effects wore off after two or three hours, and he believes he could perform surgery within three or four hours of taking morphine.

Neely tore his rotator cuff in 1999, and he admits during that time to taking "quite a bit" of Vicodin, also a narcotic and a controlled substance. He prescribed himself Darvocet, a pain medication, narcotic, and controlled substance; Darvon, Propoxyphene, and Norco, also narcotic pain relievers; Lomotil, another narcotic; Phenergan, an anti-nausea drug that can cause considerable drowsiness; Ventolin, a bronchodilator; Medrol and Azmacort, steroid treatments [**85] he used for asthma; Prilosec for acid indigestion; and Flonase. He was also taking Paxil, which his doctor had prescribed for acute depression.

Neely's self-refills were not isolated occurrences. Between August and October 1999—the time he was treating Paul Jetton—Neely self-refilled his Paregoric prescription twelve times.

During the same time, Neely drank alcohol every night that he was not on call. He admits to two drinks per night during 1999-2001, although he would sometimes have four or five at a time and would [*81] occasionally "overindulge." Neely admits that almost all of the drugs he was using, including alcohol, can cause withdrawal symptoms, although he denies any such symptoms, except with regard to Medrol. Neely also acknowledges that the dings he was using can cause dizziness, visual disturbances, mental cloudiness, euphoria, sedation, and nervousness.

---

[1]  Neely also admits taking Paxil, Flovent, and Singulair.

[2]  Unless otherwise indicated, all of this information comes from the Board's investigation, the Board's order, or Neely's testimony. The Board's order is attached as an Appendix to this opinion.

[3]  *See, e.g., Henley v. State*, 387 S.W.2d 877, 878 (Tex. Crim. App. 1965) (holding that paregoric "is, in fact, a narcotic drug known under the official drug name of 'camphorated tinture [sic] of opium' and that it contains morphine, which comes from opium").

Neely admits he was hypomanic, which he defines as "hyperactive," while on steroids, as he was in 1999. When the broadcast aired, Neely had been involved in seven malpractice cases, at least two of which alleged that he was addicted to prescription drugs and that he abused alcohol.

The Court emphasizes that the Board found that [**86] most of Neely's drugs were "legitimately and appropriately prescribed." ___S.W.3d at ___. In fact, the Board found that Neely's treating physician appropriately prescribed the medications *initially*, but it did not conclude that Neely's extensive (and unmonitored) refills were part of a legitimate treatment plan:

> Respondent's *treating physician* legitimately and appropriately prescribed a number of medications to treat these conditions. However, between 1999 and 2002, Respondent began to refill the medications himself in lieu of scheduled visits.

Agreed Order, Finding of Fact 6 (emphasis added). The Board's investigator concluded that Neely should be disciplined for "[i]nability to practice medicine with reasonable skill and safety because of illness or substance abuse." The Board ordered Neely not to prescribe or "*administer* . . . controlled substances or dangerous drugs with addictive potential or potential for abuse" to himself. (Emphasis added.) The Board required Neely to undergo an examination by a psychiatrist who was board-certified in forensic or addiction psychiatry. That directive cannot seriously be thought to relate to mental health issues unconnected to drug use. *See* Tex. Occ. Code § 164.056(d) [**87] ("The board may not require a physician . . . to submit to an examination by a physician having a specialty specified by the board unless medically indicated."). It can only relate to a determination that the doctor was actually taking these drugs and could be addicted to them. It is not hard to understand the Board's concerns: patient safety may be negatively impacted by a doctor performing surgeries while under the influence of, or experiencing withdrawal from, narcotics. The Board's requirement that Neely undergo a physical examination could only relate to the Board's fear that Neely had a condition that may adversely affect his ability to safely practice medicine.

The Court concludes that the Board's reference to Neely's "inability to practice medicine with reasonable skill and safety to patients, due to mental or physical condition" related only to Neely's hand tremors, and not his drag use. ___S.W.3d at ___("The Board Order ultimately did not discipline Neely under section 164.051(a)(4) for substance abuse but only for a 'mental or physical condition,' which was his hand tremor."). But there is nothing in the Board's order reflecting such a determination. To the contrary, the [**88] Order states that "the Board is requesting independent *physical and psychiatric evaluations to determine [Neely's] capacity to practice medicine in general, and specifically, to perform surgery.*" (Emphasis added.) Although the physical examination would address the Board's concerns about the hand tremors, the psychiatric evaluation, by a board-certified addiction specialist, could only have been intended to address the Board's concerns about Neely's possible substance abuse. We are supposed to view the communication as a whole in light of the surrounding circumstances

[*82] based upon how a person of ordinary intelligence would perceive it. *Turner*, 38 S.W.3d at 114. No reasonable person would interpret the Board's order the way the Court has.

After Neely and the Board signed the Agreed Order, the Board posted the following on its website:

ON 12-12-03 THE BOARD AND DR. NEELY ENTERED INTO AN AGREED ORDER SUSPENDING THE PHYSICIAN'S LICENSE; STAYING THE SUSPENSION, AND PLACING THE PHYSICIAN ON PROBATION FOR THREE YEARS. THIS ACTION WAS BASED ON ALLEGATIONS THAT DR. NEELY HAD SELF-PRESCRIBED MEDICATIONS WITH THE POTENTIAL TO INTERFERE WITH HIS ABILITY TO PERFORM SURGERY. THE TERMS OF THE ORDER [**89] FORBID DR. NEELY FROM SELF-PRESCRIBING MEDICATIONS, AND REQUIRE CONTINUING PHYSICAL AND PSYCHIATRIC EVALUATIONS TO VERIFY HIS FITNESS TO PERFORM SURGERY.

Shortly thereafter, and a month before the KEYE-TV broadcast, the Austin American Statesman reported on the Board's actions, noting that Neely was one of six physicians disciplined for "violations involving either ding or alcohol abuse."[4] *See* Mary Ann Roser, *6 physicians disciplined for substance abuse*, AUSTIN AMERICAN STATESMAN, Dec. 20, 2003.

The court of appeals accurately assessed the substantial truth of the "taking dangerous drugs" gist:

Neely's use of self-prescribed medications was plainly a focus of the Board's order. The order prohibited Neely from prescribing, dispensing, or administering "controlled substances or dangerous drugs with addictive potential or potential for abuse" to himself. Furthermore, the order was consistent with a concern of the Board that Neely might have become addicted to medications he was self-administering. The order required him to be evaluated by a Board-appointed psychiatrist [**90] who was board-certified in forensic or addictive psychology. These evaluations had not yet been performed, or the underlying issues resolved, at the time of the broadcast. In short, even if it was not literally true that Neely had been "disciplined for . . . taking dangerous drugs" in terms of the precise legal bases of the Board's order, that assertion would at least be substantially true because it would be no more damaging to Neely's reputation in the eyes of the ordinary viewer than a literally true recitation of the Board's order would have been.

331 S.W.3d at 924.

The Court reaches the opposite conclusion, isolating three portions of the broadcast: anchor Fred Cantu's introductory statement that Neely was disciplined for taking dangerous drugs and

---

4    The Board suspension also led Blue Cross Blue Shield to deny Neely's request to participate in their PPO, POF, and HMO networks.

controlled substances, Paul Jetton's statement that one cannot take the medications Neely was taking and drive a vehicle, and Wilson's questioning of the Texas Medical Board representative regarding whether the order would prevent Neely from using dangerous drugs and controlled substances and thereby "do the same thing he was doing before." __S.W.3d __.

But the Court's focus on a small portion of Cantu's introductory statement[5] is [**91] misplaced— [*83] even Neely admits that it was substantially true:

> Q. We'll call this paragraph one. You can read it to yourself.
>
> A. Yes.
>
> Q. Is there anything in there that—that's false about you in there?
>
> A. That's—that's fairly true.

The Court then turns to Paul Jetton's statement and concludes that "Paul's statement that one cannot take the medications Neely was 'taking' and drive a vehicle" contributed to the false gist. __S.W.3d at __. But this conflicts with the Court's later holding that some of Sheila Jetton's statements were protected by the judicial proceedings privilege. Specifically, the Court identifies a second gist involving Sheila Jetton's statements that Neely performed unnecessary surgery. The Court decides that those statements were protected because "an ordinary viewer could conclude that Sheila's allegation regarding unnecessary surgery was made in the Jetton lawsuit." __S.W.3d at __. I do not understand why this holding would [**92] not also apply to Paul Jetton's statements about Neely's drug use, which formed the basis of the same lawsuit. His petition, filed nine months before the broadcast, alleged:

> At all time [sic] material hereto, Byron Neely, M.D. was impaired from making good medical decisions and from performing neurosurgery because he was dependent on steroids and opiates and that he abused alcohol. Byron Neely, M.D. knew that he was not competent to perform neurosurgery because he had tremors in his hands as a result of the drugs that he was taking. *By providing medical treatment to Paul Jetton and surgery on Paul Jetton in an impaired state, Byron Neely, M.D. acted negligently and such negligence was a proximate cause of the complained of damages. Such impairment adversely affected Byron Neely, M.D.'s communication skills and attentiveness to Paul Jetton's infected shunt.*

(Emphasis added.)

But even if Paul's statement were not privileged, Neely acknowledges its factual truth: you should not drive a car after you've taken Vicodin, Darvocet, Paregoric, Phenergan, or Norco. Neely agrees that these drugs impact physical and mental abilities, and that a surgeon should not perform surgery after taking these [**93] drugs. He also confirms that he was taking all of them, although he denies that he operated while impaired.

---

[5] Fred Cantu: If you needed surgery would you want to know if your surgeon had been disciplined for prescribing himself and taking dangerous drugs, had a history of hand tremors and had been sued several times for malpractice in the last few years?

Finally, Neely admits that Jetton's statement was his opinion, and nothing more:

Q. Now, this is Mr. Jetton's statement, right?

A. That is correct.

Q. And these are his views or opinions about some of the drugs that you were self-prescribing, right?

. . .

A. That's his opinion.

*See, e.g., Greenbelt Coop. Publ'g Ass'n, Inc. v. Bresler*, 398 U.S. 6, 14, 90 S. Ct. 1537, 26 L. Ed. 2d 6 (1970) (holding that article reporting that people had characterized a real estate developer's position as "blackmail" was protected expression; "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] [*84] negotiating position extremely unreasonable"); *see also* ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 4:2.4[A] (4th ed. 2012) (noting that the Supreme Court has held that speech is not defamatory even if "literally containing assertions of fact [but] is intended to express only points of view").

The Court concludes that Wilson's questioning of the Board representative also [**94] contributed to the false perception that Neely was disciplined for operating on patients while using dangerous drugs. The disputed excerpt provides:

Wilson: The [Board] did discipline Dr. Neely. This past December, they suspended his license but gave it right back by staying the suspension. Now he's on probation for three years. The only requirements are that he see a psychiatrist and not write prescriptions for himself or his family. A decision the Board defends.

Board representative: We have compliance officers and the compliance officers will definitely follow to make sure that he's doing the things that his order requires him to do.

Wilson: But how would they know if he's using? He can get somebody else to prescribe him. I mean, he could say, "I've followed the order."

Board representative: Right.

Wilson I didn't prescribe myself.

Board representative: Right, Right.

Wilson: How do we, how do we know that he's, that we're not putting somebody right back out there to do the same thing he was doing before?

Board representative: That's a very good question, and why this order doesn't include drug testing, I, I honestly don't know the answer to that.

Wilson is not suggesting that the Board disciplined [**95] Neely for taking dangerous drugs, but rather that the Board did not do enough—that in the face of knowledge that a surgeon had hand tremors and had repeatedly self-prescribed numerous narcotics and controlled substances, the Board let Neely operate without requiring him to undergo drug testing. When asked whether Wilson's final question was true, Neely's response was not that her inquiries created the false impression that the Board had sanctioned him for using drugs, but that the Board would be able to obtain his medical and drug records to determine whether his confessed usage had ceased.

> Q. And then Nanci Wilson's asking about: "How would they know if he was using? He can get somebody else to prescribe for him. He could say I followed the order, and I didn't prescribe myself. How do you know that we are not putting somebody right back out there to do the same thing that he was doing before?" Do you see that?
>
> A. I see that, yes.
>
> Q. Is there anything false in there about you, in there?
>
> . . .
>
> A. You know, how would he know? They have the—the—they have the medical records and the drug records from, henceforth.
>
> Q. And so you think that they would know from the drug records?
>
> A. Absolutely.

Finally, [**96] the Court concludes that it need not address the third gist it identifies: that Neely was operating on patients while experiencing hand tremors. __S.W.3d at __. But we must evaluate the substantial truth of the broadcast as a whole,[6] and the [*85] hand tremors are an inseparable part. That portion of the broadcast is also undeniably true.

Neely has tremors, although he denies that they impact his surgical skills. He has variously ascribed the tremors to (1) tapering off of Medrol (which occurred when he treated Jetton and Wu, and he admitted some of those tremors were "major"); (2) the Ventolin he was taking; (3) nervousness while meeting with a Board investigator; and (4) being "badgered" by the attorney deposing him. The Board's investigator witnessed [**97] the tremors, as did Sheila Jetton when Neely was injecting anesthetic into her husband's head.[7] The Board's order concluded

---

[6] *See City of Keller v. Wilson*, 168 S.W.3d 802, 811 (Tex. 2005) ("[P]ublications alleged to be defamatory must be viewed as a whole including accompanying statements, headlines, pictures, and the general tenor and reputation of the source itself. A court reviewing legal sufficiency cannot disregard parts of a publication, considering only false statements to support a plaintiff's verdict or only true ones to support a defense verdict.").

[7] The Jettons fired Neely the next day.

that Neely had a history of tremors, and Neely's personal physician noted it in his medical records. The Board was concerned enough about the tremors that it ordered Neely to undergo a complete examination by a physician "to determine [Neely's] capacity to practice medicine in general, and specifically, to perform surgery."

The tremors, whether related to Neely's drug use or not, raise separate questions about Neely's fitness to perform surgeries. They formed part of the basis for the Board complaint and subsequent order, as well as the Jettons' lawsuit. We cannot consider the broadcast as a whole without including this portion of it.

The Court concludes that Neely has raised a fact issue on falsity because he denies operating while impaired and because the physician he hired after the Board instituted proceedings against him found that Neely did not have a substance abuse disorder. But Neely's controverting evidence goes to whether he was impaired or an addict, *not to whether the Board disciplined him for taking dangerous drugs* [**98] *during a time he was performing brain surgeries*.

A case from the United States Court of Appeals for the Seventh Circuit is instructive. *See Global Relief Found., Inc. v. New York Times Co*., 390 F.3d 973 (7th Cir. 2004). Global Relief Foundation, Inc., an Illinois charity, sued several media defendants, alleging that news reports after the September 11, 2001 terror attacks falsely suggested that Global Relief had funded terrorism. *Id*. at 974-75. Global Relief complained that donations to the organization evaporated following these reports. *Id*. at 980-81. The media defendants moved for summary judgment, arguing that their reports were substantially true recitations of the government's suspicions about and actions against Global Relief. *Id*.

Global Relief opposed the motion and provided two affidavits, one from its executive director and another from its lead lawyer. *Id*. at 982-83. The executive director's affidavit denied that Global Relief engaged in violence or supported violence, terrorism, or military operations; he also denied that Global Relief ever provided weapons or military items to anyone or that it had provided humanitarian aid to the families of suicide bombers. *Id*. at 983. [**99] Global Relief argued that this affidavit raised a fact issue, making summary judgment improper. *Id*.

Even in light of this evidence, the Seventh Circuit held that summary judgment was appropriate because the news reports were substantially true. *Id*. at 990. Although [*86] the executive director's affidavit "demonstrates a genuine issue on whether [Global Relief] has ever funded terrorist activity[, t]hat genuine issue . . . may not be material or relevant if the true gist or sting of the publications was not that [Global Relief] funded terrorism but that the government was investigating [Global Relief] forties to terrorism and was considering blocking the group's assets." *Id*. at 983. The court ultimately concluded that Global Relief's evidence did not raise a fact issue on the substantial truth of the story's gist, which was the latter, and it affirmed summary judgment in the defendants' favor. *Id*. at 990. The court rejected Global Relief's "argument that these media defendants must be able to prove the truth of the

government's charges before reporting on the investigation itself." *Id.* at 987. The court concluded that "[t]he fact of the investigation was true whether or not it was publicly [**100] known. That is all the defendants need to show for the defense of substantial truth. This they have done." *Id.* at 989.

The same applies to Neely's controverting evidence. Taking all of it as true, it demonstrates only a genuine issue on whether he was in fact impaired. That is immaterial to the story's gist: that the Board disciplined Neely for operating on patients while taking dangerous drugs. That gist was substantially true as a matter of law.

We come, then, to the literal truth. Even without reference to "gist," we know that the Board disciplined Neely for prescribing dangerous dings to himself, drugs he admits taking. We know that the Board ordered that Neely be supervised as a result. We know that Neely had hand tremors during a period of time in which he performed sensitive surgeries. The Board ordered psychiatric and physical evaluations that could only be tied to a concern for the safety of patients under Neely's care. We know that several of those patients experienced bad outcomes after Neely operated on them. We know that he had been involved in seven malpractice cases, at least two of which alleged that he was dependent on alcohol and drugs. These facts are not gist, only [**101] truth. Because the broadcast did not create a different effect on the average viewer's mind than the truth would have, I would hold that it is substantially true. *Masson*, 501 U.S. at 516; *Turner*, 38 S.W.3d at 114-15. I would go further. The "gist" that bothers the Court is actually an inference reasonably drawn from uncontested facts. The broadcast neither presents an inaccurate gist nor distorts the substantial truth,

## II. Because the broadcast was substantially true, we need not revisit *McIlvain*.

The Court suggests that *McIlvain* stands only for the proposition that a broadcast's report of allegations are protected if those allegations are later proved to be true. __S.W.3d at __. The Court rejects several Texas appellate courts' and the United States Court of Appeals for the Fifth Circuit's interpretation of *McIlvain*—that when a report is merely that allegations were made and were under investigation, proof that allegations were in fact made and under investigation establishes the report's substantial truth.[8] I disagree with the Court's restrictive view [*87] of *McIlvain*. But even if that case's precise limits are unclear, the speech here would be protected under the general rules protecting [**102] reports of investigations, such as Texas' fair report privilege. *See* TEX. CIV. PRAC. & REM. CODE § 73.002(b)(1).[9] As a leading treatise notes,

---

[8] *See. e.g.. Green v. CBS Inc*., 286 F.3d 281, 284 (5th Cir. 2002); *Cox Tex. Newspapers, L.P. v. Penick*, 219 S.W.3d 425, 443 (Tex. App. Austin 2007, pet. denied); *Grotti v. Belo Corp*., 188 S.W.3d 768, 771 (Tex. App. Fort Worth 2006, pet. denied); *Associated Press v. Boyd*, No. 05-04-01172-CV, 2005 Tex. App. LEXIS 3715, 2005 WL 1140369, at *3 (Tex. App.—Dallas May 16, 2005, no pet.); [**105] *UTV of San Antonio, Inc. v. Ardmore, Inc*., 82 S.W.3d 609, 611-12 (Tex. App.—San Antonio 2002, no pet.); *KTRK Television v. Felder*, 950 S.W.2d 100, 105 (Tex. App. Houston [14th Dist.] 1997, no writ).

[9] *See also* RESTATEMENT (SECOND) OF TORTS § 611 (1977) (noting that "[t]he publication of defamatory matter concerning another in a report of an official action or proceeding . . . is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported").

News reports that an investigation is underway by the police, by prosecutors, by other law enforcement agencies, or by other officials are common. Publication of the details of such inquiries is similarly common. Arguably such a report is, in substance, an implied allegation of the wrongdoing being leveled against the subject of the investigation. Readers or hearers may certainly interpret it as such; if there were no such allegation, presumably there would be no such investigation. The issue then arises as to whether the republisher of the charges is responsible for the truth thereof, that is, if the person is not guilty of the charges being investigated, does he or she have a defamation action against the republisher? . . .

*The law treats these accounts as reports of events, not as republications of allegations of wrongdoing, so that as a general matter, if there is in fact an investigation, the report of its existence is "true."* Investigations are often important governmental occurrences. Permitting lawsuits for accurate reports of such events [**103] would threaten to black out significant news. "Doubtlessly, it is painful to be cast before the public as the target of an investigation where later events point to baseless or vexatious charges. The greater wrong, however, would be to shroud in secrecy, for want of publication, the government's scrutiny of its citizens."

ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 7.3.5[C] (4th ed. 2012) (emphasis added) (quoting *Sibley v. Holyoke Transcript-Telegram Publ'g Co.*, 391 Mass. 468, 461 N.E.2d 823, 826 (Mass. 1984)). The report here presented a "fair abridgement" of the Medical Board proceedings and the Jetton and Wu lawsuits, and I would conclude that it was privileged. *See* RESTATEMENT (SECOND) OF TORTS § 611 (1977). Apart from the constitutional considerations raised by restricting such speech, these are matters of public concern. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964) (noting our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open"). Imposing liability for reporting on such issues will shield the truth, not expose it. As the *Felder* court [**104] noted:

[T]he media would be subject to potential liability everytime [sic] it reported an investigation of alleged misconduct or wrongdoing by a private person, public official, or public figure. Such allegations would never be reported by the media for fear an investigation or other proceeding might later prove the allegations untrue, thereby subjecting the media to suit for defamation. Furthermore, when would an allegation be proven true or untrue for purposes of defamation? After an investigation? After a court trial? After an appeal? Undoubtedly, the volume of litigation [*88] and concomitant chilling effect on the media under such circumstances would be incalculable. First Amendment considerations aside, common sense does not dictate any conclusion other than the one we reach today.

*KTRK Television v. Felder*, 950 S.W.2d 100, 106 (Tex. App.—Houston [14th Dist.] 1997, no writ).

## III. Conclusion

The broadcast is damning because it raises questions about Neely's fitness as a surgeon. But it is also substantially true. The Court's holding abridges the freedom to report on a matter of public concern. In that respect, it collides violently with the First Amendment. *See Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222 (7th Cir. 1993) (″The rule making substantial truth a complete defense and the constitutional limitations on defamation suits coincide.″). I would answer anchor Fred Cantu's initial question in the broadcast ″Yes.″ *See supra*, note 5. I respectfully dissent.

Wallace B. Jefferson

Chief Justice

**OPINION DELIVERED**: June 28, 2013